FILED
LAL
SEP - 8 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice, Antitrust Division,<br>325 7th Street, N.W., Suite 300<br>Washington, DC 20530,<br><br>                    Plaintiff,<br><br>      v.<br><br>NATIONAL ASSOCIATION OF<br>REALTORS<br>430 North Michigan Ave.<br>Chicago, IL 60611,<br><br>                    Defendant. | 05C 5140<br><br>JUDGE FILIP<br><br>Civil Action No.<br><br>MAGISTRATE JUDGE DENLOW |

## COMPLAINT

The United States of America, by its attorneys acting under the direction of the Attorney General, brings this civil action pursuant to Section 4 of the Sherman Act, as amended, 15 U.S.C. § 4, to obtain equitable and other relief to prevent and restrain violations of Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1. The United States alleges:

   1. The United States brings this action to enjoin the defendant – a national association of real estate brokers – from maintaining or enforcing a policy that restrains competition from brokers who use the Internet to more efficiently and cost effectively serve home sellers and buyers, and from adopting other related anticompetitive rules.

   2. The brokers against whom the policy discriminates operate secure, password-protected Internet sites that enable the brokers' customers to search for and receive real estate

listings over the Internet. These websites thus replace or augment the traditional practice by which the broker conducts a search of properties for sale and then provides information to the customer by hand, mail, fax, or e-mail. Since these websites were first developed in the late 1990s, brokers' use of the Internet in connection with their delivery of brokerage services has become an important competitive alternative to traditional "brick-and-mortar" business models.

3. Defendant's members include traditional brokers who are concerned about competition from Internet-savvy brokers. Before defendant adopted its policy, several of its members voiced opposition to brokers' delivery of listings to customers through their websites – sites that defendant referred to as "virtual office websites," or "VOWs." The head of the working group created by defendant to develop regulations for VOWs argued that defendant should act quickly in adopting regulations for the use of these websites because brokers operating VOWs were "scooping up market share just below the radar." The chairman of the board of RE/MAX, the nation's second-largest real estate franchisor, publicly expressed his concern that these Internet sites would inevitably place downward pressure on brokers' commission rates. One broker complained that because of the lower cost structure of brokers who provide listings to their customers over the Internet, "they are able to kick-back 1% of the sales price to the buyer." And Cendant, the nation's largest real estate franchisor and owner of the nation's largest real estate brokerage, asserted in a widely circulated white paper that it was "not feasible" for even the largest traditional brokers to compete with large Internet companies that operated or affiliated with brokers operating VOWs.

4. In response to such concerns, defendant, through its members, adopted a policy (the "VOW Policy") limiting this new competition. The VOW Policy significantly alters the

rules governing multiple listing services ("MLS"). MLSs collect detailed information about nearly all properties for sale through brokers and are indispensable tools for brokers serving buyers and sellers in each MLS's market area. Defendant's local Realtor associations ("member boards") control a majority of the MLSs in the United States.

5. The VOW Policy permits brokers to selectively or generally withhold their clients' listings from VOW operators by means of an "opt-out" right. In essence, the VOW Policy allows traditional brokers to block the customers of targeted competitors from using the Internet to review the same set of MLS listings that the traditional brokers provide to their customers.

6. The working group that formulated the VOW Policy understood that the opt-out right was fundamentally anticompetitive and harmful to consumers. Two members of the working group wrote that the opt-out right would be "abused beyond belief" as traditional brokers selectively withhold listings from particular VOW-based competitors. The chairman of the working group admitted that the opt-out right was likely to be exercised by brokers notwithstanding the fact that "it may not be in the seller[']s best interest to opt out." But he took comfort in the fact that the rule did not require brokers to disclose to clients that their listings would be withheld from some prospective purchasers as a result of the brokers' opt-out decision, thus providing brokers "flexibility without conversation."

