

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05 C 5140 |
| | ) | |
| v. | ) | |
| | ) | Hon. Mark Filip |
| National Association of Realtors, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO DISMISS COMPLAINT OF THE UNITED STATES

Plaintiff, the United States of America ("United States" or "Plaintiff"), has filed this civil

antitrust suit against the National Association of Realtors® ("NAR" or "Defendant").[1] (D.E. 1.)

The Amended Complaint alleges that NAR has violated Section 1 of the Sherman Act, 15 U.S.C.

§ 1. (D.E. 6.) The case is before the Court on Defendant's motion to dismiss (D.E. 22) for lack

of subject matter jurisdiction and for failure to state claims upon which relief can be granted. *See*

Fed. R. Civ. P. 12(b)(1) and 12(b)(6). For the reasons stated below, Defendant's motion to

dismiss is respectfully denied.

### FACTUAL BACKGROUND

NAR is a trade association that establishes and enforces policies and professional

standards for its over one million individual member brokers and their affiliated agents and sales

---

[1] The various docket entries in this case are designated "D.E. __." The term "Realtor®" is a collective membership mark indicating that a real estate broker or agent so designated is a member of the National Association of Realtors.

associates.[2] (D.E. 6 ¶ 11.) NAR's member brokers compete with one another in local brokerage services markets to represent consumers in connection with real estate transactions. (*Id.*) NAR's policies govern the conduct of its members in all fifty states, including all Realtors® and all of NAR's local Realtor® associations ("member boards"). (*Id.* ¶ 13.)

At any one time, there are over 1.5 million homes for sale in the United States. (*Id.* ¶ 18.) It goes without saying, and the Court takes judicial notice, that each year many billions of dollars of residential real estate are sold, with realtors taking commissions on such sales.

The vast majority of residential real estate transactions involve the use of a multiple listing service ("MLS"), a cooperative arrangement brokers have developed to pool information about nearly all properties for sale through brokers in a particular market area.[3] (*Id.* ¶ 5.) MLSs collect detailed information about nearly all properties available for sale through brokers and are alleged to be indispensable tools for brokers servicing consumers in each MLS's market area. (*Id.*) Defendant's local Realtor associations ("member boards") control a majority of the MLSs in the United States. (*Id.*)

The geographic coverage of the MLS serving each town, city, or metropolitan area normally establishes the outermost boundaries of each relevant geographic market. (*Id.* ¶ 17.) In a substantial majority of markets, a single MLS provides the only available comprehensive compilation of listings. (*Id.* ¶ 21.) The vast majority of brokers believe that they must participate in the MLS operating in their local market to adequately serve their customers and

---

[2]     The facts are taken from the Amended Complaint and presented in a light most favorable to Plaintiff. With respect to facts relevant to the jurisdictional inquiry, the Court has credited Plaintiff's version of material facts, and, to the extent that Defendant has presented uncontroverted evidence on a point, credited Defendant's evidence in that regard. *Accord, e.g., Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (collecting cases).

[3]     MLSs list virtually all homes for sale through a broker in the areas they serve. (D.E. 6 ¶ 21.)

compete with other brokers. (*Id.* ¶ 23.)

Most home sellers and buyers engage residential real estate brokers, who typically have access to MLS listings, to facilitate transactions. (*Id.* ¶ 17.) The predominant form of payment for brokerage services is a commission—a percentage of the price paid for the property. (*Id.* ¶ 19.) In a typical transaction, the seller agrees to pay a commission to the broker who has contracted with the seller to market the home (the "listing broker"). (*Id.*) If the listing broker finds the buyer, the listing broker keeps the full commission. (*Id.*) Frequently, however, a second broker (the "cooperating broker"), who is also a member of the MLS, finds the buyer, and the two brokers share the commission. (*Id.*) The commission rate is determined by, *inter alia*, the level of competition between brokers in the relevant market. (*See, e.g., id.* ¶ 3.)

NAR's member boards control a majority of the MLSs in the United States. (*Id.* ¶ 5.) NAR promulgates rules governing the conduct of MLSs and requires its member boards to adopt these rules. (*Id.* ¶ 22.) NAR's MLS rules provide for sanctions against member brokers found to have violated MLS rules. (*See, e.g., id.* ¶¶22, 37)

Beginning with the popular growth of the Internet in the late 1990s, a number of NAR member brokers began creating password-protected websites that enabled potential home buyers, once they had registered as customers of the broker, to search the MLS database themselves and to obtain responsive MLS listings over the Internet. (*Id.* ¶¶ 26-27.) These websites came to be known as virtual office websites or VOWs, and brokers who operated primarily or exclusively through a VOW came to be known as VOW-operating brokers. (*Id.* ¶ 26-27.) Certain brokers used password-protected websites and Internet-intensive business models to lower their cost structures by reducing overhead; by transferring search functions to customers; and by reducing

3

time spent showing homes to customers, as experience has shown that buyers who search listings themselves frequently tour fewer homes in person before making a purchase. (*Id.* ¶ 27.) Lower cost structures permitted VOW brokers to offer discounted commissions to sellers or to offer commission rebates to buyers. (*Id.*) Brokers also used the Internet to support a "referral" business model, in which the VOW operator refers potential customers to other brokers in exchange for a fee. (*Id.* ¶ 29.)

The United States alleges that the VOW brokers presented a competitive challenge to brokers who provide listings to their customers only or principally by traditional, non-Internet methods. (*Id.* ¶ 30.) In this regard, the United States avers, "[m]any traditional brick-and-mortar brokers fear the ability of VOW operators to use Internet technology to attract more customers and provide better service at a lower cost." (*Id.*) The United States further alleges that Defendant's subsequent VOW policies (discussed further below) were designed to impede competition of this new form. (*Id.* ¶ 31; *see also id.* ¶ 8 ("Defendant—an association of competitors—has agreed to policies that suppress new competition and harm consumers.").) In support of this contention, the United States alleges that Cendant, the nation's largest real estate franchisor and owner of the nation's largest real estate brokerage, asserted in a white paper that it was "not feasible" for traditional brokers to compete with large Internet companies that operated or affiliated with brokers operating VOWs. (*Id.* ¶ 3.) The United States further avers that the chairman of the board of RE/MAX, the nation's second-largest real estate franchisor, publicly expressed concern that VOW brokers would place downward pressure on brokers' commission rates. (*Id.*) In this regard, one broker further complained that because of the lower cost structure of brokers who provide listings to their customers over the Internet, "they are able to kick-back

4

1% of the sales price to the buyer." (*Id.*[4]) The United States further alleges that the head of NAR's working group on the VOW regulation argued that new rules were needed to alter the prior traditional MLS arrangements (by which "a broker could provide any relevant listing in the MLS database to any customer—by whatever method the customer or broker preferred, including via the Internet" (*id.* ¶ 33)), because VOW brokers were "scooping up market share just below the radar." (*Id.* ¶ 3.)

