UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05 C 5140 |
| **NATIONAL ASSOCIATION OF REALTORS,** | ) ) ) | Judge Kennelly |
| Defendant. | ) ) ) | |

**PLAINTIFF'S MOTION FOR THE COURT TO EXCLUDE
TESTIMONY OR, ALTERNATIVELY, TO ISSUE A REQUEST FOR INTERNATIONAL
JUDICIAL ASSISTANCE**

**INTRODUCTION**

This motion seeks to remedy the prejudice caused by Defendant National Association of Realtors's ("NAR") failure to disclose until one day before the discovery cutoff that it "may" call a representative of Point2 Technologies, Inc. ("Point2"), a Canadian company, as a trial witness. Although Point2 is not subject to this Court's jurisdiction, it has agreed, at NAR's request, to supply its Director of Marketing, Carey Tufts, as a trial witness on a purely voluntary basis. However, when the United States asked Point2 voluntarily to provide documents before taking Mr. Tufts's deposition, Point2 refused to produce many of the documents that the United States believes are highly relevant to his testimony.

The United States requests that the Court address this situation by granting one of three forms of relief. First, the United States moves for an order excluding the testimony of Mr. Tufts or any other Point2 representative based on NAR's late disclosure, which is neither justified nor harmless. NAR was aware of Point2 long before the November 20th discovery cutoff. Both of

NAR's expert witnesses discussed Point2 in their reports, the first of which was served on May 1, 2007.  Nevertheless, NAR did not disclose any representative of Point2 in its March or September 2007 preliminary witness lists.  Instead, NAR first disclosed that it might seek to call Brendan King, then Point2's CEO,[1] on November 19th, one day before the discovery cutoff.  NAR has provided no justification for its tardy disclosure and has refused to take reasonable steps, given the circumstances, to lessen the prejudice to the United States.  Though Point2 has agreed to have Mr. Tufts travel from Saskatoon, Saskatchewan to testify voluntarily at trial as a witness for NAR, NAR declined the United States's request for assistance in obtaining documents from Point2 and refused even to ask Point2 to produce the subject documents.  NAR also refused to stipulate that it would refrain from presenting testimony from Mr. Tufts relating to the same topics on which Point2 has refused to produce documents.

Alternatively, the United States moves for an order that NAR may not call Point2's representative to testify at trial unless Point2 substantially complies with the government's document production requests, without delay.  Such an order would make clear that if Point2 chooses to participate in a federal court proceeding in the United States by volunteering a trial witness at NAR's request, it must also voluntarily produce documents relevant to the testimony of that witness.  As with any other witness, NAR should not be allowed to call a representative from Point2 if that company – which is outside this Court's subpoena power – chooses to volunteer in this process only selectively.

A third alternative, which provides no assurance that the prejudice will be remedied, would be for this Court to issue a Request for International Judicial Assistance to the Court of

---

[1] Mr. King has since resigned.  As a result, on January 7, 2008 NAR disclosed to the United States that it would seek to call Carey Tufts in place of Mr. King.

Queen's Bench of Saskatchewan in the Province of Saskatchewan, Canada, where Point2 is located, seeking the production of documents from that company. NAR has no objection to the issuance of such an international request, which is the first step in the formal process for the United States to compel the production of documents from a Canadian company. However, this process can be expensive, burdensome and slow – often taking months and sometimes more than a year to complete. There is a significant risk that the United States will be unable to obtain the documents, or that the delays associated with the process will prejudice the United States by preventing it from receiving the documents in time to depose Point2's representative before trial. Nevertheless, the United States makes this request to try to minimize the prejudice resulting from NAR's last-minute disclosure and Point2's refusal to provide voluntarily the documents most relevant to its employee's expected trial testimony.

