# INDEX OF EXHIBITS

## EXHIBIT 1
Correspondence between counsel for the United States and defense counsel regarding Point2 Technologies

## EXHIBIT 2
Selections from the 5/1/07 expert report of Stephen Murray

## EXHIBIT 3
Selections from the 8/1/07 expert report of Frederick A. Flyer

## EXHIBIT 4
Selections from the 10/17/07 deposition of Frederick Flyer

## EXHIBIT 5
Selections from the 9/20/07 deposition of Stephen Murray

## EXHIBIT 6
Notice of deposition of Brendan King, dated 10/1/07

## EXHIBIT 7
Email exchange between Scott Stein and Brendan King discussing preparations for Chicago meeting

## EXHIBIT 8
Email exchange between counsel for the United States and Jason Golding, counsel for Point2

## EXHIBIT 9
Article from Inman News dated 12/11/07 entitled "Point2 Technologies confirms group of resignations"

# EXHIBIT 1

## Kendler, Owen

| | |
|---|---|
| **From:** | Kully, David |
| **Sent:** | Friday, November 16, 2007 8:34 AM |
| **To:** | 'Stein, Scott D.' |
| **Cc:** | 'Biro, Charles'; 'Bierig, Jack R.'; Finley, Timothy; Conrath, Craig; Kendler, Owen |
| **Subject:** | RE: Point2 Deposition |

Scott -- Your understanding is correct.

> -----Original Message-----
> **From:** Stein, Scott D. [mailto:sstein@Sidley.com]
> **Sent:** Friday, November 16, 2007 8:32 AM
> **To:** Kendler, Owen
> **Cc:** Kully, David; Biro, Charles; Bierig, Jack R.
> **Subject:** Point2 Deposition
>
> Owen -- I'm just writing to confirm what you told me yesterday, i.e., that DOJ has decided not to go forward with the deposition of Brendan King on Monday. If I misunderstood, please let me know.
>
> Scott D. Stein
> Sidley Austin LLP
> One South Dearborn Street
> Chicago, IL 60603
> (312) 853-7520
> (312) 853-7036 (fax)

> Sidley Austin LLP mail server made the following annotations on 11/16/07, 07:32:32:
> --------------------------------------------------------------------------------
> IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform yo
> that, unless expressly stated otherwise, any U.S. federal tax advice contained in this
> communication, including attachments, was not intended or written to be used, and cannot be
> used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such
> taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or r
> to by other parties in promoting, marketing or recommending any partnership or other entity
> investment plan or arrangement, then (i) the advice should be construed as written in conne
> with the promotion or marketing by others of the transaction(s) or matter(s) addressed in t
> communication and (ii) the taxpayer should seek advice based on the taxpayer's particular
> circumstances from an independent tax advisor.
>
> ********************************************************************************
> This e-mail is sent by a law firm and may contain information that is privileged or confide
> If you are not the intended recipient, please delete the e-mail and any attachments and not
> immediately.
>
> ********************************************************************************

2/5/2008

## Kendler, Owen

| | |
|---|---|
| **From:** | Kendler, Owen |
| **Sent:** | Friday, December 07, 2007 9:57 AM |
| **To:** | 'Stein, Scott D.'; Kully, David |
| **Cc:** | 'Bierig, Jack R.'; Conrath, Craig |
| **Subject:** | RE: Point2 |

Scott,

Thank you for providing a more detailed disclosure for Mr. King. NAR's decision to do so makes it unnecessary to engage in a prolonged debate about witnesses disclosed by the government. We do note for the sake of accuracy that each of the witnesses you complain about was disclosed well before the eve of the discovery cutoff.

We are not refusing to share with you the document discovery we seek. We will disclose to you exactly what documents we are seeking as soon as we prepare our requests, which will be shortly. Finally, we disagree with NAR's suggestion that our decision not to seek any discovery from Mr. King *before* NAR disclosed him as a trial witness somehow estops us from seeking discovery *after* NAR's belated disclosure. The purpose of a witness list is to disclose persons who will testify at trial in order to allow discovery to be taken from such persons.

Thank you,
Owen

> -----Original Message-----
> **From:** Stein, Scott D. [mailto:sstein@Sidley.com]
> **Sent:** Wednesday, December 05, 2007 8:53 AM
> **To:** Kully, David
> **Cc:** Bierig, Jack R.; Kendler, Owen; Conrath, Craig
> **Subject:** RE: Point2
>
> Dave --
>
> To repeat, the subject matter will be the very same as the subject matter of the deposition that DOJ was preparing to take; namely, Point 2's NLS technology, including how that technology is used by agents and MLSs, and the various features of that technology, including the handshake and syndication features. I'm not sure what additional information you contend you require. Nor do we believe that the disclosure we have provided is insufficiently detailed -- particularly when one considers the level of detail DOJ believes is appropriate for its own disclosures. In that regard, I would refer you to DOJ's disclosures concerning the myriad new witnesses identified on the even of the close of discovery: Robert Sutton, Kevin Cottrell, and Luke Steele ("business dealings with HBM II"), Jack Johnson and Lennox Scott ("NWMLS's structure and its IDX/VOW rules and topics related to the reports and deposition testimony of NAR's experts"); Craig Davis ("the history of his business, his business model and its benefits"), etc.
>
> As for document discovery, we do not understand the basis for your refusal (or inability) to specify what additional discovery you contend is required. DOJ was aware of Mr. King and Point 2 well before the discovery cutoff. Indeed, DOJ was preparing to depose Mr. King on precisely the same subject matter described above, and to do so having made a deliberate, strategic decision not to seek documents from Point2. We identified Mr. King as a potential trial witness promptly upon learning, on the eve of the deposition, that DOJ was canceling it. Given these facts, we do not think the hardly think it unreasonable to DOJ to explain what document discovery it claims to now need, and why it did not seek such discovery from Point2 in connection with the deposition it noticed.
>
> -- Scott
>
> > **From:** Kully, David [mailto:David.Kully@usdoj.gov]
> > **Sent:** Tuesday, December 04, 2007 11:28 AM
> > **To:** Stein, Scott D.
> > **Cc:** Bierig, Jack R.; Kendler, Owen; Conrath, Craig

**Subject:** RE: Point2

Scott -- I'm responding on behalf of Owen, who is on his way to Seattle.

Please provide us with a more detailed description of Mr. King's testimony to guide our documentary and deposition discovery. Your September 7th letter to us describing the anticipated subject matter NAR's trial witnesses provided greater detail than what you have provided regarding Mr. King.

In response to your questions, the documentary discovery we believe is warranted will be reflected on the requests themselves, and the discovery is prompted by NAR's untimely disclosure and will be guided by its more detailed disclosure. NAR cannot disclose a trial witness on the eve of the cutoff and then suggest that we are not entitled to relevant discovery from that trial witness.

    -----Original Message-----
    **From:** Stein, Scott D. [mailto:sstein@Sidley.com]
    **Sent:** Monday, December 03, 2007 8:24 AM
    **To:** Kendler, Owen; Conrath, Craig; Kully, David
    **Cc:** Bierig, Jack R.
    **Subject:** RE: Point2

    Owen --

    The subject matter of Mr. King's anticipated testimony is, as described in my previous e-mail, the same subject matter that was to be the subject of DOJ's deposition -- Point 2's NLS technology.

    Given that we expect Mr. King to provide testimony on the same subjects that DOJ was prepared to depose him about without the benefit of any documents, what additional document discovery does DOJ contend is warranted?

    -- Scott

---

    **From:** Kendler, Owen [mailto:Owen.Kendler@usdoj.gov]
    **Sent:** Tuesday, November 27, 2007 1:13 PM
    **To:** Stein, Scott D.; Conrath, Craig; Kully, David
    **Cc:** Bierig, Jack R.; Biro, Charles
    **Subject:** RE: Point2

    Scott,

    In your email below, you state that NAR "may" call Mr. King to testify. Because NAR disclosed the possible addition of Mr. King as a witness the day before discovery closed, because of the time and paperwork involved in traveling to Canada for a deposition, and because of the absence of any document discovery from Point2, we do not wish to consider setting up a deposition unless NAR is actually adding Mr. King to its witness list. If you are adding him, please provide a brief description of his anticipated testimony as you did with the witness disclosed in your September 7th letter. In the event that NAR adds Mr. King to its witness list, we will begin the process of seeking documents from Point2.

    Thank you,
    Owen

        -----Original Message-----
        **From:** Stein, Scott D. [mailto:sstein@Sidley.com]
        **Sent:** Monday, November 19, 2007 3:44 PM
        **To:** Conrath, Craig; Kully, David; Kendler, Owen
        **Cc:** Bierig, Jack R.; Biro, Charles

**Subject:** Point2

NAR may seek to call Brendan King as a witness at trial to testify about Point 2's technology. We will not object if DOJ wishes to reschedule his deposition for some time after Thanksgiving.