7. The VOW Policy restricts the manner in which brokers with efficient, Internet-based business models may provide listings to their customers, and imposes additional restrictions on brokers operating VOWs that do not apply to their traditional competitors. Defendant thus denies brokers using new technologies and business models the same benefits of

MLS membership available to their competitor brokers, and it suppresses technological innovation, discourages competition on price and quality, and raises barriers to entry. Defendant – an association of competitors – has agreed to a policy that suppresses new competition and harms consumers

## JURISDICTION AND VENUE

8. This Complaint is filed under Section 4 of the Sherman Act, as amended, 15 U.S.C. § 4, to prevent and restrain violations by defendant of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337(a), and 1345.

9. Venue is proper in this district under 28 U.S.C. § 1391(b) because defendant maintains its principal place of business in Chicago, Illinois, and is found here.

## DEFENDANT

10. Defendant National Association of Realtors ("NAR") is a trade association organized under the laws of Illinois with its principal place of business in Chicago, Illinois. NAR establishes and enforces policies and professional standards for its over one million individual member brokers and their affiliated agents and sales associates ("Realtors"), and 1,600 local and state member boards. NAR's member brokers compete with one another in local brokerage services markets to represent consumers in connection with real estate transactions.

## CONCERTED ACTION

11. Various others, not named as defendants, have contracted, combined, or conspired with NAR in the violations alleged in this Complaint and have performed acts and made statements in furtherance thereof.

## TRADE AND COMMERCE

12. NAR's policies govern the conduct of its members in all fifty states, including all Realtors and all of NAR's member boards. NAR's member boards control approximately eighty percent of the approximately 1,000 MLSs in the United States.

13. NAR's activities, and the violations alleged in this Complaint, affect home buyers and sellers located throughout the United States.

14. NAR, through its members, is engaged in interstate commerce and is engaged in activity affecting interstate commerce.

## RELEVANT MARKETS

15. The provision of real estate brokerage services to sellers of residential real property and the provision of real estate brokerage services to buyers of residential real property are relevant service markets.

16. The real estate brokerage business is local in nature. Most sellers prefer to work with a broker who is familiar with local market conditions and who maintains an office or affiliated sales associates within a reasonable distance of the seller's property. Likewise, most buyers seek to purchase property in a particular city, community, or neighborhood, and typically prefer to work with a broker who has knowledge of the area in which they have an interest. The geographic coverage of the MLS serving each town, city, or metropolitan area normally

establishes the outermost boundaries of each relevant geographic market, although meaningful competition among brokers may occur in narrower local areas.

## BACKGROUND OF THE OFFENSE

17. At any one time there are over 1.5 million homes for sale in the United States. Most home sellers and buyers engage residential real estate brokers to facilitate transactions.

18. The predominant form of payment for brokerage services is a "commission," a percentage of the price paid for the property. In a typical transaction, the seller agrees to pay a commission to the broker who has contracted with the seller to market the home (the "listing broker"). If the listing broker finds the buyer, the listing broker keeps the full commission. Frequently, however, a second broker (the "cooperating broker") finds the buyer, and the two brokers share the commission.

19. After a listing broker has established an agency relationship with a seller, the broker typically submits detailed information regarding the seller's property to a local NAR-affiliated MLS. Along with the information about the property it submits to the MLS, the listing broker also typically includes an offer to split the commission with any cooperating broker.

*Multiple Listing Services*

20. MLSs are joint ventures among competing brokers to share their clients' listings and to cooperate in other ways. MLSs list virtually all homes for sale through a broker in the areas they serve. In a substantial majority of markets, a single MLS provides the only available comprehensive compilation of listings. The MLS allows brokers representing sellers to effectively market the sellers' properties to all other broker participants in the MLS and their

buyer customers. Conversely, the MLS allows brokers to provide their buyer customers information about all listed properties in which the customers might have an interest.

21. NAR promulgates rules governing the conduct of MLSs and requires its member boards to adopt these rules.

22. The vast majority of brokers believe that they must participate in the MLS operating in their local market in order to adequately serve their customers and compete with other brokers. As a result, few brokers would withdraw from MLS participation even if the fees or other costs associated with that participation substantially increased.

23. By virtue of industry-wide participation and control over a critically important input, MLS joint ventures have market power in almost every relevant market.

24. The methods of making MLS information available to customers have changed as technology has evolved. From the 1920s, when MLSs first became prevalent, brokers allowed customers to view a printed "MLS book." Later, the availability of copy machines allowed brokers to reproduce pages from the MLS book and deliver the pages with responsive listings to customers by hand or mail. The advent of facsimile transmission – and, later, electronic mail – further quickened the process of delivering MLS listings to customers.