Against this backdrop, the United States explains, on May 17, 2003, NAR's Board of Directors adopted a "Policy governing use of MLS data in connection with Internet brokerage services offered by MLS Participants ('Virtual Office Websites')" (hereinafter "Initial VOW Policy"). (*Id.* ¶ 31.) NAR mandated that all 1,600 of its member boards implement the Initial VOW Policy by January 1, 2006. (*Id.*) However, shortly after NAR adopted the Initial VOW Policy, the United States Department of Justice launched an investigation of the policy and its potential anticompetitive effects. (D.E. 23 at 1.) In light of this investigation, NAR advised its member boards that they need not implement the Initial VOW Policy. (*Id.*) Approximately 200 member boards nonetheless implemented the Initial VOW Policy and received NAR's approval of their implementing rules. (D.E. 6 ¶ 31.)

Prior to the adoption of the Initial VOW Policy, a broker could provide any relevant listing in the MLS database to any customer by the method the customer or broker preferred, including the Internet, and including a VOW. (*Id.* ¶ 33.) No "opt-out" rights existed with respect

---

[4] The record is unclear as to what the prevailing commission rate(s) are nationwide or in local markets. However, the quotation provided in the United States' operative complaint is clear that the reduced commission is substantially more than simply 1% of the commission typically charged. Or, to put things in more concrete terms, the quotation suggests that the commission is being reduced by 1% of the home price; thus if the traditional commission rate was 6%, the reduction in price charged to the consumer is 1/6 of that rate, or a 16.67% reduction.

to any means of delivery—no broker was permitted to withhold his or her listings from a rival broker, seemingly under virtually any circumstances. (*Id.*) In addition, nearly all of NAR's member boards required all participants in their affiliated MLSs to submit, with minor exceptions, all of their clients' listings to the MLS. (*Id.*)

The Initial VOW Policy contained an opt-out provision that forbade any broker participating in an MLS from conveying a listing to his or her customers via the Internet without the permission of the listing broker. (*Id.* ¶ 32.) The opt-out provision allowed brokers to direct that their clients' listings not be displayed on any VOW (a "blanket opt-out"). (*Id.*) The opt-out provision also allowed brokers to direct that their clients' listing not be listed on a particular subset of targeted competing broker's or brokers' VOW(s) (the "selective opt-out"). (*Id.*)

According to the United States, the working group that formulated Defendant's Initial VOW policy understood that the opt-out rights were fundamentally anticompetitive and harmful to consumers. (*Id.* ¶ 7.) Two members of the working group wrote that the opt-out right would be "abused beyond belief," with traditional brokers selectively withholding listings from particular VOW-based competitors, as they previously had been unable to do. (*Id.*) The chairman of the working group, according to the United States, also admitted that the opt-out right was likely to be exercised by brokers notwithstanding that "it may not be in the seller's best interest to opt out." (*Id.* (internal punctuation omitted).) However, the chairman "took comfort in the fact that the rule did not require brokers to disclose to clients that their listings would be withheld from some prospective purchasers as a result of the brokers' opt-out decision, thus providing brokers 'flexibility without conversation.'" (*Id.*)

The Initial VOW Policy also contained an "anti-referral" provision that, with minor

6

exceptions, forbids VOW operators from referring their customers to "any other entity" for a fee. (*Id.* ¶ 35.) In contrast, no NAR rule limits referrals for a fee by brokers who do not convey MLS listings to customers over the Internet. (*Id.*)

The Initial VOW Policy was obligatory and enforceable. (*Id.* ¶ 37.) Under the terms of the policy, member boards were prohibited from adopting rules "more or less restrictive than, or otherwise inconsistent with" the policy. (*Id.*) Appendix A to the Initial VOW Policy provided for remedies and sanctions for violations of the policy, including financial penalties and termination of MLS privileges. (*Id.*)

On August 31, 2005, after Plaintiff informed NAR of its intention to bring this action, NAR advised its member boards to suspend application of the Initial VOW Policy.[5] (D.E. 24-1 at 2; D.E. 24-3, Ex. 2 ("Internet Listing Display Policy") at 1.) On the same day, NAR rescinded the Initial VOW Policy and announced the adoption of a new "Internet Listings Display Policy" and its revision of an MLS membership policy (together, the "Modified VOW Policy"). (D.E. 24-1 at 2.) The Modified VOW Policy mandated that all NAR members enact rules implementing the Internet Listings Display Policy by July 1, 2006. (D.E. 24-3, Ex. 2 at 5.) NAR subsequently communicated to its member boards that they "wait to adopt" the policy "until [the instant] litigation is over." (D.E. 6 ¶ 38.)

The Modified VOW Policy did not include the selective opt-out provision that was in the Initial VOW Policy. (D.E. 23 at 7.) However, Section I.3 of the Modified VOW Policy contains a blanket opt-out provision that forbids any broker participating in an MLS from conveying a

---

[5]     The Amended Complaint alleges that the Modified VOW Policy was enacted on September 8, 2005 (D.E. 6 ¶ 38), but this does not appear to be correct. In any event, this minor discrepancy concerning dates is not material for any present purpose.

listing to his or her customers via the Internet without the permission of the listing broker. (D.E. 6 ¶ 39.) The opt-out provision allows brokers to direct that their clients' listings not be displayed on any competitor's website, provided that the broker opting-out does not display any competitor's listings on its own website, if it has one. (*Id.*) When exercised, this provision would prevent a VOW broker from providing over the Internet the same MLS information that can be provided in person, or through any non-Internet technology, without restriction (*id.*), as had previously been the case for any mode of communication, including Internet-based communication. In addition, NAR's Modified VOW Policy specifically exempts its own "Official Site," Realtor.com, from the blanket opt-out that applies to all Internet sites operated by brokers such as the VOW brokers. (*Id.*)

The Modified VOW Policy also permits MLSs to downgrade the quality of the data feed they provide brokers, effectively restraining brokers from providing Internet-based features to enhance the service they offer their customers. (*Id.* ¶ 41.) The Modified VOW Policy further denies MLS membership and access to listings to brokers operating referral services, depriving Internet-based brokers from referring their customers to other brokers for a fee. (*Id.* ¶ 40.)