## I.     BACKGROUND

### A. Alleged Relevance of Testimony from Point2 for NAR

This is an antitrust action seeking to enjoin NAR from inhibiting competition from real estate brokers who use innovative Internet-based tools to offer better services and lower costs to consumers. D.E. 6 (Amended Complaint at ¶¶ 1-8). Specifically, the action seeks to stop NAR from restraining competition from brokers who operate password-protected Internet sites that enable their customers to search for and receive real estate listings over the Internet (referred to by NAR as "virtual office websites" or "VOWs"). *Id.* The NAR policies at issue govern the operation of multiple listing services ("MLSs"). *Id.* MLSs collect detailed information about nearly all properties for sale in a given market area and are the primary source of listings information for brokers and their customers. *Id.* Through its local Realtor associations, NAR

controls the majority of MLSs in the United States. NAR's policies restrict VOW brokers from accessing and using MLS listings information to the same degree that traditional brokers can. *Id.*

Chief among these restrictions is NAR's "opt-out" provision. This rule allows brokers to withhold their clients' listings from display on VOW brokers' websites by opting out. *Id.* The opt-out provision applies only to VOWs – MLS rules do not permit a broker to withhold listings from competitors who deliver listings to customers using other means, such as hand delivery, email, or fax. In essence, the policies allow traditional brokers to block customers of web-based competitors from using the Internet to review the same set of complete MLS listings that the traditional brokers provide to their customers by other means. *Id.*

NAR's affirmative defense is that there is a justification for this restriction. NAR claims that the opt-out provision was necessary to prevent brokers from withdrawing from MLSs. *See* D.E. 75 (4/16/2007 letter from Jack R. Bierig, counsel for NAR, disclosing NAR's procompetitive justifications for the VOW Policy pursuant to Court Order). According to NAR, if brokers were unable to withhold listings from VOWs, some would allegedly withdraw from MLSs. *Id.* NAR argues that if a sufficient amount of withdrawal occurred, this would threaten the existence or stability of the MLS. *Id.* Since MLSs are themselves procompetitive, a rule that protects MLS stability is also procompetitive, NAR contends. *Id.*

There will be substantial evidence that NAR's "justification" is unfounded. Brokers are unlikely to withdraw even in the absence of an opt-out provision because they need to be in the MLS to be in business. Indeed, this necessity is what gives NAR power to impose its restrictions on competition. *See United States v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1373-74 (5th Cir. 1980) (holding that defendant MLS had market power).

In an attempt to overcome this well-accepted proposition, NAR seeks to call a

representative from Point2 apparently to provide evidence that broker withdrawal from MLSs is feasible because there are technological alternatives to MLSs. Among other businesses, Point2 operates an Internet "peer to peer" network through which brokers can share their listings with one another. NAR maintains that brokers who withdraw from MLSs could use technology platforms like Point2's as an alternative means of sharing listings data. On December 5, NAR described the subject matter of Point2's testimony as "Point 2's NLS [national listing service] technology, including how that technology is used by agents and MLSs, and the various features of that technology, including the handshake and syndication features." Exhibit ("Ex.") 1 (email exchanges between counsel for the parties concerning Point2).

For its part, the United States believes that such testimony would be irrelevant. The United States does not dispute that there are many technological database platforms that brokers could use to share listings data with one another. The relevant fact for purposes of NAR's "MLS withdrawal" defense is that for economic reasons wholly unrelated to technological feasibility, no broker has ever withdrawn from an MLS because it could not opt out of VOWs, nor is any broker likely to withdraw for this reason in the foreseeable future. Moreover, even if brokers hypothetically did withdraw from MLSs to join MLS substitutes, such substitutes would also be subject to Section 1 of the Sherman Act, which prohibits any agreement among competitors that unreasonably restrains competition.

Nevertheless, because the parties' disagreement over Point2's relevance cannot be resolved until later, the United States seeks documents from Point2 relating to its business plans and strategies and the members of its national listing service, among other subjects. These documents relate directly to the subjects of Mr. Tufts's expected voluntary testimony about whether Point2 currently functions, could function, or plans to function as an MLS alternative for

brokers.