-- Scott

Scott D. Stein
Sidley Austin LLP
One South Dearborn St.
Chicago, Illinois 60603
(312) 853-7520 (phone)
(312) 853-7036 (fax)
Assistant: Marcia Cummins (312-853-7252)

Sidley Austin LLP mail server made the following annotations on 11/19/0
-----------------------------------------------------------------------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regul
that, unless expressly stated otherwise, any U.S. federal tax advice co
communication, including attachments, was not intended or written to be
used, by any taxpayer for the purpose of avoiding any penalties that ma
taxpayer by the Internal Revenue Service. In addition, if any such tax
to by other parties in promoting, marketing or recommending any partner
investment plan or arrangement, then (i) the advice should be construed
with the promotion or marketing by others of the transaction(s) or matt
communication and (ii) the taxpayer should seek advice based on the tax
circumstances from an independent tax advisor.

************************************************************************
This e-mail is sent by a law firm and may contain information that is p
If you are not the intended recipient, please delete the e-mail and any
immediately.

************************************************************************

Sidley Austin LLP mail server made the following annotations on 12/03/07, 07:23:4
--------------------------------------------------------------------------------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we
that, unless expressly stated otherwise, any U.S. federal tax advice contained in
communication, including attachments, was not intended or written to be used, and
used, by any taxpayer for the purpose of avoiding any penalties that may be impos
taxpayer by the Internal Revenue Service. In addition, if any such tax advice is
to by other parties in promoting, marketing or recommending any partnership or ot
investment plan or arrangement, then (i) the advice should be construed as writte
with the promotion or marketing by others of the transaction(s) or matter(s) addr
communication and (ii) the taxpayer should seek advice based on the taxpayer's pa
circumstances from an independent tax advisor.

********************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged
If you are not the intended recipient, please delete the e-mail and any attachmen
immediately.

********************************************************************************

Sidley Austin LLP mail server made the following annotations on 12/05/07, 07:52:40:
-----------------------------------------------------------------------------------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform yo
that, unless expressly stated otherwise, any U.S. federal tax advice contained in this
communication, including attachments, was not intended or written to be used, and cannot be
used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such
taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or r

to by other parties in promoting, marketing or recommending any partnership or other entity
investment plan or arrangement, then (i) the advice should be construed as written in conne
with the promotion or marketing by others of the transaction(s) or matter(s) addressed in t
communication and (ii) the taxpayer should seek advice based on the taxpayer's particular
circumstances from an independent tax advisor.

*********************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confide
If you are not the intended recipient, please delete the e-mail and any attachments and not
immediately.

*********************************************************************************

## Kully, David

| | |
|---|---|
| **From:** | Stein, Scott D. [sstein@Sidley.com] |
| **Sent:** | Monday, January 07, 2008 11:14 AM |
| **To:** | Conrath, Craig; Kully, David |
| **Cc:** | Bierig, Jack R. |
| **Subject:** | Point2 |

Craig and David --

Welcome back from what I hope were vacations for you two over the holidays.

Point2 has identified Carey Tufts, Point2's Director of Marketing, as a person knowledgeable about the same issues that we anticipated being the subject of Mr. King's testimony. Given that Brendan King is no longer affiliated with Point2, Mr. Tufts will replace Mr. King on NAR's witness list. We would ask that you keep us in the loop on scheduling a date for his deposition.

Thanks.

-- Scott


Scott D. Stein
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7520
(312) 853-7036 (fax)

Sidley Austin LLP mail server made the following annotations on 01/07/08, 10:10:46:
--------------------------------------------------------------------------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we in
that, unless expressly stated otherwise, any U.S. federal tax advice contained in th
communication, including attachments, was not intended or written to be used, and ca
used, by any taxpayer for the purpose of avoiding any penalties that may be imposed
taxpayer by the Internal Revenue Service. In addition, if any such tax advice is us
to by other parties in promoting, marketing or recommending any partnership or other
investment plan or arrangement, then (i) the advice should be construed as written i
with the promotion or marketing by others of the transaction(s) or matter(s) address
communication and (ii) the taxpayer should seek advice based on the taxpayer's parti
circumstances from an independent tax advisor.

*****************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or
If you are not the intended recipient, please delete the e-mail and any attachments
immediately.


*****************************************************************************

## Finley, Timothy

| | |
|---|---|
| **From:** | Finley, Timothy |
| **Sent:** | Thursday, January 24, 2008 5:38 PM |
| **To:** | 'Stein, Scott D.' |
| **Cc:** | Conrath, Craig; Kully, David; Bierig, Jack R. |
| **Subject:** | RE: Point2 |

Scott,

This summarizes the main points from the phone call that you, Dave and I had today regarding Point2.

- NAR will not ask Point2 to produce documents responsive to our request nos. 1 and 2.

- NAR is unwilling to stipulate that it will not make any arguments relating to Point2's future or potential plans for its NLS technology.

As a result, we will be moving the Court to exclude the testimony of Point2's representative for the reasons set forth in my January 16th email (below).

In response to your January 22nd email, we note first that Point2 has not agreed to produce "virtually all" the documents we requested. Rather, Point2 has refused to produce any documents relating to its business and strategic plans (request no. 1) or the members of its national listing service (request no. 2). I spoke to Point2's in-house counsel again late last week, and he confirmed that Point2 remains unwilling to produce these documents. We also do not know whether Point2 has produced or will produce all documents responsive to our remaining requests.

Second, as Dave and I mentioned during the call today, we plan to file a motion to initiate the formal process for the United States to obtain documents from a Canadian company. As we discussed, this process is burdensome, expensive and slow - often taking months or even years to complete. Resorting to this process puts us at risk of being unable to obtain the documents in time to take Mr. Tufts's deposition before trial.

Finally, there was no directive from Judge Kennelly to take Mr. Tufts's deposition before the end of February, nor did he say anything about this subject. While it might benefit NAR if we took this deposition without the relevant documents, Judge Kennelly did not remotely suggest that we should proceed in this fashion.

Tim

-----Original Message-----
From: Stein, Scott D. [mailto:sstein@Sidley.com]
Sent: Tuesday, January 22, 2008 6:30 PM
To: Finley, Timothy
Cc: Conrath, Craig; Kully, David; Bierig, Jack R.
Subject: Point2


Tim --

NAR has not had any communication with Point2 regarding its response to DOJ's request, NAR has no control whatsoever over Point 2, and NAR declines your invitation to get involved in any dispute between DOJ and Point2. And while we fail to see the relevance, the fact is that Point 2 representatives did not travel to Chicago to meet with us.

It appears from Mr. Golding's e-mail that Point2 has agreed to produce virtually all of what DOJ has requested. And, as you acknowledge, you have not even spoken with Mr. Golding about the nature and extent of their objections. Even assuming that the additional information DOJ is seeking is relevant, and without knowing what Point2's objections are or the bases therefor, we note that DOJ has avenues for obtaining that discovery through formal process, as DOJ alluded to in its filing with the Court following our first status hearing before Judge Kennelly. Moreover, as we have previously noted,

DOJ was prepared to go forward with a deposition of a Point 2 executive without obtaining any document discovery from Point 2 at all.

With respect to the threat to move to exclude Carey Tufts from testifying at trial (we are not calling "Point 2" as a witness), DOJ is of course free to file whatever motions you choose.  Presumably, before filing a motion you will apprise us of the legal and factual basis for the motion.  Suffice it to say, at this point we do not believe that such a basis exists.

Finally, please note that consistent with Judge Kennelly's directive at the last status conference, we would expect DOJ to move forward promptly to take the deposition of Mr. Tufts before the end of February.

-- Scott

-----Original Message-----
From: Finley, Timothy [mailto:Timothy.Finley@usdoj.gov]
Sent: Wednesday, January 16, 2008 4:42 PM
To: Stein, Scott D.
Subject: FW: U.S. v. National Association of Realtors

Scott,

I am forwarding an email from Jason Golding of Point2, in which Point2 refuses to produce any documents relating to its business plans and the members of its listing service.  We called Mr. Golding today in an effort to address his concerns but were unable to reach him.

If NAR still intends to call Point2's representative as a trial witness, we ask that you join us in encouraging Point2 to provide these documents voluntarily.  As a Canadian company, Point2 has no obligation to testify at trial in Chicago, yet has agreed to do so at NAR's request.  Based on the recently produced Sidley documents, we observe that Point2's representatives also agreed to travel to Chicago to meet with NAR's attorneys to discuss anticipated testimony (we do not know whether this meeting actually took place).  In fairness, under the circumstances, NAR should prevail upon Point2 to provide the requested documents voluntarily, without the need for expensive and time-consuming formal process to a Canadian company.

We hope that Point2 will readily agree to produce the documents once its concerns about confidentiality have been addressed.  Failing that, however, Point2 cannot participate in this case as a trial witness on a selective basis while at the same time withholding relevant evidence.  Accordingly, if we are unable to obtain the documents without undue cost and delay, and if NAR still seeks to call a Point2 witness at trial, then the United States will move to preclude any testimony from Point2.

Tim

-----Original Message-----
From: Jason Golding [mailto:jgolding@point2.com]
Sent: Tuesday, January 15, 2008 5:38 PM
To: Finley, Timothy
Cc: Kendler, Owen
Subject: RE: U.S. v. National Association of Realtors

Hi Tim,

Thanks for the call today. I have reviewed the PDF requesting documents.