*Virtual Office Websites*

25. With the development of the Internet as an information source for consumers, potential home buyers began to seek Internet sources of information about homes for sale. Beginning in the late 1990s, a number of NAR member brokers began creating password-protected websites that enabled potential home buyers, once they had registered as customers of the broker and agreed to certain restrictions on their use of the data, to search the MLS database

themselves and to obtain responsive MLS listings over the Internet. These websites came to be known as virtual office websites or VOWs. NAR recognizes the Internet delivery of MLS listings to customers to be an authorized method of providing brokerage services.

26. Brokers can use the Internet to operate more efficiently than they can by using only traditional methods. By transferring search functions from the broker to customers who prefer such control over the process, VOW-operating brokers allow customers to educate themselves at their own pace about the market in which they are considering a purchase. By doing so, brokers with successful password-protected websites are able to reduce or eliminate the time and expense involved in identifying and providing relevant listings and otherwise educating their customers. These brokers also spend less time on home tours with their buyer customers, as these buyers frequently tour fewer homes before making a purchase decision than typical buyers. With lower cost structures, brokers with Internet-intensive business models have offered discounted commissions to sellers or commission rebates to buyers.

27. Other sources of listing information on the Internet are inferior to the password-protected VOWs because they do not and cannot guarantee access to all information available in the MLS.

28. Brokers can also use the Internet to support a "referral" business model. Referral services provide brokers information about potential buyers in return for a share of any commission the broker receives if the "lead" results in a completed transaction. Brokers are not obliged to purchase leads from referral services and do so only when they choose to. Some traditional brokers refer customers to other brokers for a fee, and some VOW operators, similarly, have referred (or have considered referring) some of their customers to other brokers

for a fee. Many brokers dislike the concept of paying for leads, and the prospect that Internet-savvy brokers could support referral business models has been a source of industry antipathy to VOWs.

## NATURE OF THE OFFENSE

29. Brokers with innovative, Internet-based business models present a competitive challenge to brokers who provide listings to their customers only by traditional methods. Many brick-and-mortar brokers fear the ability of VOW operators to use Internet technology to attract more customers and provide better service at a lower cost.

30. In response to concerns raised by certain NAR members about this new form of competition, NAR's Board of Directors voted on May 17, 2003, to adopt the VOW Policy, a "Policy governing use of MLS data in connection with Internet brokerage services offered by MLS Participants ('Virtual Office Websites')." NAR has mandated that all 1,600 of its member boards implement the VOW Policy by January 1, 2006. Approximately 200 member boards have already implemented the VOW Policy and have received NAR's approval of their implementing rules.

31. Section I.3 of the VOW Policy contains an opt-out provision that forbids any broker participating in an MLS from conveying a listing to his or her customers via the Internet without the permission of the listing broker. Specifically, the opt-out provision allows brokers to direct that their clients' listings not be displayed on any VOW (a "blanket opt-out"), or on a particular competing broker's VOW (a "selective opt-out").

32. In contrast, prior to NAR's adoption of the VOW Policy, a broker could provide any relevant listing in the MLS database to any customer – by whatever method the customer or

broker preferred, including via the Internet. Nearly all of NAR's member boards had also adopted rules requiring all participants in their affiliated MLSs to submit, with minor exceptions, all of their clients' listings to the MLS. More importantly, NAR did not permit any broker to withhold his or her clients' listings from a rival.

33. In several of the markets in which NAR's member boards have implemented the VOW Policy, brokers have already exercised their opt-out rights to withhold their clients' listings from the customers of brokers operating VOWs, as well as from brokers who will use password-protected websites to provide listings to their customers in the future. In at least one such instance, an innovative broker discontinued operation of his website because all of his competitor brokers had opted out, making him unable to effectively serve his customers through operation of his site.

34. Section II.4.g of the VOW Policy contains an "anti-referral" provision that, with minor exceptions, forbids VOW operators from referring their customers to "any other entity" for a fee. In contrast, no NAR rule limits referrals for a fee by brokers who do not convey MLS listings to customers over the Internet.