The United States filed this suit in September 2005 (D.E. 1), and filed an amended complaint in October 2005. (D.E. 6.) The Amended Complaint alleges that NAR, by adopting the Initial VOW Policy and the Modified VOW Policy, violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, the Amended Complaint maintains that the aforementioned policies constitute a contract, combination, or conspiracy by and between NAR and its members which unreasonably restrains competition in brokerage service markets throughout the United States to the detriment of American consumers. (*Id.* ¶ 44.) The United States "challenges both policies in

8

this action as part of a single, ongoing contract, combination, or conspiracy." (*Id.* ¶ 4.) The United States alleges that the aforesaid combination or conspiracy has had and will continue to have anticompetitive effects in the market for residential real estate services by suppressing technological innovation, reducing competition on price and quality, raising barriers to entry, and restricting efficient cooperation among brokers, thereby making express or tacit collusion more likely. (*Id.* ¶ 45.)

Defendant has filed a motion to dismiss (D.E. 22) what Defendant characterizes as "[P]laintiff's claims challenging the [Initial VOW Policy] and [P]laintiff's claims challenging the opt-out provisions of both the [Initial VOW Policy] and the [Modified VOW Policy]." (D.E. 23 at 22.) As explained below, this is not a challenge to all of the claims made by the United States in the operative complaint. *Accord, e.g., id.* at 6, n.8.

## LEGAL STANDARD

When a defendant challenges standing via a motion to dismiss, "'courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Sanner v. Bd. of Trade*, 62 F.3d 918, 925 (7th Cir. 1995) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975), and collecting numerous circuit precedents). "'The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (quoting *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993) (per curiam) (further internal quotation marks and

citations omitted)).[6]

"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint for failure to state a claim upon which relief may be granted." *Johnson v. Rivera*, 272 F.3d 519, 520-21 (7th Cir. 2001). In ruling on a motion to dismiss, the court must assume all facts alleged in the complaint to be true and view the allegations in the light most favorable to plaintiffs. *See, e.g., Singer v. Pierce & Assocs., P.C.*, 383 F.3d 596, 597 (7th Cir. 2004). Dismissal for failure to state a claim is appropriate where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).[7]

## ANALYSIS

Defendant has filed a motion to dismiss "[P]laintiff's claims challenging the [Initial VOW Policy] and [P]laintiff's claims challenging the opt-out provisions of both the [Initial VOW Policy] and the [Modified VOW Policy]." (D.E. 23 at 22.) Defendant argues that Plaintiff lacks standing to obtain injunctive relief for any claim relating to the Initial VOW Policy. (*Id.* at 8.) Defendant further maintains that Plaintiff has failed to state a claim with respect to the opt-out provisions of both VOW policies because neither is a restraint of trade and because Plaintiff has not adequately pleaded anti-competitive effects from the Modified VOW Policy. (*Id.* at 12,

---

[6]      Contrary to what seems to be Defendant's implicit suggestion, the fact that Defendant has submitted some limited factual materials does not mean that the United States' other uncontradicted averments in its operative complaint are thereby rendered inoperative for purposes of the Rule 12(b)(1) analysis. *See generally Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (collecting cases). Otherwise, a defendant could file an affidavit on a minimally relevant or trivial point concerning jurisdiction, and all of the plaintiff's otherwise unchallenged averments relevant to jurisdictional issues would need to be supported by admissible evidence. Defendant offers no authority in support of such a method of analysis.

[7]      Contrary to the tenor of many of Defendant's arguments, there are no fact-pleading or heightened pleading requirements for antitrust claims. *See, e.g., S. Austin Coalition Cmty. Council v. SBC Communs., Inc.*, 274 F.3d 1168, 1171 (7th Cir. 2001) (collecting numerous precedents).

10

19.)

I.     The Court Does Not Lack Jurisdiction To Adjudicate Issues Concerning the Initial VOW Policy or To Grant Equitable Relief Concerning It

Defendant spends considerable effort attempting to preclude any review or analysis of the Initial VOW Policy. In this regard, it argues that "this Court lacks jurisdiction to adjudicate" issues concerning the Initial VOW Policy or to grant equitable relief that impacts on it. (D.E. 23 at 8 (certain capitalization omitted).) This contention is unpersuasive.

To begin, it is important to explain what Defendant concedes before it attempts to excise issues relating to the Initial VOW Policy and any possible injunctive relief relating to its provisions or their impact. First, although Defendant speaks broadly and at length in terms of Article III case-or-controversy requirements, Defendant does not even suggest that this Court lacks Article III jurisdiction to adjudicate the validity of the Modified VOW Policy or to grant injunctive relief concerning its provisions and effects. (See D.E. 70 at 11, n. 6 (Defendant conceding that the Court properly has jurisdiction to adjudicate the validity of the Modified VOW Policy and to enter injunctive relief, as appropriate).) Defendant also concedes that its motion to dismiss does not attempt to dismiss those portions of the United States' complaint concerning NAR and its members' alleged corrosion of data-feed quality, interference with co-branding relationships, and membership rules. (D.E. 23 at 6, n.8.) Those portions of the suit, and the propriety of this Court proceeding concerning them, are therefore unchallenged at the present stage of the litigation.[8]

---

[8]    A defendant's concession as to the propriety of federal court jurisdiction of course does not resolve the issue, and a district court needs to assess the propriety *vel non* of subject matter jurisdiction even if both parties stipulate concerning the issue or otherwise concede it. *See, e.g., Drake v. Minnesota Mining & Mfg. Co.* 134 F.3d 878, 883 (7th Cir. 1998). Nonetheless, the Defendant's concessions about the propriety of the portions of the United States' suit discussed above are well-taken. Put differently, the Court agrees that subject matter jurisdiction and

Defendant nonetheless seeks to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), any putative claims of the United States to injunctive relief relating to the provisions of the Initial VOW Policy. (*Id.* at 8.) Specifically, Defendant claims that injunctive relief would not redress any injury caused by the Initial VOW Policy because that policy has been rescinded and replaced by the Modified VOW Policy. (*Id.* at 8-12.) This contention is respectfully rejected.