### B. NAR's Untimely Disclosure and Point2's Refusal to Produce Documents

NAR did not disclose Point2 in its March 2007 and September 2007 preliminary witness list exchanges, though NAR had been aware of the company for some time. NAR's first mention of Point2 appeared in the May 1, 2007 report of NAR's proffered industry expert, Steven Murray. Mr. Murray's report discusses Point2 very briefly, alleging that the company could have the technical capabilities to create "MLS-like systems." Ex. 2 (Murray Report 19-20). In support, Mr. Murray cited two pages from Point2's website. *Id.*

NAR's proffered economic expert, Dr. Frederick Flyer, claimed in his August 1, 2007 report that Point2 has created a "peer-2-peer" system where brokers may share listings. Ex. 3 (Flyer Report 20-21). Similar to Mr. Murray, Dr. Flyer's only cited basis for his conclusion were two pages from Point2's website. *Id.* Dr. Flyer mentioned Point2 in one paragraph of his 74-page report.[2]

In his September 2007 deposition, Mr. Murray identified Point2 as a company he believed would become capable of permitting real estate brokers to exchange offers of cooperation and compensation, a function of MLSs.[3] Ex. 5 (Murray dep. 197-200). Based on this testimony, the United States arranged for the voluntary deposition of Brendan King, Point2's then Chief Operating Officer and acting Chief Executive Officer, in order to test the accuracy of Mr. Murray's

---

[2]Dr. Flyer testified that his assistant interviewed Point2 and discussed the interview with him, but Dr. Flyer hedged that he did not know whether what he learned about Point2's business model was pertinent to any of his opinions. Ex. 4 (Flyer dep. 47).

[3]Under NAR's MLS rules, brokers must submit a unilateral offer of cooperation and compensation when they submit information about properties to the MLS. By doing so they offer to pay the stated compensation (usually a percentage of the commission) to any broker who "cooperates" in the sale of the property listed in the MLS by finding a buyer for the property.

prediction. Point2's in-house counsel, Jason Golding, identified Mr. King as a witness with knowledge of Point2's technology and business model. The United States and Point2 agreed that Mr. King's deposition would occur at Point2's offices in Saskatoon, Saskatchewan, Canada on November 19 to permit the United States enough time to apply to Canada's Department of Foreign Affairs and International Trade through the United States Department of State for permission to conduct Mr. King's voluntary deposition in Canada. The United States gave notice of Mr. King's deposition to NAR on October 1, 2007. Ex. 6. At no point did NAR cross-notice Mr. King's deposition.

Faced with competing demands on resources, the United States ultimately determined that because it was not the proponent of Point2's relevance, there was no need to go forward with the deposition. Accordingly, on November 15, the United States informed NAR and Point2 that it had elected not to go forward with Mr. King's deposition. Ex. 1. NAR did not indicate that it wished to proceed with Mr. King's testimony. Rather, on November 19, the day before discovery closed, NAR informed the United States for the first time that it "may" call Mr. King as a trial witness. *Id.*

On November 27, the United States sought confirmation from NAR that it was adding Mr. King to its witness list, requested a description of his anticipated testimony as required by the Court's scheduling order, and informed NAR that the United States would be seeking deposition and document discovery from Point2. *Id.* Although the United States had not sought documents from Point2 in connection with the previously scheduled November 19th deposition, NAR had not disclosed before then that it would be calling a witness from Point2. Prior to that disclosure, the United States was planning on taking the deposition for the limited purpose of using publicly

available information about Point2 to disprove the predictions of NAR's expert regarding the company.