The following are the applicable documents requested and Point2's intention
to provide or not to provide. I will attempt to provide them before I leave

on holidays as of January 24th, 2008.

1. Business and strategic plans - Will not provide
2. Members - Will not provide
3. Board, Association and MLS members - N/A at present
4. Agreements - Will provide
5. Listing Data Fields - will provide screenshots of listing entry
system
and detailed listings that can be viewed publicly
6. Listing Information - Will provide where available
7. Listings Share - Will provide as available
8. Rules - Will provide as available
9. User Manual - Will provide
10. Compliance - Will provide
11. MLS Membership - N/A at present
12. Listings data - Will provide in aggregate where available
13. DOJ investigation and suit - Will provide as available


My understanding all along that any production of documents by Point2
was
voluntary due to our jurisdiction. This is the basis of us withholding
documents as above. If this is not the case, then I will provide
additional
reasons.

Jason Golding
CFO/General Counsel
Point2 Technologies Inc.
Phone: (306) 955-9736 ext. 215
Fax: (306) 955-0471
www.point2.com

-----Original Message-----
From: Finley, Timothy [mailto:Timothy.Finley@usdoj.gov]
Sent: Tuesday, January 15, 2008 3:11 PM
To: Jason Golding
Cc: Kendler, Owen
Subject: RE: U.S. v. National Association of Realtors


Jason, as discussed during our call today, please let us know when you
expect to send us the documents.  You also mentioned that you may have
some
objections to our requests - please let us know what they are and we
will
try to work with you on that.  Once we agree on a date by which the
documents will be produced, we can then schedule the deposition.
Thanks.

Tim


>  -----Original Message-----
> From:          Kendler, Owen
> Sent: Tuesday, January 15, 2008 4:04 PM
> To:    'jgolding@point2.com'
> Cc:    Finley, Timothy
> Subject:       FW: U.S. v. National Association of Realtors
>
> Jason,
>
> Below is the email with the document request attached.
>
> --Owen
>  -----Original Message-----

3

> From:          Kendler, Owen
> Sent: Wednesday, December 12, 2007 1:51 PM
> To:     'jgolding@point2.com'
> Subject:       U.S. v. National Association of Realtors
>
> Mr. Golding,
>
> Thank you for talking with us about Point2's willingness to voluntary
produce documents to the Division and the status of Mr. King with the
company.  As we discussed, I have attached for your review a schedule of
the
documents to be voluntarily submitted.  Let me know if you have any
difficulty opening the pdf.  We look forward to discussing our requests
with
you once you have had the opportunity to look them over.
>
> Please let us know at your earliest convenience if Mr. King or an
another
Point2 representative will be appearing as a trial witness for the NAR
and
whether Point2 will agree to voluntarily comply with our requests.
>
> Thank you,
> Owen
>
>   << File: 54704_1.pdf >>
> Owen Kendler
> Trial Attorney
> Antitrust Division, Litigation III
> United States Department of Justice          Tel:    (202)
305-8376
> 325 Seventh St., N.W.        Fax:   (202) 514-7308
> Suite 300, LPB
> Washington D.C. 20530   (FedEx Zip: 20004)
>
>


Sidley Austin LLP mail server made the following annotations on 01/22/08, 17:26:08:
-------------------------------------------------------------------------------
-----------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform
you
that, unless expressly stated otherwise, any U.S. federal tax advice contained in this
communication, including attachments, was not intended or written to be used, and cannot
be
used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on
such
taxpayer by the Internal Revenue Service.  In addition, if any such tax advice is used or
referred
to by other parties in promoting, marketing or recommending any partnership or other
entity,
investment plan or arrangement, then (i) the advice should be construed as written in
connection
with the promotion or marketing by others of the transaction(s) or matter(s) addressed in
this
communication and (ii) the taxpayer should seek advice based on the taxpayer's particular
circumstances from an independent tax advisor.

**********************************************************************************
**********
This e-mail is sent by a law firm and may contain information that is privileged or
confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and
notify us
immediately.

# EXHIBIT 2

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 05 C 5140 |
| | ) |
| vs. | ) Judge Filip |
| | ) |
| **NATIONAL ASSOCIATION OF** | ) Magistrate Judge Denlow |
| **REALTORS®** | ) |
| | ) |
| Defendant. | |

## REPORT OF STEPHEN H. MURRAY

I have been retained to serve as an expert witness for the National Association of

Realtors® ("NAR") in this case concerning several issues relating to the Virtual Office Website

("VOW") Policy that was adopted by NAR in 2003, the Internet Listing Display ("ILD") Policy

adopted by NAR in 2005, and the revised 2005 definition of who may be a "participant" in the

multiple listing service (MLS). For purposes of my report, I will divide the issues on which I

have been asked to provide expert testimony into two areas:

> 1.     The procompetitive justifications for the selective opt-out and the blanket
>
>         opt-out provisions of the VOW Policy[1], and the blanket opt-out provision

---

[1] The opt-out provisions of the 2003 VOW Policy (attached as Exhibit 3) can be found in Section I(3). That section states: "Use of MLS active listing data on a VOW is subject to the permission of the listing brokers whose listings may be available to consumers via a VOW. Unless prohibited by state law or regulation, such permission is presumed unless a listing broker 'opts out' by directing that its or her listings not be available for search or display on the VOWs of other participants. A listing broker may independently elect to opt-out of (i) the VOWs of all other participants in the MLS ('Blanket opt-out'), or (ii) the VOWs of selected other participants determined independently by the listing broker ('Selective opt-out.')"

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

available. In addition to existing MLS software solutions, the Internet could easily serve as the backbone of an alternative to the MLS. Firms like Trulia, Google, Yahoo, MSN, Zillow, and others could replicate the technologies needed to run an MLS or MLS-like facility for sharing of listings and cooperation among brokers almost seamlessly. Likewise, firms like RE/MAX, Prudential, all five Realogy brands (Century 21, Coldwell Banker, Corcoran, ERA and Sotheby's), Keller Williams, Realty Executives and Help-U-Sell already have the technologies to aggregate listing information from their affiliates, and indeed many have already implemented that technology. It would not be terribly difficult for these networks to make that aggregated listing inventory available to their affiliates and those from other nationally-branded real estate organizations. The listing inventory of firms associated with the national franchise brands, together with that of leading independent non-branded firms, would in many or perhaps even most markets approach or exceed 60-65% of all listed properties.

The technology has further evolved to enable even small firms or groups of brokers to share listings or offer cooperation to one another. Brokers could enter into data sharing agreements, often referred to as "peer-to-peer arrangements," with other brokers. Such data sharing agreements would give the participating brokers access to a large percentage of available properties. Moreover, the technology to facilitate peer-to-peer data sharing arrangements is available and inexpensive. As far back as 1997, IKON Office Solutions had developed a Java application that would have created an easy to manage peer-to-peer network capability.

Today, other companies like Point2 Technologies provide accessible and convenient capability to create MLS-like systems through their custom "handshake" system, where sales professionals can agree to share listings on each others sites with but one mouse

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

click, including an offer of compensation to one another.[13]   According to its website, as of April 2007, Point2NLS (which stands for "national listing service") had almost 123,000 members sharing well over half a million listings directly with each other, and is adding over 200 new members each day.[14]   Without doubt there are others who either have this technology available or could quickly develop it.

For these reasons, I conclude that the threat that brokers would withdraw from MLSs in 2003 over concerns about the VOW Policy was credible, and that it was therefore reasonable and procompetitive for NAR to include the opt-out safety valve as part of the VOW Policy in order to deter such withdrawals.

### c.   NAR Was Correct To Conclude That Opt-Outs, While Important To Provide For, Would Rarely Be Exercised

I also conclude that NAR was correct in its assessment that the opt-out provisions were safety valves that would rarely be exercised.  My conclusion is based on a number of considerations.

First, my conclusion is based on my personal interactions with senior executives of dozens of leading real estate brokerage firms from across the nation.  Discussions with these executives in the spring of 2003 revealed a common belief that there should be both blanket and selective opt-out provisions in the VOW Policy.  However, none of the executives with whom I spoke ever indicated that they planned to exercise any opt-out right, or indicated a desire to exercise the opt-out right.  Rather, they emphasized the importance of the opt-out as a safety valve if a broker engaged in practices that undermined their ability to serve their clients.

---

[13] http://nls.point2.com/Content/Documents/NLS-principles-practices.pdf.

[14] http://www.point2nls.com/Content/Statistics.asp

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

Significantly, the referral rule addressed only one form of misuse or "free riding" on the MLS. As noted above, free-riding occurs whenever the MLS is used for purposes other than brokering the sale of the residential real property. Because the referral rule was under inclusive, it made sense to create a broad based rule. The NAR was also challenged in trying to draft the policy to create language that identified what behaviors they were trying to identify. The revised definition of "participant" more clearly defines and captures the fundamental purpose of the MLS. It guards against use of the MLS by those who may have a real estate license but who would use the MLS for reasons other than real estate brokering, in a straightforward effort to prevent free-riding generally.