35. The VOW Policy includes other provisions that impose greater restrictions and limitations on brokers with Internet-based business models than on traditional brokers. For example, under section IV.1.b of the VOW Policy, NAR's member boards may forbid VOW operators from displaying advertising on any website on which MLS listings information is displayed. In contrast, no NAR rule limits the ability of traditional brokers to include advertisements in packages of printed listings they provide to their customers.

36. The VOW Policy also contains provisions to make it obligatory and enforceable. Section 1.4 of the VOW Policy expressly forbids NAR's member boards from adopting rules "more or less restrictive than, or otherwise inconsistent with" the VOW Policy, including the opt-out provisions and the anti-referral provision. Appendix A to the VOW Policy provides for remedies and sanctions for violation of the Policy, including financial penalties and termination of MLS privileges.

37. The VOW Policy thus prevents brokers from guaranteeing customers access through the Internet to all relevant listing information, increases the business risk and other costs associated with operating an efficient, Internet-intensive brokerage, denies brokers a source of high-quality referrals, and withholds from Internet brokers revenue streams permitted to other participants in the MLS. Moreover, the opt-out provisions provide brokers an effective tool to individually or collectively punish aggressive competition by any Internet-based broker.

38. NAR has informed plaintiff of its intention to replace the VOW Policy with a new "Internet Listings Display Policy" and to make restrictive membership rules changes. NAR's revised policies continue to discriminate against brokers who use the Internet to more efficiently and cost effectively serve home sellers and buyers.

39. Unless permanently restrained and enjoined, defendant will continue to engage in conduct that restricts competition from innovative brokers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## VIOLATION ALLEGED

40. NAR's adoption of the above-referenced provisions in its VOW Policy, or equivalent provisions, constitutes a contract, combination, or conspiracy by and between NAR and its members which unreasonably restrains competition in brokerage service markets throughout the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

41. The aforesaid contract, combination, or conspiracy has had and will continue to have anticompetitive effects in the relevant markets, including:

   a. suppressing technological innovation;

   b. reducing competition on price and quality;

   c. restricting efficient cooperation among brokers;

   d. making express or tacit collusion more likely; and

   e. raising barriers to entry.

42. This contract, combination, or conspiracy is not reasonably necessary to accomplish any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

## REQUEST FOR RELIEF

WHEREFORE, the United States prays that final judgment be entered against defendant declaring, ordering, and adjudging:

   a. that the aforesaid contract, combination, or conspiracy unreasonably restrains trade and is illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.  that the defendant be restrained and enjoined from requiring or permitting its member boards or the MLSs with which they are affiliated to adopt rules implementing the opt-out provisions;

c.  that the defendant be restrained and enjoined from requiring or permitting its member boards or the MLSs with which they are affiliated to adopt rules implementing the anti-referral provision;

d.  that the defendant be restrained and enjoined from requiring or permitting its member boards or the MLSs with which they are affiliated to adopt rules that restrict – or condition MLS access or MLS participation rights on – the method by which a broker interacts with his or her customers, competitor brokers, or other persons or entities;

e.  that the Court grant such other relief as the United States may request and the Court deems just and proper; and

f.  that the United States recover its costs in this action.

Dated: September 7, 2005

_(signature)_
J. BRUCE McDONALD
Deputy Assistant Attorney General

_(signature)_
J. ROBERT KRAMER II
Director of Operations

_(signature)_
JOHN R. READ, Chief
NINA HALE, Assistant Chief
Litigation III

_(signature)_
PATRICK J. FITZGERALD
United States Attorney
Northern District of Illinois
by Linda Wawzenski
Assistant United States Attorney

_(signature)_
DAVID C. KULLY
ROBERT P. FAULKNER
CRAIG W. CONRATH
MARY BETH McGEE
ALLEN P. GRUNES
LISA A. SCANLON
OWEN M. KENDLER

Attorneys for the United States
Department of Justice
Antitrust Division
325 Seventh Street, N.W., Suite 300
Washington, DC 20530
Telephone: (202) 205-9969
Facsimile: (202) 307-9952