    A.      The United States Is Correct That Subject Matter Jurisdiction Is Proper Because of Alleged Continuing Effects of the Initial VOW Policy and The Potential It Could Be Reinstituted

The Defendant is generally correct when it argues that there is a "general rule," by which "[t]here is no case or controversy regarding a request for injunctive relief when the complained of conduct ceased before the lawsuit was brought." (D.E. 23 at 9-10.) However, the authorities Defendant cites in support of what it labels a "general rule" reflect that the United States properly has Article III standing here. For example, *O'Shea v. Littleton*, 414 U.S. 488 (1974), teaches that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . *if unaccompanied by any continuing, present adverse effects.*" *Id.* at 495-96 (emphasis added). Under *O'Shea*, a plaintiff must allege something more than exposure to illegal conduct in the past—either continuing violations or continuing effects stemming from them, or a likelihood of defendant resuming the prior conduct as against the Plaintiff—to show that the alleged injury or threatened injury can be redressed by an injunction. *See, e.g., id.*; *Sierakowski v. Ryan*, 223 F.3d 440, 445 (7th Cir. 2000) (stating that, "past wrongs, while not sufficient [alone] to confer standing for injunctive relief, may be evidence that future violations are likely to occur") (citing, *inter alia, O'Shea*, 414 U.S. at 496). The United States has met its

---

Article III case-and-controversy requirements are satisfied as to these issues, which are central aspects of the suit.

burden of pleading with respect to the additional showing(s), and thus has demonstrated that an injunction would address its alleged injury.

1. Subject Matter Jurisdiction Exists Because of Alleged Continuing Effects and Violations

The United States alleges that the Initial VOW Policy and the Modified VOW Policy are part of a "single, ongoing contract, combination or conspiracy." (D.E. 6 ¶ 4.) The United States further alleges that the two policies are part of a continuing conspiracy among NAR and its member brokers to restrain competition from VOW brokers. (*Id.* ¶ 38; *see also, e.g., id.* ¶ 45 ("[t]he aforesaid contract, combination, or conspiracy has had and will continue to have anticompetitive effects."). Defendant argues that there is no ongoing conspiracy because "[t]he two policies are different; the latter has replaced the former." (D.E. 23 at 11.) However, the United States alleges that a common purpose driven by a common motive—to restrain the competitive threat posed by Internet-based brokerages—unites the two policies. (*See, e.g.,* D.E. 6 ¶ 42.) The United States' theory in this regard is not implausible given that Defendant appears to have changed its policy under immediate threat of suit and the United States has pleaded that the allegedly illicit motivation behind the Initial VOW Policy also motivated the Modified VOW Policy. (*Id.* ¶¶ 3, 38-44.)

Even more important, the Amended Complaint alleges that the United States and American consumers have and will continue to suffer injury as a result of Defendant's conduct. (*See, e.g., id.* ¶ 45.) Specifically, the Amended Complaint maintains that various brokers exercised their opt-out rights under the Initial VOW Policy, which restricted competition and technological innovation in the real estate brokerage business, particularly in several markets.

13

(*Id.* ¶ 34; *see also id.* ¶ 31 (alleging that "[a]pproximately 200 member boards [out of 1,600] implemented the Initial VOW Policy and received NAR's approval of their implementing rules").) The United States further claims in this regard that, were it not for Defendant's past policies, the current market for real estate brokerage services would be more competitive and efficient. (*Id.* ¶ 44-46.) For example, at least one VOW broker was allegedly forced out of business altogether as a result of the alleged misconduct of Defendant and its members. (*See* D.E. 6 ¶ 34.) These allegations are sufficient to establish continuing alleged adverse effects so as to ground subject matter jurisdiction for the United States' claim concerning the Initial VOW Policy.

A contrast with one of Defendant's cited cases is instructive in this regard. In *Stevens v. Northwest Indiana Dist. Council, Int'l B'hood of Carpenters*, 20 F.3d 720 (7th Cir. 1994), the Seventh Circuit determined that the plaintiffs, members of a local of an international union, lacked standing to pursue an "illegal trusteeship" claim against the international because superseding events—the election of a new district council that adopted new policies—meant that the plaintiff's injury was not caused by the international's imposition of any putatively illegal trusteeship. *See id.* at 724 n.11 ("Here, by contrast, the alleged wrong—the trusteeship—ended long before this case began. Whether, in such a circumstance, the complained of injury is adequately traceable for Article III purposes to the past allegedly unlawful conduct is a matter of 'causation,' which is in turn a component of the jurisprudence of standing.") (citation omitted); *see also id.* at 725 ("Any continuing harm flows from measures taken by the elected District Council and is properly addressable through a challenge to their, not the trusteeship's, actions.") (emphasis omitted). In the instant case, the United States has alleged (and Defendant cannot

14

meaningfully deny) that both VOW policies were enacted by NAR, and thus the alleged injury is fairly traceable to NAR. Moreover, the United States has plausibly alleged that the allegedly anticompetitive effects which flowed from adoption of the Initial VOW Policy have had enduring effects, at least in certain markets, such that the fact that the Modified VOW Policy putatively has superceded the Initial VOW Policy has not eliminated all effects of the Initial VOW Policy.[9] As a result, subject matter jurisdiction for the United States' claim is well grounded.