In addition, when the United States scheduled Mr. King's subsequently canceled deposition, it was not aware that Point2 had any interest in this case. The United States has since learned that, although Point2 is a third party, it is not a disinterested one. After canceling the deposition scheduled for November 19, the United States then learned that, although Point2 is a Canadian company with no legal obligation to provide a trial witness at NAR's request, it has volunteered to do so. The United States has also since learned that counsel for NAR and Point2 were in communication at least as early as October 1, 2007. Ex. 7 (10/1/07 email exchanges between Point2 and NAR's counsel). Indeed, Point2's CEO and in-house counsel – Mr. King and Mr. Golding – agreed to travel to Chicago on October 29 to discuss anticipated testimony with NAR's lawyers (the meeting ultimately did not take place). *Id.* Moreover, since November 19, Point2 produced a document showing that it had sided publicly with NAR in this lawsuit in an effort to attract business from NAR's membership. *See* Jason Golding, "Point2 NLS White Paper, DOJ v. NAR: A Third Way" (June 15, 2007) (alleging that the Department of Justice, as well as the Federal Trade Commission, the media, and "limited service" brokers, "have joined together to take aim at the REALTOR commission"; stating that the "DOJ ... are [sic] effectively 'choosing winners' through government intervention"; and marketing Point2's services as a "third way"), *available at* http://nls.point2.com/Content/documents/ Point2NLSWhitepaperDOJvsNAR.pdf .

On December 3, in response to the government's November 27 request, NAR confirmed that it was adding Point2 to its witness list. Ex. 1. Shortly thereafter, the United States asked Point2, through its in-house counsel Mr. Golding, to produce documents voluntarily prior to Mr.

King's deposition. Mr. Golding agreed that Point2 would voluntarily produce documents, thus precluding the need then for Plaintiff to request a letter rogatory.

On December 11, the United States learned that Mr. King had resigned from Point2, reportedly based on differences over Point2's strategic direction.[4] On the following day, the United States and Point2 discussed whether the company would be providing another witness to testify on behalf of NAR. Point2 advised that it was not sure, but would make a decision after the holidays. Based on this discussion, the United States sent its document requests to Point2 with the understanding that Point2 would produce documents only if and when it agreed to volunteer a new witness to testify for NAR. Ex. 8 (emails between counsel for Plaintiff and Jason Golding of Point2). On January 7, 2008, NAR informed the United States that it intended to call Carey Tufts, Point2's Director of Marketing, to testify about the company's technology at trial. Ex. 1.

On January 15, 2008, Point2, for the first time, stated that it would not voluntarily produce documents responsive to all of the United States's requests. Point2 refused to provide any documents related to its business strategies and plans (request no. 1) or its membership (request no. 2). Ex. 8. On January 17, Point2 produced only eight documents in a partial response to the remaining requests. *Id.* The only reason Point2 gave for not producing the requested documents was its concern regarding confidentiality. The United States sought to address this concern in written and oral communications with Point2, including by explaining the confidentiality protections contained in the Protective Order, but it failed to persuade Point2 to produce the documents. *Id.*

---

[4]*Point2 Technologies Confirms Group of Resignations*, Inman News (Dec. 11, 2007), Ex. 9.

In meet and confer communications pursuant to Local Rule 37.2, the United States also sought assistance from NAR's counsel in obtaining the documents, given that Point2 had volunteered to provide a trial witness at NAR's request. *See* Ex. 1.  In writing and in a telephone conference, the United States asked NAR to join it in requesting that Point2 voluntarily produce the documents it had refused to turn over.  NAR declined.  *Id.*  The United States then sought a stipulation from NAR that it would not make any arguments relating to Point2's future or potential plans for its NLS technology.  NAR declined this request as well.  *Id.*  Instead, NAR argued that the United States should proceed with Mr. Tufts's deposition without documents, as the United States had planned to do on November 19th, while ignoring that Point2 was not then known to the United States as an interested party, volunteering to testify at trial for NAR.  *Id.*  Proceeding in this manner would insulate Mr. Tufts from cross examination based on Point2's documents and create an admissible deposition transcript for NAR to use at trial in lieu of having the witness testify live.

## II. The Court Should Exclude Mr. Tufts's Testimony

The United States moves to exclude Mr. Tufts's testimony for two independent reasons.