Date: May 1, 2007

Stephen H. Murray

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ) | |
| UNITED STATES OF AMERICA ) | |
| ) | Civil Action No. 05 C 5140 |
| Plaintiff, ) | |
| ) | Judge Filip |
| v. ) | |
| ) | Magistrate Judge Denlow |
| NATIONAL ASSOCIATION OF ) | |
| REALTORS® ) | |
| ) | |
| Defendant. ) | |
| ) | |

**Expert Report of Fredrick A. Flyer**

August 1, 2007

*CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER*

allows agents and brokers to post their listings at no charge.[55] Zillow allows sellers (e.g., FSBOs) as well as brokers and agents to post listings on their site, also at no charge.[56] Zillow and Trulia were recently reported to be among the most frequently trafficked real estate related websites on the Internet.[57]

53.    Notably, many brokers have embraced the concept of providing consumers with direct access to information about listings through these third-party Internet websites.  For example, Realogy, which owns major franchises such as Coldwell Banker, Century 21, and ERA, as well as the largest brokerage in the U.S. (NRT), recently announced plans to submit its listings, which number over 500,000, to Google Base and Trulia.[58]  Similarly, the Houston Association of Realtors® submits all of its listings to Google Base.[59]  Other significant brokers in large markets have likewise embraced this form of direct dissemination of listing information to consumers.[60]

54.    Furthermore, new technologies are making it less cumbersome for listing brokers to place their listings on various websites.  For example, Point2 is a company that allows brokers to automatically "syndicate" their listings to several websites, including Trulia, Google Base, and Yahoo! Classifieds, at little cost to the broker.[61]  Point2 also has developed

---

[55]  See http://www.trulia.com/ (last visited on August 1, 2007) and Trulia Real Estate Search – FAQ http://www.trulia.com/faq/ (last visited on August 1, 2007)

[56]  See http://www.zillow.com/ (last visited August 1, 2007) and Zillow – About Zillow – Home Real Estate Valuation, Services, The Big Question, http://www.zillow.com/corp/HowZillowMakesMoney.htm (last visited on August 1, 2007)

[57]  See "Monthly Internet Traffic Reports" for January, February, and March available on at: NAR Website Traffic Statistics: 2007, http://www.realtor.org/realtororg.nsf/pages/sitetraffic?OpenDocument (last visited August 1, 2007)

[58]  "Realogy Announces Comprehensive Online Listings Distribution  Strategy," Realogy Press Release, March 2, 2007, http://www.realogy.com/media/pr/show_release.cfm?id=329 (last visited on August 1, 2007)

[59]  Deposition of Curtis Robert Hale, III, March 16, 2007, p. 141.

[60]  http://www.trulia.com/testimonials/ (last visited August 1, 2007)

[61]  Point2 NLS, Listing Syndication, http://nls.point2.com/Content/FeaturesServices/SyndicationAdvertising.asp (last visited August 1, 2007).  The websites to which brokers can "syndicate" their listings through Point2 include Google

peer-to-peer technology (referred to as "handshake") that allows brokers to directly share listings with one another, rather than through the MLS.[62]

55.    The abundance of websites that provide consumers access to MLS and non-MLS listings illustrate that Internet access to listings is not dependent on VOWs. Further, as I explain in Section IV, these sites provide a range of information that appears to be valued by consumers. Also, as I discuss in that section, the comprehensiveness or completeness of VOW listings does not appear to distinguish VOWs from IDX or other sites. Ultimately, the fact that these many alternative sites are not only common but popular suggests that the information on these sites provides a good substitute for Web-based access to property listings available via VOWs.

### C.    VOWs Are Not Distinguished by Increased Productivity, Unique Non-Price Benefits, or Broker Discounting

56.    Dr. Vistnes asserts that consumers benefit from VOWs because brokers operating VOWs are more productive.[63] He states that this productivity advantage derives from the fact that VOWs allow brokers to offload much of their work to the client and, hence, saves broker resources. Dr. Vistnes further claims that due to these productivity advantages, consumers not only receive better service from VOWs, but also pay lower fees because of significant rebates.[64] These alleged better services include lower-cost, expedited transactions, as well as non-pecuniary benefits such as automated search processes, property

---

Base, Yahoo! Classifieds, NYTimes.com, Point2 Homes, Trulia, Oodle, PropSmart, Edgeio, RealEstateAdvisor.com, US Condo Exchange, LiveDeal.com, LiveDeal.ca, Craigslist, HotPads.com, Vast.com, CityCribs.com, Propbot.com, House.com, VideoHomes.com, TheHousingPages.com, Backpage.com, and eBay. Realtown: Point2 NLS Expands Real Estate Listing Syndication Network, http://www.realtown.com/articles/technology/point2-nls-expands-real-estate-listing-syndication-network (last visited August 1, 2007)

[62]   Point2 NLS, Listing Syndication, http://nls.point2.com/Content/FeaturesServices/SyndicationAdvertising.asp (last visited August 1, 2007)

[63]   Expert Report of Dr. Vistnes, pp. 24-34.

[64]   Expert Report of Dr. Vistnes, p. 16.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this $\underline{\phantom{1}}$ day of August, 2007

Fredrick A. Flyer, Ph.D.

# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

UNITED STATES OF AMERICA,    )

           Plaintiff,    )

      vs.                     )    Civil Action

NATIONAL ASSOCIATION OF     )    No. 05 C 5140

REALTORS,                   )

          Defendant.    )

The videotaped deposition of

DR. FREDRICK FLYER, called as a witness for

examination, taken pursuant to the Federal Rules of

Civil Procedure of the United States District

Courts pertaining to the taking of depositions,

taken before VICTORIA C. CHRISTIANSEN, a Notary

Public within and for the County of DuPage, State

of Illinois, and a Certified Shorthand Reporter of

said state, CSR No. 84-3192, at Suite 3800, One

South Dearborn Street, Chicago, Illinois, on the

17th day of October, A.D. 2007, at 9:10 a.m.

DR. FREDRICK FLYER,  OCTOBER 17,  2007

Page 47

1          A.     He may have.

2          Q.     Okay.  Has he used those in his

3     discussions with you?

4          A.     He may have.

10:06 5          Q.     Have you relied on those discussions

6     in -- in preparing your report?

7          MR. STEIN:  Object to form.

8     BY THE WITNESS:

9          A.     I don't recall relying on any particular

10:06 10     fact in preparing my report.

11     BY MR. KRAMER:

12          Q.     Do -- do you recall --

13          A.     Did it help my general understanding of

14     what these different -- for example, Point2,

10:07 15     exactly -- my understanding of what their business

16     model is comes from my discussions with Josh Nixt.

17     I don't know that it's pertinent to any of the

18     opinions draw in the report or any of the analysis

19     I undertake.

10:07 20          Q.     But -- but it helped you in

21     understanding the -- the industry?

22          A.     It helped me understand a different type

23     of website that was out there, and it was partly --

24     you know, not just related to the case.  I find

Page 48

1    the -- the development of Inter- -- the Internet

2    and Internet websites interesting, so I found it

3    intellectually interesting.

4         Q.    Are there any other industry

10:07  5    participants other than Ms. Janik and Mr. Holmen

6    and Point2 that you're recollecting Dr. Nixt

7    related information to you about a discussion he

8    had?

9         A.    Well, also Steve Murray.

10:07 10         Q.    Besides him.

11         A.    Based on his discussions?

12         Q.    Yes, sir.

13         A.    Not that I recollect.

14         Q.    Okay.  Did your August 1 expert report

10:08 15    contain a complete statement of all opinions to be

16    expressed in your testimony at the trial of this

17    case?

18         A.    It contained my understanding of what my

19    opinions would be at the time the report was

10:08 20    provided.

21         Q.    Approximately when did you form the

22    opinions to be expressed in your testimony at trial

23    of this case that are contained in your report?

24         A.    When did I form the understanding of my

# EXHIBIT 5

STEPHEN H. MURRAY,  SEPTEMBER  20,  2007

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

UNITED STATES OF AMERICA, )

                    Plaintiff,  ) Civil Action

        vs.                     ) No. 05 C 5140

NATIONAL ASSOCIATION OF    )

REALTORS,                       )

                    Defendant.  )


        The videotaped deposition of

STEPHEN H. MURRAY, called as a witness for

examination, taken pursuant to the Federal Rules

of Civil Procedure of the United States District

Courts pertaining to the taking of depositions,

taken before PAULINE M. VARGO, a Notary Public

within and for the County of DuPage, State of

Illinois, and a Certified Shorthand Reporter of

said state, C.S.R. No. 84-1573, at Suite 3700,

One South Dearborn Street, Chicago, Illinois, on

the 20th day of September, A.D. 2007, at 9:06 a.m.