2. Subject Matter Jurisdiction Independently Exists Because of the Reasonable Threat of Defendant Resuming the Prior Alleged Misconduct

As the United States contends, there also is subject matter jurisdiction because of a reasonable threat that NAR will resume the prior conduct at issue in the Initial VOW Policy. An instructive case in this regard is *Wilk v. Am. Med. Ass'n*, 895 F.2d 352 (7th Cir. 1990), in which the Seventh Circuit affirmed the district court's issuance of an injunction against the American Medical Association's ("AMA") boycott directed toward chiropractors. *Id.* at 355. Defendant argues that the primary lesson of *Wilk* is that, to defeat the need for injunctive relief, an organization must clearly communicate a change in policy to its members, and that NAR has done so here by adopting the Modified VOW Policy. (D.E. 70 at 9-10 (citing *Wilk*, 895 F.2d at 356).) With all respect, this is not a persuasive reading of the teaching of *Wilk*. In that case, the AMA's failure to communicate its policy change was only one of many factors the court considered when it affirmed the district court's issuance of an injunction. *See id.* at 366 ("The

---

[9] In a related context, Seventh Circuit precedent instructs that, when there is factual uncertainty that could be clarified by discovery, jurisdictional dismissal of antitrust claims for lacking a sufficient nexus to interstate commerce is premature. *See, e.g., Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1282 (7th Cir. 1983). The reasoning is apt here, where the bulk of the instant case is otherwise moving forward into discovery, and Defendant's claim that there is effectively no cognizable possibility of continuing effects is speculative, given that the Initial VOW Policy was adopted in 200 markets, with the approval of the NAR. (D.E. 6 ¶ 31.)

trial court concluded there were lingering effects of the AMA's conspiracy; that the AMA never acknowledged the lawlessness of its past conduct, and in fact continued to maintain that it had always been in compliance with the antitrust laws; that the AMA had never affirmatively stated that it was ethical for medical physicians to professionally associate with chiropractors; that the AMA had never publicly [related] to its members the admissions made in the trial court about chiropractic's improved nature, despite the fact that the AMA currently claims that it made changes in its policy in recognition of chiropractic's change and improvement . . . . and, finally, that the AMA's systematic, long-term wrongdoing and long-term intent to destroy chiropractic suggested that an injunction was appropriate.") (internal quotations and brackets omitted).

With respect to the various factors discussed in *Wilk*—those concerning the likelihood of future resumption of Defendant's past practices—Plaintiff has alleged that Defendant has never acknowledged the alleged lawlessness of its past conduct and has continued to maintain that it has always been in compliance with the antitrust laws. (*See, e.g.*, D.E. 6 ¶ 43; D.E. 58 at 12.) In addition, the Amended Complaint states that NAR did not adopt the Modified VOW Policy until after the United States informed the NAR of its intention to file suit. (D.E. 6 ¶ 4.) Furthermore, the Amended Complaint asserts that, without an injunction, Defendant is likely to return to its past practices due to the alleged competitive threat posed by VOW brokers to NAR's core constituents. (*See, e.g., id.* ¶¶ 3-4, 43-44.) These factors all point in favor of jurisdiction under the rubric of *O'Shea*'s teaching concerning a Defendant's likelihood of resuming the prior conduct. *Id.*, 414 U.S. at 495-96.

Defendant's citation of *United States v. Oregon State Med'l Society*, 343 U.S. 326 (1952), does not change this conclusion on the record assembled in the suit to date. *Oregon State*

16

affirmed a district court's decision, after a lengthy trial, to reject a claim for injunctive relief because the plaintiff did not carry its burden of proving that the defendant was likely to resume its past and clearly abandoned practices. *Id.* at 330; *see also id.* at 333 ("When defendants are shown to have . . . entered into a conspiracy violative of the antitrust laws, courts will not assume that it has been abandoned without clear proof."). An important factor in the decision was that the defendant had ceased the challenged practice seven years prior to the filing of the suit. *See id.* at 334 ("But we find not the slightest reason to doubt the genuineness, good faith or permanence of the changed attitude and strategy of these defendant-appellees which took place in 1941. It occurred seven years before this suit was commenced and, so far as we are informed, before it was predictable. It did not consist merely of pretensions or promises but was an overt and visible reversal of policy, carried out by extensive operations which have every appearance of being permanent because wise and advantageous for the doctors."). If the policy changes were made closer to the onset of litigation, and were not in the members' own economic interests, the result may well have differed. *See id.* at 334 ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption") (citing *United States* v. *United States Steel Corp.*, 251 U.S. 417, 445 (1920)). As previously stated, the United States in the instant suit has alleged that NAR only altered its policy after Plaintiff announced its intention to file suit. (*See, e.g.*, D.E. 6 ¶¶ 42, 43, 45.) Moreover, the United States has alleged that both the Initial VOW Policy and the Modified VOW Policy are "part of a single, ongoing contract, combination, or conspiracy" in violation of the Sherman Act. (D.E. 6 ¶ 4.) As a result, there is Article III standing under the prong of *O'Shea* concerning conduct which reasonably may be

17

reinstituted, in addition to the aforementioned basis under the prong of O'Shea concerning

alleged misconduct with continuing effects.

      B.      The Initial VOW Policy Still Would Properly Be Within the Scope of Review
                 Given Teaching in Precedent Concerning Appropriate Potential Remedial Relief
                 If a Sherman Act Violation Is Proven By the United States

In addition, and independently, Defendant's attempt to excise the Initial VOW Policy and

any of its alleged effects from review in this case is misguided because of well-settled law

concerning the potential scope of equitable relief if an antitrust violation is proved by the United

States. If the United States shows that an antitrust violation has occurred, such that equitable

relief is warranted, the remedy can go beyond the prohibition of those practices which, strictly

speaking, were found to constitute the illegal conduct. Thus, for example, *Trabert & Hoeffer,*

*Inc. v. Piaget Watch Corp.*, 633 F.2d 477 (7th Cir. 1980), teaches that:

> It is settled that once a Sherman Act violation is proven, the district court "has the duty to
> compel action by the conspirators that will, so far as practicable, cure the ill effects of the
> illegal conduct, and assure the public freedom from its continuance. Such action is not
> limited to prohibition of the proven means by which the evil was accomplished, but may
> range broadly through practices connected with acts actually found to be illegal. . . .
> Relief to be effective must go beyond the narrow limits of the proven violation."