### A. NAR's Late Disclosure Is Unjustified and Prejudicial to the United States

The *Manual for Complex Litigation* advises that "[t]he need for evidence located outside the United States should be explored early in the proceedings to allow for the extra time that may be required to obtain it." *Manual for Complex Litigation* § 11.494, at 104 (4th ed.2004).  NAR failed to identify a Point2 witness early in the proceedings to permit appropriate discovery.  NAR did not amend its Rule 26(a)(1)(A) disclosures, add Mr. King to its March 2007 or September 2007 preliminary witness lists, nor even cross-notice Mr. King's November 19th deposition.  Instead, it waited until the day before the discovery cutoff to disclose that it might offer

volunteered trial testimony from a Canadian witness from Point2. There is no legitimate reason for NAR's late disclosure.

Considering that discovery closed the day after NAR disclosed a Point2 witness and trial is just months away, there is precious little time to seek and obtain document production through judicial process in a foreign country. The United States should not be forced to expend its energies at this late date to try to obtain a foreign document production through compulsory process when this time has been reserved in the Court's scheduling order for trial preparation. The letters rogatory process will also consume judicial resources here and in Canada, yet there is a substantial risk that the entire exercise will be a waste of time given the late stage of these proceedings. This is precisely the type of situation that the Court sought to avoid when it reminded the parties at the January 16th status conference that discovery had closed over two months ago, and that the parties should avoid continuing prolonged discovery by stipulation.

Under Rule 37(c), "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Because NAR's tardy disclosure on the day before the Court's discovery cutoff that it "may" call a Point2 witness at trial is neither justified nor harmless, Rule 37(c) bars NAR from relying on Mr. Tufts' testimony. *See Musser v. Gentiva Health Services*, 356 F.3d 751, 755 & 758 (7th Cir. 2004) ("The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless").[5]

---

[5] The Seventh Circuit does not require a showing of bad faith or willfulness before excluding evidence under Rule 37(c). *See Musser,* 356 F.3d at 760 (affirming exclusion because proponent of evidence failed to demonstrate substantial justification or harmlessness); *Salgado v.*

**B.    This Court Should Bar NAR from Offering Mr. Tufts's Testimony if Point2 Remains Unwilling to Produce Documents Bearing on the Truth of that Testimony**

The Court should not allow NAR to gain an advantage by disclosing at the close of discovery a foreign witness who will voluntarily appear at trial on its behalf, but who refuses reasonable requests for documents related to the witness's anticipated testimony. Pursuant to Federal Rule of Evidence 611, the Court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth . . . ." Fed. R. Evid. 611(a). Under Rule 611(a), courts may "properly preclude parties from calling witnesses who refuse reasonable requests from their party opponents." MOORE'S FEDERAL PRACTICE § 611.02[2][b], at 611-28 (June 2004); *see also Neibur v. Town of Cicero*, 212 F. Supp. 2d 790, 806-07 (N.D. Ill. 2002) (excluding testimony of defendant's former attorney when the witness refused to travel from Florida when called during the plaintiff's case-in-chief but was willing to appear during the defendant's case); *In re Gulf Oil/Cities Services Tender Offer Litig.*, 776 F. Supp. 838, 839 (S.D.N.Y. 1991) (excluding defendant from testifying when called by a co-defendant because he refused to testify during plaintiff's case; holding that co-defendant's lack of control over the witness not relevant).

Point2 may choose whether it will participate in these proceedings, but once it decides to volunteer trial testimony, it must also produce the evidence that the United States needs to test that testimony on cross examination. A contrary result would compromise the Court's ability to ascertain the truth. Accordingly, the Court should rule that NAR may call Point2's representative

---

*General Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998) (same), *cited by* MOORE'S FEDERAL PRACTICE § 37.60[2][b] at 37-130 (Dec. 2007) (noting absence of bad faith or willfulness requirement in Seventh Circuit case law).

to testify at trial only if the company makes a complete production of relevant documents to allow a timely and effective deposition.