STEPHEN H. MURRAY, SEPTEMBER 20, 2007

Page 196

```
14:27:57  1    given to me in my work when we were trying to do
14:28:00  2    this.  That wasn't a complete list, but it was a
14:28:03  3    sample of rules.
14:28:06  4              If these brokers, this group that was
14:28:08  5    withdrawing to form something else complied with
14:28:13  6    the rules about membership and admittance and
14:28:17  7    various other things, it would not be
14:28:21  8    anticompetitive necessarily at all.
14:28:23  9    BY MR. KRAMER:
14:28:23 10        Q.    Let's go back to your opinion that
14:28:24 11    threats of withdrawal from an MLS as a result
14:28:26 12    of the VOW policy were reasonable and any such
14:28:30 13    withdrawal would have been harmful to competition.
14:28:33 14    What did you mean there by "harmful to
14:28:35 15    competition," please?
14:28:38 16        A.    Most, if not all, of the new
14:28:41 17    technologies and the platforms that provide
14:28:47 18    MLS-type features, Google, Yahoo, Point 2, AOL,
14:28:56 19    MSN, Trulia -- I could go on -- they have because
14:29:01 20    of their business models larger firms with more
14:29:04 21    listings and more advertising dollars, can purchase
14:29:07 22    and hold the top search positions in those search
14:29:11 23    engines; and therefore, what would end up happening
14:29:13 24    is that the largest firms with the largest budgets
```

STEPHEN H. MURRAY,   SEPTEMBER  20,   2007

Page 197

14:29:15  1   and the largest number of listings and the most

14:29:18  2   traffic and the most references, and there is all

14:29:21  3   kinds of measurements on these sites -- Yahoo is

14:29:24  4   another one -- that the firms that are largest with

14:29:27  5   the most listings would be found first by any

14:29:31  6   consumer doing a search.  That's what I was

14:29:33  7   referring to in that regard.

14:29:38  8       Q.   I am sorry to skip back, but I

14:29:40  9   overlooked a question I meant to ask a little while

14:29:42 10   ago, and when you were talking about groups of

14:29:50 11   brokers threatening to withdraw from an MLS in

14:29:52 12   connection with the VOW opt-out policy, what was

14:29:57 13   your expectation of what the withdrawing brokers

14:30:02 14   that threatened withdrawal would do as a substitute

14:30:06 15   to the original MLS?

14:30:06 16       A.   I just mentioned a number of technology

14:30:09 17   companies and I will mention them again for this

14:30:11 18   particular question.  Google, Yahoo, Trulia, Point

14:30:15 19   2 -- that's with the number "2" after the word

14:30:19 20   "point" -- Reply, Homescape.  I can go on and list

14:30:26 21   numerous companies that have search and retrieval

14:30:30 22   capabilities on a real estate, residential real

14:30:33 23   estate website which would provide most, if not

14:30:38 24   all, of the MLS search and retrieval that's

14:30:40  1   required by consumers, agents and brokers.

14:30:47  2       Q.    Mr. Murray, what information did you

14:30:50  3   consider in reaching your opinion that threats of

14:30:53  4   withdrawal from the MLS as a result of the VOW

14:30:55  5   policy were reasonable and any such withdrawal

14:30:59  6   would have been harmful to competition?

14:31:01  7       A.    As I have just said, most, if not all,

14:31:05  8   of the current technology providers that we are

14:31:08  9   aware of that could replace the technologies

14:31:10 10   provided by MLS provide for a bias in the search

14:31:15 11   for property, and the bias can favor and does often

14:31:21 12   favor the largest, the ones who spend the most, the

14:31:24 13   ones who have the most listings and so on and so

14:31:27 14   forth, which is contrary to the way MLSs operate

14:31:31 15   today.

14:31:32 16       Q.    And do the technology companies that you

14:31:33 17   just referenced permit the exchange of offers of

14:31:37 18   cooperation and compensation?

14:31:38 19       A.    Not today, not to my knowledge.

14:31:40 20       Q.    Do you have any knowledge of them

14:31:45 21   offering that in the near future?

14:31:46 22       A.    I know of at least one company that is

14:31:48 23   building that into their capabilities already.

14:31:51 24       Q.    What company is that?

Page 199

14:31:51  1        A.     Point 2 Technologies.

14:31:54  2        Q.     And would you elaborate on what you know

14:31:56  3   about that, please?

14:31:56  4        A.     I know that they are building in fields

14:32:00  5   into their data that has to do with the offer of

14:32:05  6   compensation and the offer to cooperate with

14:32:10  7   agents.  They also are one of the few that operate

14:32:14  8   within the Point 2 system what we would refer to

14:32:16  9   as a peer-to-peer networking system where agents

14:32:21 10   and/or brokers now can execute what's called a

14:32:26 11   handshake.  That is, if I am an agent and put my 20

14:32:29 12   listings on my personal site and you are an agent

14:32:31 13   in the same market with your 20 listings, if we

14:32:34 14   both agree to a handshake, then my listings are on

14:32:37 15   your page and your listings are on my page, which

14:32:40 16   now broadens the number of potential visitors to

14:32:43 17   our mutual site.

14:32:44 18        Q.     So that handshake requires a

14:32:49 19   coordination between individual brokers?

14:32:50 20        A.     Literally it's, you know, do you agree

14:32:54 21   this guy offers you a handshake, and you look at it

14:32:57 22   and you go "I agree," click.  It's automatic.

14:32:59 23        Q.     I take it, though, there are some

14:33:02 24   underlying considerations before agreeing to a

STEPHEN H. MURRAY,  SEPTEMBER 20,  2007

Page 200

14:33:03  1   handshake?

14:33:04  2        A.    You know, I don't know the level of

14:33:06  3   detail, but as far as I know, the actual if you and

14:33:10  4   I knew each other and respect each other and both

14:33:13  5   wanted to exchange listings, it would be a matter

14:33:17  6   of those two mouse clicks.

14:33:18  7        Q.    Let's go back to the opinion we were

14:33:21  8   discussing about, and let's go to the other facet,

14:33:24  9   the threats of withdrawal from the MLS as a result

14:33:28 10   of the VOW policy were reasonable.  What

14:33:30 11   information did you consider in reaching that facet

14:33:34 12   of the opinion?

14:33:35 13        A.    Discussions with numerous brokers and

14:33:37 14   reading of some documents that they had written.

14:33:47 15        Q.    Anything else, sir?

14:33:49 16        A.    No.

14:33:52 17        Q.    And are the discussions that you are

14:33:53 18   talking about with numerous brokers the ones that

14:33:57 19   we were discussing before the last break?

14:33:59 20        A.    Some of them were in those discussions,

14:34:01 21   yes.

14:34:04 22        Q.    Which brokers do you remember

14:34:08 23   specifically then in connection with those

14:34:16 24   discussions that we are talking about now as

# EXHIBIT 6

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05C-5140 |
| | ) | |
| v. | ) | Judge Filip |
| | ) | |
| **NATIONAL ASSOCIATION OF REALTORS,** | ) | Magistrate Judge Denlow |
| | ) | |
| Defendant. | ) | |

<u>**NOTICE OF DEPOSITION OF BRENDAN KING**</u>

TO:    Jack R. Bierig, Counsel for Defendant National Association of Realtors

PLEASE TAKE NOTICE that counsel for the United States shall take the deposition of

**Brendan King**, upon oral examination pursuant to Rule 30 of the Federal Rules of Civil

Procedure on the 19th of November 2007, commencing at 9:30 a.m. (CST), at the offices of

Point2 Technologies, Inc., 500 - 3301 8th Street East, Saskatoon, SK, S7H 5K5, Canada, at

which time and place you may appear and examine this person if you so desire. Testimony shall

be recorded by videographer and stenographic means.

UNITED STATES OF AMERICA

By:    Owen M. Kendler
       U.S. Department of Justice
       Antitrust Division
       325 Seventh Street, NW, Suite 300
       Washington, DC 20530
       Tel: (202) 305-8376
       Fax: (202) 514-7308

Dated: October 1, 2007
cc: Jason Golding, CFO & General Counsel of Point2 Technologies, Inc.

## CERTIFICATE OF SERVICE

I, Owen M. Kendler, certify that on this 1st day of October, 2007, I caused a copy of the DEPOSITION NOTICE OF BRENDAN KING to be served on the person listed below by electronic mail.

Jack Bierig, Esq.
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
phone: 312-853-7614
fax: 312-853-7036
e-mail: jbierig@sidley.com

Counsel for Defendant NAR

_____
Owen M. Kendler

# EXHIBIT 7

| | |
|---|---|
| **From:** | Brendan King <bking@point2agent.com> |
| **Sent:** | Monday, October 1, 2007 4:10 PM |
| **To:** | Stein, Scott D. <sstein@Sidley.com>; Jason Golding <jgolding@point2.com> |
| **Subject:** | RE: exchange of emails |

Thanks for the invite I will get back to you with our flights and hotel.  It would be great if you could put together a concise agenda covering the topics you would like to cover.   If may be that there is no specific agenda and so alternatively the people that will attend may best serve as a preparation tool.