*Id.* at 485 (quoting *United States v. Ward Baking Co.*, 376 U.S. 327, 330 (1964)); *accord, e.g.*,

*Nat'l Society of Prof. Eng'rs v. United States*, 435 U.S. 679, 697-98 (1978) ("Having found the

Society guilty of a violation of the Sherman Act, the District Court was empowered to fashion

appropriate restraints on the Society's future activities both to avoid a recurrence of the violation

and to eliminate its consequences. . . . [Moreover,] advantages already in hand may be held by

methods more subtle and informed, and more difficult to prove, that those which, in the first

place, win a market. When the purpose to restrain trade appears from a clear violation of the law,

18

it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed.") (internal citations omitted); *Ford Motor Co. v. United States*, 405 U.S. 562, 573 n.8 (1972) ("The relief which can be afforded [to the United States under the Sherman Act and Clayton Act] is not limited to the restoration of the *status quo ante*. There is no power to turn back the clock. Rather, the relief must be directed to that which is 'necessary and appropriate in the public interest *to eliminate the effects*' . . . or . . . '*cure the ill effects* of the illegal conduct, and *assure the public freedom from* its continuance.'") (quoting *United States v. Du Pont & Co.*, 353 U.S. 586, 607 (1957), and *United States v. United States Gypsum Co.*, 340 U.S. 76, 88 (1951); emphases in *Ford Motor Co.*); *see also Associated Press v. United States*, 326 U.S. 1, 22 (1945) (teaching that, "[t]he fashioning of a decree in an Antitrust case in such [a] way as to prevent future violations and eradicate existing evils" is a subject for the informed discretion of the trial court). As a result, the putative effects of the Initial VOW, and the ways by which it allegedly would impair competitive forces and incentives in relevant markets, cannot be cabined from this case at the outset, as Defendant apparently desires.

In this regard, the Court also notes that, as Defendant elsewhere concedes in a footnote, the Initial VOW Policy "is relevant to the issues that are properly before this Court" (D.E. 70 at 9, n.4), even under Defendant's suggestion that only the Modified VOW Policy be meaningfully reviewed in discovery and, if appropriate, in the proceedings here. The Initial VOW Policy is relevant, at least for discovery purposes, because, for example, issues about the intent of the NAR in passing it will potentially help to illuminate Defendant's intent generally as either benign or improper. *See, e.g., Bd. of Trade of the City of Chicago v. United States*, 246 U.S. 231, 238 (1918) (Brandeis, J.) (stating, in the context of a federal civil antitrust enforcement action, that

19

the intent behind a challenged business arrangement or practice is relevant, "not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."); *see also* D.E. 6 ¶ 3 (detailing various alleged statements of NAR members and/or officials, in which they noted competitive threats posed by VOW brokers, including an alleged statement by the head of the working group created by NAR to develop regulations for VOWs). As a result, Defendant's effort to withdraw the Initial VOW Policy from the case—even if it had been successful on threshold standing grounds, which it was not—would be unavailing.[10]

Finally, Defendant suggests that "the absence of jurisdiction over the claim for injunctive relief against the . . . [Initial VOW Policy] will save the time and resources of the parties and the Court." (D.E. 70 at 9, n.4.) Defendant then proceeds to suggest that certain discovery about the economic impact (or putative economic impact) of the NAR's Initial VOW Policy is burdensome and inappropriate. (*Id.*; *see also id.* ("Exercising jurisdiction over the . . . [Initial VOW Policy] is thus not only inappropriate as a matter of law; it would also be a waste of the parties' and the Court's resources."). The Court respectfully rejects this suggestion. First, subject matter jurisdiction is not determined on the basis of whether an assertion of it will save the Court or the

---

[10]     This dynamic simply underscores the atypical nature of Defendant's jurisdictional standing argument. There is no meaningful dispute that there is Article III standing for the United States to proceed in this suit: Defendant makes various concessions and qualifications in the footnotes of its briefs to make clear that it does not contend that the United States lacks Article III standing to bring a civil enforcement action of the general form advanced here under the Sherman Act, and that fact is manifestly correct. Instead, Defendant is unsuccessfully attempting to break off aspects of the case concerning the Initial VOW Policy on Article III standing grounds; as explained elsewhere, the record assembled so far, along with the uncontradicted averments in the United States' pleadings, satisfies the United States' burden of showing that Article III standing exists over the operative complaint in its entirety. Moreover, even if the Initial VOW Policy were outside the strict confines of the Article III "case or controversy," the provisions of the Initial VOW Policy could, under settled Supreme Court and Seventh Circuit precedent spanning back decades, properly be the subject of an injunctive order in the case, as explained at length above.

20

parties time and resources.[11] Second, even construed as an argument about the discovery that likely is warranted in the case, the argument seems unpersuasive—although the Court will not resolve definitively any putative discovery disputes or issues in the instant setting. The scope and nature of the case is such that the discovery burdens Defendant notes (*see* D.E. 70 at 9, n.4) would likely not be undue or unwarranted. In any event, they are not a proper basis to find that Article III standing is absent concerning the Initial VOW Policy.

II.     The United States Has Not Failed to State a Claim

As previously stated, the United States is subject only to orthodox pleading burdens under Fed. R. Civ. P. 8. *See, e.g., S. Austin Coalition Cmty. Council v. SBC Communs., Inc.*, 274 F.3d 1168, 1171 (7th Cir. 2001) (collecting numerous precedents). Under those standards, the United States has not, as Defendant contends, failed to state a claim.

A.     The United States Has Stated a Sherman Act Claim

In the operative complaint, the United States alleges that the NAR and its members have adopted policies and by-laws (that is, the two VOW Policies), enforced by sanctions for non-compliance, "that restrain competition from brokers who use the Internet to more efficiently and cost effectively serve home sellers and buyers." (D.E. 6 ¶ 1; *see also id.* ¶ 11, 22 .) The United States has defined relevant markets and has alleged NAR's market power therein. (*Id.* ¶¶ 23-24.) Moreover, the United States has alleged that the VOW Policies substantially alter the pre-

---

[11]     The Court is skeptical that this assertion is what Defendant wanted to say, as opposed to an awkward rephrasing of other arguments. This skepticism is grounded in the fact that Defendant's briefs are well-written and researched, and very thoughtful and professional, and no one would reasonably contend that subject matter jurisdiction could properly be denied, where it was otherwise appropriate, because such a denial would save the Court and the parties time and money. The Court addresses the contention more as a scope-of-appropriate-discovery argument, which appears to have been intended as an alternative argument made concerning the positive consequences that would flow, in the Defendant's view, from dropping the Initial VOW Policy from the case.

existing landscape, in which, under prior NAR agreements, rules, and practices, a broker could provide any relevant listing in the MLS listing to a customer by whatever means was desired by the broker or customer, including via the Internet. (*Id.* ¶ 33; *see also id.*¶ 5 ("These [new VOW/Internet] policies significantly alter the rules governing multiple listing services.").) Nearly all of the NAR member boards also had adopted rules that required all members participating in their affiliated MLSs to submit, with minor exceptions, all of the clients' listings to the MLS, and the NAR did not permit any broker to withhold his or her clients' listings from a rival. (*Id.*) The United States has also alleged substantial concrete evidence that, if credited and true, could be understood to reflect that the new VOW Policies were developed and utilized with anti-competitive animus, as well as with a recognition that the VOW Policies would harm American consumers. (*Id.* ¶¶ 3 (collecting statements), 4, 7, 34, 41.) The United States alleges that the VOW Policies produce and will produce a variety of anti-competitive effects, have and will "make express or tacit collusion more likely," and have and will "provide brokers an effective tool to individually or collectively punish aggressive competition by any Internet-based broker." (*Id.* ¶¶ 42, 45.) Under such circumstances, the NAR has failed, with all respect, to demonstrate that this case should be dismissed at the outset.