**III.     The Court Should Issue a Request for International Judicial Assistance**

In the alternative, the United States moves for the issuance of a Request for International Judicial Assistance.  The United States needs documents from Point2 to ensure an opportunity to effectively depose and cross-examine Mr. Tufts at deposition and trial.  The evidence sought will bear directly on the validity of NAR's anticipated claim that Point2's alleged "MLS-like systems" could be a timely, likely, and sufficient alternative to MLSs for American real estate brokers.  For example, Mr. King reportedly left Point2 based on his "fundamental disagreement with the company's future plans,"[6] which highlights the importance of obtaining Point2's strategic and business plans (request no. 1) to gain perspective on and test Mr. Tufts's testimony.

When entities or persons who possess relevant evidence are outside the United States, this Court is authorized pursuant to 28 U.S.C. § 1781 and its inherent authority to issue international Letters of Request for testimony and production of documents.  *See United States v. Reagan*, 453 F.2d 165, 171-73 (6th Cir. 1971).  Point2 is based in Canada, and the documentary evidence relating to its technology, scale, penetration into the United States, and business plans are located at its headquarters in Saskatchewan.  Point2 is unwilling to produce the needed documents voluntarily.  A request for international judicial assistance is the only available avenue to compel production of these documents, and NAR does not object to the issuance of such a request.

---

[6]*Point2 Technologies Confirms Group of Resignations*, Inman News (Dec. 11, 2007), Ex. 9.

13

Accordingly, the United States respectfully requests, in the alternative, that the Court sign its proposed request.[7]

Although the United States is pursuing this course to protect its rights, the international process for seeking these documents can be burdensome and time-consuming, and there is substantial risk that the United States will not obtain the documents in time for trial, if at all. If this Court issues the international request, the United States will then apply for production of the documents from Point2 in Saskatchewan. Once service of the application is made in Canada, Point2 will have the opportunity to cross-examine the United States representative who will sign the affidavit accompanying the application for process. *See* ABA SECTION OF ANTITRUST LAW, OBTAINING DISCOVERY ABROAD 92-94 (2005). There may be a six to eight-week interval between the time the application is served and the hearing before the appropriate Canadian Court on the Letter of Request. *Id.* at 94-95. Thereafter, Point2 may appeal the decision as of right, which may add two to twelve months to the process. *Id.*

If and when the United States receives the necessary responsive documents, it will confer with Point2's counsel regarding a date that will permit enough time for the United States to obtain permission from Canada's Department of Foreign Affairs and International Trade to take the voluntary deposition of Mr. Tufts. The Department of State application advises that applications be made no less than fifteen business days in advance of the deposition date, but may not be made until a deposition date has been set. This lengthy process is inconsistent with the current schedule, pursuant to which discovery closed over two months ago and trial is set for July 7, and with the Court's admonition to the parties about continuing discovery by stipulation in any prolonged time

---

[7]The United States will email its proposed request to the Court in accordance with the instructions relating to proposed orders set forth on the Court's website.

frame.

## IV.  Conclusion

For the foregoing reasons, the Court should exclude Mr. Tufts, or any other representative from Point2, from testifying.  Alternatively, the Court should (i) order that Mr. Tufts's testimony will be barred unless Point2 promptly and substantially complies with the government's document requests; or (ii) issue a Request for International Judicial Assistance to Saskatchewan, Canada.

Respectfully submitted,

    s/Steven Kramer
Craig W. Conrath
Steven Kramer
Timothy T. Finley
Owen M. Kendler
U.S. Department of Justice
Antitrust Division
325 Seventh Street, N.W., Suite 300
Washington, D.C. 20530
Tel: (202) 307-0997
Fax: (202) 307-9952

Dated: February 8, 2008

**CERTIFICATE OF SERVICE**

I, Steven Kramer, hereby certify that on this 8th day of February, 2008, I caused a copy of the foregoing to be served on the person listed below by ECF.

Jack R. Bierig
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
jbierig@sidley.com

                                                s/ Steven Kramer

                                                Steven Kramer