See you on the 29th

**Brendan King**
**COO Point2**
BKing@Point2.com
www.Point2.com
www.Point2homes.com
http://point2agent.wordpress.com
ph 306.955.9736 ext 212
Cell 306.717.380

**From:** Stein, Scott D. [mailto:sstein@Sidley.com]
**Sent:** October 1, 2007 2:43 PM
**To:** Jason Golding; Brendan King
**Subject:** RE: exchange of emails

Brendan and Jason --

We look forward to meeting with you on October 29.  The meeting will be at our office, the law firm of Sidley Austin LLP, One South Dearborn St., Chicago, IL, 60603. When you arrive, you will be directed to the 37th floor.

I recommend that you fly into O'Hare Airport.  The closest hotel is called Hotel Burnham (a Kimpton hotel), and is two blocks away. The Palmer House Hilton is also a couple of blocks away, though it's a little older.  Let's plan on meeting at 9:30.

-- Scott

**From:** Jason Golding [mailto:jgolding@point2.com]
**Sent:** Monday, October 01, 2007 3:18 PM
**To:** Brendan King; Stein, Scott D.
**Subject:** RE: exchange of emails

Hi Scott,

See my contact info below.

Jason Golding
CFO/General Counsel
Point2 Technologies Inc.
Phone: (306) 955-9736 ext. 215
Fax: (306) 955-0471
www.point2.com

**From:** Brendan King
**Sent:** Monday, October 01, 2007 2:11 PM
**To:** Jason Golding; Stein, Scott D.
**Subject:** exchange of emails

Confidential

SIDLEY000647

Here they are.

**Brendan King**
**COO Point2**
BKing@Point2.com
www.Point2.com
www.Point2homes.com
http://point2agent.wordpress.com
ph 306.955.9736 ext 212
Cell 306.717.380


Sidley Austin LLP mail server made the following annotations on 10/01/07, 15:40:03:
------------------------------------------------------------------------------------------------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you
that, unless expressly stated otherwise, any U.S. federal tax advice contained in this
communication, including attachments, was not intended or written to be used, and cannot be
used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such
taxpayer by the Internal Revenue Service.  In addition, if any such tax advice is used or referred
to by other parties in promoting, marketing or recommending any partnership or other entity,
investment plan or arrangement, then (i) the advice should be construed as written in connection
with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this
communication and (ii) the taxpayer should seek advice based on the taxpayer's particular
circumstances from an independent tax advisor.

*****************************************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

*****************************************************************************************************

Confidential

# EXHIBIT 8

## Kendler, Owen

| | |
|---|---|
| **From:** | Kendler, Owen |
| **Sent:** | Wednesday, December 12, 2007 1:51 PM |
| **To:** | 'jgolding@point2.com' |
| **Subject:** | U.S. v. National Association of Realtors |

Mr. Golding,

Thank you for talking with us about Point2's willingness to voluntary produce documents to the Division and the status of Mr. King with the company.  As we discussed, I have attached for your review a schedule of the documents to be voluntarily submitted.  Let me know if you have any difficulty opening the pdf.  We look forward to discussing our requests with you once you have had the opportunity to look them over.

Please let us know at your earliest convenience if Mr. King or an another Point2 representative will be appearing as a trial witness for the NAR and whether Point2 will agree to voluntarily comply with our requests.

Thank you,
Owen



54704_1.pdf

Owen Kendler
Trial Attorney
Antitrust Division, Litigation III
United States Department of Justice
325 Seventh St., N.W.
Suite 300, LPB
Washington D.C. 20530  (FedEx Zip: 20004)

Tel:  (202) 305-8376
Fax:  (202) 514-7308

1

## SCHEDULE OF DOCUMENT REQUESTS FOR
## POINT2 TECHNOLOGIES, INC.

### I. INSTRUCTIONS

1.      Unless otherwise specified, the documents requested in this schedule are only those documents in the possession, or custody of Point2 Technologies, Inc. ("Point2") that were applicable, prepared, dated or received at any time from January 1, 2004, to the present.  Please refer to the appendix below for definitions of many of the terms used in this schedule.

2.      Please produce documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in this schedule.  In either event, please identify the persons from whose files the documents have been taken for production.  When documents that in their original condition were stapled, clipped, or otherwise fastened together please produce them in such form.

3.      Please produce documents or data maintained by Point2 in electronic form in a reasonably accessible electronic form.  Contact the attorneys for the United States to determine, with the assistance of the appropriate government technical officials, how to produce the information in data formats and choices of media that will be accessible to the government's equipment and resources.  When Point2 provides documents or data in electronic form, it should also provide documents sufficient to show what information is contained in the data and how it is obtained, such as a data manual or data entry instructions.

4.      To the extent Point2 objects to the production of any document or portion of a document based on a claim of privilege, please identify the nature of the privilege (including work product) that is being claimed and provide (a) the type of document, *e.g.*, letter or memorandum; (b) the general subject matter of the document; (c) the date of the document; and (d) such other

information as is sufficient to identify the document, including, the author of the document, the

addressees of the document, and any other recipients shown in the document.

## II. DOCUMENT REQUESTS

1.    **Business and Strategic Plans**.  Excluding documents related solely to Point2's

heavy equipment business, please submit:  (a) one example of each document that Point2 provided

its investors or creditors, or to potential investors or creditors; (b) all strategic plans, business

plans, and forecasts prepared by, reviewed by, or disseminated to Point2's senior management;

and (c) all documents prepared by, reviewed by, or disseminated to Point2's senior management

relating to entities that Point2 considers to be its competitors in any market for any product or

service that Point2 provides or has considered providing.

Attached to this Schedule of Document Requests is a December 11, 2007 article

from *Inman News* about recent executive resignations at Point2.  Please provide all documents

regarding Point2's "new directions" and "strategy and direction going forward" as discussed in the

*Inman News* article.

2.    **Members**.  Please submit documents sufficient to show:  (a) each real estate broker

who is or, since January 1, 2004, has been, a member of or subscriber to Point2's NLS; (b) the

name, address, and telephone number of the brokerage company with which each such broker is or

was affiliated; (c) any identifying code or number that Point2 uses or used to refer to each such

broker; and (d) the multiple listing service(s) to which the broker belongs.

3.      **Board, Association, and Multiple Listing Service Members**.   Please submit documents sufficient to identify each board or association of realtors, or multiple listing service who is or, since January 1, 2004, has been, a customer of Point2; and any identifying code or number that Point2 uses or used to refer to each such customer.

4.      **Agreements**.  One example of each agreement that Point2 establishes with agents or brokers (*e.g.*, the standard, professional, and premium agreements); and one example of each agreement that Point2 establishes with multiple listing services, boards, or associations.

5.      **Listing Data Fields**.  Documents (such as forms for submitting listings and the instructions for such forms) sufficient to show the fields or categories of real estate listing information that: (a) brokers are required to provide when submitting a listing to Point2; (b) brokers are permitted to provide when submitting a listing to Point2; (c) Point2 displays on its website with each property listing; (d) Point2 makes available to brokers for display to display on their public websites with each property listing; and (e) members or participants in Point2's NLS are able to access or view about listings submitted to Point2's NLS by other members or participants.

6.      **Listing Information**: Documents sufficient to show the number and percentage of active listings maintained by Point2 that include:  (a) a cooperative compensation offer; (b) the listing's street address; (c) the listing's multiple listing service number (*i.e.* the number assigned to the listing by the broker's local or regional MLS); (d) past price changes for the listing; (e) showing instructions; and (f) days on market.

7.      **Listings Share**: Documents discussing the share or percentage of active listings in any area within the United States displayed by Point2 or represented in Point2's NLS.

8. **Rules**. One copy of each set of current or past rules, regulations, policies, or principles relating to Point2's NLS, listings, arbitration, or ethics.

9. **User Manuals**. One copy of each set of user manuals or instructions relating to the use of Point2 by multiple listing services, boards or associations of realtors, brokers, or other real estate professionals.

10. **Compliance**. Documents sufficient to show how Point2: (1) enforces its rules, regulations, policies, or procedures; and (2) ensures the accuracy and timeliness of listings, data fields concerning the listings, and the status of the listings (*e.g.* active, pending, withdrawn, under contract, sold).

11. **MLS Membership**. Each document discussing the withdrawal from any multiple listing service by any Point2 member or participant, or the participation or non-participation of any Point2 member or participant in any multiple listing service.

12. **Listings data**. All listings data, including all data relating to any active listings, expired listings, withdrawn listings, or listings of properties that were sold for the following metropolitan areas and regions:

| Atlanta and Dekalb County, GA | Ithaca, NY |
|---|---|
| Austin, TX | Jackson, WY |
| Bakersfield, CA | Las Vegas, NV |
| Boston and Central Massachusetts | Maine |
| Charlotte, NC | Monroe County, FL |
| Chicago, IL | Orlando, FL |
| Cleveland, OH | Philadelphia, PA |
| Columbia, NY | Phoenix, AZ |

| Dallas/Fort Worth Region | Portland, OR |
|---|---|
| Denver, CO | San Diego, CA |
| Detroit, MI | Tampa, FL |
| Emporia, KS | Tulsa, OK |
| Fargo, ND | Washington/Baltimore Region |
| Hays KS | York, PA |

The United States is prepared to discuss the contours of the above areas with Point2 and to provide Point2 metrics (*e.g.* county names or zip codes) that would give greater definition to the this request. In the alternative, if it is easier for Point2 to produce the all listings in the United States rather than for the select market areas, the United States would be willing to take receipt of the larger database.