In this regard, the Court notes that MLSs are joint ventures among competing brokers to share their clients' listings and to cooperate in other ways. (D.E. 6 ¶ 21.) The most fulsome treatment of realtor MLSs in appellate precedent is provided in *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980), a decision which reversed a grant of summary judgment against the government concerning realtor rules regarding MLS participation. *See id.* at 1388-89. *Realty Multi-List* stated that, "[w]hen a group of competitors like the members of RML join

together to cooperate in the conduct of their business, there naturally arise antitrust suspicions." *Id.* at 1370. *Realty Multi-List* further taught that while "a multiple listing service may create significant competitive advantages both for its members and for the general public, there exists the potential for significant competitive harms when the group, having assumed significant power in the market, also assumes the power to exclude other competitors from access to its pooled resources." *Id.*; *see also id.* at 1371 (stating that "where a broker is excluded from a multiple listing service with the requisite market power without an adequate justification in the competitive needs of the service, both the broker and the public are clearly harmed.").

Defendant concedes, for present purposes at least, that the challenged VOW Policies and rules are the product of a "combination among NAR's members," which is a prerequisite for the practices to be actionable under Section 1 of the Sherman Act. (D.E. 23 at 12; *see also, e.g.*, D.E. 6 ¶ 4 (United States challenging the VOW Policies "as part of a single, ongoing contract, combination, or conspiracy").) NAR nonetheless claims that the VOW Policies cannot constitute actionable restraints of trade.

Applicable precedent recognizes the obvious fact that not all contracts or combinations among marketplace participants are actionable restraints of trade that violate the Sherman Act. *See, e.g., Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723 (1988) ("Since the earliest decisions of this Court interpreting this provision [*i.e.*, Section 1 of the Sherman Act], we have recognized that it was intended to prohibit only unreasonable restraints of trade.") (citing *Nat'l Collegiate Athletic Assn. v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 98 (1984); and *Standard Oil Co. v. United States*, 221 U.S. 1, 60 (1911)). Instead, with the exception of certain, limited *per se* prohibitions not relevant here (*e.g.*,

the *per se* prohibition of horizontal price-fixing efforts), "whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason–that is, 'the factfinder weighs all of the circumstances of the case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'" *Sharp Electronics, Corp.*, 485 U.S. at 723 (citation omitted); *see also, e.g., Nat'l Society of Prof. Eng'rs*, 435 U.S. at 691 (stating that, under longstanding precedent, "the Court has adhered to the position that the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition. 'The true test of legality is whether the restraint imposed is such as merely regulates and thereby promotes competition or whether it is such as may suppress or even destroy competition.'") (quoting *Board of Trade of the City of Chicago*, 246 U.S. at 238); *Realty Multi-List*, 629 F.2d at 1369 (employing Rule of Reason analysis to review realtor/MLS rules and practices); *Austin Bd. of Realtors v. E-Realty, Inc.*, No. Civ. A-00-CA-154 JN, 2000 WL 34239114, at *2 (W.D. Tex. March 30, 2000) (issuing preliminary injunction, after employing Rule of Reason analysis, against realtor board's restrictive practices concerning MLS access for Internet-focused realty company; stating further that the plaintiff/e-Realty model "allow[ed] the client to initially bypass the Realtor by becoming a client of e-Realty and conducting his own search" and that e-Realty often could "charge a lower commission than traditional Realtors").[12] In this regard, precedent

---

[12]    Defendant notes that the preliminary injunction later was dissolved when the realtor board in *Austin Bd. of Realtors* modified certain business practices. *See Austin Bd. of Realtors v. E-Realty, Inc.*, No. Civ. A-00-CA-154 JN, unpublished order attached as exhibit to D.E. 23 at 2-4 (W.D. Tex. Sept. 12, 2000). However, that result does not support throwing out the United States' suit under Rule 12(b)(6). The *Austin Bd. of Realtors* district court merely lifted the preliminary injunction on the grounds that the plaintiff had failed to demonstrate continuing threat of irreparable injury, and the district court did not pass on the underlying merits of the plaintiff's claim. *See id.* at 4. Accordingly, the case does not stand as authority for the proposition that the United States' suit is fatally defective as pleaded.

further reflects that a group of market participants cannot immunize "arrangements or combinations designed to stifle competition . . . by adopting a [group] membership device accomplishing that purpose." *Associated Press*, 326 U.S. at 19.

Defendant cites various cases in support of its contention that the government's suit must be dismissed at the outset, but these cases do not support that result. For example, Defendant cites *Schachar v. American Academy of Ophthalmology*, 870 F.2d 397 (7th Cir. 1989), in support of its argument that, when the association leaves its members free to act independently,[13] Section 1 is not implicated. (D.E. 23 at 14 (citing *Schachar*, 870 F.2d at 398-400).) However, *Schachar* is not of assistance to Defendant because the defendant association in *Schachar—i.e.*, the American Academy of Opthalmology ("AAO")—did not have the ability to restrict supply by issuing a press release stating that a medical procedure was "experimental." At best, the plaintiff's argument in that case was that the press release had anticompetitive effects because it reduced demand for the procedure. *Schachar*, 870 F.2d at 399. Unlike the present case, the AAO did not create a regulatory regime governing supply backed up by sanctions. *See id.* ("[I]n a market with thousands of providers . . . . what any one producer does cannot curtail output; someone else will step in. Other trade association cases . . . involved enforcement devices . . . . These enforcement mechanisms are the 'restraints' of trade. Without them there is only uncoordinated individual action, the essence of competition.") (internal citations omitted). No member doctor was bound by the AAO's opinion—if a doctor expressed an opinion contrary to