13. **DOJ investigation and suit**. Each document discussing the lawsuit in which this document request was issued (*United States v. National Association of Realtors*, Civil Action No. 05 C 5140 (N.D. Ill.)), or the Department of Justice investigation that preceded the filing of this lawsuit, including all communications with the National Association of Realtors and its representatives (*e.g.* attorneys and experts).

IV.  APPENDIX

The United States sets forth the following definitions applicable to this schedule:

A.      "Point2" means Point2 Technologies, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.

B.      "And" and "or" are terms of inclusion and not of exclusion, and shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this Schedule any document or response that might otherwise be construed to be outside its scope.

Point2 -- Page 5

C.    "Broker" means a person licensed by a state to provide services to a buyer or seller in connection with a real estate transaction. The term includes any person who lawfully possesses a broker's license, any Realtor, and any agent or sales associate who is affiliated with a broker.

D.    "Cooperative compensation offer" means the compensation offered by an agent or broker to other agents or brokers for their services in the sale of the agent or broker's listing, or how the term is otherwise defined by the National Association of Realtors in its *Handbook on Multiple Listing Policy* (2007).

E.    "Discussing" means analyzing, constituting, summarizing, reporting on, commenting on, considering, recommending, setting forth, or describing a subject, regardless of the length of the discussion. Documents that merely mention or refer to a subject without further elaboration do not discuss that subject. Documents discussing a particular subject include all documents that contain reports, studies, forecasts, analyses, calculations, plans, proposals, evaluations, recommendations, directives, procedures, policies, guidelines, or any other comments that address or concern the subject.

F.    "Document" means all written, recorded, and graphic materials and all electronic data of every kind in the possession, custody, or control of the company. The term "documents" includes spreadsheets, as well as underlying cell formulae and other codes. The term "documents" also includes electronic mail messages and other documents and data stored in, or accessible through, computer or other information retrieval systems, such as personal computers, portable computers, workstations, portable or removable storage media, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of online or offline storage, whether on or off company premises.

G.    "Each" includes "every" and vice versa.

Point2 -- Page 6

H.     "Including" means including, but not limited to.

I.     "Listing" means a record of a residential property for sale and any information relating to that property stored or maintained by Point2's MLS.

J.     "MLS" means a multiple listing.

K.     "Person" means any natural person, corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office or other business or legal entity, whether private or governmental.

L.     "Plans" means tentative and preliminary proposals, recommendations, or considerations, whether or not finalized or authorized, as well as those that have been adopted.

M.     "Point2's NLS" refers to Point2's national listing and advertising service for real estate professionals, or how the term is otherwise defined in Point2's *Principles & Practices* (2007) or on its website at http://nls.point2.com/Content/FAQ.asp as of December 11, 2007.

N.     "Relating to" means, in whole or in part, discussing, describing, pertaining to, referring or alluding to, reflecting, containing, analyzing, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, or concerning.

O.     "Rule" means any bylaw, policy, guideline, operating procedure, operating rule, or other agreed upon practice, whether formal or informal.

## Finley, Timothy

| | |
|---|---|
| **From:** | Jason Golding [jgolding@point2.com] |
| **Sent:** | Monday, February 04, 2008 3:01 PM |
| **To:** | Finley, Timothy |
| **Cc:** | Kendler, Owen |
| **Subject:** | RE: U.S. v. National Association of Realtors |
| **Signed By:** | jgolding@point2.com |
| **Security Label:** | Signed |

Hi Tim,

In response to your last email below, I shall note the following:

1. I am unfamiliar with any correspondence between our employees and Joshua Nixt. I have personally never heard the name. We had a number of senior employees resign on December 3, 2007. I can not say for certain that one or more of them did not have correspondence with Mr. Nixt but his name was never mentioned in any executive or manager meetings to my knowledge. If you have knowledge of correspondence between any of said employees and Mr. Nixt, please indicate the applicable employees and we will search their records and/or attempt to contact them to derive the applicable documentation.

2. As per your questions:

   *"First, could you explain what you mean when you write that Point2 has "provided the documents that we have identified as relevant." Does this mean that you have provided all documents responsive to the requests, or is it possible that certain responsive documents were not produced because Point2 determined they were not relevant?"*

   The answer is that we have provided all documents responsive to the requests.

   *"Second, were the documents produced by Point2 prepared or used during the ordinary course of its business, or were some of them created for the purpose of responding to our request for documents?"*

   These documents were used in the ordinary course of our business.

   *"Third, we did not see any documents that appear to come from Carey Tufts' files. If it has not done so already, would Point2 be willing to search his files as well?"*

   Mr. Tuft's stepped into a senior position after the aforementioned resignations and as such has had no contact before or subsequent to NAR employees. While he may have prepared documents in his own files, Point2 employees a "wiki" document sharing concept so they are available to other employees. Mr. Tufts has posted on www.reliberation.com extensively as the editor of said blog. His posts are catalogued fully for the public at such site. I doubt that many of said documents and/or posts are relevant, but I will let you and your staff be the judge of that by reviewing said site as you desire.

Regards,

Jason Golding
CFO/General Counsel
Point2 Technologies Inc.
Phone: (306) 955-9736 ext. 215
Fax: (306) 955-0471
www.point2.com

-----Original Message-----
From: Finley, Timothy [mailto:Timothy.Finley@usdoj.gov]
Sent: Tuesday, January 29, 2008 2:07 PM
To: Jason Golding
Cc: Kendler, Owen
Subject: RE: U.S. v. National Association of Realtors

Jason,

To answer the first of your questions, our request does include
documents or internal notes or e-mails relating to communications
between Point2 and NAR's outside legal counsel.  As to your second
question, we believe that Point2 communicated on one or more occasions
with Joshua Nixt, a consultant retained by NAR in this case, and
possibly others in the same communication(s).  We ask that Point2
produce any documents, internal notes or e-mails embodying or relating
to these communications.  We do not know if there are other documents
embodying or relating to  communications between Point2 and any other
NAR employees or representatives, so we are asking that those be
produced if they exist.

With respect to our document request no. 1, we have already sought to
make this request as narrow as possible.  We are unable to narrow it
further without possibly excluding relevant documents, especially since
we do not know what responsive documents Point2 has.  If there is a
specific type of document that you believe can be excluded from your
response without compromising our need to obtain relevant documents, we
can discuss this with you.

As to request no. 2, we tried to reconstruct information about Point2's
members using publicly available information from its website, but were
unable to do so in a systematic or reliable way.  If this information is
publicly available, we believe Point2 should be willing to provide it to
us in a readily accessible form.

As I mentioned earlier, there is a protective order in this case which
protects confidential third party information from unnecessary
disclosure.  Like other third parties who have produced evidence in this
case, Point2 can make any production of confidential information subject
to the provisions of this order, a copy of which is enclosed.

Finally, we would appreciate a few clarifications regarding your
responses to the remaining requests.  First, could you explain what you
mean when you write that Point2 has "provided the documents that we have
identified as relevant."  Does this mean that you have provided all
documents responsive to the requests, or is it possible that certain
responsive documents were not produced because Point2 determined they
were not relevant?  Second, were the documents produced by Point2
prepared or used during the ordinary course of its business, or were
some of them created for the purpose of responding to our request for
documents?  Third, we did not see any documents that appear to come from
Carey Tufts's files.  If it has not done so already, would Point2 be

willing to search his files as well?

Thanks and hope you enjoy your holidays.

Tim




-----Original Message-----
From: Jason Golding [mailto:jgolding@point2.com]
Sent: Thursday, January 24, 2008 4:24 PM
To: Finley, Timothy
Cc: Kendler, Owen
Subject: RE: U.S. v. National Association of Realtors


Hi Tim,

As discussed with Owen, I am leaving for holidays today until February
4th.
I have attempted to reply to your queries. Any further inquiries will
have
to wait until after I return from holidays.

I can say that if there is any correspondence between Point and NAR on
the
matter, we have no problem providing such. Does this include NAR's
external
legal counsel as that is, to my recollection, the extent of my contact
with
them?

If you are referring to other correspondence you believe occurred, can
you
please narrow down the individuals in Point2 who you believe has had
such
correspondence so I can derive such from them?

I can confirm that, based on the request made, I have provided the
documents
that we have identified as relevant except for the requests in 1. and 2.
As
discussed, we do not wish to provide the documents in 1. and less the
DOJ is
more specific in said requests. As for question 2., I provided you with
knowledge of where such information can be acquired as public
information
and will not voluntarily turn over customer records.