---

[13]     Recall please that, under the Modified VOW Policy, individual realtors are given the option to exercise a blanket opt-out, such that customers will be stripped of Internet-access to MLS listings (*e.g.*, via VOW Brokers) and only can receive them in other ways; the Initial VOW Policy allowed the individual realtor even more discretion, so as to effect a blanket opt-out or to effect selective, individualized opt-outs.

the press release, or attempted to perform the procedure, he or she would not face sanctions from the AAO. *See generally id.* Nor was competition limited, as "someone else . . . [could] step in" and provide the medical procedure. *Id.* Here, the NAR regime is backed up by sanctions and further is alleged to promote, *inter alia*, express and tacit anti-competitive collusion and to provide a NAR-created mechanism to punish overly aggressive competition from any Internet-based broker. (*See, e.g.*, D.E. 6 ¶¶ 37, 42, 45.) Moreover, the VOW Policies allegedly single out Internet access, allegedly without any legitimate basis, for unique treatment vis-a-vis all other methods by which a broker can provide information to a client—with the potential and intended effect, it is alleged, of corroding competitive forces concerning price and quality. (*See, e.g.*, *id.* ¶¶ 33, 39, 45.)[14]

In sum, Defendant's contention that the United States has failed even to plead a claim is unpersuasive. Discovery may (or may not) prove that the United States' allegations are unfounded, but Defendant and its members have entered into collective action that purports to regulate how they will compete in the marketplace. Under such circumstances, the United States is entitled to proceed forward. *See, e.g.*, *Realty Multi-List, Inc.*, 629 F.2d at 1370.

     B.     The United States Has Sufficiently Alleged Anti-Competitive Effects

Defendant also alleges that the United States has failed to sufficiently allege anti-competitive effect from the challenged VOW policies. Defendant maintains that the specific factual averments concerning anticompetitive effect all relate to the Initial VOW Policy, and that

---

[14]    Defendant cites additional cases that suffer from the same defect discussed in the context of *Schachar*–the association was not implementing a rule that was enforced with sanctions against members who violate the rule. For example, in *Consolidated Metal Prods. v. Am. Petroleum Inst.*, 846 F.2d 284 (5th Cir. 1988), the association certified products (which admittedly had commercial value), but it did not, by failing to certify a particular product for approval, adopt any rule that imposed sanctions against members or constrain others to follow its recommendations or limit consumer-access to products at all. *Id.* at 293.

any allegations with respect to the Modified VOW Policy are "pleaded in conclusory fashion" (D.E. 23 at 19), and thus the case should be dismissed for failure to state a claim. (*Id.* at 19-20.)

The short answer to Defendant's argument is that it is—at least as to a substantial bulk of the argument as advanced—based on the rejected notion that there is an express or implicit heightened pleading burden against the United States for antitrust cases. Thus, Defendant's cited cases—some from out-of-circuit, and none from the Seventh Circuit after its decision in *S. Austin Coalition Cmty. Council v. SBC Communs., Inc.*, 274 F.3d 1168 (7th Cir. 2001)—are of no assistance to Defendant, as *S. Austin* made clear that no such heightened pleading burdens are applicable here. *Id.* at 1171 (collecting cases).

The Court further notes that Defendant does not dispute that Plaintiff has alleged adequate anticompetitive effects with respect to the Initial VOW Policy. (D.E. 23 at 19.) In acknowledging Plaintiff's allegations, though, Defendant narrowly characterized the alleged anticompetitive effect as deriving from a broker's or several brokers' decision to "target the VOW of a particular MLS participant." (*Id.* at 20.) Underlying Defendant's argument is an assumption that the "blanket" opt-out imposes higher costs on the broker deciding to opt-out, and thus it is less likely to be used than the selective opt-out.[15] However, Plaintiff has alleged that "Internet-based business models present a competitive challenge to brokers who provide listings to their customers *only by traditional methods*." (D.E. 6 ¶ 30 (emphasis added).) Thus, Plaintiff's theory does not depend upon a "selective" or "targeted" opt-out right—if a number of

---

[15]     The Modified VOW Policy provides that if a broker exercises its opt-out rights, it may not display listings of other MLS participants on its own website. Defendant correctly notes that everyone has the same right to opt-out (D.E. 70 at 12), but does not meaningfully challenge Plaintiff's facts that the opt-out is of more detriment to a VOW broker than to a broker that does not use a website to deliver listings to client, or that the opt-out undermines brokers who have a referral-based business model (*i.e.* they do not have their own listings). (*See* D.E. 6 ¶¶ 39-40.)

more traditional brokers do not provide their customers with information via a password-protected website, they are not deterred from opting out because they do not use a website to display competitors' listings. Plaintiff has also alleged harm to competition from the threat of opting out. (*See, e.g.*, D.E. 6 ¶ 45 (amended complaint alleging that, by restraining competition from VOW brokers, NAR's policies "ha[ve] had and will continue to have anticompetitive effects," including "suppressing technical innovation," reducing competition among brokers based "on price and quality," and "raising barriers to entry."); *see also id.* ¶¶ 42, 45 (stating that Policies will "make express or tacit collusion more likely," and have and will "provide brokers an effective tool to individually or collectively punish aggressive competition by any Internet-based broker.").) On the basis of these allegations, a factfinder could infer that anti-competitive effect (or its substantial potential if not corrected) has been shown. *See, e.g., United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1283 (7th Cir. 1990) (Section 1 of the Sherman Act can be used by the government to "prevent transactions likely to reduce competition substantially"). In addition, Plaintiff's allegations with respect to actual exercise of opt-out rights apply to the blanket opt-out rights in the Modified VOW Policy. Brokers in Emporia, Kansas collectively exercised their "blanket opt-out" rights, which resulted in an Internet-based competitor discontinuing the operation of his website. (*See* D.E. 58-2, Ex. A; *see also* D.E. 6 ¶ 34.) Such allegations confirm the sufficiency of the United States' allegations of anti-competitive effect and the reasonable potential thereof. In sum, the United States has offered sufficient allegations of anti-competitive effect, including various specific allegations, that, when viewed in the light most favorable to the United States, would allow a factfinder to conclude that the Modified VOW Policy has anticompetitive effects. At this stage of the proceedings, the United States has

28

alleged enough to satisfy Rule 8.

## CONCLUSION

For the reasons discussed above, Defendant's motion to dismiss (D.E. 22) is respectfully

denied.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: _11/27/06_