Regards,

Jason Golding
CFO/General Counsel
Point2 Technologies Inc.
Phone: (306) 955-9736 ext. 215
Fax: (306) 955-0471
www.point2.com

-----Original Message-----

From: Finley, Timothy [mailto:Timothy.Finley@usdoj.gov]
Sent: Thursday, January 24, 2008 12:56 PM
To: Jason Golding
Cc: Kendler, Owen
Subject: RE: U.S. v. National Association of Realtors

Jason,

Thanks for speaking to me on January 15th and again on the 18th
concerning our requests that Point2 voluntarily provide us with
documents in advance of the deposition of Point2's representative, Carey
Tufts.  While we are pleased that Point2 has voluntarily provided some
of the documents we have requested, we need documents responsive to our
first and second requests before we can question Mr. Tufts at deposition
or trial.  Accordingly, we wanted to let you know that we are moving
forward with the letters rogatory process, which as I mentioned is the
formal procedure for the United States to obtain documents from a
Canadian company.

This is a burdensome, expensive and time-consuming process which
typically takes months and sometimes years to complete.  The Court in
our case has ordered that trial begin on July 7, 2008 and has indicated
that the parties should complete any remaining discovery promptly.  For
this reason, we continue to believe that the best course would be for
Point2 to voluntarily provide all of the documents we are requesting.
We note Point2 has agreed - on a voluntary basis and at NAR's request -
to provide a witness at trial.  Point2 should also be willing to
voluntarily provide all documents that are relevant to the testimony of
that witness, and we hope that Point2 will agree to do so.

With respect to our remaining requests, would you please confirm that
all responsive documents have been produced?  We note by way of example
that we did not receive any emails between NAR and Point2 (request no.
13), though we believe such communications occurred.

Tim

-----Original Message-----
From: Jason Golding [mailto:jgolding@point2.com]
Sent: Tuesday, January 15, 2008 5:38 PM
To: Finley, Timothy
Cc: Kendler, Owen
Subject: RE: U.S. v. National Association of Realtors


Hi Tim,

Thanks for the call today. I have reviewed the PDF requesting documents.

The following are the applicable documents requested and Point2's
intention
to provide or not to provide. I will attempt to provide them before I
leave
on holidays as of January 24th, 2008.

1. Business and strategic plans - Will not provide
2. Members - Will not provide
3. Board, Association and MLS members - N/A at present
4. Agreements - Will provide
5. Listing Data Fields - will provide screenshots of listing entry

system
and detailed listings that can be viewed publicly
6. Listing Information - Will provide where available
7. Listings Share - Will provide as available
8. Rules - Will provide as available
9. User Manual - Will provide
10. Compliance - Will provide
11. MLS Membership - N/A at present
12. Listings data - Will provide in aggregate where available
13. DOJ investigation and suit - Will provide as available


My understanding all along that any production of documents by Point2 was
voluntary due to our jurisdiction. This is the basis of us withholding
documents as above. If this is not the case, then I will provide additional
reasons.

Jason Golding
CFO/General Counsel
Point2 Technologies Inc.
Phone: (306) 955-9736 ext. 215
Fax: (306) 955-0471
www.point2.com

-----Original Message-----
From: Finley, Timothy [mailto:Timothy.Finley@usdoj.gov]
Sent: Tuesday, January 15, 2008 3:11 PM
To: Jason Golding
Cc: Kendler, Owen
Subject: RE: U.S. v. National Association of Realtors


Jason, as discussed during our call today, please let us know when you
expect to send us the documents.  You also mentioned that you may have some
objections to our requests - please let us know what they are and we will
try to work with you on that.  Once we agree on a date by which the
documents will be produced, we can then schedule the deposition.
Thanks.

Tim


> -----Original Message-----
> From:         Kendler, Owen
> Sent: Tuesday, January 15, 2008 4:04 PM
> To:   'jgolding@point2.com'
> Cc:   Finley, Timothy
> Subject:      FW: U.S. v. National Association of Realtors
>
> Jason,
>
> Below is the email with the document request attached.
>
> --Owen
> -----Original Message-----

> From:          Kendler, Owen
> Sent: Wednesday, December 12, 2007 1:51 PM
> To:    'jgolding@point2.com'
> Subject:      U.S. v. National Association of Realtors
>
> Mr. Golding,
>
> Thank you for talking with us about Point2's willingness to voluntary
produce documents to the Division and the status of Mr. King with the
company.  As we discussed, I have attached for your review a schedule of
the
documents to be voluntarily submitted.  Let me know if you have any
difficulty opening the pdf.  We look forward to discussing our requests
with
you once you have had the opportunity to look them over.
>
> Please let us know at your earliest convenience if Mr. King or an
another
Point2 representative will be appearing as a trial witness for the NAR
and
whether Point2 will agree to voluntarily comply with our requests.
>
> Thank you,
> Owen
>
>   << File: 54704_1.pdf >>
> Owen Kendler
> Trial Attorney
> Antitrust Division, Litigation III
> United States Department of Justice                  Tel:   (202)
305-8376
> 325 Seventh St., N.W.        Fax:  (202) 514-7308
> Suite 300, LPB
> Washington D.C. 20530   (FedEx Zip: 20004)
>
>

# EXHIBIT 9

Back                                          Send to Printer

# Point2 Technologies confirms group of resignations

## Outgoing COO says departure relates to disagreement

*Tuesday, December 11, 2007*

Inman News

The chief operating officer, chief technology officer and five other leaders at real estate technology and marketing company Point2 Technologies announced their resignations last week, a Point2 spokesman and its former chief operating officer confirmed Monday.

A team of employees, including COO Brendan King, chief technology officer Jason Collins, and vice president of strategy and business development Jeff Tomlin were among the departing group. Jay Thompson, who authors the Phoenix Real Estate Guy blog, suggested in a Friday blog post that something was perhaps askew at Point2. And a related blog posting at the RELiberation site drew scores of comments.

King said he left for personal reasons including a fundamental disagreement with the company's future plans. "I disagreed with the strategy and direction going forward, so I decided to move onto different opportunities," King said. He did not reveal his career plans. He said that the group of employees at Point2 "was a dream team."

"I, as did everyone else, gave a very long resignation period," King said, adding, "I haven't been back to the office as of last Monday. I've been helping over the phone and via e-mail."

The group of departing employees included Jon Levesque, John Fothergill, Greg Miller, Allan Wolinski -- who all worked in the company's real estate division. Chester Hagen, chief operating officer for Point2's heavy equipment division, has also resigned, Noujeim said.

It has been a challenge to fill the roles of the departing employees, said Noujeim. "People are getting figured out -- who's going to assume what role." But he said there will be "no change whatsoever to our customer business or the systems."

The company announced today that company president Barry Willick has assumed the responsibilities of King and Hagen, and, "Recently promoted executives will work together with key departing officials during their respective notice periods to ensure a smooth tradition."

Willick said in a statement today, "It's always hard to see Point2 team members move on, and more so when it is a group of senior staff, even though the core of Point2 maintains a very solid bench of veteran and senior managers. "While many organizations at some point face such departures, this occurrence at Point2 is unfortunate for all our staff, as Point2 staff members are like family."

He added, "Our customers both in real estate and heavy equipment should expect the leadership and investment in technology innovation they are accustomed to seeing from Point2, to continue to forge ahead. All our business, technology systems and operational functions remain on course," and, "we intend to continue to invest in our growth and in new technologies.

Willick said that the executive-level departures "would present magnificent challenges to any organization, including ours," and the vacated positions will be filled internally when possible and also through recruitment efforts if necessary.

The company announced a series of new duties and titles for Point2 employees today in the wake of the resignations. Linda Jame, *manager of the broker division for Point2's real estate business,* has assumed additional responsibility as director enterprise solutions.

Carey Tufts will serve as marketing director, Adnan Fida has been named syndication director, Zach Scott has been promoted to director of systems development, James Townley has been promoted to director of product development, Jennifer Anderson now serves as customer service manager, and Joel Loewen assumes the lead position for Point2's systems department.

Point2 operates an international property advertising and marketing service, dubbed the Point2 National Listing Service or Point 2 NLS, that allows members to forge marketing agreements with other real estate professionals. According to the Point2 NLS Web site, that system has about 163,300 members in 85 countries.

King said Monday that customers of Point2's real estate services "shouldn't feel any visible change," though the company may go in "new directions now." He also said that the workers who resigned would probably "love to come back."

Noujeim said that the company's financial position "remains solid," and there are "no plans to reduce the size of the company. We continue on the same track of innovation. The overall direction where the company is headed remains the same."

He also said there were no plans to terminate the workers who resigned.

In September, the company announced that its CEO and co-founder, Wendell Willick, resigned his position. That same month, he entered a guilty plea in a criminal case that is not related to the company or his work at the company. Point2 announced at the time that Barry Willick, Wendell's brother, would continue to serve as company president and chief technology officer, as the company board determined that an interim CEO position was not necessary.

Point2, which has offices in Saskatoon and Vancouver, Canada, launched in 1996 offering services for heavy-equipment dealers. The company added estate operations in 2003.

\*\*\*

## *What's your opinion? Send your Letter to the Editor to opinion@inman.com.*

Copyright 2007 Inman News

Back          Top          Send to Printer