**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | Civil Action No. 05 C 5140 |
| Plaintiff, | ) | |
| | ) | Judge Kennelly |
| v. | ) | |
| | ) | |
| **NATIONAL ASSOCIATION OF** | ) | |
| **REALTORS®,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**EXHIBITS IN SUPPORT OF**
**UNITED STATES' MOTION IN LIMINE TO EXCLUDE DR. FLYER'S TESTIMONY**
**REGARDING NAR'S ALLEGED PROCOMPETITIVE JUSTIFICATIONS**

## TABLE OF CONTENTS

| Exhibit No. | Exhibit Description |
|---|---|
| 1 | Time line regarding NAR's expert disclosures on procompetitive justifications |
| 2 | NAR letter disclosing procompetitive justifications (April 16, 2007) |
| 3 | Steven Murray Expert Report (May 1, 2007)[1] |
| 4 | Dr. Frederick Flyer Expert Report (August 1, 2007) – *REDACTED*<br><br>*[Contains Confidential Information – Pursuant to Jan 11, 2006 Protective Order, Redacted Version Filed with Clerk of Court and Unredacted Version Submitted Directly to Chambers of Judge Kennelly. D.E. 53 ¶17]* |
| 5 | Transcript of November 13, 2007 hearing before Judge Denlow |
| 6 | Collection of deposition testimony from MLS executives Kathleen E. Condon and Brad Tertell |
| 7 | Collection of deposition testimony from brokers Ken Carter, George Ulrych, and Christopher T. Eigel |
| 8 | Collection of deposition testimony regarding MLS withdrawal from brokers Karen Wass and Christopher T. Eigel |
| 9 | Deposition of Steven Murray (September 20, 2007) |
| 10 | Deposition of Dr. Frederick Flyer (October 17, 2007) |
| 11 | Dr. Frederick Flyer Supplemental Expert Report (February 29, 2008) – *REDACTED*<br><br>*[Contains Confidential Information – Pursuant to Jan 11, 2006 Protective Order, Redacted Version Filed with Clerk of Court and Unredacted Version Submitted Directly to Chambers of Judge Kennelly. D.E. 53 ¶17]* |
| 12 | Deposition of Dr. Frederick Flyer (April 16, 2008) |

---

[1]Although Defendant NAR originally designated Mr. Murray's Report as containing "Confidential Information," NAR has agreed that the portions of his report included in this appendix do not contain "Confidential Information."

# EXHIBIT 1

**EXHIBIT 1**

**Time Line of Events Relating to
<u>NAR's Disclosure of its Procompetitive Justifications</u>**

| DATE | EVENT |
|------|-------|
| 7/11/2006 | Court Orders that NAR "shall disclose in writing all of its procompetitive justifications for the challenged policies along with a list of the MLS areas for which it intends to present evidence by 4/15/2007." D.E. 75. |
| 10/24/2006 | Court Orders NAR to "provide their expert reports on pro-competitive justification and the nature of the market on or by 5/1/07." D.E. 79. |
| 4/16/2007 | NAR sends letter disclosing pro-competitive justifications.  Ex. 2. |
| 5/1/2007 | NAR serves report of industry expert, Steven Murray, providing opinions on NAR's pro-competitive justifications.  Ex. 3. |
| 8/1/2007 | NAR serves report of economic expert, Dr. Frederick Flyer.  At the end of his report, Dr. Flyer provides brief opinions on NAR's pro-competitive justifications.  Ex. 4 at ¶¶ 175-83. |
| 9/20/2007 | United States deposes Mr. Murray.  Ex. 9. |
| 10/17/2007 | United States deposes Dr. Flyer.  Ex. 10. |
| 11/21/2007 | Scheduled close of all discovery. |
| 2/29/2008 | NAR serves Dr. Flyer's supplemental report containing new pro-competitive justifications. Ex. 11 at ¶¶ 93-105.  Dr. Flyer states that another pro-competitive justification for NAR's policies is that they prevent "disruptions and frictions" amongst MLS members even if the policies are not necessary to prevent withdrawal from an MLS. Ex. 11 ¶¶ 95-96. |
| 4/16/2008 | United States deposes Dr. Flyer.  Ex. 12. |

# EXHIBIT 2



SIDLEY AUSTIN LLP
ONE SOUTH DEARBORN
CHICAGO, IL 60603
(312) 853 7000
(312) 853 7036 FAX

jbierig@sidley.com
(312) 853-7614

| | | |
|---|---|---|
| BEIJING | GENEVA | SAN FRANCISCO |
| BRUSSELS | HONG KONG | SHANGHAI |
| CHICAGO | LONDON | SINGAPORE |
| DALLAS | LOS ANGELES | TOKYO |
| FRANKFURT | NEW YORK | WASHINGTON, DC |

FOUNDED 1866

April 16, 2007

**By Email and Mail**

Craig W. Conrath, Esq.
U.S. Department of Justice, Antitrust Division
Liberty Place Building
325 Seventh Street NW
Washington, DC 20530

Re:     U.S. v. National Association of Realtors®, No. 05-C-5140 (N.D. Ill.)

Dear Craig:

In accordance with Magistrate Denlow's July 11, 2006 Order, we are writing to summarize the procompetitive justifications for the VOW and ILD Policies and for the definition of who may be an MLS participant. We focus on those provisions that have been at the center of DOJ's investigation and this litigation: (1) the blanket and selective opt-out provisions of the 2003 VOW Policy, and the blanket and reciprocal opt-out provision of the 2005 ILD Policy; and (2) the referral rule of the 2003 VOW Policy and the 2005 change to the definition of who may be an MLS participant. In addition, we address the issue of specific market areas in which these provisions are expected to have procompetitive effects.

## 1. Opt-Out Provisions

There are two basic procompetitive justifications for the opt-out provisions of the 2003 VOW Policy and the 2005 ILD Policy. First, competition is promoted when a listing broker is permitted to make an independent decision regarding how its listings are used. Indeed, individualized determinations regarding the use of an asset by the owner of that asset is a key element of competition. It would have been anticompetitive for NAR to have dictated to each MLS participant that it had no choice but to make all of its listings available for display on all VOWs of all other MLS participants – regardless of the preferences of the listing broker.

In this connection, it should be noted that NAR does not regard VOWs as mere delivery mechanisms by which a broker transmits specific listing information to specific existing clients – as DOJ has contended. Rather, VOWs are, at least in large measure, promotional devices by which VOW operators exploit the listings of other MLS participants to attract new clients for themselves. In this respect, display of a listing broker's listings on the VOW of another MLS participant is far more analogous to display of those listings in the office window or newspaper advertisements of the other MLS participant than it is to sending specific

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships



Craig W. Conrath
April 16, 2007
Page 2

information to existing clients by facsimile transmission or e-mail. Significantly, such promotional use of a listing broker's listings was never permitted without the consent of the listing broker.

Second, the opt-out provisions of the two Policies enhance competition by assuring that those brokers who do not want to have all of their listings displayed on the VOWs of every other MLS participant need not drop out of the MLS in order to effectuate this choice. The MLS is a powerful procompetitive tool. Its procompetitiveness depends on the percentage of brokers in the geographic market who participate in the MLS. By not forcing listing brokers to withdraw from the MLS if they choose not to authorize display of those listings on every VOW, the opt-out provisions assure the continuing viability and procompetitiveness of MLSs.

The prospect of withdrawal from MLSs by brokers who did not want to be forced to authorize display of their listings on all VOWs was quite real in 2003 – and remains real today. During the formulation and adoption of the VOW Policy, numerous brokers stated that if the VOW rules did not contain a provision allowing them to opt-out, they would have no recourse but to drop out of the MLS. NAR had a very legitimate concern that, without the safety valve of opt-out provisions, brokers might withdraw from the MLS and would instead share listings among themselves or form an alternative MLS or listing-sharing arrangement. Any of these consequences would make MLSs significantly less efficient and effective and would thus make competition by smaller brokers more difficult. Inclusion of an opt-out provision in the 2003 VOW Policy (and later in the 2005 ILD Policy) was therefore intended to preserve the integrity and procompetitiveness of the MLS system.

Notably, most members of the VOW Work Groups, NAR executives, and NAR's Leadership team believed that the number of opt-outs, both blanket and selective, would be small – and that the number of listings that would be unavailable for display on VOWs as a result of opt-outs would also be small. This belief was based on several factors including, inter alia, the following:

- Brokers can use the fact that another broker has opted out in competing for listings by encouraging prospective clients not to engage a broker who provides less than full dissemination on the Internet of the listing of the seller's property;

- Brokers can use the fact that another broker has opted out in competing for agents by advising current or prospective agents that associating with such other brokers may result in their listings not being disseminated on the Internet as widely as possible;

- There was, and had been, relatively little opting out under the IDX Policy where authorization was presumed absent an opt-out;



Craig W. Conrath
April 16, 2007
Page 3

- Opting out was viewed by most who advocated for that option as a "safety valve" to guard against abuses of MLS data or against unforeseen adverse effects of inclusion of a broker's listings on the VOW site of another broker – not as an option that would lightly be chosen.

The selective opt-out provision promoted competition in that it permitted a broker who desired to exercise an opt-out right only with respect to a particular VOW operator or operators not to have to withhold listings from the VOWs of all other VOW operators. The wisdom of this approach has been borne out by subsequent developments. For example, the operators of some internet sites include estimates of the value of the listed property that are substantially less than the listed price which the listing broker is trying to obtain for its client. Similarly, the operators of some internet sites include unflattering comments about the listed property which undermine efforts by the listing broker to sell that property at the listed price. A listing broker would, quite understandably, not want its listings to be displayed on the VOW of an MLS participant who engaged in either sort of practice. However, requiring such a listing broker to opt out against all VOWs simply because the broker wished to opt-out against a particular VOW operator would be to impose a solution more restrictive of competition than necessary.

Finally, NAR had every reason to take seriously suggestions by brokers that they might withdraw from MLSs absent inclusion of opt-out provisions. The people who raised the issue of possible withdrawal from MLSs without the safety valve of an opt-out provision were highly-respected individuals who don't normally make idle threats. Moreover, NAR was aware that brokers dissatisfied with MLS policies had withdrawn from an MLS. NAR recognized also that the technology to effectuate peer-to-peer sharing was available – and that large brokers stood a greater chance of getting both sides of a transaction if they determined not to place their listings on the MLS – but instead just shared those listings with other large brokers. Then too, the existence of areas such as Manhattan and the Hamptons – where there is no MLS – provided further indication that MLSs, as procompetitive as they are, are not indispensable.

In short, giving individual brokers the freedom to make unilateral decisions regarding the appropriate use of their listings is itself procompetitive. In addition, inclusion of the opt-out provisions of the 2003 VOW Policy and 2005 ILD Policy promoted competition by helping to assure the continuing viability and efficiency of MLSs – institutions generally recognized as highly procompetitive.

## 2. The Referral Rule and Revised Definition of MLS Participant

### a.

An MLS has one basic purpose: To enable listing brokers to offer cooperation and compensation to other participating brokers who are in the business of finding buyers for the



Craig W. Conrath
April 16, 2007
Page 4

listed properties. An MLS is not a public utility intended to provide information to entrepreneurs who would like to use information on the MLS to advance the interests of whatever business they might be in. Thus, an MLS is not intended to be a source of information for moving van companies, mortgage brokers, or others who would use the information for their own commercial advantage in a manner that does not directly further the basic purpose of the MLS.

MLS were established, and are operated, by brokers who offer cooperation and compensation to other MLS participants whose business it is to find buyers for the listed properties – and by brokers who find such buyers. The referral rule promotes competition by reducing free-riding on the efforts of such brokers. One example of free-riding on the MLS would be the establishment of a VOW for the purpose of attracting consumers to register and then selling the identity of such registrants as leads to other brokers and agents – without the slightest intention on the part of the VOW operator to use the MLS for the purpose for which the MLS was created and is maintained, _i.e._ to offer cooperation and compensation to those whose business is to find buyers for the listed properties.

To be sure, it can be said – and has been said by DOJ – that a VOW whose purpose is to generate leads for resale to others is indirectly facilitating the brokerage of residential real estate by transmitting leads to real estate licensees who will seek a buyer for the property. But facilitating the operation of a lead generation business by a person who has no intention of finding a willing buyers for listed properties is not the purpose of the MLS. While such a business may be closer to the line than promoting the services of moving van companies or mortgage brokers, it is still free-riding.

In addition, like the opt-out provisions, the referral rule served the procompetitive purposes of helping to assure the continuing viability and efficiency of MLSs. At the time the VOW Policy was being considered, it was thought that brokers might well withdraw from the MLS if their listings were fed to VOW operators who established VOWs principally as a means to generate leads to sell to others. One way to avoid the risk of unraveling of the MLS was to permit opt-outs; another way was to fashion rules prohibiting behaviors likely to lead to such unraveling. The referral rule is an example of the second approach.

**b.**

Because the referral rule appeared in a policy addressing VOWs, it was misperceived as imposing restrictions on use of the internet that did not apply outside of the internet context. In fact, however, the referral rule was, as noted above, directed against free-riding on the MLS by any broker who sought to use listings for purposes other than the basic purpose of the MLS, _i.e._ facilitating the brokerage of residential real estate by the offering of cooperation and compensation to other MLS participants whose business is to find buyers for the properties listed on the MLS. The elimination of the referral rule and its replacement with the revised definition of MLS participants in 2005 were intended to make clear that NAR's purpose



Craig W. Conrath
April 16, 2007
Page 5

was to address free-riding on the MLS generally – not to discriminate against brokers who operate VOWs.

The MLS is a joint venture of brokers for a limited purpose. Competition is promoted by reducing free-riding on a joint venture by those who seek access for purposes other than those for which the venture was established and is operated. Preventing free-riding on the MLS by those who have a real estate license but whose objective in participating in the MLS is something other than directly facilitating the brokerage of listed properties is precisely the purpose of the revised definition of MLS participant. Indeed, the revised definition of MLS participant confirms the procompetitiveness of the 2003 referral rule.

### 3. Disclosure of Specific Market Areas

The 2003 VOW Policy, the 2005 ILD Policy, and the 2005 definition of MLS participant would apply to all of the NAR-affiliated MLSs operating throughout the country. The procompetitive justifications described above were intended to be applicable in every market in which there is a MLS, including each of the markets in which DOJ previously has stated it intends to demonstrate anticompetitive effects.

Of course, the threat of broker withdrawal from the MLS and the extent of free-riding on the MLS will differ from local market to local market. For example, the likelihood of broker withdrawal from the MLS is greater in more concentrated markets. Similarly, the adverse effects of free-riding depend on the practices of specific companies in specific markets. However, NAR had to make, and did make, rules and policies that applied generally and that were thought, on balance, not to be anticompetitive. For this reason, the procompetitive justifications for the policies at issue, unlike claims of anticompetitive consequences, do not depend on a detailed analysis of the facts of specific local markets.

* * *

These disclosures are subject to the same caveats as those made by DOJ in its disclosure of information concerning anticompetitive effects. As you know, discovery in this case is still ongoing. Accordingly, there may be other information of which we are not currently aware. In addition, we anticipate that the exchange of reports by the parties' respective experts on May 1 will result in the disclosure of more specific information by both sides concerning their respective claims of anticompetitive effects or procompetitive justifications.



Craig W. Conrath
April 16, 2007
Page 6


      For now, I trust that this letter provides the information called for by Magistrate Denlow's Order of July 11, 2006. Please let me know if you want to discuss this letter.

Very truly yours,

Jack. R. Bierig

cc: David Kully, Esq.
     Avery Gardiner, Esq.
     Scott D. Stein, Esq.

# EXHIBIT 3

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 05 C 5140 |
| ) | |
| vs. ) | Judge Filip |
| ) | |
| **NATIONAL ASSOCIATION OF** ) | Magistrate Judge Denlow |
| **REALTORS®** ) | |
| ) | |
| Defendant. | |

## <u>REPORT OF STEPHEN H. MURRAY</u>

I have been retained to serve as an expert witness for the National Association of

Realtors® ("NAR") in this case concerning several issues relating to the Virtual Office Website

("VOW") Policy that was adopted by NAR in 2003, the Internet Listing Display ("ILD") Policy

adopted by NAR in 2005, and the revised 2005 definition of who may be a "participant" in the

multiple listing service (MLS). For purposes of my report, I will divide the issues on which I

have been asked to provide expert testimony into two areas:

1.      The procompetitive justifications for the selective opt-out and the blanket

opt-out provisions of the VOW Policy[1], and the blanket opt-out provision

---

[1] The opt-out provisions of the 2003 VOW Policy (attached as Exhibit 3) can be found in Section I(3). That section states: "Use of MLS active listing data on a VOW is subject to the permission of the listing brokers whose listings may be available to consumers via a VOW. Unless prohibited by state law or regulation, such permission is presumed unless a listing broker 'opts out' by directing that its or her listings not be available for search or display on the VOWs of other participants. A listing broker may independently elect to opt-out of (i) the VOWs of all other participants in the MLS ('Blanket opt-out'), or (ii) the VOWs of selected other participants determined independently by the listing broker ('Selective opt-out.')"

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

of the ILD Policy[2], and any changes in those justifications between the time of their adoption and today; and

2.      The procompetitive justifications for the so-called "referral rule" in the VOW Policy[3], and for the 2005 revised definition of a "participant" in an MLS.[4]

---

[2] The opt-out provisions of the 2005 ILD Policy (attached as Exhibit 4) can be found in Section I(3). That section states: "Unless state law requires prior written consent, each Participant's consent for display of that Participant's listings on the ILD site of other MLS Participants is presumed unless a Participant affirmatively notifies the MLS in writing that it has withdrawn consent to such display ('opt-out'). A Participant that opts out may not display on its ILD site(s) (including by framing any other website), if any, the listings of any other MLS Participant provided by the MLS. A Participant that opts out may not permit display of its listings on any ILD site of any other Participant. It may, however, display its listings on public websites of third parties, including but not limited to Realtor.com. A decision to opt-out may not be revoked for a period of ninety (90) days from the date the decision becomes effective."

[3] The referral rule is found in Section II(4)(g) of the 2003 VOW Policy: "A Participant may not provide the identity of a Registrant to any other entity for compensation. Notwithstanding the foregoing, a Participant may provide the identity of a Registrant to another broker for compensation if (1) the Participant's residential real estate brokerage activities principally consist of listing or selling the types of properties required to be filed with the MLS; (2) the Registrant is seeking property of a type, in a price range, or in a location for which the Participant does not ordinarily provide real estate brokerage services; and (3) the number of Registrant identities provided or the corresponding revenue generated is an insubstantial portion of the Participant's real estate brokerage activities. For purposes of this paragraph, selling does not include making referrals of prospective purchasers to other real estate brokers and listing does not include making referrals of prospective sellers to other real estate brokers." (Exhibit 3)

[4] The revised definition of who may be a "participant" in an MLS (attached as Exhibit 5) states that in order to participate in an MLS, an individual (other than an appraiser) must "hold a current, valid real estate broker's license and offer or accept cooperation and compensation to and from other Participants." The previous definition of participant allowed anyone to join an MLS who held a brokerage license and was "capable of offering and accepting cooperation and compensation."

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

Opponents of this position believed that, regardless of whether VOWs were capable of engaging in online brokerage, display of their listings on a VOW still required their permission. Some contended that whether or not VOWs provided brokerage services, the display of listing information on a website fundamentally is advertising, regardless of whether the consumer has to register to see the data. Others were concerned about new uses of the listing data made possible by the Internet that were not anticipated at the time brokers agreed to join the MLS.[6] They were of the view that, given the unforeseeable nature of these uses, their consent to display of their listings on VOWs should be required.

The VOW Policy required, for the first time, that each NAR-affiliated MLS make available all active listing data for display on the VOWs of MLS participants. Although the VOW Policy did not definitively resolve the extent to which display of listing information on VOWs involves advertising, it did require the consent of listing brokers for the display of their listings on VOWs. Significantly, it also provided that MLS participants are presumed to consent to the display of their listings on other participants' VOWs. However, it gave participants the right to withdraw consent to the display of their listings either from all VOWs generally ("blanket opt-out"), or from the VOWs of specific participants ("selective opt-out"). *See* Exhibit 3 (2003 VOW Policy).

Based on my readings and discussions with persons involved in real estate brokerage at the time that the VOW Policy was being considered, as well as my review of documents and depositions, I understand that the principal justifications advanced in support of the opt-out provisions were as follows:

---

[6] While the IDX Policy allowed MLS participants to show other brokers' listings on the Internet, it also allowed listing brokers to opt out of allowing other participants to display their listings.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

1.      Listings are valuable assets of the listing broker.  In a competitive market, listing brokers should be permitted to determine how best to utilize or market those assets as they see fit.  Allowing brokers to make individual decisions about how their listings may be used is procompetitive in its own right.

2.      If MLS rules required all participants to permit display of their listings on the VOWs of every other MLS participant, then listing brokers who did not want to have their listings displayed on specific VOWs – or on any VOWs – would have no option for preventing such use of their listings other than withdrawal from the MLS.  Thus, the opt-out provisions helped to assure the continuing viability of MLSs – which are themselves extremely procompetitive.  Notably, the opt-out provisions were seen as a "safety valve" which, as a result of market forces cutting against exercise of an opt-out, were expected to be used rarely, if ever.

2.  Analysis

Based on my knowledge of the real estate industry and the materials I have reviewed, I believe that the procompetitive justifications for inclusion of an opt-out right in the 2003 VOW Policy were valid.  NAR quite properly concluded that it is important that brokers be able to control how and where their listings are displayed and marketed, and NAR's decision to take seriously the threat that, without the safety valve of the opt-out provisions, brokers might elect to withdraw from the MLS was not only reasonable but correct.  Indeed, NAR would have

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

Significantly, the referral rule addressed only one form of misuse or "free riding" on the MLS. As noted above, free-riding occurs whenever the MLS is used for purposes other than brokering the sale of the residential real property. Because the referral rule was under inclusive, it made sense to create a broad based rule. The NAR was also challenged in trying to draft the policy to create language that identified what behaviors they were trying to identify. The revised definition of "participant" more clearly defines and captures the fundamental purpose of the MLS. It guards against use of the MLS by those who may have a real estate license but who would use the MLS for reasons other than real estate brokering, in a straightforward effort to prevent free-riding generally.

Date: May 1, 2007

/Stephen H. Murray

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

# EXHIBIT 4

*(REDACTED VERSION)*

This exhibit has been designated by Defendant NAR as containing "Confidential Information" as defined under the Jan 11, 2006 Protective Order entered in this case by Magistrate Judge Denlow. *See* D.E. 53. Pursuant to the directives of this Order, a redacted copy of this exhibit has been filed with Clerk of Court and an unredacted version has been submitted directly to the chambers of Judge Kennelly in a sealed envelope. *See* D.E. 53 ¶17.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | Civil Action No. 05 C 5140 |
| Plaintiff, | ) | |
| | ) | Judge Filip |
| v. | ) | |
| | ) | Magistrate Judge Denlow |
| **NATIONAL ASSOCIATION OF REALTORS®** | ) | |
| | ) | |
| Defendant. | ) | |

**Expert Report of Fredrick A. Flyer**

August 1, 2007

*CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER*

# Table of Contents

I.    Overview and Summary ...............................................................................1

    A.    Qualifications.................................................................................1

    B.    Task.................................................................................................2

    C.    Summary of Conclusions............................................................4

II.    Framework for Competitive Analysis of NAR VOW Policies.....................6

    A.    Overview of Competitive Analysis..............................................6

    B.    Competitive Analysis of NAR Policies:
        Evaluation of Competitive Effects within a Relevant Market...........8

    C.    Empirically Establishing the Competitive Effects of the VOW Policies ..........9

III.    Evidence on the Competitive Significance of VOWs,
      Does Not Support the Conclusion of Consumer Harm From the NAR Policies.........11

    A.    Services Associated with VOWs ....................................................12

    B.    Provisions of Listings Via the Internet does Not Distinguish VOWs .............14

    C.    VOWs Are Not Distinguished by Increased Productivity,
        Unique Non-Price Benefits, or Broker Discounting.......................................21

    D.    Dr. Vistnes Does Not Show That Innovation Distinguishes VOWs ..............33

    E.    Growth Rates for ZipRealty and eRealty Fail to Establish that VOWs are an
        Important Source of Competition in General.....................................................34

    F.    A Guarantee of an Opportunity to Display All Non-Confidential
        Fields Online May Be the Only Characteristic That Distinguish VOWs ........35

    G.    Conclusion ........................................................................................35

IV.    None of the Challenged Policies has been Shown to Reduce the
      Competitiveness of VOWs or any Other Form of Competition ..................37

    A.    "Opt-Out" Provisions of VOW Policy ...........................................38

    B.    "Opt-Out" Provision of ILD Policy .................................................54

    C.    Referral Rule ....................................................................................56

    D.    Revised Membership Rules .............................................................58

    E.    Clean Page Rule...............................................................................59

F.      Co-Branding Rule ................................................................................61

G.      Data Feeds ...........................................................................................62

V.     Dr. Vistnes Analysis Ignores the Procompetitive Aspects of the NAR Policies .........63

A.      Role of the MLS ..................................................................................63

B.      Economic Benefit of the MLS .............................................................66

C.      Economic Incentives to Leave the MLS ..............................................67

D.      Procompetitive Effects of the NAR Policies .......................................67

VI.     Conclusions ...................................................................................................70

APPENDIX 1 – Market Definitions ...........................................................................72

APPENDIX 2 – Tables .................................................................................................75

as a means of hindering VOWs.[188]  However, even if we assume that VOW operators consider transient feeds to be inferior, Dr. Vistnes does not show that transient feeds are a significant hindrance to VOWs or that MLSs will have a strong incentive to adopt them.[189]

162.    On its face, the fact that the MLS can choose which technology to employ in an area doesn't appear to be anticompetitive.  Many factors can influence the optimal choice of technology including costs of implementation and related consumer benefits.  Dr. Vistnes points to no evidence, and I have seen no evidence, why the MLS would ignore all these other factors that influence implementation decisions and, instead, focus solely on attempting to disadvantage VOWs in choosing a data feed.

## V.    DR. VISTNES ANALYSIS IGNORES THE PROCOMPETITIVE ASPECTS OF THE NAR POLICIES

163.    As noted above, I find no reliable evidence that any of the challenged provisions of the NAR Policies are likely to have anticompetitive effects.  However, even if some anticompetitive effect can be linked to the NAR Policies, these anticompetitive effects would need to be weighed against the procompetitive benefits of the NAR Policies.  The potential procompetitive benefits, especially those linked to greater MLS stability, may be best understood after first providing context on the role and economic benefits of the MLS.

### A.    Role of the MLS

164.    MLSs were developed by brokers for the specific purpose of facilitating real estate brokerage services.[190]  Listings – information about homes for sale – are a key aspect

---

[188]  The Expert Report of Dr. Vistnes (at page 90) states: "By providing MLSs with the discretion to provide VOWs with a transient feed rather than a persistent feed, NAR's VOW Policies create a situation where a local MLS can disadvantage and increase the costs of brokers using VOWs."

[189]  The Expert Report of Dr. Vistnes (at page 90) cites an e-mail from what he refers to as a technical consultant to NAR, who states: "[A transient feed] limits the brokers' ability to effectively use and display the information."  However, she also acknowledges that many MLSs do not use transient feeds. Email from Ann Bailey to Al Unser dated Jun 12, 2005 (NORES 001329-30 at NORES-001329).

[190]  Deposition of Clifford Niersbach, March 23, 2007, pp. 261-262; Deposition of Cathy Whatley, April 24, 2007, pp. 13-14 & 125-127; Deposition of Ronald Phipps, July 13, 2004, pp. 67-68; and

of a MLS. As noted in the <u>Handbook on Multiple Listing Policy:</u>

> [T]he basis of the multiple listing activity is the creation of a facility whereby Realtors® may most effectively invite other brokers to enter into cooperative agreements with them for the sale of their listings and provide information necessary to permit such cooperation. . . .[191]

165.   MLS rules usually require a broker to submit each of his or her listings to the MLS database within a certain time period after the broker obtains the listing.[192,193] Once the listing is placed on the MLS database, the other MLS participants can access it. For example, brokers representing buyers can access the MLS database to provide their customers information about the properties available for sale. Similarly, brokers that wish to provide valuation analyses to either buyers or sellers can view comparable listings and historical sales data from the MLS.

166.   As noted above, an MLS also facilitates cooperation among participants. When a participant submits a listing to the MLS, the listing broker must state what compensation will be paid to the broker who finds the buyer for the property (the "cooperating broker"). In addition to requiring notification in advance of the compensation to be paid to a cooperating

---

Deposition of Richard Mendenhall, April 11, 2007, pp. 173-174.

[191]   NAR, *Handbook on Multiple Listing Policy 2007*, p. 1. See also Deposition of Richard Mendenhall (April 11, 2007) pp. 149-150.

[192]   For example, Metrolist in Denver, Colorado requires brokers to place each listing on the MLS database within three days after the listing has been obtained by the broker. See, Metrolist, "Multiple Listing Service, Rules and Regulation" (Government Ex. 370), p. 6. The NAR's model rules for MLSs suggest 48 hours as a usual length of time. NAR, *Handbook on Multiple Listing Policy 2007*, p. 45.

[193]   Notwithstanding these rules, there are various types of MLS broker listings that do not appear on the MLS. A broker and seller can agree to withhold a listing from the MLS database. An important example of these types of listings is "office exclusive listings." NAR, *Handbook on Multiple Listing Policy 2007*, p. 17 and        REDACTED                                   (example of office exclusive listings). However, there are various other types of non-MLS listing agreements as well. For example, ZipRealty offers a service to FSBO (for sale by owner) sellers in which ZipRealty will show the FSBO property to potential buyers that use ZipRealty. If a ZipRealty client purchases the property, then a 2½% commission is owed to ZipRealty. "ZipRealty Launches Program to Aid FSBOs in Marketing Their Homes to Buyers," ZipRealty Press Release dated August 3, 2006 (ZipRealty Ex. 14).

broker, MLS rules facilitate cooperation among brokers in other ways. MLS rules govern several issues such as membership, MLS data usage, and interactions between MLS members.[194]

167. Typically, MLS membership ("participation") is limited to licensed brokers and appraisers who meet a set of criteria.[195] Affiliates of MLS participants, such as agents and technical/clerical staff, may also be provided with access to MLS data, but their access to the MLS typically is derivative of the broker-participant.[196] MLSs have rules regarding MLS data usage, which, among other things, seek to prevent the dissemination of confidential information contained in the MLS and prevent wide-scale reproduction of MLS information for purposes other than engaging in real estate brokerage.[197] MLSs normally have procedures in place to enforce rules and impose sanctions on members who violate MLS rules.[198] For example, MLSs have arbitration procedures to resolve disputes between members.[199]

168. Participation in the MLS by brokers is completely voluntary.[200] The voluntary nature of the MLS association means that there are strong incentives to establish rules that encourage participation, and to avoid rules that impose costs on member brokers. In other words, MLS policies that disregard or diminish the value of participating brokers' business interests potentially put at risk the viability of this cooperative endeavor.[201]

---

[194] See Metrolist, Multiple Listing Service, Rules and Regulation (Government Ex. 370) for a specific example of MLS rules. The NAR *Handbook on Multiple Listing Policy 2007* provides more general examples of MLS rules.

[195] NAR, *Handbook on Multiple Listing Policy 2007*, pp. 4-5.

[196] NAR, *Handbook on Multiple Listing Policy 2007*, pp. 4-5.

[197] NAR, *Handbook on Multiple Listing Policy 2007*, pp. 19-20.

[198] NAR, *Handbook on Multiple Listing Policy 2007*, pp. 28-29.

[199] For example, Metrolist in Denver has a hearing panel to review and rule on broker disputes about commissions. See Metrolist, "Multiple Listing Service, Rules and Regulation" (Government Ex. 370), pp. 21-22.

[200] Deposition of Richard Mendenhall (April 11, 2007) pp. 198-199.

[201] Deposition of Richard Mendenhall (April 11, 2007) pp. 198-201.

B.     **Economic Benefit of the MLS**

169.    The MLS has an economic impact on the various participants in the real estate industry.  It provides benefits to consumers of real estate brokerage services by making many listings available to MLS participants in a common location.  By centralizing these listings, the MLS reduces the costs to buyers of identifying properties that meet their purchasing criteria, and helps sellers more effectively reach large groups of potential buyers.  These efficiencies increase as the number of brokers participating in the MLS becomes large and, thus, the number of properties available for sale increases.  In economic terms, the MLS provides customers "network" benefits, as high participation rates translate into greater benefits to customers.

170.    Prior to the development of the MLS, sellers of real estate typically contracted with multiple brokers to list their property.  These agreements were called open listings.[202] Only the broker that found the ultimate buyer was entitled to the commission.  If the seller found the buyer, then no broker was entitled to a commission.  Therefore, open listings often led to conflicts about which broker (if any) was entitled to a commission. This system tended to discourage cooperation among brokers, and reduced brokers' incentive to invest in marketing a property listing.

171.    The development of MLSs allowed a seller to contract with a single broker to market his or her property but still benefit from exposure of the property to a large number of brokers (and potential buyers).  Similarly, the development of the MLS allowed buyers to have access to information about a large number of properties, without contacting multiple brokers.  MLSs reduced the time and cost incurred to match sellers and buyers.  This reduction in time and cost is perhaps the most important benefit of MLSs to consumers.[203]

172.    While membership in an MLS provides productivity benefits to participating

---

[202]  Edward L. Sumber, "Attorney explains MLS," *Real Estate Weekly*, April 9, 2003.

[203]  See, for example, John Yinger, "A Search Model of Real Estate Broker Behavior," *American Economic Review*, pp. 591-605.

brokers, it also entails certain costs. First, participants must pay membership dues. Each broker must also conform to MLS rules that may not be in the individual broker's own best interests. A primary cost of MLS participation to brokers who submit listings is that submission of the listing to the MLS increases the probability that the listing broker will not find the buyer for the property, as another broker may find the buyer first. Thus, a listing broker reduces the likelihood of getting a commission on both the buy-side and the sell-side of transactions.

173.     Additionally, by providing access to large pools of listings, smaller brokers are better positioned to compete. In other words, the MLS provides the greatest net benefits to smaller brokers. For larger brokers -- *i.e.*, those who have a significant number of listings and the ability to find buyers efficiently on their own -- this potential sharing of revenues represents a significant cost to MLS participation while the incremental value gained from access to new listings is smaller.

### C.     Economic Incentives to Leave the MLS

174.     Although the ability of the MLS to disadvantage brokers through the MLSs' alleged market power is not central to the analysis of the NAR Policies, the possible market power of individual brokers is more relevant. In particular, larger brokers that represent many buyers and sellers in an area gain the least from participation in the MLS. Further, the participation of these large brokers provides the greatest network benefits to the MLS and enables smaller brokers to compete (due to their access to the large brokers' listings). Therefore, the large individual brokers are precisely the brokers with the greatest incentives to pull out of an MLS, and if they were to leave their withdrawal would cause the largest decline in the value of the MLS.

### D.     Procompetitive Effects of the NAR Policies

175.     Dr. Vistnes claims there is "no legitimate procompetitive justification for NAR's

VOW Policies".[204]  In particular, he attributes no weight to greater MLS stability induced by the policies and ignores listing brokers' greater incentives to invest in providing service for their listings.  He largely ignores substantial evidence supporting these procompetitive justifications.  In general, increased returns associated with MLS participation would encourage:

176.    **Enhanced MLS Stability** -- If certain VOWs dilute the value of a listing broker's asset through misuse of the Internet (*e.g.* misleading statements about other brokers' listings), brokers may withdraw from the MLS, be more likely to withdraw in the future, or choose to pursue non-MLS avenues such as exclusive listings.[205]

177.    **Increase Incentives to Innovate** – Policies that protect the returns listing brokers earn from acquiring clients also protect these brokers' incentives to invest in new technology and business methods.  If the MLS allows its information to be used in a way that diminishes the value of listing brokers' assets, then not only will the incentives of these brokers to participate in the MLS be reduced, but the incentives to compete for and invest in these listing assets will be diminished.  In other words, if these returns are not diminished by practices governing MLS data, sell-side brokers would have greater incentives to invest in acquiring new clients and develop new technologies, other business innovations and enhanced services (*e.g.*, full service web sites with enhanced virtual tours) that distinguish sell-side brokers from their competitors.

178.    Dr. Vistnes analyses further ignore the fact that the largest, most important brokers are the ones with the greatest incentives and best positioned to leave the MLS in response to policies that diminish the value of participation.  It was the large brokers that left

---

[204]   Expert Report of Dr. Vistnes, p. 3.

[205]   Steve Murray's Expert Report indicates that these policies did indeed enhance MLS stability, as he concludes that the threat of broker withdrawal from the MLS was real. In particular, he states: "My interactions with brokers during this time period caused me to conclude that these firms could in fact have developed and implemented alternatives to the MLS had the VOW Policy been adopted without an opt-out provision." (p. 17)

the MLS in Bakersfield, California;[206] Chicago, Illinois;[207] and St. Louis, Missouri[208] in response to dissatisfaction with then-existing MLS rules.

179.    I understand that the major provisions of the NAR Policies were implemented to protect brokers against potential abuses of the MLS. Specifically, a number of the most concerned MLS participants were precisely these larger brokers who would be best positioned to leave the MLS.[209] Moreover, many brokers and other industry participants expressed a willingness to withdraw from the MLS if their concerns were not addressed.[210]

180.    Each of the major provisions addressed particular concerns voiced by these brokers. The opt-out provisions of the VOW and ILD policies provided brokers with a safety valve against potential abuses that didn't require full withdrawal from the MLS.[211]

181.    The "clean-page" and "co-branding" rules address potential use of listing information that may counter the purpose of the MLS. For example, allowing other brokers to place advertisements on listings potentially reduces the value of that asset to the listing broker, and is unrelated to the objective of providing the listing to the MLS network (making a sale).

182.    The Referral and Revised Membership Rules address concerns that business entities with no intention of consummating real estate transactions would use the proprietary

---

[206] The Bakersfield Californian, "Second listing has industry in uproar," August 25, 2004, http://www.bakersfield.com/business/story/4898677p-4954158c.html (KDG_001354- KDG_001356).

[207] Chicago Tribune, "Real estate listings land in disputed territory," May 4, 2004.

[208] Deposition of Richard Mendenhall, April 11, 2007, pp. 99-101.

[209] See, e.g., Cendant White Paper, "The Emerging Issues Posed by the Misuse of Virtual Office Web Sites," February 28, 2003 (Smith Ex. 7; USDOJ-000006479-848) and Geoff Lewis, RE/MAX, "Competition in the Residential Real Estate Brokerage Industry," October 6, 2005 (Liniger Ex. 2; EREMAX-BE-0001714-30)

[210] See, e.g., email from Bob Blount to Ralph Holmen, September 16, 2002 (ENAR 35679-81); email from Ann Bailey to Gar Andersen, August 1, 2003 (ENAR 32880-87 at 82); Deposition of Robert Most, July 15, 2004, p. 67 and April 18, 2007, pp. 235-236 as well as Most Ex. 1 (PREG 01251).

[211] See, e.g., Depositions of Ron Phipps, July 13, 2004, pp. 212-214 and April 5, 2007, pp. 150-151; Deposition of John Veneris, July 14, 2004, pp. 146-147; Deposition of Laurie Janik, August 24, 2004, pp. 69; Deposition of Cathy Whatley, April 24, 2007, p. 171; and Deposition of Robert Most, April 18, 2007, p. 272.

information of the MLS for profit while imposing additional costs on participants. For example, it would be possible for a person or company to operate a VOW to use listing information to attract potential buyers solely for the purpose of referring them to other brokers or generating ancillary income.[212] Referral-based VOWs, which do not provide brokerage services, are unlikely to increase the number of buyers who view brokers' real estate listings. Such VOW operators profit from the listings of other brokers without bringing any corresponding benefits to the listing brokers. Hence, the costs that these free-riding referral services impose on the value of MLS participation, specifically lowering the value of listing brokers' assets, reduces listing brokers' incentives to participate in the MLS.

183.    Therefore, to the extent that VOW Policies are protecting broker participants against potential abusive use of listing information, as I understand was a motive for the implementation of the policies, brokers will have less incentive to leave the network. This maintenance of MLS stability is a procompetitve aspect of the NAR Policies. These potential benefits are simply dismissed by Dr. Vistnes, despite testimony that indicates these policies were implemented to provide a safety valve for brokers against abuse of the MLS system.[213]

## VI.    CONCLUSIONS

184.    The competitive effects of the NAR Policies depend on how these policies change the competitive offerings available to current and potential customers of brokerage services. Harmful effects, if any exist, would come in the form of reduced brokerage service quality, lower availability of alternative substitute services, higher prices, or slowed rates of dynamic innovation. The evidence I have reviewed in my analysis does not reliably support the

---

[212]

## REDACTED

[213]    Deposition of John Veneris, February 13, 2007, pp. 174-175.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ⌊ day of August, 2007

Fredrick A. Flyer, Ph.D.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS (Chicago)

UNITED STATES OF AMERICA, )
)
  Plaintiff, )
  v. ) Docket No. 05-CV-5140
)
NATIONAL ASSOCIATION OF )
REALTORS, et al., ) Chicago, Illinois
) November 13, 2007
  Defendants. )

REPORT OF PROCEEDINGS
BEFORE THE
HONORABLE MAGISTRATE JUDGE MORTON DENLOW

APPEARANCES:

For Plaintiff:   CRAIG W. CONRATH
      U.S. DEPARTMENT OF JUSTICE
      ANTITRUST DIVISION
      325 Seventh Street N.W.
      Suite 400
      Washington, DC 20530

      STEVEN B. KRAMER
      U.S. DEPARTMENT OF JUSTICE
      ANTITRUST DIVISION
      325 7th Street, NW
      Suite 300
      Washington, DC 20530

For Defendants:
National Association  JACK R. BIERIG
 of Realtors    SCOTT DAVID STEIN
      SIDLEY AUSTIN LLP
      One South Dearborn Street
      Chicago, IL 60603

PLEASE PROVIDE CORRECT VOICE IDENTIFICATION

Transcribed by:   Riki Schatell
      6033 North Sheridan Road, 28-K
      Chicago, Illinois 60660
      773/728-7281

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

3

1      We have also noticed a motion with respect to expert

2   discovery which I think the parties are prepared to argue today

3   if your Honor is willing to hear us on that.

4      THE COURT:  It came in over the weekend, I guess.

5      MR. CONRATH:  Right.

6      THE COURT:  Or after I was gone, so I'm happy to hear

7   the argument.  I'm not sure there's -- I have not read the

8   motion but I skimmed it.  I have the gist of it, so . . .

9      MR. BIERIG:  We're prepared to argue it, your Honor.

10      THE COURT:  Yes.

11      MR. BIERIG:  We agree with something you said in a

12   previous case, that we're not big fans of --

13      THE COURT:  Right.

14      MR. BIERIG:  -- briefing discovery motions.  Even so,

15   we're prepared to argue it orally today.

16      THE COURT:  Go ahead.

17      MR. BIERIG:  But I think --

18      THE COURT:  Well, bring me up to date on the status.

19      MR. BIERIG:  Yes, I'd like Mr. Stein, if he wouldn't

20   find, to bring you up to date on where things stand from our

21   point of view.

22      MR. STEIN:  Well, your Honor, as Mr. Conrath said, we

23   are coming up on the November 20th date for the close of

24   discovery, although there are currently I think at least nine

25   depositions that are scheduled to take place in December, and

13

1   fact that the Federal Rules are right; there should be a seven-

2   hour deposition per report. That's what we're advocating and

3   that's what we think should govern.

4       THE COURT: Okay, Mr. Kramer, you get the final word.

5       MR. KRAMER: The only thing I would say is at this

6   point if Mr. Bierig has a complaint about Dr. Vistnes'

7   responsiveness in the two days, he's of course free to raise

8   that. I think what we have before us is the problem created by

9   the report that -- and the testimony that we're subjecting the

10   motion to.

11       The only other point I would make is this has come up

12   before with the Court but I think it's an important point is

13   the fact that expert reports are long, according to the

14   Advisory Committee notes of the Federal Rule that deals with

15   expert disclosure, all things equal suggest to me there should

16   be less time needed to depose an expert. The Rule was amended

17   in '93 to --

18       THE COURT: Well --

19       MR. BIERIG: -- provide more disclosure to limit --

20       THE COURT: -- the Rule --

21       MR. BIERIG: -- the deposition time.

22       THE COURT: The Rule was designed to try to put

23   experts in a position of having their report stand really

24   without the need for deposition, I mean in theory. You know,

25   I'm not aware of any lawyer who has relied upon that but that's

14

1   really what the Rule is intended.  I'm still waiting for a

2   lawyer, still waiting for a lawyer to take the gutsy move to

3   say I'm not going to depose and then, when the expert opens his

4   mouth and tries to say or utter an opinion that goes beyond

5   anything in the report, says I move to bar.  I move to bar

6   because the report is supposed to be all-inclusive.

7        Now in your infinite wisdom you've continued to open

8   the door for experts by asking experts all sorts of questions

9   and then when you try to bar the door at trial the other side

10  then points out and says well, even though it wasn't in the

11  report they asked it so there's no surprise there and generally

12  the Judge does that.  So at some point somebody, you know, show

13  some guts and don't take the deposition.

14        But my own feeling is because of the seven-hour rule,

15  life isn't perfect.  I mean it used to be that experts could be

16  deposed for three days, and the seven-hour rule really forces

17  attorneys to focus on what's important and my concern is I

18  don't want to open Pandora's box and get into, well, you know,

19  it's 112-page report so now I need 11 hours as opposed to seven

20  hours.  Or it's a 75-page report and therefore it's a seven-

21  hour dep.

22        So I'm going to deny the motion because I'm operating

23  on the proposition one report, one deposition.  Get in, get

24  out, do the best you can.  I don't see that trying to analyze

25  issues of evasiveness in the context of very complicated

15

1    theories is -- that I'm going to go anywhere or make a

2    conclusion.  I have no reason to think that the expert wasn't

3    testifying based on what his understanding was and trying to be

4    as responsive as he could be, and if it turns out that he's not

5    effective because it sounds evasive, then you should feel good

6    about that, Mr. Kramer, because it will sound evasive to a jury

7    and you'll be able to point out:  He's evasive and didn't ever

8    answer the question.

9         So I'm going to deny the motion and I want to caution

10   Mr. Bierig to not bring a similar motion when they go into the

11   other side's deposition and find out that after seven hours the

12   doctor, whatever his name is --

13        MR. KRAMER:  Vistnes.

14        THE COURT:  -- Vistnes, they feel that he's evasive.

15   Once I start opening that door we're going to go down a

16   slippery slope to nowhere.  So I'm going to deny the motion.

17        MR. BIERIG:  Thank you, your Honor.

18        MR. KRAMER:  Thank you.

19        THE COURT:  Okay, any further settlement discussions

20   or do you still have to exhaust another few trees here

21   before. . .

22        MR. BIERIG:  Well, you know, your Honor, we feel very

23   strongly, as I said so many times before your Honor, that we

24   would love to settle this case and I know what Mr. Conrath is

25   going to say because I can see him approach the microphone:  As

# EXHIBIT 6

KATHLEEN E. CONDON,  OCTOBER 25, 2007

Page 1

Volume:    I

Pages :   1 - 59

Exhibits: See Index

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CIVIL ACTION NO. 05C-5140

Judge Filip

Magistrate Judge Denlow

- - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

Plaintiff,

V.

NATIONAL ASSOCIATION OF REALTORS,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - x

VIDEOTAPED DEPOSITION OF KATHLEEN E. CONDON

Thursday, October 25, 2007,  9:40 a.m.

Edwards Angell Palmer & Dodge LLP

111 Huntington Avenue

Boston, Massachusetts

Reporter:  Rosemary F. Grogan, CSR, RPR

KATHLEEN E. CONDON, OCTOBER 25, 2007

Page 27

1        A.    I'd say they're certainly in our top five.

2   Their agents certainly make up for about 10 percent of

3   our subscriber based, if not our No. 1, but I'm not -- I

4   couldn't -- I haven't run the reports lately, so I

5   couldn't give you the exact information.

6        Q.    So as I understand it, they're in the top five

7   and it's possible they rank at the top?

8        A.    Yes.

9        Q.    Going back, you mentioned when the VOW policy

10  was initially adopted, there was some confusion among

11  other brokers, I believe.

12               And I'm wondering if you could elaborate

13  a bit on what that entailed and how that was resolved,

14  please?

15       A.    I remember phone calls asking me what gave ABC

16  the right to show XYZ's listing on their website?  Once

17  it was explained to them that it was a way of doing

18  business and that they could do the same thing, many of

19  them adopted that type of technology very quickly and

20  realized it was another way to market their companies.

21       Q.    Has MLS PIN experienced any brokers

22  withdrawing from the MLS and attempting to continue

23  their operations without being in the MLS because of MLS

24  PIN adopting the VOW policy?

KATHLEEN E. CONDON, OCTOBER 25, 2007

Page 28

1      A.    Not to my knowledge.

2      Q.    Has MLS PIN experienced any brokers

3   withdrawing for any reason while continuing in business

4   from MLS PIN?

5      A.    I can't really answer that question.  If they

6   withdraw from an MLS PIN, I don't really pay much

7   attention as to whether or not they continue in the

8   business, to be honest.

9      Q.    So it could be a brokerage goes out of

10  business and withdraws, but you wouldn't know whether

11  they're going out of business or continuing, it sounds?

12     A.    That's right.

13     Q.    Going back -- well, let me at this point --

14  I'm going to ask you to identify another document.  And

15  I apologize; it wasn't clipped together better than it

16  is but this is how I realized I had them when I looked

17  at them earlier this morning.

18              This is a Government Exhibit 1902.

19  (Government Exhibit No. 1902 Marked for Identification)

20  BY MR. KRAMER:

21     Q.    Please familiarize yourself, Miss Condon, with

22  document marked as a Government Exhibit 1902 which

23  appears to be a set of MLS PIN Rules and Regulations

24  amended through March 14, 2007.

Page 57

```
 1               C E R T I F I C A T E

 2    COMMONWEALTH OF MASSACHUSETTS )

 3                                  )

 4    COUNTY OF PLYMOUTH            )

 5              I, Rosemary F. Grogan, a Registered

 6    Professional Reporter and Notary Public duly

 7    commissioned and qualified in and for the Commonwealth

 8    of Massachusetts, do hereby certify:

 9              That KATHLEEN E.CONDON, the witness whose

10    deposition is hereinbefore set forth, was duly

11    identified and sworn by me, and that the foregoing

12    transcript is a true record of the testimony given by

13    such witness to the best of my ability.

14              I further certify that I am not related to any

15    of the parties in this matter by blood or marriage, and

16    that I am in no way interested in the outcome of this

17    matter.

18              IN WITNESS WHEREOF, I have hereunto set my

19    hand and affixed my notarial seal this 2nd day of

20    November, 2007.

21

22                     Rosemary F. Grogan, RPR

23                     CSR No. 112993

24    My Commission Expires:  January 7, 2011
```

BRAD TERTELL, NOVEMBER 20, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| -vs- | ) | |
| NATIONAL ASSOCIATION OF | ) | No. 05 C 5140 |
| REALTORS, | ) | |
| Defendant. | ) | |

The videotaped deposition of

BRAD TERTELL, called for examination, taken

pursuant to the Federal Rules of Civil Procedure of

the United States District Courts pertaining to the

taking of depositions, taken before LINDA M.

STRATTON, CSR No. 84-2613, a Notary Public within

and for the County of DuPage, State of Illinois,

and a Certified Shorthand Reporter of said state,

at Suite 1100, 122 South Riverside Plaza, Chicago,

Illinois, on November 20, 2007, at 9:22 a.m.

BRAD TERTELL,  NOVEMBER 20, 2007

Page 30

09:48:40  1    doing what we call a market analysis when a seller

09:48:44  2    contacts a -- a realtor to determine the pricing of

09:48:49  3    their house.  That information is in our database,

09:48:52  4    comparable sales.  That's why.

09:48:56  5         Q.    Do you know of any brokers in the

09:48:59  6    greater Chicago area who are not actively

09:49:03  7    engaged -- I'm sorry.  Strike that.

09:49:05  8              Do you know of any brokers in the

09:49:07  9    greater Chicago area who are actively engaged in

09:49:09 10    residential real estate but who don't participate

09:49:12 11    in any MLS?

09:49:20 12         A.    I'm sure there's some.  I couldn't tell

09:49:22 13    you who they are.

09:49:24 14         Q.    And what makes you say you're sure

09:49:25 15    there's some?

09:49:26 16         A.    Well, because I'd say there's a lot of

09:49:30 17    commercial brokers that don't necessarily belong to

09:49:32 18    an MLS.

09:49:33 19         Q.    Okay.  How about brokers actively

09:49:36 20    engaged in residential real estate?  Do you know of

09:49:39 21    any who don't participate in any MLS?

09:49:42 22         A.    Not that I'm aware of.

09:49:44 23         Q.    MAP Multiple Listing Service is another

09:49:48 24    MLS that exists in this area, is that right?

BRAD TERTELL, NOVEMBER 20, 2007

Page 254

1    STATE OF ILLINOIS )

2                     )  SS:

3    COUNTY OF DU PAGE )

4              I, LINDA M. STRATTON, a Notary Public

5    within and for the County of DuPage, State of

6    Illinois, and a Certified Shorthand Reporter of

7    said state, do hereby certify:

8              That previous to the commencement of the

9    examination of the witness, the witness was duly

10   sworn to testify the whole truth concerning the

11   matters herein;

12             That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony

16   given and the proceedings had;

17             That the said deposition was taken

18   before me at the time and place specified;

19             That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in

23   the outcome of this action.

24             IN WITNESS WHEREOF, I do hereunto set my

1  hand and affix my seal of office at Chicago,

2  Illinois, this 27th day of November, 2007.

3

4

5 

6

7        Notary Public, DuPage County, Illinois

8        My commission expires 7/2/11.

9

10  C.S.R. Certificate No. 84-2613.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 7

```
 1                UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                     EASTERN DIVISION
 4                        ---o0o---
 5    UNITED STATES OF AMERICA,   )
                                  )
 6                   Plaintiff,   ) Civil Action No. 05C-5140
                                  )
 7             vs.                ) Judge Filip
                                  )
 8    NATIONAL ASSOCIATION OF     ) Magistrate Judge Denlow
      REALTORS,                   )
 9                                )
                   Defendants.    )
10    _____ )
11
12                        ---o0o---
13             VIDEOTAPED DEPOSITION OF
14                      KEN CARTER
15                Wednesday, May 30, 2007
16        by DAVID C. KULLY, Esq., Attorney at Law
17                        ---o0o---
18
19
20
21
22
      Reported by:
23    BRIAN S. CARDOZA
      C.S.R. #8362
24    Job No. 25809
25
```

KEN CARTER, MAY 30, 2007

| 1 | THE WITNESS: I don't really recall that | 02:10:44 |
| 2 | that was the discussion. I believe the discussion was | 02:10:48 |
| 3 | just the dissatisfaction in general of the structure | 02:10:52 |
| 4 | and the responsiveness of the Association as to the | 02:10:56 |
| 5 | needs of some of the larger brokers. | 02:11:00 |
| 6 | MR. KULLY: | 02:11:02 |
| 7 | Q. Did you, at any point, contemplate | 02:11:04 |
| 8 | withdrawing Watson from the MLS and not participating | 02:11:12 |
| 9 | in any MLS, because of this dissatisfaction? | 02:11:14 |
| 10 | A. Absolutely not. | 02:11:16 |
| 11 | Q. And -- and why didn't you contemplate | 02:11:20 |
| 12 | doing that? | 02:11:20 |
| 13 | A. It would be suicidal. | 02:11:22 |
| 14 | Q. And why would it be suicidal? | 02:11:26 |
| 15 | A. The Multiple Listing Service, like it or | 02:11:30 |
| 16 | not, is the source for -- it's the gathering source | 02:11:38 |
| 17 | for data that we need in the conduct of our daily | 02:11:44 |
| 18 | activities. | 02:11:46 |
| 19 | Q. Are you familiar with the term, "Virtual | 02:11:52 |
| 20 | Office Web site"? | 02:11:52 |
| 21 | A. I am familiar, yes. | 02:11:54 |
| 22 | Q. Before the formation of the Bakersfield | 02:12:02 |
| 23 | Listing Service, did you know any brokers in | 02:12:04 |
| 24 | Bakersfield who were operating Virtual Office Web | 02:12:06 |
| 25 | sites? | |

KEN CARTER, MAY 30, 2007

| | | |
|---|---|---|
| 1 | A. I did not, and I do not. | 02:12:08 |
| 2 | Q. Did your concerns about a | 02:12:12 |
| 3 | dissatisfaction with the Multiple Listing Service at | 02:12:14 |
| 4 | that time have anything to do with Virtual Office Web | 02:12:18 |
| 5 | sites? | |
| 6 | A. Not for me, no. | 02:12:20 |
| 7 | Q. When the BLS was founded, was it your | 02:12:28 |
| 8 | plan to withdraw from the Multiple Listing Service? | 02:12:30 |
| 9 | MR. MILLER: That's vague as to time. | 02:12:34 |
| 10 | THE WITNESS: Yeah, can you restate that? | 02:12:36 |
| 11 | MR. KULLY: | 02:12:36 |
| 12 | Q. At the time the BLS was founded, which I | 02:12:38 |
| 13 | think we've established was in -- sometime roughly in | 02:12:40 |
| 14 | August 2004, was it your plan to have Watson withdraw | 02:12:44 |
| 15 | from the Multiple Listing Service? | 02:12:46 |
| 16 | A. I don't know that it was my plan. | 02:12:52 |
| 17 | Q. It -- it was something that -- that | 02:12:58 |
| 18 | you -- you -- | 02:12:58 |
| 19 | A. It's what happened, but I don't know | 02:13:00 |
| 20 | that it was my plan. | 02:13:02 |
| 21 | Q. Looking back to that time, did you | 02:13:04 |
| 22 | think, at the time that the BLS was founded, that it | 02:13:06 |
| 23 | was a possibility that Watson would -- would withdraw | 02:13:10 |
| 24 | from the Multiple Listing Service? | 02:13:12 |
| 25 | A. It's a possibility. | 02:13:16 |

KEN CARTER, MAY 30, 2007

| | | |
|---|---|---|
| 1 | Q. When you said that you wouldn't withdraw | 02:13:22 |
| 2 | individually from the Multiple Listing Service, that | 02:13:26 |
| 3 | it would be suicide to do so, is it -- would it be | 02:13:30 |
| 4 | easier for Watson to do so if it was -- there were | 02:13:34 |
| 5 | others who were also withdrawing from the MLS and -- | 02:13:36 |
| 6 | and forming a second MLS? | 02:13:38 |
| 7 | MR. MILLER: Objection to form, calls for | 02:13:40 |
| 8 | speculation and opinion. | 02:13:40 |
| 9 | THE WITNESS: My opinion is that, yes, it | 02:13:44 |
| 10 | would be easier if there were others that had done the | 02:13:50 |
| 11 | same, yes. | 02:13:50 |
| 12 | MR. KULLY: | 02:14:10 |
| 13 | Q. Let me show you a -- a document that | 02:14:12 |
| 14 | I've marked as Government Exhibit 521. | 02:14:16 |
| 15 | (Government Exhibit No. 521 was marked for | |
| 16 | identification purposes.) | |
| 17 | MR. KULLY: | 02:14:18 |
| 18 | Q. Which appears to be an e-mail -- I'm | 02:14:24 |
| 19 | sorry -- from Scott Tobias, to Scott Tobias, dated | 02:14:28 |
| 20 | October 1st, 2004, and it has Bates numbers | 02:14:32 |
| 21 | Watson-000029 through 30. And once you've had a | 02:14:40 |
| 22 | chance to look at Exhibit 521, I'll ask you if you | 02:14:44 |
| 23 | recognize it. | 02:14:46 |
| 24 | A. Okay. | 02:15:40 |
| 25 | Q. Do you recognize Exhibit 521? | 02:15:42 |

```
 1 | STATE OF CALIFORNIA, )
 2 |                       )  ss.
 3 | COUNTY OF KINGS.      )
 4 |
 5 |        I, BRIAN S. CARDOZA, a Certified Shorthand
 6 | Reporter in and for the State of California, DO HEREBY
 7 | CERTIFY:
 8 |        That the foregoing proceedings were taken
 9 | before me at the time and place herein set forth; that
10 | any witnesses in the foregoing proceedings, prior to
11 | testifying, were placed under oath; that a verbatim
12 | record of the proceedings was made by me using machine
13 | shorthand which was thereafter transcribed under my
14 | direction; further, that the foregoing is an accurate
15 | transcription thereof.
16 |        I further certify that I am neither
17 | financially interested in the action nor a relative or
18 | employee of any attorney or any of the parties.
19 |        IN WITNESS WHEREOF, I have this date
20 | subscribed my name.
21 |
22 |        Dated: June 6, 2007
23 |
24 |
25 |                        _____
   |                        BRIAN S. CARDOZA  C.S.R. #8362
```

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


UNITED STATES OF AMERICA,

    Plaintiff,

                          Case No. 05C-5140

    -vs-

NATIONAL ASSOCIATION OF REALTORS,

    Defendant.

_____/


    DEPONENT: GEORGE ULRYCH

    DATE:     Thursday, March 8, 2007

    TIME:     9:00 a.m.

    LOCATION: 4850 Investment Drive

            Troy, Michigan

    REPORTER: Timothy M. Floury, CSR-5780

GEORGE ULRYCH,  MARCH 8, 2007

1      brokers.  Is it your understanding that there are

2      some listings in MiRealSource that don't also

3      appear in RealComp?

4  A.  I'm not certain about how other people do it.

5  Q.  Have you ever considered dropping out of RealComp

6      all together and using only MiRealSource?

7  A.  We had talked about that.  There was some movement

8      afoot several years ago of combining the two MLS

9      services in order to save money and it never

10     reached any sort of conclusion so we remained the

11     way we are now.

12 Q.  Okay.  I think we're -- those sound like two

13     different things.  Let's talk about you said you

14     thought about withdrawing from RealComp entirety at

15     some point?

16 A.  No.  We never thought about withdrawing from

17     RealComp, no.  RealComp is the predominant MLS

18     service that services our area.  If we ever

19     withdraw from RealComp, we might as well just close

20     our doors.

21 Q.  You said there was a movement afoot at some point

22     to -- was the movement afoot relating to the

23     withdrawal by some brokers from RealComp?

24          MS. JONES:  Objection to form.

25          THE WITNESS:  The movement afoot was a

GEORGE ULRYCH,  MARCH 8, 2007

Page 26

1    cost savings.  We have two services that are doing

2    practically the same thing and that why don't we

3    try to combine that, have one service service the

4    entire geographical area and save all the agents,

5    consumers, whoever, the cost of having two

6    services.

7  Q.  (By Mr. Kully):  So the movement afoot was an

8    effort to try to have RealComp and MiRealSource

9    consolidate?

10  A.  Correct.

11  Q.  Okay.  Was that something you were in favor of?

12  A.  I was, yes.

13  Q.  Uh-huh.  Okay.  And when was this -- when were

14    these, if you can remember, these --

15  A.  Very generally, I'd say it was 2003, 2002, in that

16    time frame.

17  Q.  And I take it these -- these consolidation

18    discussions didn't actually result in the

19    consolidation of the two MLSs?

20  A.  Correct.

21  Q.  Do you have an understanding why?

22  A.  Other than there was an issue as to who was going

23    to own the MLS service and the two parties that

24    currently own it could not agree as to the

25    ownership structure.

GEORGE ULRYCH, MARCH 8, 2007

```
 1  STATE OF MICHIGAN    )
 2  COUNTY OF MACOMB     )
 3
 4              Certificate of Notary Public
 5      I do hereby certify the witness, whose attached
 6  testimony was taken in the above matter, was first duly
 7  sworn to tell the truth; the testimony contained herein
 8  was reduced to writing in the presence of the witness, by
 9  means of stenography; afterwards transcribed; and is a
10  true and complete transcript of the testimony given.  I
11  further certify that I am not connected by blood or
12  marriage with any of the parties, their attorneys or
13  agents, and that I am not interested directly, indirectly
14  or financially in the matter of controversy.
15
16      In witness whereof, I have hereunto set my hand this
17  day at Shelby Township, Michigan, County of Macomb, State
18  of Michigan.
19  Dated: March 22, 2007
20
21          Timothy M. Floury, CSR-5780
22          Certified Shorthand Reporter
23          Notary Public, Macomb County, Michigan
24          My Commission expires 4/11/2012
25
```

CHRISTOPHER T. EIGEL,   SEPTEMBER 6, 2007
CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


UNITED STATES OF AMERICA,          )   CONFIDENTIAL

                 Plaintiff,        )

              vs.                   ) Civil Action No.

NATIONAL ASSOCIATION OF             )   05 C 5140

REALTORS,                           )

                 Defendant.         )


The videotaped deposition of CHRISTOPHER

T. EIGEL, called for examination, taken pursuant to

the provisions of the Code of Civil Procedure and

the Rules of the Supreme Court of the State of

Illinois pertaining to the taking of depositions for

the purpose of discovery, taken before ELIA E.

CARRIÓN, CSR No. 084.004641, a Notary Public within

and for the County of Cook, State of Illinois, and a

Certified Shorthand Reporter of said state, taken at

120 South Riverside Plaza, Chicago, Illinois, on the

6th day of September, A.D. 2007, at 9:16 a.m.

CHRISTOPHER T. EIGEL,   SEPTEMBER 6, 2007
CONFIDENTIAL

Page 121

1      A.    Yes.

2            (WHEREUPON, a certain document was

3        marked Government Deposition Exhibit No. 888,

4         for identification, as of this date.)

5             (WHEREUPON, the document was

6              tendered to the witness.)

7   BY MR. KULLY:

8      Q.    I've marked the next document as

9   Government Exhibit 888, which appears to be an

10  article from Realtor magazine, dated June 2004,

11  entitled MLS Dispute Heats Up.

12           Do you recall seeing this article before?

13     A.    Not specifically, but I probably did.

14     Q.    Okay.  Let me refer you to the first

15  page, the top of the middle column.  There's a

16  sentence that says, "For Ayers -- for Ayers and

17  Eigel, the situation comes down to three things:

18  Data protection and control, operational structure,

19  and, to a lesser extent, technology."

20           Were those the three categories that you

21  identified earlier as to the concerns you had about

22  MLSNI?

23     A.    More or less, yes.  Yes, I think so

24  mm-hmm, yes.

CHRISTOPHER T. EIGEL,    SEPTEMBER 6, 2007
CONFIDENTIAL

Page 122

1      Q.    Does that bring to mind any other

2   concerns you had with MLSNI?

3      A.    No.

4      Q.    Let me ask you to look at the second page

5   of the article.  In the second full paragraph, it

6   starts "Besides."

7            Do you see where I'm referring?

8      A.    Oh, besides, yes.

9      Q.    Okay.  It says, "Besides the data sharing

10   issue, Eigel says the structural differences between

11   MLSNI and MAP are so fundamental, he's not sure they

12   can ever be resolved."

13            Do you recall stating something to that

14   effect at that time?

15      A.    No, but it sounds right.

16      Q.    Was that a statement you agreed with?

17      A.    Yes.

18      Q.    Why did you feel they were so

19   fundamental, they could never be resolved?

20      A.    Well, primarily I was talking about

21   ownership, and that's the primary one; but then also

22   governance.  But ownership would have been the

23   primary one.

24      Q.    And the next sentence says, "The MLS is

CHRISTOPHER T. EIGEL,    SEPTEMBER 6, 2007
CONFIDENTIAL

Page 123

1    the most important marketing element that brokers

2    have, by a huge margin."

3             Do you remember saying that?

4    A.    No, but I agree with it.

5    Q.    You do agree with it?

6    A.    I would have said it.

7    Q.    And why do you feel it's the most

8    important marketing element that brokers have?

9    A.    It just is.  You can do a survey of

10   agents and ask them how, if you had to give up, if

11   you had to give up one, or if you couldn't give up

12   one thing, what would it be; it would be MLS, by a

13   huge margin.  They'd give up everything else before

14   MLS.

15   Q.    When Koenig & Strey withdrew some offices

16   from MLSNI, did it continue operating its VOW?

17   A.    Yes.

18   Q.    Could potential buyers working with an

19   agent in one of the North Shore offices see MLSNI

20   listings on Koenig & Strey's VOW?

21   A.    Yes, yes.

22   Q.    But if a buyer went into a North Shore

23   office, talked to a Koenig & Strey agent, could that

24   agent search MLSNI listings to show listings --

CHRISTOPHER T. EIGEL,   SEPTEMBER 6, 2007
CONFIDENTIAL

Page 256

1   STATE OF ILLINOIS )

2                     )  SS:

3   COUNTY OF C O O K )

4

5            I, ELIA E. CARRIÓN, a Notary Public

6   within and for the County of Cook, State of

7   Illinois, and a Certified Shorthand Reporter of said

8   state, do hereby certify:

9            That previous to the commencement of the

10  examination of the witness, the witness was duly

11  sworn to testify the whole truth concerning the

12  matters herein;

13           That the foregoing deposition transcript

14  was reported stenographically by me, was thereafter

15  reduced to typewriting under my personal direction

16  and constitutes a true record of the testimony given

17  and the proceedings had;

18           That the said deposition was taken before

19  me at the time and place specified;

20           That I am not a relative or employee or

21  attorney or counsel, nor a relative or employee of

22  such attorney or counsel for any of the parties

23  hereto, nor interested directly or indirectly in the

24  outcome of this action.

CHRISTOPHER T. EIGEL,  SEPTEMBER 6, 2007
CONFIDENTIAL

1              IN WITNESS WHEREOF, I do hereunto set my

2    hand and affix my seal of office at Chicago,

3    Illinois, this 19th day of September, 2007.

4

5

6                   Notary Public, Cook County,

7                   Illinois

8                   My commission expires 1-17-11

9

10   C.S.R. Certificate No. 084.004641.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 8

.

KAREN WASS, MAY 31, 2007

Page 1

```
1              UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
4                      ---oOo---
5   UNITED STATES OF AMERICA,    )
                                 )
6                  Plaintiff,    ) Civil Action No. 05C-5140
                                 )
7              vs.               ) Judge Filip
                                 )
8   NATIONAL ASSOCIATION OF      ) Magistrate Judge Denlow
    REALTORS,                    )
9                                )
                 Defendants.     )
10  _____  )
11
12                     ---oOo---
13             VIDEOTAPED DEPOSITION OF
14                   KAREN WASS
15              Thursday, May 31, 2007
16       by SAMUEL R. MILLER, Esq., Attorney at Law
17                     ---oOo---
18
19
20
21
22
    Reported by:
23  BRIAN S. CARDOZA
    C.S.R. #8362
24  Job No. 25810
25
```

KAREN WASS, MAY 31, 2007

| | | |
|---|---|---|
| 1 | MR. KENDLER: | 10:02:14 |
| 2 | Q.   Okay.   Now, -- and the uploading of | 10:02:16 |
| 3 | listings in a timely manner by other brokers permitted | 10:02:20 |
| 4 | your agents the opportunity to sell that property, and | 10:02:24 |
| 5 | present buyers for that property? | 10:02:26 |
| 6 | MR. MILLER:   Objection to form, calls for | 10:02:28 |
| 7 | speculation. | 10:02:28 |
| 8 | MR. DUNCAN:   I'd join. | 10:02:30 |
| 9 | THE WITNESS:   Well, I would think that | 10:02:34 |
| 10 | they -- the timely uploading by other brokers was -- | 10:02:36 |
| 11 | is -- is important for the same reasons the timely | 10:02:42 |
| 12 | uploading by my sales associates was.   It's for the | 10:02:44 |
| 13 | benefit of the client, and to keep the business | 10:02:46 |
| 14 | moving. | 10:02:48 |
| 15 | MR. KENDLER: | 10:02:48 |
| 16 | Q.   Did you find that the timely uploading | 10:02:50 |
| 17 | by other brokers was beneficial to KW Associates' | 10:02:56 |
| 18 | ability to represent buyers? | 10:02:58 |
| 19 | A.   Yes. | 10:02:58 |
| 20 | Q.   Okay.   And how -- how was it beneficial | 10:03:02 |
| 21 | to representing the buyers? | 10:03:04 |
| 22 | A.   What -- what could happen is that you | 10:03:12 |
| 23 | would have a -- a system of -- a broker who engaged in | 10:03:16 |
| 24 | a system of, what we call, sandbagging listings, and | 10:03:18 |
| 25 | they would actually hold all of their properties.   And | 10:03:24 |

KAREN WASS, MAY 31, 2007

```
 1   this happened in all market conditions.  Not only a      10:03:28
 2   hot market.  It's happening today.  The better          10:03:30
 3   listings, the better priced listings, are not           10:03:34
 4   submitted in a timely manner, and, therefore, they're   10:03:38
 5   marketed in-house prior to the time that other members  10:03:42
 6   of the listing service have access.  And, again, it     10:03:46
 7   goes back to client service.                            10:03:48
 8              MR. KENDLER:                                  10:03:50
 9              Q.  And -- and when they keep a -- a good     10:03:54
10   listing in-house, that would prevent your -- your       10:04:00
11   agents from selling the property?                       10:04:02
12              MR. MILLER:  Calls for -- well, it lacks      10:04:04
13   foundation, calls for speculation.                      10:04:06
14              MR. DUNCAN:  I'm going to join.              10:04:08
15              MR. KENDLER:                                  10:04:08
16              Q.  Okay.  Well, --                           10:04:08
17              MR. DUNCAN:  But the odd's vague as well.     10:04:10
18              MR. KENDLER:                                  10:04:12
19              Q.  Yeah, you may answer, if you can.         10:04:14
20              A.  Oh, I understand it real well.  Yes, it   10:04:16
21   keeps my people -- if -- if my -- if my -- if an -- if  10:04:20
22   an agent at Coldwell Banker and an -- and an agent at   10:04:24
23   KW had -- had a buyer for -- for a similar property     10:04:26
24   and the listing agent at Coldwell Banker did not place  10:04:30
25   that listing in a timely manner, yes, my agent would    10:04:32
```

| | | |
|---|---|---|
| 1 | be disadvantaged. | 10:04:36 |
| 2 | Q. Okay. Now, you had said earlier that | 10:04:54 |
| 3 | you were -- correct me if I'm wrong, but I believe you | 10:04:58 |
| 4 | said earlier that you were not in favor of requiring | 10:05:02 |
| 5 | written notice in order to opt in to an IDX system. | 10:05:06 |
| 6 | Is -- is that what you were testifying to earlier? | 10:05:08 |
| 7 | MR. MILLER: Well, mischaracterizes prior | 10:05:12 |
| 8 | testimony, object to form. Why don't you just ask -- | 10:05:14 |
| 9 | ask a new question, just so the record is clear. | 10:05:18 |
| 10 | MR. KENDLER: Okay. | |
| 11 | MR. KULLY: You can answer it, if you can. | 10:05:20 |
| 12 | MR. KENDLER: | 10:05:22 |
| 13 | Q. Yeah, you can answer it, if you could. | 10:05:22 |
| 14 | A. I said that I was not in favor of | 10:05:24 |
| 15 | requiring a written agreement to market an IDX. | 10:05:32 |
| 16 | Okay. Because I think that -- IDX and MLS are two | 10:05:36 |
| 17 | different things. IDX deals with the public. MLS, | 10:05:40 |
| 18 | and the offers of compensation, deal with the sales | 10:05:44 |
| 19 | associates. I look at IDX as -- as that deals with | 10:05:50 |
| 20 | our -- our -- our public Web sites and our marketing | 10:05:54 |
| 21 | abilities. MLS is a -- is a -- in my mind, is a | 10:05:58 |
| 22 | completely different matter. | 10:06:02 |
| 23 | Q. And -- and I -- earlier you were also | 10:06:16 |
| 24 | talking about the information available on -- on a | 10:06:18 |
| 25 | particular listing that appeared in IDX, and you had | 10:06:24 |

KAREN WASS, MAY 31, 2007

| | | |
|---|---|---|
| 1 | said that IDX information doesn't include the | 10:06:28 |
| 2 | confidential remarks or the commission agreement? | 10:06:32 |
| 3 | A. Right. | 10:06:32 |
| 4 | Q. Do you know if IDX information would | 10:06:36 |
| 5 | include the days-on-market for a property? | 10:06:38 |
| 6 | A. No, that would be one of the pieces of | 10:06:46 |
| 7 | data that would not be available. | 10:06:48 |
| 8 | Q. Do you know if the IDX would include | 10:06:50 |
| 9 | property disclosures? | 10:06:52 |
| 10 | MR. MILLER: It's vague. | 10:06:54 |
| 11 | THE WITNESS: Yeah, I -- I -- I don't -- I | 10:06:58 |
| 12 | don't know what property disclosures. | 10:07:00 |
| 13 | MR. KENDLER: | 10:07:02 |
| 14 | Q. Does California require a -- a | 10:07:04 |
| 15 | written -- the seller to present written disclosures | 10:07:06 |
| 16 | on the property? | 10:07:06 |
| 17 | A. Yes. Yes. | 10:07:08 |
| 18 | Q. Okay. Are those disclosures included in | 10:07:10 |
| 19 | the MLS listing? | 10:07:12 |
| 20 | A. No. | 10:07:14 |
| 21 | Q. Okay. Now, you had also testified | 10:07:44 |
| 22 | earlier that you had -- KW Associates had returned to | 10:07:50 |
| 23 | the MLS in -- in part because of the agreement reached | 10:07:54 |
| 24 | with the -- between the BLS and the MLS, and I was | 10:07:58 |
| 25 | wondering, what were the other reasons for -- for | 10:08:02 |

KAREN WASS, MAY 31, 2007

| | | |
|---|---|---|
| 1 | returning? | 10:08:02 |
| 2 | A. Well, they were the only MLS. I | 10:08:06 |
| 3 | mean, -- and -- and the expectation by the client is | 10:08:12 |
| 4 | that you will belong to an MLS. And, actually, the | 10:08:18 |
| 5 | practical implication of that is it would be very | 10:08:22 |
| 6 | difficult to do business without being a member of an | 10:08:24 |
| 7 | MLS. | 10:08:24 |
| 8 | Q. Did K -- KW Associates -- or -- or did | 10:08:30 |
| 9 | it ever consider going without MLS access altogether? | 10:08:34 |
| 10 | A. No. | 10:08:34 |
| 11 | Q. Okay. And -- and that's because of | 10:08:36 |
| 12 | client demand? | 10:08:38 |
| 13 | MR. MILLER: Objection to form. | 10:08:40 |
| 14 | MR. KENDLER: | 10:08:40 |
| 15 | Q. Or why is that? | 10:08:42 |
| 16 | A. Well, it's a practical business matter, | 10:08:46 |
| 17 | as -- as -- I -- and let's look at it a lot of ways. | 10:08:52 |
| 18 | First of all, I would have lost all of my sales | 10:08:54 |
| 19 | associates, because they would require that a broker | 10:08:58 |
| 20 | did, regardless of my personal feelings, because it's | 10:09:02 |
| 21 | very difficult to -- to market property, or to -- to | 10:09:06 |
| 22 | be in the business if you're not a member of the MLS, | 10:09:10 |
| 23 | and the guarantee of compensation is -- is very high | 10:09:16 |
| 24 | on agents' expectation levels of -- of something that | 10:09:20 |
| 25 | will exist. | 10:09:22 |

KAREN WASS, MAY 31, 2007

```
1          Q.  Okay.  Are -- are there any other        10:09:26
2     reasons, or --                                     10:09:28
3          A.  Well, I -- it -- I think that it's -- in  10:09:34
4     the practice of -- of selling residential real estate, 10:09:36
5     the compilation of data that MLS has is critical to 10:09:42
6     the success of that business.  And, basically, do   10:09:46
7     you -- you know, could you do a business without an 10:09:52
8     ML -- being a member of MLS?  Perhaps.  If you're, you 10:09:58
9     know, super techno savvy, and -- but -- but that    10:10:02
10    doesn't exist in the real world either.  So, it's -- 10:10:06
11    it's that we've -- over the years, we've come to look 10:10:08
12    at that compilation of data as -- as a keystone to our 10:10:14
13    business.                                           10:10:14
14         Q.  Do you know of any brokers in             10:10:18
15    Bakersfield, who represent residential clients, do you 10:10:22
16    know of any that operate in Bakersfield without access 10:10:26
17    to the MLS?                                         10:10:26
18         A.  I don't know.  I don't have that          10:10:30
19    information.  I mean, I'm sure there are -- well,   10:10:34
20    there are licensees in Bakersfield who do not belong 10:10:36
21    to the MLS, but I wouldn't consider them "in the    10:10:40
22    business".                                          10:10:48
23         MR. KENDLER:  Okay, do you mind if we take a  10:10:50
24    five-minute break?  We might be able to --         10:10:52
25         THE WITNESS:  No, go ahead.  Go ahead.  I'm   10:10:54
```

KAREN WASS, MAY 31, 2007

```
 1   STATE OF CALIFORNIA, )

 2                        )  ss.

 3   COUNTY OF KINGS.     )

 4

 5            I, BRIAN S. CARDOZA, a Certified Shorthand

 6   Reporter in and for the State of California, DO HEREBY

 7   CERTIFY:

 8            That the foregoing proceedings were taken

 9   before me at the time and place herein set forth; that

10   any witnesses in the foregoing proceedings, prior to

11   testifying, were placed under oath; that a verbatim

12   record of the proceedings was made by me using machine

13   shorthand which was thereafter transcribed under my

14   direction; further, that the foregoing is an accurate

15   transcription thereof.

16            I further certify that I am neither

17   financially interested in the action nor a relative or

18   employee of any attorney or any of the parties.

19            IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22            Dated: June 7, 2007

23

24

25                    _____
                      BRIAN S. CARDOZA  C.S.R. #8362
```

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


UNITED STATES OF AMERICA,        )   CONFIDENTIAL

                 Plaintiff,      )

            vs.                  ) Civil Action No.

NATIONAL ASSOCIATION OF          )   05 C 5140

REALTORS,                        )

                 Defendant.      )


        The videotaped deposition of CHRISTOPHER

T. EIGEL, called for examination, taken pursuant to

the provisions of the Code of Civil Procedure and

the Rules of the Supreme Court of the State of

Illinois pertaining to the taking of depositions for

the purpose of discovery, taken before ELIA E.

CARRIÓN, CSR No. 084.004641, a Notary Public within

and for the County of Cook, State of Illinois, and a

Certified Shorthand Reporter of said state, taken at

120 South Riverside Plaza, Chicago, Illinois, on the

6th day of September, A.D. 2007, at 9:16 a.m.

CHRISTOPHER T. EIGEL,   SEPTEMBER 6, 2007
CONFIDENTIAL

Page 165

1    meaning all of our office would have had to have

2    been in MLSNI.  Or all of them -- none of them could

3    have been.  They either all had to be in or none of

4    them were in.

5              So for us, if we were going to continue

6    to leave the North Shore offices out of MLSNI, then

7    we would have had to withdraw all the other offices

8    as well.

9         Q.    And I take it at the time this was a rule

10   you opposed?

11        A.    Yes.

12        Q.    Why did you oppose it?

13        A.    We weren't prepared to take the other

14   offices out of MLSNI.

15        Q.    And why weren't you prepared to take the

16   other offices out of MLSNI?

17        A.    Because we were still struggling with

18   succeeding in doing it in the North Shore.  We

19   didn't want to spread that condition any further.

20   It was causing difficulty in the North Shore

21   branches, and we didn't need to expand that into the

22   other branches.

23        Q.    And what difficulties was it causing in

24   the North Shore branches?

CHRISTOPHER T. EIGEL,   SEPTEMBER 6, 2007
CONFIDENTIAL

Page 166

```
 1        A.    Upset on the part of the agents, of the

 2   type of things we've described about having the

 3   listings not be in MLSNI and competitors using it

 4   against them; the difficulty of getting them into

 5   MLSNI, if they did, and how that happened and not

 6   being able to search.  All those things.

 7             (WHEREUPON, a certain document was

 8          marked Government Deposition Exhibit No. 898,

 9          for identification, as of this date.)

10                (WHEREUPON, the document was

11                tendered to the witness.)

12   BY MR. KULLY:

13        Q.    I'll show you what I've marked as

14   Exhibit 898, which appears to be a letter from

15   Christopher J. Eigel to Doug Ayers and Steve Baird,

16   dated September 30, 2004 and has Bates numbers

17   REAL 1746827 through 6828.

18        A.    Mm-hmm.  Okay.

19        Q.    Do you recognize Exhibit 898?

20        A.    Actually, I do recognize this one.  I

21   remember this letter.

22        Q.    What do you recognize it to be?

23        A.    A letter to Doug and to Steve, explaining

24   my, my concerns about where we were, with regard to
```

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087      800.708.8087      FAX: 312.704.4950

CHRISTOPHER T. EIGEL,    SEPTEMBER 6, 2007
CONFIDENTIAL

Page 167

1    the whole MAP program.

2        Q.    And Doug is Doug Ayers from

3    Coldwell Banker?

4        A.    Yes.

5        Q.    Steve is Steve Baird from Baird & Warner?

6        A.    Yes.

7        Q.    You start the letter by saying "It's not

8    working."

9              What wasn't working?

10       A.    The, the, what I was referring to there

11   is that what I thought was going to happen was that

12   other brokers would join MAP and leave MLSNI; and

13   MAP would become the dominant, if not the only MLS

14   serving the North Shore.  And then that same, that

15   same approach, that same result would happen in the

16   other markets that I described before, starting with

17   the northwest and going around the city and then

18   Chicago.  And that didn't happen.

19             Brokers did join MAP, so that part

20   happened; but they didn't leave MLSNI, so that was

21   the part that didn't work.  So the, the original

22   plan that -- of having MAP supplant MLSNI was not

23   succeeding.

24       Q.    You say at the second sentence of the

CHRISTOPHER T. EIGEL,    SEPTEMBER 6, 2007
CONFIDENTIAL

Page 168

1    second paragraph, "Obviously, there were problems

2    associated with our departure from MLSNI for agents

3    and clients, both in our city and North Shore

4    offices, but everyone in our organization was

5    optimistic that they would be short-lived."

6            What were the problems for agents in

7    Koenig & Strey's North Shore offices -- I'm sorry,

8    city offices?

9        A.    Well, in the city offices they, the city

10   agents didn't have ready access to North Shore

11   inventory, because it wasn't in MLSNI, and they

12   weren't members of MAP.  So, so they didn't have

13   good access to information on the North Shore, so

14   that was a problem for them.

15       Q.    So --

16       A.    It was hard for them to show.

17       Q.    Okay, I thought we talked before about

18   Koenig & Strey had all of its Chicago offices in

19   MAP.

20            That's not true?

21       A.    But the city agents, whether they were in

22   MAP or not, didn't use it.  They didn't -- it was

23   not something that they were attuned to using.

24       Q.    Okay.  And I think we've discussed the

CHRISTOPHER T. EIGEL,   SEPTEMBER 6, 2007
CONFIDENTIAL

Page 169

1  problems for agents in Koenig & Strey's North Shore

2  offices.

3       A.    Yes.

4       Q.    What were the problems for clients in

5  Koenig & Strey's city offices?

6       A.    For clients, that would be primarily

7  buyer clients who were looking with city agents in

8  the suburbs.  For the same reason the agents would

9  have difficulty, the clients would, too.

10           The city clients was not as -- the focus

11  was not as strong on them.  That was a lesser part

12  of the issue.

13       Q.    And what were the problems for clients in

14  the North Shore offices?

15       A.    Well, in the North Shore, both buyer

16  clients and seller clients didn't have access to

17  MLSNI, so they didn't have -- buyers didn't have

18  access to the full, full inventory, and sellers

19  didn't have their home exposed in, in the full -- to

20  all the brokers through the MLS system.

21       Q.    Why were the procedures, take them one at

22  a time, for sending hot sheets of new listings to

23  the North Shore offices not sufficient so that

24  buyers in the North Shore would know of the listings

CHRISTOPHER T. EIGEL,    SEPTEMBER 6, 2007
CONFIDENTIAL

Page 170

1   in MLSNI?

2        MS. JONES:  Object to the form.

3   BY THE WITNESS:

4        A.    It was just a cumbersome system, just not

5   efficient.  Agents had to be in the office to get

6   the hot sheet.  It just -- and then the hot sheet is

7   only a listing, a, you know, a one-line listing of

8   address and price.  So it didn't have much

9   information on it.  So if you saw one you thought

10  you liked, then you had to figure out how to get the

11  further information; which you could do; but again,

12  it was just not very efficient.

13  BY MR. KULLY:

14       Q.    Why did you think that the problems would

15  be short-lived?

16       A.    Well, because I was naive.  I thought

17  that, I honestly thought that other brokers would do

18  the same thing we did and leave MLSNI, but that

19  didn't happen.

20       Q.    And why do you think they didn't?

21       A.    In some cases I think it was simply

22  resistance to change, just flat-out resistance to

23  change.  For -- in some cases it was because this

24  gave them a competitive advantage and an opportunity

CHRISTOPHER T. EIGEL,   SEPTEMBER 6, 2007
CONFIDENTIAL

Page 171

1    to, to have a point of distinction against the

2    bigger brokers that they'd never had before, so they

3    wanted to maximize that.

4            Some of them just didn't want to do

5    whatever the big brokers wanted to do.  They didn't

6    want -- there was some big broker/little broker

7    issue; and to the extent that this was looked at as

8    a big broker move, some, some brokers didn't want to

9    do it just because they didn't want to be part of

10   that and didn't want to -- whatever was good for the

11   big brokers, they didn't want to promote.

12           So there were a number of factors.

13   Q.    You say in the third paragraph, I guess

14   the fourth paragraph, "We have all lost business, we

15   have all lost business in the North Shore as a

16   result of our inability to provide full MLS access."

17           Was that true for Koenig & Strey?

18   A.    Yes.

19   Q.    Can you quantify --

20   A.    No.

21   Q.    -- the losses?

22   A.    No.  But I know it was true.

23   Q.    Can you identify the measure of the, that

24   you were using to --

CHRISTOPHER T. EIGEL,    SEPTEMBER 6, 2007
CONFIDENTIAL

Page 172

1        A.    The fact that we, we did not get listings

2    that we otherwise would have, that we lost listings

3    to competitors that we otherwise would have gotten.

4              And, and I just made the assumption that

5    if that happened to us, it happened to Baird &

6    Warner and Coldwell Banker.  I didn't know that

7    firsthand, but I was 99 percent sure of it.

8        Q.    And were you losing business to brokers

9    who had access to both MLSs?

10       A.    Yes.

11       Q.    Had Koenig & Strey lost agents?

12       A.    No.

13       Q.    But you feared that that would, that

14   might happen?

15       A.    Yes.

16             Let me -- we didn't, we didn't have

17   agents leave our company to go other companies.

18   There may have been agents we didn't hire or weren't

19   able to hire as a result.  I don't know that, but

20   that could have happened.

21       Q.    In the last paragraph on the first page

22   starts, "So far what we've done has been great for

23   MAP and for our competitors, but it has been a

24   negative for our agents, our clients and our

CHRISTOPHER T. EIGEL,    SEPTEMBER 6, 2007
CONFIDENTIAL

Page 173

 1  organizations."

 2          How was it great for MAP?

 3      A.    Well, their membership increased

 4  dramatically, so they generated a lot more fee

 5  income as a result.

 6      Q.    You say -- if you turn to the second

 7  page, below the bullets, the sentence says, "I'm not

 8  yet ready to return to MLSNI unilaterally, as doing

 9  so will only prolong the agony and make things even

10  more difficult for your organizations."

11          Why did you think that returning

12  unilaterally would prolong the agony?

13      A.    Well, it would just put more pressure on

14  them, because they were -- I was convinced they were

15  feeling the same pressure we were, the same pressure

16  from agents and clients, primarily agents; and that

17  if we went back to MLSNI, that would only intensify

18  on them.

19      Q.    And why was that something you cared

20  about?

21      A.    Just because we had been in this

22  together, and I didn't want to just leave them in

23  the lurch, so to speak, without letting them know I

24  was going to do it.

CHRISTOPHER T. EIGEL,   SEPTEMBER 6, 2007
CONFIDENTIAL

Page 174

1      Q.    You propose in the last paragraph that
2  you need to discuss this as soon as possible.
3            Do you recall meeting with Doug Ayers and
4  Steve Baird to discuss what you raise in this
5  letter?
6      A.    I don't think we ever did, actually.  I
7  don't recall meeting, and I think we never did.  But
8  I really don't recall.
9      Q.    Do you recall receiving any reaction
10 from --
11     A.    No, I don't.
12     Q.    No reaction from either of them?
13     A.    I don't recall a reaction from either one
14 of them, mm-mm.
15     Q.    Do you recall Doug Ayers or Steve Baird
16 urging you to stay the course?
17     MS. JONES:  Object to the form.
18 BY THE WITNESS:
19     A.    No, I don't recall that either.
20            I think, I don't recall much reaction to
21 this at all, which is a little surprising to me, but
22 I don't recall anything.
23 BY MR. KULLY:
24     Q.    Why did you write this letter when you

CHRISTOPHER T. EIGEL,   SEPTEMBER 6, 2007
CONFIDENTIAL

Page 175

1  did?

2      A.    I wrote to let them know how concerned I

3  was about how this had developed and the pressure

4  that I was feeling that I was confident they were

5  feeling; and that I wasn't -- to let them know that

6  it was not likely that Koenig & Strey was going to

7  continue on.

8      Q.    Was there -- were you thinking of any

9  upcoming market events, when you decided to write

10  it, at the time you wrote it?

11      MS. JONES:  Object to form.

12  BY THE WITNESS:

13      A.    I don't think so.

14          (WHEREUPON, a certain document was

15       marked Government Deposition Exhibit No. 899,

16       for identification, as of this date.)

17            (WHEREUPON, the document was

18              tendered to the witness.)

19  BY MR. KULLY:

20      Q.    I show you what I've marked as Government

21  Exhibit 899.

22      MR. PERNA:  My confidentiality stamp is faded

23  on this.  It's on the back.  Your copy is not

24  picking it up.  It's on a couple others.

CHRISTOPHER T. EIGEL,   SEPTEMBER 6, 2007
CONFIDENTIAL

Page 256

1   STATE OF ILLINOIS )

2                     )  SS:

3   COUNTY OF C O O K )

4

5           I, ELIA E. CARRIÓN, a Notary Public

6   within and for the County of Cook, State of

7   Illinois, and a Certified Shorthand Reporter of said

8   state, do hereby certify:

9           That previous to the commencement of the

10  examination of the witness, the witness was duly

11  sworn to testify the whole truth concerning the

12  matters herein;

13          That the foregoing deposition transcript

14  was reported stenographically by me, was thereafter

15  reduced to typewriting under my personal direction

16  and constitutes a true record of the testimony given

17  and the proceedings had;

18          That the said deposition was taken before

19  me at the time and place specified;

20          That I am not a relative or employee or

21  attorney or counsel, nor a relative or employee of

22  such attorney or counsel for any of the parties

23  hereto, nor interested directly or indirectly in the

24  outcome of this action.

CHRISTOPHER T. EIGEL, SEPTEMBER 6, 2007
CONFIDENTIAL

1          IN WITNESS WHEREOF, I do hereunto set my

2   hand and affix my seal of office at Chicago,

3   Illinois, this 19th day of September, 2007.

4

5

6                    Notary Public, Cook County,

7                    Illinois

8                    My commission expires 1-17-11

9

10  C.S.R. Certificate No. 084.004641.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 9

STEPHEN H. MURRAY,   SEPTEMBER   20,   2007

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

UNITED STATES OF AMERICA, )

                Plaintiff,  ) Civil Action

    vs.                  ) No. 05 C 5140

NATIONAL ASSOCIATION OF   )

REALTORS,                 )

                Defendant.  )


      The videotaped deposition of

STEPHEN H. MURRAY, called as a witness for

examination, taken pursuant to the Federal Rules

of Civil Procedure of the United States District

Courts pertaining to the taking of depositions,

taken before PAULINE M. VARGO, a Notary Public

within and for the County of DuPage, State of

Illinois, and a Certified Shorthand Reporter of

said state, C.S.R. No. 84-1573, at Suite 3700,

One South Dearborn Street, Chicago, Illinois, on

the 20th day of September, A.D. 2007, at 9:06 a.m.

STEPHEN H. MURRAY,   SEPTEMBER   20,   2007

                                                        Page 142

13:09:39  1        THE VIDEOGRAPHER:  We are going back on the

13:09:41  2    video record at the start of Tape 4 at 1:09 p.m.

13:09:46  3        MR. KRAMER:  Thank you.

          4                STEPHEN H. MURRAY,

          5    called as a witness herein, having been previously

          6    duly sworn and having testified, was examined and

          7    testified further as follows:

          8                EXAMINATION (Resumed)

          9    BY MR. KRAMER:

13:09:47 10        Q.    Mr. Murray, before we broke for lunch,

13:09:51 11    you were referring to ZipRealty in connection with

13:09:54 12    opt-outs.  Do you recall that?

13:09:55 13        A.    Yes.

13:09:57 14        Q.    Were you suggesting that ZipRealty

13:10:01 15    supported NAR's opt-out provisions?

13:10:03 16        A.    No, I don't -- I don't recall their

13:10:07 17    exact position on it at this moment, but no, I

13:10:10 18    don't think -- to the best of my knowledge, they

13:10:12 19    are not in support of it back in 2002 and '3.

13:10:16 20        Q.    Do you know if they are any different in

13:10:20 21    their views today on the 2005 policy?

13:10:22 22        A.    I don't know.  I don't know what their

13:10:24 23    position is at this time.

13:10:26 24        Q.    Before the break also, did I understand

STEPHEN H. MURRAY,  SEPTEMBER  20,  2007

Page 143

13:10:29  1   you to say that it would be suicide for a broker to

13:10:33  2   take their listings off a broker's VOW?

13:10:38  3       A.   It could be, yes.

13:10:39  4       Q.   And would that generally be your view?

13:10:42  5       A.   Yes.

13:10:43  6       Q.   If that is your general view, would it

13:10:46  7   also be a general view that it would be suicide

13:10:49  8   even more so for brokers to withdraw from an MLS

13:10:54  9   over their listings appearing on a VOW?

13:10:56 10       A.   It would be very difficult, yes.  It

13:11:02 11   could be, again, very harmful to their business.

13:11:06 12       Q.   And as a general proposition would you

13:11:08 13   expect that it would be very harmful to their

13:11:10 14   business?

13:11:11 15       A.   Yes, I do.

13:11:22 16       Q.   Would you agree that allowing brokers to

13:11:24 17   make individual decisions about their listings --

13:11:30 18   excuse me.  Strike that, please.

13:11:33 19            Would you agree that allowing brokers to

13:11:35 20   make individual decisions about how their listings

13:11:37 21   may be used is procompetitive in its own right?

13:11:42 22       A.   Yes.

13:11:45 23       Q.   What do you mean when you use the word

13:11:48 24   "procompetitive" in that context?

STEPHEN H. MURRAY, SEPTEMBER 20, 2007

Page 190

14:21:09  1      Q.    And is it also your view that threats

14:21:12  2  of withdrawal from the MLS as a result of the VOW

14:21:16  3  policy were reasonable, as you also stated, in

14:21:20  4  connection with the concern that withdrawal would

14:21:22  5  have been harmful to competition?

14:21:24  6      A.    Yes.  I mean, based also on the --

14:21:32  7  particularly the now-rapid expansion of

14:21:34  8  alternatives to MLS, on which I have commented

14:21:36  9  earlier today.

14:21:38 10          I do want to correct one impression I

14:21:40 11  think earlier, and I hope I didn't misstate this

14:21:44 12  too badly.  I think you asked me about the

14:21:46 13  withdrawal.  We talked about the definition of

14:21:48 14  what you and I meant to be absolute withdrawal.

14:21:51 15      Q.    Yes, sir.

14:21:51 16      A.    When I talk about the threat of

14:21:53 17  withdrawal, I am really talking about a group, and

14:21:58 18  I meant that in that context all along.  I really

14:22:03 19  truthfully don't see any one individual broker

14:22:07 20  withdrawing from the MLS entirely as a reasonable

14:22:14 21  expectation.

14:22:15 22      Q.    Why would you not expect to see that,

14:22:17 23  sir?

14:22:19 24      A.    Regardless of their market share, one

STEPHEN H. MURRAY,  SEPTEMBER  20,  2007

Page 191

14:22:24  1   broker withdrawing from the MLS, and, if you will,

14:22:28  2   we used the term "going naked," the damage done to

14:22:34  3   their ranks of real estate agents who are wedded,

14:22:38  4   you know, who are fairly embedded with the MLS or

14:22:41  5   an MLS-type program, that the damage to any one

14:22:46  6   firm trying to do that by itself would be very,

14:22:48  7   very harmful to that brokerage company.

14:22:50  8        Q.    You used the term earlier "economic

14:22:54  9   suicide."  Would you view it as that?

14:22:55 10        A.    I do.  And so when I referred to in

14:22:58 11   these statements that NAR was right to perceive the

14:23:03 12   threat, I wanted to clarify.  In that context I am

14:23:06 13   always talking about a group of "X" number or more

14:23:12 14   that develop -- and I think I said earlier today,

14:23:14 15   develop an alternative to MLS, and I meant a group.

14:23:22 16   I didn't mean one.  I just wanted to be sure I

14:23:24 17   communicated that clearly with you.

14:23:26 18        Q.    And when you say a group, what would you

14:23:28 19   view it, a critical mass to be to make that type of

14:23:34 20   withdrawal viable, please, in your view?

14:23:36 21        A.    In my work in the past where we would

14:23:40 22   gather brokers to try to compel change in an MLS,

14:23:44 23   we always felt like we had to have at least 60

14:23:47 24   percent of the listings in a given marketplace to

STEPHEN H. MURRAY, SEPTEMBER 20, 2007

Page 348

1    STATE OF ILLINOIS )

2                     )  SS:

3    COUNTY OF DuPAGE  )

4           I, PAULINE M. VARGO, a Notary Public

5    within and for the County of DuPage, State of

6    Illinois, and a Certified Shorthand Reporter of

7    said state, C.S.R. No. 84-1573, do hereby certify:

8           That previous to the commencement of the

9    examination of the witness, the witness was duly

10   sworn to testify the whole truth concerning the

11   matters herein;

12          That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony

16   given and the proceedings had;

17          That the said deposition was taken

18   before me at the time and place specified;

19          That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in

23   the outcome of this action.

24

STEPHEN H. MURRAY, SEPTEMBER 20, 2007



1    IN WITNESS WHEREOF, I do hereunto set my

2   hand and affix my seal of office at Chicago,

3   Illinois, this 3rd day of October, 2007.

4

5

6    Notary Public, DuPage County, Illinois.

7    My commission expires July 27, 2011.

8

9   C.S.R. Certificate No. 84-1573

10

11    OFFICIAL SEAL
       PAULINE M VARGO
12   NOTARY PUBLIC - STATE OF ILLINOIS
      MY COMMISSION EXPIRES:07/27/11

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 10

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

UNITED STATES OF AMERICA,  )

              Plaintiff,  )

      vs.  )  Civil Action

NATIONAL ASSOCIATION OF  )  No. 05 C 5140

REALTORS,  )

            Defendant.  )

      The videotaped deposition of

DR. FREDRICK FLYER, called as a witness for

examination, taken pursuant to the Federal Rules of

Civil Procedure of the United States District

Courts pertaining to the taking of depositions,

taken before VICTORIA C. CHRISTIANSEN, a Notary

Public within and for the County of DuPage, State

of Illinois, and a Certified Shorthand Reporter of

said state, CSR No. 84-3192, at Suite 3800, One

South Dearborn Street, Chicago, Illinois, on the

17th day of October, A.D. 2007, at 9:10 a.m.

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 7

        1    circumstance that would prevent you today from

        2    providing truthful and complete answers to

        3    questions I ask?

        4        A.    I am not.

09:14   5        Q.    Okay.  In this case, you have applied

        6    the DOJ FTC guidelines for collaboration among

        7    competitors, more commonly referred to as the joint

        8    venture guidelines, to assess the overall

        9    competitive consequences of the NAR policies at

09:14  10    issue, correct?

       11        A.    I used the methodology outlined.  I also

       12    applied economic analyses, as well, so it wasn't

       13    sole application of the guidelines that leads me to

       14    the methodology or the conclusions that I reach.

09:14  15        Q.    That wasn't my question.

       16            My question was:  Did you apply the --

       17    the guidelines?

       18        MR. STEIN:  Objection, asked and answered.

       19    BY THE WITNESS:

09:14  20        A.    I relied on the guidelines as well as

       21    the merger guidelines to create a framework that I

       22    applied to this analysis, but it wasn't the sole

       23    piece of information that I used in developing my

       24    conclusions or applying my methodology.

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 8

1    BY MR. KRAMER:

2        Q.    Okay.   The joint -- the joint venture

3    guidelines that you have employed prescribe a

4    framework to evaluate whether policies or practices

09:15 5    of a joint venture among competitors are likely to

6    cause harm to competition, right?

7        A.    They describe, from what I recollect,

8    a -- a framework for analyzing collaborations and

9    describe certain types of collaborations that are

09:15 10   what they call per-se violations and alternative

11   collaborations that rely on rule of reason -- or

12   what's called rule of reason to analyze and provide

13   a framework from which to evaluate consumer welfare

14   in terms of the collaboration that's at -- that's

09:15 15   being evaluated.

16       Q.    You agree that under the guidelines, the

17   appropriate framework for evaluating whether a

18   joint venture among competitors is likely to harm

19   competition requires balancing the likely

09:16 20   anti-competitive effects of the joint venture which

21   might reduce innovation, quality of service which

22   might lead to higher prices with the venture's

23   likely pro-competitive effects which might increase

24   innovation, efficiency, quality of service --

DR. FREDRICK FLYER,  OCTOBER  17,  2007

Page 9

```
         1    quality or service or lead to lower prices?
         2         A.    That's my understanding of the approach
         3    outlined in the guideline.
         4              I would say that approach is based on an
09:16    5    economic analysis of consumer welfare, so anytime
         6    that you look at any activity in a merger or a
         7    collaboration and you're trying to assess the
         8    effects on consumer welfare, you would balance the
         9    anti-competitive effects vis a -- versus the
09:16   10    pro-competitive effects.
        11         Q.    You have used the -- the framework of
        12    the joint venture guidelines in assessing the
        13    overall competitive consequences of the NAR
        14    policies at issue in this case?
09:17   15         A.    I used the framework of balancing an
        16    assessment of the anti-competitive effects versus
        17    the potential pro-competitive effects of the VOW
        18    policy and the other policies I describe in my
        19    report.
09:17   20         Q.    Would you agree that in applying the
        21    joint venture guidelines to this case, the central
        22    question is whether the policy at issue likely
        23    harms competition by increasing the joint venture's
        24    ability or incentive profitably to raise price
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 10

1    above or reduce output quality, service or

2    innovation below or likely would prevail in the

3    absence of a relevant agreement?

4         MR. STEIN:  Object to the form and vagueness

09:17 5    as to "the policy."

6    BY THE WITNESS:

7         A.    I would say that in evaluating consumer

8    welfare, you would want to look at the effects of

9    the policies on the offerings in the marketplace,

09:17 10    and the characteristics you described, at least the

11    ones I understood, of -- relate to the quality of

12    the offerings in the marketplace.  Price,

13    characteristics of the product, rate of innovation,

14    all of those affect the quality of the products in

09:18 15    the marketplace.

16              When an economist -- let me just define

17    a term.  When an economist uses the word "price,"

18    they may actually incorporate measures of quality,

19    so it's essentially a quality-controlled price

09:18 20    measure.

21    BY MR. KRAMER:

22         Q.    Okay.  And when talking in terms of

23    harms and -- and benefits, likely harms and likely

24    benefits?

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 11

```
        1        A.    Well, this is a -- you're assessing the

        2   effects in the future, so yes.

        3        Q.    Okay.  You mentioned you're also

        4   employing the DOJ FTC horizontal merger guidelines

09:19   5   to this matter?

        6        A.    I'm employing the framework described in

        7   that -- in those guidelines, yes.

        8        Q.    And when you have assessed the

        9   likelihood of antitrust harm of a merger, you have

09:19  10   followed the merger guidelines methodology in

       11   defining relevant markets and assessing the effect

       12   on competition in those markets, correct?

       13        A.    Generally.  I'm not saying there's not

       14   exceptions to all the analyses that I've done, but

09:19  15   generally I follow those guidelines.

       16        Q.    Okay.  Do you agree with the merger

       17   guidelines precept that analysis prescribed

       18   throughout the guidelines should be focused on

       19   whether consumers or producers likely would take

09:19  20   certain actions?

       21        A.    Well, that -- are you asking me in a

       22   philosophical sense?  Because in Canada, for

       23   example, they use a slightly different guideline

       24   where they look at the -- what you're -- what the
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 12

```
        1   merger guidelines focus on are the consumer effects

        2   in the U.S.  In Canada, you also look at producer

        3   effects and whether --

        4        Q.    No, no.

09:20   5        A.    Okay.

        6        Q.    We're in the United States, so let's --

        7        A.    Are you -- are you asking do I agree in

        8   a philo- -- philosophical sense or do I agree

        9   that's what the guidelines focus on, consumer

09:20  10   welfare?  I'm not sure I follow the question.

       11        Q.    Let me -- let me re-ask the question,

       12   because I think that's where maybe the --

       13        A.    Okay.

       14        Q.    -- disconnect arose.

09:20  15             Do you agree with the merger guidelines

       16   precept that analysis of -- of matters under the

       17   guidelines should be focused on whether consumers

       18   or producers likely would take certain actions?

       19        A.    I agree that's a key criterion in

09:20  20   evaluating a merger, a collaboration or any type of

       21   business activity.

       22        Q.    Are you familiar with cost/benefit

       23   analysis?

       24        A.    I am.
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 53

1     of the MLSs.

2          Q.    Which MLS is that?

3          A.    Josh relayed this to me a few days ago,

4     and I don't recall as I sit here, but there's only

10:14 5     five or six that have I think "N/A" in there, maybe

6     a little more than that, so it would be one of

7     those.

8          Q.    Do you plan to use any exhibit as

9     support for the opinions in your August 1 report

10:14 10     that was not attached to your report?

11          A.    Any exhibits that were not attached to

12     my report?  I mean, I may use the data to -- in --

13     in the report and display it in a different way, so

14     I'm not sure what you mean by -- I -- I have no

10:14 15     anticipation of using other information unless

16     other information that bears on the question

17     becomes available, and if it does, I -- I likely

18     would use it.

19          Q.    In addition to opinions you have formed

10:15 20     that criticize Dr. Vistnes's conclusions about the

21     likely competitive consequences of NAR's policies,

22     have you actually formed your own conclusions about

23     the likely competitive consequences of any of

24     NAR's policies?

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 54

1        MR. STEIN:  Objection, asked and answered.

2     BY THE WITNESS:

3        A.    To understand the likely effects of the

4     policy, I believe you have to undertake an

10:15  5     MLS-by-MLS analyses, because the types of products

6     being offered in these different markets seem to be

7     different, the types of substitute products seem to

8     be different, the role of VOWs in these different

9     markets seems to be different.

10:15  10             And let me just actually step back,

11     because I -- I'm using the word "market" and "MLS"

12     as one here, and I don't mean it in that way, so I

13     want to be more precise.

14             You have to do -- whatever the market

10:15  15     definition is -- the relevant market definition is

16     in terms of geography and product set, you would

17     have to do an analysis on a market-by-market basis

18     in order to form reliable conclusions on the likely

19     outcomes of the policies.

10:16  20             That -- I haven't done that analysis for

21     the 900 different MLSs that exist.  I have looked

22     at the broad spectrum of services that are

23     available, the penetration rates of VOWs, the

24     market acceptance of VOWs on a whole, and I think

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 55

         1    that evidence is suggestive of the likely

         2    competitive outcomes, but I haven't undertaken a

         3    market-by-market analysis.

         4    BY MR. KRAMER:

10:16    5         Q.    When you talk about a -- likely

         6    competitive outcomes, I take it that subsumes both

         7    likely anti-competitive and likely pro-competitive

         8    effects?

         9         A.    That's correct.

10:17   10         Q.    Have you done the type of analysis

        11    you've described for any single MLS?

        12         A.    I've looked at single MLSs more

        13    carefully, certain ones.

        14               For example, I've -- I've gone -- I've

10:17   15    looked at the Houston MLS.  Part of that was

        16    reviewing the testimony of Robert Hale or at least

        17    parts of both of his depositions and understanding

        18    the type of substitute services that are available

        19    in -- in Houston, his view of competition in the

10:17   20    marketplace, VOW penetration rates in -- in

        21    Houston, which I understand besides eRealty --

        22    eRealty was fairly limited maybe until recently.

        23               So I've looked at aspects of the

        24    marketplace in certain markets that would provide

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 56

```
         1    me more information regarding the likely

         2    competitive outcomes in other markets, yes.

         3         Q.    Have you formed any of your own

         4    affirmative opinions about the likely competitive

10:18    5    effects of NAR policies in Houston?

         6         A.    Based on the -- my understanding of the

         7    Houston marketplace, the fact that you have almost

         8    complete coverage, if not complete coverage, of --

         9    on IDX both in terms of number of listings and in

10:18   10    terms of the fields that are available; the fact

        11    that you have -- I think Robert Hale testified -- I

        12    don't remember the exact number, but it might have

        13    been over a thousand different IDX sites available

        14    in Houston with almost complete listings; the fact

10:18   15    that you only have very limited presence of any VOW

        16    in Houston, I think that very strongly suggests

        17    that there would be no anti-competitive effects in

        18    Houston associated with the policies.

        19         Q.    Okay.  Aside from Houston, have you

10:19   20    formed an opinion about the likely competitive

        21    effects of any NAR policies on any other MLS?

        22         A.    Well, I've looked at Denver, as well,

        23    and Denver you could characterize in a similar

        24    manner.
```

DR. FREDRICK FLYER,  OCTOBER  17,  2007

Page 57

                    1         But I've looked at certain other

                    2    markets.  I've looked at Chicago.

                    3         Q.    Anyplace else?

                    4         A.    I've looked at a number of markets.  I

10:19          5    mean, there's a large body of evidence --

                    6         Q.    But I'm talking in the context of the

                    7    question about have you formed an opinion about the

                    8    likely competitive effects of NAR's policies in

                    9    places besides Houston.

10:19        10         You've mentioned Denver, and --

                  11         A.    Well, it's an opinion about what the

                  12    evidence suggests.  You know, I haven't

                  13    definitively concluded, you know, exactly -- I

                  14    haven't measured exactly what the pro-competitive

10:19      15    benefits would have been, so that analysis would be

                  16    incomplete without an analysis of what the

                  17    pro-competitive benefits of the policy might have

                  18    been in Houston or in Denver and so on.

                  19         So it would -- it would only be

10:20      20    evaluating the strength of the evidence that would

                  21    support anti-competitive effects that I've looked

                  22    at in these different markets or different MLSs.

                  23         Q.    Have -- have you formed an opinion in

                  24    any MLS that the NAR policies at issue are likely

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 58

         1    not anti-competitive?

         2         A.    I think a more precise wording of my

         3    opinion would be I've -- I think that the evidence

         4    strongly suggests that the policy would not be

10:20    5    anti-competitive.

         6         Q.    And you -- you've reached that opinion

         7    on Houston, Denver and where else --

         8         A.    Well --

         9         Q.    -- if anyplace.

10:20   10         A.    -- I haven't seen any evidence that the

        11    policy itself would be anti-competitive in any

        12    area.  I haven't seen any reliable evidence that

        13    indicates that it would be anti-competitive in any

        14    particular area, but to say that -- you know, to

10:21   15    have the body of evidence to measure the actual

        16    competitive effects, as I say, the -- you'd have to

        17    measure both the costs and the benefits of the

        18    policy that you mentioned earlier, and I haven't

        19    undertaken an analysis of what the pro-competitive

10:21   20    benefits would be of the policy, so I have no

        21    measure of what the ultimate effects of the policy

        22    would be.

        23         Q.    Okay.  My question was -- let me try --

        24    have you formed an opinion about the likely

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 59

```
         1    anti-competitive effects of the NAR policies at

         2    issue as concerns any MLS in the country?

         3        MR. STEIN:  Objection, asked and answered.

         4    BY THE WITNESS:

10:21    5        A.    Well, if you look at Table 1 and you see

         6    areas where you have complete coverage on IDX or

         7    close to complete coverage and you have complete

         8    display of fields, you have an MLS website -- and

         9    there are number of areas.  I think there are 29 or

10:21   10    30 in Table 1 that identify an MLS website that

        11    gives access to complete listings, you look at

        12    Realtor.com -- you look at the popularity of

        13    Realtor.com and -- and the websites -- for example,

        14    if you take Houston -- I'm just going to go back to

10:22   15    it -- the most popular website in Houston,

        16    according to their website, is -- what is it?  HAR?

        17    I think that's the MLS in Houston.  They -- their

        18    website claims that they are the most popular --

        19        Q.    Let me -- let me ask you --

10:22   20        A.    -- Realtor.- -- so they -- let me

        21    just -- I'm going to try to response.

        22            So the answer is that I think that

        23    there's a strong body of evidence for a number of

        24    areas that suggests that the competitive effects
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 60

1    would -- there would be no anti-competitive

2    effects.

3        Q.    I understand you're saying that, and I

4    my question is:  Have you formed any opinion

10:22  5    regarding ML- -- any MLS in the country that NAR's

6    policies are not likely anti-competitive?

7        A.    That's -- what I'm saying is --

8        MR. STEIN:  Objection, asked and answered.

9    BY THE WITNESS:

10:22 10        A.    -- if you'd look at Table 1 where you

11    see that there's widespread dissemination of

12    listings on the Internet and that the popularity of

13    the sites are -- are high in those areas, I think

14    there's little -- little basis to think that the

10:23 15    policies themselves would have any anti-competitive

16    effect.

17    BY MR. KRAMER:

18        Q.    Have you done a full analysis of whether

19    the policies are anti-competitive in any MLS aside

10:23 20    from looking at Table 1?

21        MR. STEIN:  Objection to form.

22    BY THE WITNESS:

23        A.    No.  What I've done is looked to see

24    whether or not there are close substitutes for

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 61

1    those products.

2              If there are close substitutes, I -- I

3    would say that that's evidence that there's very

4    little basis to think that even if there were harm

10:23 5   to VOWs that there would be any effect on

6    consumers, and I think the evidence on the

7    substitutes is provided in Table 1, so -- so

8    Table -- where Table 1 identifies a strong group of

9    substitutes, I would say that the evidence strongly

10:23 10  supports there would be no competitive effects.

11             And let me just step back for a second

12   and say:  What type of analytical structure would

13   you apply to an area in order to show that there

14   would be anti-competitive effects?  And you would

10:24 15  want to, A, show that VOWs are an important source

16   of competition; B, that VOWs are providing some

17   unique services that wouldn't be substituted for by

18   other services -- so maybe A-1 and A-2; two, that

19   the policies themselves would actually adversely

10:24 20  affect the offerings of VOWs in that area, and you

21   could just stop at Point 1 if you see that there

22   is -- and that the pro-com- -- and then thirdly,

23   that the pro-competitive benefits in those areas

24   wouldn't outweigh the anti-competitive effects.

DR. FREDRICK FLYER,  OCTOBER  17,  2007

Page 62

         1              So what I'm saying is in Table 1, you're

         2       identifying areas where you have what appears to be

         3       a lot of close substitutes for VOWs and very good

         4       substitutes for -- for VOWs, so that suggests that

10:24    5       there are no anti-competitive effects.

         6              Now, there are other areas that you'd

         7       have to go to Step 2 to see, well, what would be

         8       the effect --

         9       BY MR. KRAMER:

10:24   10          Q.    Understood.

        11          A.    Okay.

        12          Q.    Do you have -- well, strike that.

        13              Have you formed an opinion whether any

        14       of NAR's policies have a likely pro-competitive

10:25   15       effect?

        16          A.    I've surveyed the information regarding

        17       the initial implementa- -- or development of the

        18       initial VOW policy in 2003; I've read some of the

        19       depositions expressing what the brokers' concerns

10:25   20       were, including Ron Phipps, John Veneris, who is

        21       both -- I think Phipps chaired the VOW work group

        22       and Veneris is on the --

        23          Q.    Let me interrupt.

        24          A.    Okay.

DR. FREDRICK FLYER,  OCTOBER  17,  2007

Page 63

```
         1       Q.    My question was:  Have you formed an

         2   opinion whether any of NAR's policies have a likely

         3   pro-competitive effect?  I -- I'm not asking at

         4   this point for what you have reviewed.

10:25    5       A.    I've formed the opinion that there is

         6   evidence to suggest it would have a pro-competitive

         7   effect or could have a pro-competitive effect.

         8       Q.    Have you formed an opinion that any of

         9   NAR's policies have a likely pro-competitive effect

10:26   10   in any market?

        11       MR. STEIN:  Object to form.

        12   BY THE WITNESS:

        13       A.    I haven't done a market-by-market

        14   analysis, so I -- I haven't evaluated the

10:26   15   probability of -- of brokers dropping out of the

        16   MLS in any particular market, and I think an

        17   analysis of the pro-competitive benefits would have

        18   to be pertinent to the relevant market, and that's

        19   not an analysis that I've -- I've undertaken.

10:26   20   BY MR. KRAMER:

        21       Q.    Do you have an opinion on whether NAR's

        22   2003 VOW -- strike that, strike that.

        23            Do you have an opinion on whether NAR's

        24   2003 VOW policy has a likely pro-competitive
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 64

          1    effect?

          2        A.    As I said, there is evidence suggesting

          3    that brokers would have dropped out had the policy

          4    or some policy not been adopted.  I observed areas

10:27     5    where there has been dropout of the MLS -- for

          6    example, Bakersfield -- where you had large brokers

          7    forming an alternative MLS, and I understand that

          8    there were costs imposed on transactions because,

          9    for example, brokers now had to negotiate terms on

10:27    10    transactions if they belonged to different MLSs.

         11            So the threat, based on the body of

         12    evidence that I reviewed, seems to have been real

         13    that brokers were willing to either sue the NAR if

         14    they didn't adopt a policy.  I think from RE/MAX,

10:27    15    Liniger discussed a -- that he considered suing the

         16    NAR if they wouldn't adopt a policy.

         17            So the answer is I think the evidence

         18    suggests that there may indeed have been brokers

         19    that dropped out of the MLS.  That would have

10:28    20    imposed costs on the system, so there were likely

         21    pro-competitive benefits.

         22            Where those pro-competitive benefits

         23    would be located, what particular markets, that's

         24    an analysis that I have not done, but what I have

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 65

           1    done is looked to see whether or not there are

           2    costs associated with brokers dropping out, whether

           3    there's a body of evidence that suggests that

           4    brokers could drop out and whether or not there was

10:28      5    evidence suggesting that brokers were willing to

           6    drop out if a policy was not adopted.

           7         Q.    Have you considered whether there's

           8    evidence that brokers would not have dropped out of

           9    MLS?

10:28     10         A.    Yes.

          11         Q.    Okay.  And what have you found in that

          12    regard?

          13         A.    There is incentives not to drop out

          14    because the MLS provides benefits to brokers in --

10:28     15    in solidifying listings and providing terms of

          16    agreement or terms that -- that guide broker

          17    interactions, and so there's a cost of dropping out

          18    on the broker's part.

          19         Q.    Well, let me go back to the question I

10:29     20    asked, because I understand what you have reviewed,

          21    and -- and please try to answer the question.  I

          22    understand there are considerations in terms of

          23    what you reviewed, but the question once again is:

          24    Do you have an opinion whether NAR's 2003 VOW

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 66

1    policy has a likely pro-competitive effect?

2        A.    I think the evidence suggests that there

3    are pro-competitive effects associated with the

4    policy.

10:29 5        Q.    And -- and given that, my question is:

6    Have you formed an opinion whether NAR's 2003 VOW

7    policy has a likely pro-competitive effect?

8        MR. STEIN:  Objection, asked and answered.

9    BY THE WITNESS:

10:30 10        A.    I -- I think the evidence suggests that

11    it had -- that it was likely to have a

12    pro-competitive effect or some pro-competitive

13    effects were associated with the policy.

14    BY MR. KRAMER:

10:30 15        Q.    Have you formed that opinion?

16        MR. STEIN:  Objection, asked and answered.

17    BY THE WITNESS:

18        A.    Yeah, I -- I've formed the opinion that

19    the evidence suggests that there were

10:30 20    pro-competitive effects likely associated with the

21    policy.

22    BY MR. KRAMER:

23        Q.    Do you have an opinion whether the

24    selective opt-out provision of NAR's 2003 VOW

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 67

         1   policy has a likely pro-competitive effect?

         2       MR. STEIN:  Objection, asked and answered.

         3   BY THE WITNESS:

         4       A.    My understanding from the testimony was

10:30    5   that the policy was -- the opt-out option in the

         6   VOW policy was viewed as a safety valve on the part

         7   of brokers, and to the extent that it encouraged

         8   brokers to participate in the MLS or to not take

         9   activity in terms of litigating with NAR, that

10:31   10   would, you know, inc- -- that -- where they would

        11   incur costs that there were likely benefits from

        12   that.

        13   BY MR. KRAMER:

        14       Q.    My question once again was:  Do you have

10:31   15   an opinion whether the selective opt-out provision

        16   has a likely pro-competitive effect?

        17       MR. STEIN:  Objection, asked and answered.

        18   BY THE WITNESS:

        19       A.    I think the evidence that -- states that

10:31   20   brokers would be -- or would consider leaving the

        21   MLS if they didn't have the opt-out option, large

        22   brokers -- not just little brokers, large brokers,

        23   RE/MAX, Cendant --

        24   BY MR. KRAMER:

DR. FREDRICK FLYER,  OCTOBER  17,  2007

Page 68

1        Q.    Let me -- let me interrupt --

2        A.    Okay.

3        Q.    -- because I'm asking you a question

4    that I think can be answered yes or no --

10:31  5        MR. STEIN:  Well --

6    BY MR. KRAMER:

7        Q.    -- and we can always get to -- we can

8    always get to what your basis is for your answer,

9    but if you can --

10:32 10        A.    Okay.

11        Q.    -- answer the question yes or no to

12    start with, that will be helpful.

13        A.    Let me -- let me state it --

14        Q.    And it will save time, because --

10:32 15        A.    Okay.

16        Q.    -- we're starting to waste time and

17    we're under time constraints, and if we're going to

18    waste time, then I'm going to need more time than

19    today.

10:32 20        MR. STEIN:  Well, excuse me, I don't think

21    that's appropriate and I don't think his answers --

22    you may think they're a waste of time.  I don't

23    think they're a waste of time.

24        MR. KRAMER:  I don't think they're a waste of

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 69

```
           1    time.  What I'm saying is I'm looking for

           2    responsive answers, and then we can always go to

           3    what he's talking about at an appropriate point if

           4    I -- if I want to cover it.

10:32      5         MR. STEIN:  Well --

           6         MR. KRAMER:  I'm not asking at this point what

           7    the evidence is; I'm asking whether he's formed an

           8    opinion.

           9         MR. STEIN:  I believe his answers are

10:32     10    responsive.  They may be longer than you might like

          11    or not as succinct as you might like, but I --

          12         MR. KRAMER:  Well --

          13         MR. STEIN:  -- but I don't believe they're

          14    nonresponsive, and I don't -- I don't think this

10:32     15    will be productive.

          16         MR. KRAMER:  Well, let me just say that's your

          17    opinion.  I have an opinion, and if you want to

          18    have this deposition concluded in seven hours, then

          19    keep my opinion in mind, please.

10:33     20         MR. STEIN:  I --

          21         MR. KRAMER:  Okay.

          22         MR. STEIN:  I will keep your opinion in mind.

          23    I would just ask that you -- that you not interrupt

          24    the witness.
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 70

1          MR. KRAMER:  Let's take a little break at this

2     point.

3          THE VIDEOGRAPHER:  We're going off the video

4     record at 10:32 a.m.

10:33  5               (WHEREUPON, the deposition was

6               recessed from 10:32 to 10:41 a.m.)

7          THE VIDEOGRAPHER:  We are going back on the

8     video record at 10:41 a.m.

9     BY MR. KRAMER:

10:41 10     Q.    Dr. Flyer, I believe you said just a

11     little while ago that you saw evidence that

12     Mr. Liniger and RE/MAX considered suing NAR

13     if NAR did not adopt the policy?

14     A.    That -- that's my recollection from his

10:41 15     deposition.

16     Q.    And what policy in particular were you

17     referring to?

18     A.    Well, I think he was particularly

19     concerned with the referral rule.

10:41 20     Q.    And what -- what importance does

21     RE/MAX's concern about that and lit- -- and a

22     litigation context have in your assessment of the

23     policy's pro-competitive effects, please?

24     A.    Well, if RE/MAX, which is a large

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 71

```
         1    broker, wanted to sue the NAR or undertake costs,

         2    that would be a -- essentially a tax on the system,

         3    and, you know, those costs would be inefficient.

         4             So there's an efficiency gain associated

10:42    5    with trying to avoid litigation.

         6        Q.    Any other efficiency gain, or is that --

         7        A.    Well, if -- if indeed there would be

         8    brokers that would drop out of the MLS or try --

         9        Q.    I meant in terms -- in connection

10:42   10    with --

        11        A.    With RE/MAX?

        12        Q.    Yes, sir, and -- and the threat of

        13    litigation.

        14        A.    When you say, "additional efficiency

10:43   15    gain," you mean --

        16        Q.    Beyond the cost of litigation.

        17        A.    Costs and the resources -- when you say,

        18    "cost," the full cost of litigation, the resources

        19    you devote to it, the --

10:43   20        Q.    Okay.

        21        A.    -- the lack -- maybe the bad will it

        22    creates in terms of lack of participation in -- in

        23    the joint venture?

        24             I mean, there could be many forms of
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 72

```
         1   cost, not just direct litigation costs, that can

         2   come --

         3       Q.    And --

         4       A.    -- from the litigation.  It may make a

10:43    5   broker less likely to cooperate.

         6       Q.    Understood.  Thank you.

         7             Is RE/MAX a broker?

         8       A.    Well, my understanding of their business

         9   model -- and I know it's discussed -- is that they

10:43   10   essentially rent a space to agents, agents pay them

        11   a fee, and because of the fact that agents are

        12   collecting a larger portion if they're productive

        13   of the revenues that are generated through their

        14   service, they're perceived or have been perceived

10:44   15   by industry participants as having an efficient

        16   business model to provide brokerage services.

        17       Q.    I understand that in terms of the nature

        18   of their operations, but my question was:  Are they

        19   a broker, RE/MAX?

10:44   20       A.    They -- they participate in brokerage

        21   services, based on my understanding.

        22       Q.    But I understand that.  A lot of people

        23   do, including yourself, when you buy a house, but

        24   my question was:  Is RE/MAX a broker?
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 73

1       A.    I don't -- I mean, if you're using it in

2   the legal sense, whether they -- their agents have

3   passed, you know, whatever the broker standard --

4       Q.    No, that's not what I'm using.

10:44 5     A.    Okay.

6       Q.    Is Dave Liniger affiliated with RE/MAX

7   International, the franchisor?

8       A.    I -- I -- well, in his -- from what I

9   recollect, he owned -- he -- well, he was an

10:45 10  executive with RE/MAX and might have owned

11  franchisees or fran- -- franchises.  I don't

12  recollect exactly.  I think there were four.  I

13  don't rem- -- recollect where.

14      Q.    So he was a -- working for a franchisor,

10:45 15  Mr. Liniger?

16      A.    No, I don't -- I don't know that.  I

17  mean, he -- my understanding is that he's a higher

18  level than that.

19      Q.    But --

10:45 20    A.    But I don't know his exact -- exact

21  title.  I mean --

22      Q.    Is RE/MAX -- I wasn't asking for the

23  title.  I was asking:  Does --

24      A.    What's his role within RE/MAX?

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 74

1      Q.    No.  What I was asking is:  Is RE/MAX

2    International a franchisor?

3      A.    Oh, my understanding is that they have

4    offices in many different cities, so if that

10:45 5    defines a national franchisor, yes.

6      Q.    And Mr. Liniger works for RE/MAX

7    International?

8      A.    At the time -- or at least did.  I don't

9    know what his current status is.

10:46 10      Q.    Were the opt-out provisions in the 2003

11    NAR VOW policy pro-competitive in that they

12    prevented litigation between brokers and NAR?

13      A.    There's testimony that states that.  I

14    don't -- I didn't participate in the negotiations,

10:46 15    so I can only read the record -- what the record

16    says.

17      Q.    Were the referral rule provisions

18    pro-competitive in that they prevented litigation

19    between brokers and NAR?

10:46 20      A.    If indeed they prevented litigation,

21    they would have been -- there would have been a

22    pro- -- there potentially would have been a

23    pro-competitive benefit, and there's a record that

24    seems to support the contention that they did

DR. FREDRICK FLYER, OCTOBER 17, 2007

           1    indeed prevent litigation.

           2         Q.    Have you asserted anyplace in your

           3    expert report that the prevention of litigation was

           4    evidence of a pro-competitive benefit?

10:47 5         A.    I stated in my report -- well, I'd have

           6    to look at my report.  I mean, I don't --

           7         Q.    Okay.  Let's leave it at that.

           8              Let's get back to where we left off

           9    before we broke to see if we can get a -- a

10:47 10   directly responsive yes-or-no answer to the

          11    question, and the -- the first one would be:  Have

          12    you formed an opinion whether NAR's 2003 VOW policy

          13    has a likely pro-competitive effect?

          14         MR. STEIN:  Objection, asked and answered.

10:47 15   BY THE WITNESS:

          16         A.    I've formed the opinion that the

          17    evidence suggests that it would have had some

          18    pro-competitive -- or likely would have had some

          19    pro-competitive benefits and, therefore, it's an

10:48 20   important aspect of any competitive analyses for

          21    that competitive analyses to be complete to

          22    undertake a market-by-market analyses of what those

          23    pro-competitive benefits might have been in order

          24    to assess the effects of the policy.

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 76

```
        1  BY MR. KRAMER:

        2      Q.   And so just to be clear, as I understand

        3  it -- and I understand you think there is evidence

        4  that suggests that the policy is pro-competitive

10:48   5  but that you have not formed an opinion whether the

        6  VOW policy itself has a likely pro-competitive

        7  effect.

        8      A.   On a national level, based on the

        9  evidence I reviewed, it -- my opinion is that it

10:49  10  would likely have some pro-competitive effects in

       11  some places.

       12           Exactly what they may be, how large they

       13  may be I don't have a sense of as I sit here.

       14      Q.   Do you have an opinion on whether the

10:49  15  selective opt-out provision of NAR's 2003 VOW

       16  policy has a likely pro-competitive effect?

       17      MR. STEIN:  Objection, asked and answered.

       18  BY THE WITNESS:

       19      A.   I haven't taken an -- an analysis of

10:49  20  individual -- of the individual provisions.

       21           I note that in the testimony, many of

       22  the players involved in developing the policy or

       23  filing declarations about the policy --

       24  BY MR. KRAMER:
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 77

1        Q.    Let -- just to be clear, I -- I

2    understand --

3        A.    -- have -- have explicitly cited the

4    out-opt, and the fact that they have explicitly

10:50 5    cited the opt-out as a -- an important feature of

6    the policy suggests that the opt-out indeed would

7    have had some pro-competitive benefits in some

8    places on a national basis.

9        Q.    But what I'm trying to avoid -- and we

10:50 10   don't seem to be succeeding so far -- is having you

11   spend time outlining the evidence that you've

12   considered and the likely probative value of that.

13          What I'm trying to understand is whether

14   you've formed an opinion that either has

10:50 15   evidentiary support or does not, so let me try

16   again.

17          Do you have any opinion on whether the

18   selective opt-out provision of NAR's 2003 VOW

19   policy has a likely pro-competitive effect?

10:50 20     MR. STEIN:  Objection, asked and answered.

21   BY THE WITNESS:

22       A.    My opinion is based on the evidentiary

23   basis, so what I do is try to understand the facts

24   and interpret what the economic implications of

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 78

                    1    those facts may be, and so when you speak about the

                    2    opt-out policy, I think the -- or the opt-out

                    3    provision, the opt-out provision -- the factual

                    4    basis in the case suggests that the opt-out

    10:51     5    provision, some --

                    6    BY MR. KRAMER:

                    7         Q.    Dr. Flyer, let me interrupt, because --

                    8         A.    Okay.

                    9         Q.    -- you're going back to exactly in a

    10:51    10    conceptual way to your last answer that I'm trying

                   11    to get past, and that is -- I understand that you

                   12    have considered evidence.  What I'm trying to

                   13    understand is whether you have formed an opinion on

                   14    these points.

    10:51    15         So let me ask you once again:  Do you

                   16    have an opinion on whether the selective opt-out

                   17    provision of NAR's 2003 VOW policy has a likely

                   18    pro-competitive effect in a yes-or-no sense,

                   19    please?

    10:51    20       MR. STEIN:  Objection, asked and answered.

                   21         And if you can answer in a yes or no,

                   22    you can answer that way.

                   23       THE WITNESS:  Okay.

                   24    BY THE WITNESS:

DR. FREDRICK FLYER, OCTOBER 17, 2007

```
      1      A.    On a national basis, the -- my opinion

      2  is that the opt-out policy likely had some

      3  pro-competitive benefits.

      4  BY MR. KRAMER:

10:51 5      Q.    Okay.  Thank you.

      6            And can we go back to the one we were

      7  struggling with before?  Do you -- and in the same

      8  vein of answers that I'm asking for a yes or no, do

      9  you have an opinion --

10:52 10     MR. STEIN:  Can -- can we stop the colloquy?

     11  Nobody's struggling here except for you,

     12  Mr. Kramer, so there's no need to characterize his

     13  answers.  Just if you want to ask the same question

     14  again, ask the question.

10:52 15  BY MR. KRAMER:

     16      Q.    Okay.  Do you have an opinion on whether

     17  NAR's 2003 VOW policy has a likely pro-competitive

     18  effect, sir?

     19      MR. STEIN:  Objection, asked and answered.

10:52 20  BY THE WITNESS:

     21      A.    The policy as a whole?

     22  BY MR. KRAMER:

     23      Q.    Yes, sir.

     24      A.    Again, from what I understand at this
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 80

1    point as I sit here, I think on a national basis,

2    it likely had a pro-competitive -- some

3    pro-competitive effects somewhere.

4         Q.    Okay.  Have you stated that opinion in

10:52 5    your report?

6         A.    I think I have.  I mean, my report

7    states my opinion as precisely as -- as I could

8    state it at the time.

9         Q.    Do you have any opinion on whether the

10:52 10    blanket opt-out provisions of NAR's 2003 VOW policy

11    have a likely pro-competitive effect, sir?

12         A.    The blanket opt-out?

13         Q.    Yes, sir.

14         A.    No.

10:53 15         Q.    Do you have an opinion on whether the

16    anti-referral rule in NAR's 2003 VOW policy has a

17    likely pro-competitive effect?

18         A.    Again, the -- my interpretation of the

19    evidence suggests that on a national basis --

10:53 20         Q.    Let me -- let me --

21         A.    Let me just -- let me just state --

22    okay.

23         Q.    I'm -- that's where I'm trying to save

24    some time.  I -- we can get at some point to -- to

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 81

1    the evidentiary basis for the opinion and your

2    interpretations.  What I'm trying to do is find out

3    first of all before we get to whatever evidence

4    you've looked at whether you have formed an opinion

10:53  5    on whether the anti-referral rule in NAR's 2003 VOW

6    policy has a likely pro-competitive effect.

7         MR. STEIN:  Object to the interruption and to

8    the form of the question.

9    BY THE WITNESS:

10:54 10    A.    My opinion is that on a national basis,

11    there were likely pro-competitive benefits

12    associated with the anti-referral rule.

13    BY MR. KRAMER:

14    Q.    Do you have an opinion on whether the

10:54 15    clean page provisions of NAR's 2003 VOW policy have

16    a likely pro-competitive effect?

17    A.    I'd have to go back to the evidence that

18    I've reviewed because I don't recollect specific --

19    I'd have to go back to certain depositions, but to

10:54 20    the extent that what I do recollect from

21    the depositions is there was --

22    Q.    I'm not asking now for -- again -- and

23    I'm sorry to interrupt, but I'm -- I'm really

24    trying to save time, because as I explained to

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 82

1    Mr. Stein while we were out, we have limited time,

2    and -- and if you're not going to respond to the

3    questions, then I'm going to need additional time,

4    and if Mr. Stein is unwilling to give it to me,

10:55  5    then we'll have to go to the court to seek it.

6        A.    You --

7        Q.    So I'm trying to avoid that whole

8    process by asking for yes-or-no answers to these

9    questions, which I think can fairly be answered yes

10:55 10    or no.

11        MR. STEIN:  I -- I think the witness is

12    answering the questions, and I also will just note

13    that you're wasting your own time here, because if

14    you continue with this type of colloquy, I'm not

10:55 15    going to be amenable to giving you additional time,

16    if need be.

17        MR. KRAMER:  Okay.

18        MR. STEIN:  So I would ask that you let the

19    witness finish his answers, and if you don't like

10:55 20    the answer, then you move on or you can ask the

21    question again and --

22        MR. KRAMER:  I understand your position.

23        MR. STEIN:  -- he can give the same answer.

24        MR. KRAMER:  I understand your position.  I'm

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 83

        1    just asking the answer -- the witness to answer

        2    responsively.

        3         MR. STEIN:  And he is.

        4         MR. KRAMER:  In your opinion.  Okay.

10:55   5    BY THE WITNESS:

        6         A.    From what I recollect on the

        7    depositions, I think there --

        8    BY MR. KRAMER:

        9         Q.    Let me -- let me interrupt, because --

10:55  10         A.    Okay.

       11         Q.    -- I'm not asking you for the

       12    evidentiary basis of your -- of your opinion.

       13         A.    All right.

       14         Q.    What I'm asking is:  Have you formed an

10:56  15    opinion whether the clean page provisions of NAR's

       16    2003 VOW policy have a likely pro-competitive

       17    effect?

       18         A.    If you want the most precise description

       19    of my opinion, I think that comes from the report,

10:56  20    so if you want to put the report in front of me, I

       21    can state -- you know, because it would help me

       22    also recollect what I -- what testimony I used as

       23    support for the opinions that I draw within the

       24    report.

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 84

1          But it likely had pro-competitive

2     effects on a national basis from the evidence that

3     I've reviewed.

4          Q.   When you've used the term "national

10:56 5     basis" in your last few answers, could you explain

6     what you mean by that, please?

7          A.   Sure.  When you say, "pro-competitive

8     effect," the real question that I'm trying to

9     answer is:  Is it likely that there would have been

10:56 10    any costs that would have been imposed in the

11    marketplace because of either brokers dropping out

12    of the MLS or entering into litigation or not

13    cooperating; in other words, that would make the

14    system function less efficiently?  And if indeed

10:57 15    there was any reduction in costs in any place, then

16    there would be some pro-competitive effects

17    somewhere.

18          What I haven't undertaken is a

19    market-by-market analysis to say, "Ah-ha, brokers

10:57 20    in -- in Fort Lauderdale would have dropped out if

21    this policy wasn't implemented."

22          So I can't answer whether or not there

23    would be pro-competitive effects on any particular

24    MLS, but from the testimony that I've reviewed, it

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 85

         1    suggests that there would have been costs imposed

         2    on the system, and those costs -- at least some

         3    costs were avoided by implementing or developing

         4    this policy.  Or would have been avoided.

10:57    5         Q.    Do you have an opinion on whether NAR's

         6    2005 ILD policy has a likely pro-competitive

         7    effect?

         8         A.    Well --

         9         Q.    Yes or no, please.

10:58   10         MR. STEIN:  If you can answer that way.

        11    BY THE WITNESS:

        12         A.    It -- it likely would have -- as a

        13    whole, it would likely have a pro-competitive

        14    effect.

10:58   15    BY MR. KRAMER:

        16         Q.    Do you have an opinion on whether the

        17    opt-out provision of the 2005 ILD policy has a

        18    likely pro-competitive effect, sir?  Yes or no.

        19         MR. STEIN:  Again, if you can answer that way.

10:58   20    BY THE WITNESS:

        21         A.    Well, it depends on the timing of the

        22    policy.

        23               My -- given -- if it was implemented

        24    today, implemented in 2005?

DR. FREDRICK FLYER, OCTOBER 17, 2007

```
        1    BY MR. KRAMER:

        2         Q.    I'm asking simply:  Do you -- do you

        3    have an opinion --

        4         A.    Well --

10:59   5         Q.    -- on whether the opt-out provision of

        6    the 2005 ILD policy has a likely pro-competitive

        7    effect?

        8         A.    It depends on -- the market -- the

        9    marketplace is changing, so the effects of the

10:59  10    policy are going to be different at different

       11    points in time, so --

       12         Q.    I understand that.  My question is

       13    simply --

       14         A.    -- so I need to understand your

10:59  15    question.

       16              When are you asking me would the

       17    policy -- what I'm asking is:  When would the

       18    policy have been implemented?  2005, 200- --

       19         Q.    The policy, as I think you know, has not

10:59  20    been implemented, and my question is simply:  Do

       21    you have an opinion on whether the opt-out

       22    provision of the 2005 ILD policy has a likely

       23    pro-competitive effect?  It's a question in the

       24    future.
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 87

          1      A.    You mean looking forward?

          2      Q.    Yes, sir.

          3      A.    Okay.  It may.

          4      Q.    You don't know if you have an opinion?

11:00    5      A.    I -- I don't think the body of evidence

          6   is as strong --

          7      Q.    Okay.

          8      A.    -- as it was --

          9      Q.    I'm not -- let me interrupt, because --

11:00   10      MR. STEIN:  Please stop interrupting him.

         11      MR. KRAMER:  No.  I'm -- I'm not getting

         12   responsive answers, and that's why I am.

         13      MR. STEIN:  You are getting responsive

         14   answers.

11:00   15      MR. KRAMER:  I'm asking -- I'm asking him if

         16   he's formed opinions, and he's going into the

         17   evidence that he's considered.  They can -- these

         18   are questions that I don't understand how anyone

         19   can contend cannot be answered yes or no, and then

11:00   20   at an appropriate point, if I want to get what

         21   evidence he's considered, he can review the

         22   evidence.

         23      MR. STEIN:  Let me just suggest --

         24      MR. KRAMER:  That's what I'm trying to

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 88

            1    understand.

            2         MR. STEIN:  Let me just suggest that as I said

            3    at the break, this will not be productive.  I'm

            4    going to continue to object if you interrupt him,

11:00       5    and so I suggest that you allow him to finish his

            6    answer and then you can ask another question.

            7         MR. KRAMER:  Okay.  I mean, you understand my

            8    view, and you -- and you think that we're not

            9    wasting time, I take it --

11:01      10         MR. STEIN:  I -- I wouldn't --

           11         MR. KRAMER:  -- with the -- with the types of

           12    answers that I'm getting that aren't yes or no?

           13         MR. STEIN:  I don't believe his answers are

           14    wasting time.

11:01      15         MR. KRAMER:  Well, okay.

           16    BY MR. KRAMER:

           17         Q.   Let me try once more.

           18         Do you have an opinion on whether the

           19    opt-out provision of the 2005 ILD policy has a

11:01      20    likely pro-competitive effect, yes or no?

           21         MR. STEIN:  Objection, asked and answered.

           22    BY THE WITNESS:

           23         A.   If -- my opinion is that it very well

           24    may have a pro-competitive effect.  To use the word

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 89

```
          1   "likely," I haven't drawn that conclusion --

          2   BY MR. KRAMER:

          3        Q.    Thank you.

          4        A.    -- looking forward, from today forward.

11:01     5        Q.    Thank you.

          6              Do you have an opinion on whether the

          7   2005 revised membership rule has a likely

          8   pro-competitive effect, sir, yes or no?

          9        A.    Again, it very well may have a

11:02    10   pro-competitive effect.

         11              I would say that there's some evidence

         12   that it's likely, so yeah, there's some -- there is

         13   support to say that there is a likely

         14   competitive -- a pro-competitive benefit associated

11:02    15   with that membership ruled.

         16        Q.    Have you formed an opinion that the

         17   membership rule has a likely pro-competitive

         18   effect, sir?

         19        A.    Yes.

11:02    20        Q.    Okay.  Have you formed an opinion on the

         21   relevant product market in this case?

         22        A.    I haven't formed an opinion on -- you

         23   said, "relevant product market"?

         24        Q.    Yes.
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

          1      Q.    Yes, sir.

          2      A.    I don't see the evidence that would

          3  support that opinion, so no, I haven't formed an

          4  opinion that they would be likely anti-competitive.

11:06  5      Q.    Let me go back to some of these other

          6  questions to see if my rephrasing now has cured the

          7  problem.

          8           Have you formed any opinion on whether

          9  NAR's 2003 VOW policy has a likely pro-competitive

11:07 10  effect?

          11      MR. STEIN:  Objection, asked and answered.

          12  BY THE WITNESS:

          13      A.    On a national basis, I think there --

          14  there is support for the conclusion that it would

11:07 15  have pro-competitive effects.

          16  BY MR. KRAMER:

          17      Q.    Okay.  Have you formed -- and my

          18  question is:  Have you formed that opinion?

          19      MR. STEIN:  Objection, asked and answered.

11:07 20  BY THE WITNESS:

          21      A.    My opinion is that the evidence suggests

          22  that it has pro-competitive benefits on a national

          23  basis.

          24  BY MR. KRAMER:

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 163

1      THE VIDEOGRAPHER:  We are going back on the

2  video record at 1:35 p.m.

3      MR. KRAMER:  Thank you.

4              DR. FREDRICK FLYER,

13:35 5  called as a witness herein, having been previously

6  duly sworn and having testified, was examined and

7  testified further as follows:

8              EXAMINATION (Resumed)

9  BY MR. KRAMER:

13:35 10    Q.    Dr. Flyer, if you were to analyze

11  whether pro-competitive effects were likely to

12  result from NAR's policies, would you outline the

13  methodology you would use to determine that,

14  please?

13:36 15    A.    Well, first I would try to identify what

16  the risks associated with -- when you -- let me

17  just step back.

18              You mean -- you asked for

19  pro-competitive effects?

13:36 20    Q.    Yes, sir.

21    A.    Okay.  So the first thing, I would try

22  to identify the risks associated with actions that

23  may impose costs on the system such as lack of

24  op- -- broker cooperation, reduced incentives for

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 164

```
        1    brokers who -- to go out and compete for listings

        2    if they thought the value of those listings were

        3    diminished, and then -- and one way you might do

        4    that -- or the possibility that they might withdraw

13:36   5    from the MLS.

        6              So one way you may go about doing that

        7    is looking at the experience in other areas where

        8    you had a significant dropout of the MLS -- for

        9    example, Bakersfield -- and try to estimate the

13:37  10    costs, and, you know, those costs may be counts of

       11    instances where there was broker conflict involving

       12    commission sharing or other type of activities, and

       13    I would try to quantify that and then use the data

       14    that's available to try to quantify what the risks

13:37  15    were to any particular area that I was looking at,

       16    per se.

       17         Q.    Risks of the nature that you just

       18    described, you mean?

       19         A.    Of the ac- -- yes, of those types of --

13:37  20    of those types of outcomes.

       21         Q.    Okay.  And is that it?

       22         A.    Well, I mean, yeah.  The -- one is to

       23    quantify the cost of those outcomes and to -- and

       24    the second part would be to identify the pos- --
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 165

1    the -- the increased probability of those outcomes

2    because of a lack of policy.

3              When you say --

4         Q.   Right.

13:37  5         A.   -- the pro-competitive benef- --

6    benefits of the policy, you have to be careful

7    about what you're comparing it to, what's the

8    correct counterfactual.

9              I assume the counterfactual would be a

13:38 10   world where there was no policy implemented at all,

11   but it can be another counterfactual where there's

12   some type of amended --

13        Q.   Right.

14        A.   -- and then you'd have to understand

13:38 15   exactly what the outcomes of that alternative

16   counterfactual would be.

17        Q.   Right.  Okay.  Your report describes

18   alternatives for Dr. Vistnes's findings on the

19   greater productivity of ZipRealty agents in

13:38 20   Washington D.C. compared to other agents in the

21   Washington D.C. area employed by other brokers,

22   right?

23        A.   I address the evidence that Dr. Vistnes

24   puts forth regarding what I -- you know, closings

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 221

            1    to representing buyers and sellers in the final

            2    transaction --

            3    BY MR. KRAMER:

            4         Q.    Okay.  So --

14:54  5         A.    -- in the report, as I -- as I recall.

            6         Q.    The evidence you considered suggests

            7    some MLSs chose not to -- chose to adopt -- strike

            8    that.

            9              Let me -- the evidence you considered

14:54 10    suggests some MLSs chose to adopt the 2003 NAR VOW

           11    policy while others did not, correct?

           12         A.    The evidence I've looked at suggests

           13    that there is disparity in whether or not an MLS

           14    adopted or did not adopt the policy, so there were

14:54 15    a number that did and a number that did not.

           16         Q.    Is there any reason all MLSs must

           17    necessarily adopt the NAR policy on VOWs at the

           18    same time for these policies to have

           19    pro-competitive benefits?

14:54 20         A.    No.

           21         Q.    And -- and why is that?

           22         A.    Because if -- if a particular area was

           23    under greater threat and it adopted early, you can

           24    have pro-competitive benefits, while another area

DR. FREDRICK FLYER,  OCTOBER  17,  2007

Page 222

```
       1    that may not have been -- when I say, "a threat,"

       2    that -- that brokers wouldn't have taken action

       3    against NAR or pulled out of the MLS or been less

       4    willing to cooperate with other brokers, then you

14:55  5    wouldn't necessarily need implementation of the

       6    policy in those areas in order for the policy to

       7    have any -- to have effect -- pro-competitive

       8    effects.

       9         Q.    Do you believe it would be necessary for

14:55 10    all MLSs nationwide to adopt the ILD policy for

      11    those policies to have pro-competitive benefits?

      12         A.    Again, no.

      13         Q.    And why is that?

      14         A.    Because the markets -- I believe the

14:55 15    markets are local, so you can have effects in one

      16    market and -- and you not -- and not adopt the

      17    policy in another market and it wouldn't

      18    necessarily affect the outcomes in -- in the market

      19    that did adopt the policy.

14:56 20         Q.    Is it your understanding that different

      21    MLSs have adopted different policies historically?

      22         A.    My understanding is that different R- --

      23    MLSs have a different set of rules that govern

      24    their brokers.
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 305

            1        Q.    Did you conduct what you believed to be
            2    an efficiencies analysis in this matter?
            3        A.    Well, typically when I think of an
            4    efficiency analysis, I think of a merger where two
16:54   5    firms, you know, can produce at lower cost, so I'm
            6    not sure that that -- you know, that's applicable
            7    here, although it may be that, you know, providing
            8    a guarantee of a VOW feed creat- -- creates
            9    efficiencies because it may encourage investment
16:54  10    that otherwise wouldn't be encouraged if that type
           11    of feed wasn't made available.
           12        Q.    Did you conduct an analysis of
           13    pro-competitive effects in this matter?
           14        A.    I've looked at factors that I think
16:54  15    are -- that speak to pro-competitive effects.
           16        Q.    Okay.  And to what end?
           17        A.    I haven't conduct- -- I think to do a
           18    full-scale analysis of what the pro-competitive
           19    effects would be, you would need to go to each
16:55  20    market, understand through -- the risks to that
           21    market, understand the costs that would be
           22    associated if those risks came to fruition and --
           23    and understand how the policy itself may have
           24    reduced or not reduced those risks, and that's --

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 306

```
           1    that type of full-blown analysis I have not

           2    undertaken.

           3        Q.    As you -- does your opinion that there

           4    is no likely anti-competitive effect in this matter

16:55      5    hold if you accept that there are no efficiencies?

           6        A.    When you say, "no --" you mean no

           7    pro-competitive benefits?

           8        Q.    That's right.  Thank you.

           9        A.    If you had no pro-competitive benefits,

16:55     10    you can -- if there was no anti-competitive harm,

          11    there would be no anti-competitive effect of the

          12    policy, and since I've seen no evidence that

          13    indicates or reliably indicates that there would

          14    indeed be anti-competitive harms associated with

16:56     15    the policy, I've seen no evidence that precludes --

          16    that says if you have no pro- -- pro-competitive

          17    benefits, the policies would lead to

          18    anti-competitive harm.

          19        Q.    So I take it you haven't in any sense

16:56     20    attempted to net out anti-competitive effects and

          21    pro-competitive effects?

          22        A.    That's correct.  I think to do that,

          23    you'd have to go market by market, evaluate the

          24    anti-competitive harm, if any existed, and evaluate
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 307

           1   the pro-competitive benefits, if any existed.

           2        Q.    In reaching your opinion that the --

           3   there's likely no anti-competitive effect from

           4   NAR's policies, have you relied on Mr. Murray's

16:56      5   report?

           6        A.    Well, I cite the report in my -- my

           7   report as a -- when he discusses, you know -- you

           8   know, likelihood of MLS withdrawal or -- I don't

           9   know the right word -- dropout, so -- so, you know,

16:57     10   to the extent that there was indeed risks, the

          11   pro- -- and the policy alleviated or reduced those

          12   risks, you know, that those -- those would

          13   represent pro-competitive benefits.

          14        Q.    Is Mr. Murray's -- is Mr. Murray's

16:57     15   report a -- something you have relied on in

          16   assessing likely pro-competitive effects from NAR's

          17   policies?

          18        A.    Where I cite it, I rely on the report in

          19   the way I cite it.

16:57     20        Q.    Do you rely on it for anything more than

          21   you've cited it?

          22        A.    Not that I recall.

          23        Q.    Would your conclusions, Mr. --

          24   Dr. Flyer, about likely pro-competitive

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 308

        1    justifications be different if you had never seen

        2    Mr. Murray's report?

        3         A.    I don't know that it would have been.

        4         Q.    After you got Dr. Vistnes's report and

16:58   5    data, did you attempt to replicate his results?

        6         A.    I asked Josh to try to replicate his

        7    results, and I typically do that when I get a

        8    report or some type of analysis that's being

        9    presented to me in the course of a merger, one,

16:59  10    just to make sure we understand exactly what he

       11    did, but two, to make sure that we understand the

       12    data accordingly --

       13         Q.    Okay.  And you understood --

       14         A.    -- and help gain familiarity with the

16:59  15    data.

       16         Q.    And you understood my question to be

       17    focused on empirical results?

       18         A.    The empirical results, I don't recall

       19    exactly what we've looked at and did not look at.

16:59  20    I mean, we looked at IDX -- I mean, he has a table

       21    on IDX participation.  We certainly checked that.

       22    We checked to see what the characteristics of the

       23    provisions were in that area.

       24              So I'd have to go back to see exactly --

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 314

```
           1        MR. KRAMER:  Okay.
           2   BY MR. KRAMER:
           3        Q.    Do you agree that allowing brokers to
           4   make individual decisions about how their listings
17:05      5   may be used is pro-competitive in its own right?
           6        A.    Do I agree that a stipulation that --
           7        Q.    Allowing brokers to make individual
           8   decisions about how their listings may be used is
           9   pro-competitive in its own right.
17:05     10        A.    In its own right.
          11              Well, if a listing broker can use the --
          12   a listing in a way that doesn't harm competition --
          13   well, let's put this way:  Even if it harms
          14   competition, it could have pro-competitive
17:05     15   benefits, so if -- if you can -- if you allow
          16   brokers -- a listing broker to use that listing in
          17   a way that enhances the value of the listing, it
          18   could encourage greater investments in terms of
          19   acquiring listings, so it could have
17:06     20   pro-competitive benefits.
          21        Q.    What I'm trying to get at is:  Do you
          22   agree that allowing brokers to make individual
          23   decisions about how their listings may be used is
          24   pro-competitive, putting aside any analysis of the
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 315

         1   effects?  Pro se pro-competitive would be the way

         2   to put it.

         3       MR. STEIN:  Object to the form.

         4   BY THE WITNESS:

17:06    5       A.    Well, when you -- when you say,

         6   "brokers," you mean listing brokers, how they --

         7   how they can use their own listings?

         8   BY MR. KRAMER:

         9       Q.    Yes, sir.

17:06   10       A.    I would say that if -- that if you give

        11   listing brokers greater freedom that -- to market

        12   those listings, you could create value or increase

        13   the asset value of those listings to the broker

        14   which may encourage greater competition for those

17:06   15   listings or greater services provided in order to

        16   acquire those listings, and that can -- those

        17   greater services can translate into consumer

        18   benefits.

        19       Q.    Let me ask if you would agree that

17:07   20   allowing individual brokers to make individual

        21   decisions about how their listings may be used

        22   could be anti-competitive under some circumstances.

        23       A.    If -- if individual brokers could use

        24   their listings or -- to foreclose competition, it

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 316

         1   could be anti-competitive.

         2       Q.    Do you believe there is a free rider

         3   problem, as you've suggested in -- let me just

         4   ask:  Do you believe there's a free rider problem

17:07    5   here?

         6       MR. STEIN:  I'm going to object to the form.

         7   BY THE WITNESS:

         8       A.    Again, I'm not -- I'm not sure exactly

         9   what you mean.

17:07   10   BY MR. KRAMER:

        11       Q.    Is -- is there a free rider problem that

        12   NAR's policies are -- are reactive to in any way

        13   that you see?

        14       MR. STEIN:  Same objection.

17:07   15   BY THE WITNESS:

        16       A.    If you -- what you mean by that question

        17   is that -- let's take the referral rule as an

        18   example of -- of a VOW policy, that brokers were

        19   upset that -- listing brokers were upset that their

17:08   20   listings were being used to potentially create

        21   value for another broker who didn't go out and

        22   earn -- and acquire those listings and diminished

        23   the value of those lis- -- the asset value of those

        24   listings to the brokers, the listing -- the initial

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 317

         1    listing broker, I understand that's a -- that's

         2    been a -- a concern that was voiced by many

         3    brokers.

         4    BY MR. KRAMER:

17:08    5        Q.    And -- and I guess my question is:  Do

         6    you view that in any way as a -- amounting to a

         7    free rider problem as a matter of economics?

         8        A.    Well, a free rider problem I mean I

         9    guess strictly speaking would be gaining the

17:08   10    benefits from others' efforts, so if those brokers

        11    could gain the benefits associated with listings

        12    and have other brokers go out and spend the

        13    resources to acquire those listings, I suppose you

        14    could describe it as a free rider problem, if -- if

17:09   15    indeed there was such a problem.

        16        Q.    Did you just give a complete and

        17    accurate definition of "free riding"?

        18        A.    I don't know that it was complete.  It

        19    was as accurate as I could make it as -- right now.

17:09   20          Typically when I think of free rider,

        21    you know, you have instances where you say, "Okay.

        22    How much are you willing to pay for something," and

        23    you're trying to create a collection, and your

        24    incremental benefit you get from providing

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 318

1    resources for a collective activity is -- is small

2    and it the cost to you may be high, and so you may

3    not participate in -- in -- in the collection

4    and -- and depend on others, and the equilibrium

17:10  5    from that type of outcome is that nobody

6    participates.

7    Q.    Do you agree that brokers who offer

8    listings to sites like Trulia do so in order to get

9    the benefits of increased exposure?

17:10 10    A.    If a broker provides their listings to

11    other Internet sites, I would -- I would think that

12    that suggests that they were trying to get more

13    exposure for their listings.

14    Q.    How can that be a free rider problem if

17:10 15    providing exposure to listings benefits brokers?

16    A.    Well, I -- I was referring to instances

17    where those -- if -- in an absence of let's say a

18    selective opt -- opt-out, that if I -- in order for

19    me to provide Internet listings to -- to brokers

17:10 20    that I think are generating more eyeballs for my

21    listings or other brokers who are using those

22    listings for other purposes besides bringing buyers

23    or showing those listings to buyer eyeballs, then

24    that's the context in which a -- a free rider

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 319

          1   problem might -- might occur.

          2              And, by the way, I didn't characterize

          3   it as a free rider; you characterized it as a -- as

          4   a free rider problem.

17:11     5        Q.    Have you concluded that the VOWs

          6   affected by the referral provision fit the

          7   characterization you just gave?

          8        A.    I --

          9        MR. STEIN:  Object to the form and foundation.

17:12    10   BY THE WITNESS:

         11        A.    The VOWs I've looked at actually

         12   participate in real brokerage services, so eRealty,

         13   ZipRealty, I -- well, HBM II is a little different,

         14   but it doesn't sell referrals, so it wouldn't --

17:12    15   that wouldn't be characteristic of its business

         16   model as I understand its business model.

         17              So I don't know of any VOWs that

         18   actively -- to organize listings and just sell them

         19   or try to sell them for referrals, so I'm -- it's

17:12    20   not to say it doesn't exist, but I'm not aware of

         21   any VOW that does that.

         22   BY MR. KRAMER:

         23        Q.    And if they did exist, would they fit

         24   the characterization that you gave in your --

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 320

1      A.    Well --

2      Q.    -- second-to-last answer?

3      A.    -- they would fit --

4      MR. STEIN:  Object to the form and foundation.

17:12 5   BY THE WITNESS:

6      A.    They would fit the characterization of

7      some of the concerns that I was relaying earlier

8      that I reviewed.

9      BY MR. KRAMER:

17:12 10      Q.    But I take it it would not fit the

11      characterization of your second-to-last question?

12      A.    Well, why don't you repeat the

13      second-to-last question.

14      Q.    Have -- have you concluded that the VOWs

17:13 15      that would be affected by the referral policy would

16      not generate more eyeballs for listings or other --

17      for listings?

18      A.    Again, I haven't identified VOWs that

19      follow that business model that I have described,

17:14 20      so I don't know that I've identified any VOWs that

21      don't generate more eyeballs.

22           I'm not sure that -- let's just -- let's

23      just -- let me be precise.

24           The VOWs that I've looked at participate

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 321

```
          1    in brokerage service, they have traffic on their

          2    site, so there are individuals or customers who are

          3    looking at listings via these -- via these VOWs.

          4           That's not to say that in absence of

17:14     5    these VOWs, fewer buyers would be in the market or

          6    fewer buyers would have access to Internet-based

          7    listings, so I don't know that they generate any

          8    new buyers looking at the listings, but there are

          9    buyers that use their sites and see listings via

17:14    10    their sites.

         11       Q.    Do you agree that consumers' access to

         12    the Internet has had some impact in -- in the

         13    decline of brokerage commission rates?

         14       MR. STEIN:  Objection, lack of foundation.

17:14    15    BY THE WITNESS:

         16       A.    That's a very complex question.

         17           It's possible.  I haven't undertaken

         18    a -- an analysis that would allow me to reliably

         19    make that conclusion, but it's -- it's very

17:15    20    possible.

         21    BY MR. KRAMER:

         22       Q.    Do you agree that VOWs are a new form of

         23    technology in relation to bricks-and-mortar

         24    brokerage services?
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 346

```
         1   BY MR. KRAMER:

         2        Q.    Okay.  Let's put aside VOW operators.

         3        A.    Okay.

         4        Q.    What I'm talking about are non-VOW
17:47    5   operators.

         6              Have you considered information

         7   suggesting that non-VOW operators sought to have

         8   NAR --

         9        A.    Well, when I --
17:48   10        Q.    -- adopt its 2003 VOW policy to hinder

        11   the development of VOWs?

        12        A.    I reviewed testimony from the working --

        13   or from the VOW work group, and I'm trying to

        14   recall the testimony -- Ron Phipps's testimony and,
17:48   15   you know, Pat Biebe or -- from Denver, her

        16   testimony, and I -- I don't recall that, or Robert

        17   Hale's testimony.  I don't recall that as -- as

        18   really a part of their deposition that stood out in

        19   my mind.
17:48   20        Q.    Would -- would information that brokers

        21   sought to have NAR adopt its 2003 VOW -- VOW policy

        22   to hinder the development of VOWs have any effect

        23   on your analysis of the likely competitive effects

        24   of NAR's policies?
```

DR. FREDRICK FLYER,  OCTOBER  17,  2007

Page 347

 1        A.     Well, it wouldn't change the fact that

 2   opt-outs have been low; it wouldn't change the fact

 3   that IDX participation rates seems to be generally

 4   high; it wouldn't change the fact that Internet

17:49  5   participation through other means, from

 6   MLS-provided services, is high; it wouldn't change

 7   the fact that Realtor.com has high participation

 8   rates over many cities; it wouldn't change the fact

 9   that VOWs don't uniquely discount.

17:49 10            It wouldn't change a lot of the facts

11   that I rely on, no.

12        Q.     Well, let me ask you this:  Would

13   information suggesting that brokers sought to have

14   NAR adopt its 2003 VOW policy to hinder the

17:49 15   development of VOWs be relevant to your assessment

16   of the -- the pro-competitive justifications

17   advanced for the 2003 VOW policy?

18        A.     If the policy was adopted for the

19   purposes of hindering VOWs and that was the primary

17:49 20   purpose of the policy, it could -- it could

21   influence an evaluation of what the pro-competitive

22   benefits might be, yes.

23        Q.     Have you analyzed the -- since you've

24   been retained the significance to any conclusion

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 348

         1    you've drawn about pro-competitive benefits as

         2    stated in your report information suggesting that

         3    brokers sought VOWs as a substantial competitive

         4    threat?

17:50    5         A.    I'm sure that --

         6         MR. STEIN:  Object to the form.

         7    BY THE WITNESS:

         8         A.    Well, you know, brokers may have seen

         9    VOWs -- some brokers may have seen VOWs as a

17:50   10    sig- -- significant competitive threat.  I've also

        11    seen testimony that -- by brokers that said, "We

        12    didn't see VOWs as a significant competitive

        13    threat."  I've seen testimony that said, "We

        14    actually liked the emergence of VOWs because we

17:50   15    learned from them."

        16    BY MR. KRAMER:

        17         Q.    Okay.  And my question is:  Have you

        18    analyzed the -- the varying testimony in connection

        19    with your conclusion that there are pro-competitive

17:50   20    justifications for NAR's 2003 VOW policy?

        21         A.    I'm sorry.  Say -- have --

        22         Q.    Have you analyzed information suggesting

        23    that brokers saw VOWs as a substantial competitive

        24    threat in the process of reaching your conclusion

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 349

         1    that there are pro-competitive justifications for

         2    NAR's policy?

         3         A.    I've seen -- some of the evidence

         4    suggested some brokers saw VOWs as a com- --

17:51    5    significant competitive threat.  I don't know that

         6    it changes any of the analyses I put forth in terms

         7    of pro-competitive benefits or the evidence that

         8    suggests pro-competitive benefits.  It doesn't

         9    change my evaluation of Dr. Vistnes's evidence or

17:51   10    lack of evidence, so --

        11         Q.    I understood that.

        12         A.    Okay.

        13         Q.    Did -- did you see any contemporaneous

        14    documents concerning a perception that VOWs posed a

17:51   15    competitive threat to traditional brokers?

        16         MR. STEIN:  Object to the form.

        17    BY THE WITNESS:

        18         A.    Well, I've saw -- I saw the DOJ FTC

        19    report that suggested that.

17:51   20         MR. STEIN:  And I just -- I guess

        21    contemporaneous to what?

        22    BY MR. KRAMER:

        23         Q.    Have you --

        24         MR. KRAMER:  Contemporaneous to the

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 350

1    consideration of promulgating the 2003 VOW rule.

2    BY THE WITNESS:

3        A.    So contemporaneous to 2003 you're saying

4    or --

17:52 5    BY MR. KRAMER:

6        Q.    Yeah.  Documents from brokers expressing

7    compet- -- competitive concerns about VOWs

8    contemporaneous with the adoption of the 2003

9    VOW --

17:52 10        MR. STEIN:  Object -- sorry.  Object to form.

11    BY THE WITNESS:

12        A.    I've seen documents where brokers

13    expressed concerns about VOWs.  I mean, I saw the

14    Cendant white paper.

17:52 15        So there's lots of papers I saw where --

16    where brokers expressed concerns.

17    BY MR. KRAMER:

18        Q.    I'm talking about competitive concerns.

19        A.    There may have been.

17:52 20        MR. STEIN:  Object to form.

21    BY MR. KRAMER:

22        Q.    Did you consider any documents --

23    contemporary documents expressing competitive

24    concerns about VOWs in determining that NAR has

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 351

         1   valid pro-competitive justifications for its 2003

         2   VOW -- VOW policy?

         3       MR. STEIN:  Object to form, this phrase

         4   "competitive concerns."

17:53 5   BY THE WITNESS:

         6       A.    Well, if the concern with the policy was

         7   competitive, then that wouldn't provide support for

         8   pro-competitive justification, so did I look at --

         9   BY MR. KRAMER:

17:53 10      Q.    I -- well, I mean anti-competitive

        11   concerns.

        12      A.    Okay.

        13      Q.    That's what I'm talking about.

        14      A.    Okay.  I've seen concerns that brokers

17:53 15   had as VOWs -- you know, that VOWs were unknown

        16   competitors, but what I relied on in terms of

        17   understanding what the purpose of the policy was

        18   was essentially testimony from the work group,

        19   because they were the ones who developed and

17:53 20   suggested the policy.

        21           So I -- I relied on their testimony as

        22   really the main basis for what I understood to be

        23   the purpose of the policy.

        24      Q.    And did you look at anyone else's

DR. FREDRICK FLYER,  OCTOBER  17,  2007

Page 352

        1    expressions of anti-competitive intent toward VOWs

        2    that were contemporaneous with those --

        3            A.    Well, I know that --

        4            Q.    -- proceedings?

17:54   5            MR. STEIN:  Let him finish his question.

        6            THE WITNESS:  Okay.

        7    BY MR. KRAMER:

        8            Q.    That were contemporaneous with those

        9    proceedings.

17:54  10            A.    Well, I've looked at declarations by

       11    eRealty --

       12            Q.    But those are not --

       13            MR. STEIN:  Well, wait.  We're -- this -- you

       14    should see what this transcript looks like with

17:54  15    everybody talking over each other.

       16            MR. KRAMER:  Okay.

       17            MR. STEIN:  If -- if you mean to -- I'm just

       18    asking if you mean to limit -- exclude from his

       19    consideration --

17:54  20            MR. KRAMER:  All right.  I've got it.

       21            MR. STEIN:  -- certain things --

       22            MR. KRAMER:  We've done pretty well today

       23    without your refereeing of us.

       24            MR. STEIN:  Thank you.  That was -- I'm sure

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 353

          1   you -- you think so, and I appreciate that.

          2       MR. KRAMER:  So let -- let's take a break at

          3   any rate.  The tape needs to be changed.

          4       THE WITNESS:  Okay.

17:54     5       THE VIDEOGRAPHER:  We are going off the video

          6   record at the end of Tape 7 at 5:54 p.m.

          7                   (WHEREUPON, the deposition was

          8                   recessed from 5:54 to 6:01 p.m.)

          9       THE VIDEOGRAPHER:  We are going back on the

18:01    10   video record at the start of Tape 8 at 6:01 p.m.

         11   BY MR. KRAMER:

         12       Q.   Is it your opinion that brokers'

         13   withdrawal from MLSs is likely in the absence of

         14   provisions allowing selective opt-out from VOWs?

18:02    15       A.   There's evidence to suggest that some

         16   brokers may have opted out.  I don't know that

         17   it -- I'd use the word "likely."  That's not my

         18   opinion.

         19       Q.   What is your opinion on the likelihood

18:02    20   of brokers withdrawing from MLSs in the absence of

         21   provisions allowing selective opt-outs from VOWs?

         22       A.   I haven't done an evaluation on what the

         23   probability would be, so I can't speak to the

         24   likelihood.

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 354

1          I saw that there was threats made, but

2     whether those threats would have come to fruition

3     and the probability of those threats coming to

4     fruition, that's a much more complex question and

18:02 5     it would require understanding the dynamics in play

6     in -- in the different MLSs, because the

7     probability of that outcome would vary across MLSs

8     because the characteristics of the marketplace vary

9     across MLSs.

18:03 10     Q.    Is it your opinion that brokers'

11     withdrawal from MLSs is likely in the absence of

12     provisions allowing blanket opt-outs from VOWs?

13     A.    Again, my answer would be similar, that

14     that's not my opinion.

18:03 15          My opinion is that there is basis to

16     think that there would be some actions, whether it

17     be dropping out of the MLS or lack of cooperation

18     or litigation that were threatened, and those

19     threats may have been real in certain MLSs.

18:03 20          I haven't done an MLS-by-MLS evaluation

21     to assess the probability of those actions, so I

22     couldn't say whether those actions would be likely,

23     not likely or assess -- or assign a probability to

24     those actions.

DR. FREDRICK FLYER,  OCTOBER  17,  2007

Page 355

```
         1       Q.    Okay.  Is there any reason you have not

         2   undertaken that analysis?

         3       A.    Well, I -- as I said, I viewed my

         4   principal role in -- in this matter as assessing

18:04    5   whether or not Dr. Vistnes was thorough in his

         6   analysis.

         7             Part of what he did in his analysis was

         8   dismiss even the possibility of pro-competitive

         9   effects, and there seemed to be a body of evidence

18:04   10   that suggested that that type of possibility

        11   couldn't just be routinely dismissed, that there

        12   was possibility for real pro-competitive benefits

        13   associated with the policy.

        14       Q.    Is there any market in which you have

18:04   15   concluded that brokers would be likely to withdraw

        16   from the MLS in the absence of opt-out rights?

        17       A.    No.

        18       Q.    Do you believe there is any reasonable

        19   expectation that an individual broker would

18:04   20   withdraw from MLSs and not join another MLS?

        21       MR. STEIN:  Object to the form.

        22   BY THE WITNESS:

        23       A.    I think there are network benefits

        24   associated with having common listings.  Whether
```

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 356

           1    you need an M- -- an MLS to actually provide those

           2    benefits or those benefits could be provided by

           3    some alternative Internet or computer database, I

           4    don't know.

18:05      5            So I would think that brokers who opted

           6    out would maybe form some type of reciprocity

           7    program or -- or join another MLS, but there would

           8    be some type of efforts undertaken to coordinate

           9    sharing of listings because there is benefits from

18:05     10    that type of sharing.

          11    BY MR. KRAMER:

          12        Q.    And an MLS would certainly be a -- a way

          13    to -- to do that?

          14        A.    Until now, it's been the most common,

18:05     15    prevalent way to do that.

          16        Q.    And when you say, "until now," you mean

          17    through now?

          18        A.    Through now.

          19        Q.    Yes.

18:05     20        A.    Going to the future, technology is

          21    changing, the world is changing, so it's hard to

          22    say that what happened in the past is nec- --

          23    necessarily reflective of what would occur in the

          24    future.

DR. FREDRICK FLYER, OCTOBER 17, 2007

Page 383

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF ILLINOIS

 3                     EASTERN DIVISION

 4     UNITED STATES OF AMERICA,  )

 5                    Plaintiff,  )

 6            vs.                  )  Civil Action

 7     NATIONAL ASSOCIATION OF     )  No. 05 C 5140

 8     REALTORS,                   )

 9                    Defendant.   )

10

11            I hereby certify that I have read the

12     foregoing transcript of my deposition given at the

13     time and place aforesaid, consisting of Pages 1 to

14     382, inclusive, and I do again subscribe and make

15     oath that the same is a true, correct and complete

16     transcript of my deposition so given as aforesaid,

17     and includes changes, if any, so made by me.

18

19                            DR. FREDRICK FLYER

20     SUBSCRIBED AND SWORN TO before me this     day

21     of               , A.D. 200  .

22                            Notary Public

23

24
```

DR. FREDRICK FLYER,  OCTOBER  17,  2007

Page 384

1   STATE OF ILLINOIS )

2                    )  SS:

3   COUNTY OF DuPAGE  )

4            I, VICTORIA C. CHRISTIANSEN, a Notary

5   Public within and for the County of DuPage, State

6   of Illinois, and a Certified Shorthand Reporter of

7   said state, do hereby certify:

8            That previous to the commencement of the

9   examination of the witness, the witness was duly

10  sworn to testify the whole truth concerning the

11  matters herein;

12           That the foregoing deposition transcript

13  was reported stenographically by me, was thereafter

14  reduced to typewriting under my personal direction

15  and constitutes a true record of the testimony

16  given and the proceedings had;

17           That the said deposition was taken

18  before me at the time and place specified;

19           That I am not a relative or employee or

20  attorney or counsel, nor a relative or employee of

21  such attorney or counsel for any of the parties

22  hereto, nor interested directly or indirectly in

23  the outcome of this action.

24           IN WITNESS WHEREOF, I do hereunto set my

1    hand and affix my seal of office at Chicago,

2    Illinois, this 19th day of October, 2007.

3

4

5              Notary Public, DuPage County, Illinois.

6              My commission expires June 20, 2011.

7

8

9    C.S.R. Certificate No. 84-3192.

10

11

12

13

14                              OFFICIAL SEAL
                                VICTORIA C CHRISTIANSEN
15                         NOTARY PUBLIC - STATE OF ILLINOIS
                           MY COMMISSION EXPIRES:06/20/11
16

17

18

19

20

21

22

23

24

# EXHIBIT 11

### (*REDACTED VERSION*)

This exhibit has been designated by Defendant NAR as containing "Confidential Information" as defined under the Jan 11, 2006 Protective Order entered in this case by Magistrate Judge Denlow. *See* D.E. 53.  Pursuant to the directives of this Order, a redacted copy of this exhibit has been filed with Clerk of Court and an unredacted version has been submitted directly to the chambers of Judge Kennelly in a sealed envelope.  *See* D.E. 53 ¶17.

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| _____ ) | |
| **UNITED STATES OF AMERICA** ) | |
| ) | Civil Action No. 05 C 5140 |
| Plaintiff, ) | |
| ) | Judge Kennelly |
| v. ) | |
| ) | Magistrate Judge Denlow |
| **NATIONAL ASSOCIATION OF** ) | |
| **REALTORS**® ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

### Supplemental Report of Frederick A. Flyer

February 29, 2008

*CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER*

**Table of Contents**

I.      **Introduction**                                                                          **1**

        A.      Scope of Supplemental Report                                             1

        B.      Outline of Main Conclusions                                              1

II.     **Dr. Vistnes Has Not Shown That the NAR Policies Will Harm Competition**        **3**

        A.      Dr. Vistnes Defines a Relevant Market in an Arbitrary Fashion           4

                1.      Industry Evidence Indicates that Alternative Websites are
                        Substitutes for VOWs                                            7

                2.      Dr. Vistnes Provides No Cross-Price Elasticity Evidence Between
                        VOWs and the Alternative Sites                                 11

                3.      Dr. Vistnes' Dismissal of FSBOs from the Relevant Market is not
                        Based on a Meaningful Economic Analysis                        13

        B.      Dr. Vistnes Does Not Show That VOWs Offer Unique Benefits              15

                1.      Dr. Vistnes' Analysis of VOW Productivity Is Conceptually
                        Flawed                                                         15

                2.      Dr. Vistnes Reaches His Conclusions Only by Refusing to Address
                        Obvious Confounding Factors                                    19

        C.      Dr. Vistnes' Analysis Purporting to Show that VOWs Have Forced
                Commissions Down in a Relevant Market Is Flawed                        23

                1.      Description of Dr. Vistnes' Analysis                           23

                2.      Dr. Vistnes' Analysis of the Effect of ZipRealty on NRT
                        Commissions Is Conceptually Flawed                             24

                3.      Dr. Vistnes' Model Is Methodologically Flawed                  26

                4.      The Results of Dr. Vistnes' Analysis Are Not Robust            29

        D.      Dr. Vistnes' Argument That VOWs Have Unique Incentives to Innovate
                Is Flawed                                                              30

        E.      Dr. Vistnes' Argument that VOWs Drive Innovation is Unsupported        31

**III.** **Evidence Does Not Support the Conclusion That VOW Policies Are Likely to Harm VOWs** **34**

    A.    Opt Outs Appear Unlikely     34

    B.    Even If Some Brokers Opt Out of VOWs, Dr. Vistnes Has Not Shown That VOWs Will Be Harmed     37

**IV.** **New Evidence Does Not Support Dr. Vistnes' Conclusions Regarding the Likely Anticompetitive Effects of Specific NAR Provisions** **40**

    A.    Referral and Membership Rules     40

    B.    Clean Page and Cobranding Rule     41

    C.    Data Feeds Rule     43

**V.** **Dr. Vistnes Continues To Ignore Evidence Substantiating Procompetitive Benefits of the VOW Policies** **45**

    A.    There Are Other Potential Procompetitive Benefits of the VOW Policies     46

    B.    Dr. Vistnes Improperly Dismisses the Benefits of Reducing the Likelihood of MLS Break Up     48

**Exhibits and Appendix**

Feed Rule will foster "uncertainty as to what type of data feed [VOW operators] will be forced to use," which "serves to reduce brokers' incentives to invest in, and adopt, the new VOW technology as a means of competing, and can subsequently limit competition from those brokers that nevertheless opt to go forward and offer VOWs."[93]  But Dr. Vistnes does not cite any reliable evidence to support this theory and, thus, fails to substantiate the assertion that harm to competition would result from the Data Feed Rule.

92.    In sum, Dr. Vistnes fails to show that persistent feeds are the efficient solution for all markets.  Consequently, Dr. Vistnes does not provide sufficient economic evidence to support a mandate that MLSs must always provide persistent data feeds to VOWs.

## V.    Dr. Vistnes Continues To Ignore Evidence Substantiating Procompetitive Benefits of the VOW Policies

93.    Dr. Vistnes has agreed that the government's position in this case is that listing brokers, who have expended resources to secure listings, should be mandated to make those listings available to VOWs for display on Internet websites.  Without the opt-out provisions, listing brokers would lose a protection mechanism in instances where VOW operators misuse listing information.  These misuses may include VOW operators taking actions (or allowing others to take actions) that are against the interest of the seller or imposing other types of costs on the listing broker.  Nevertheless, Dr. Vistnes continues to assert that there are no plausible procompetitive justifications for providing the listing broker the safety valve of a right to "opt out" of providing its listings to the VOW operator.[94]

---

[93] Vistnes Rebuttal at 58.

[94] Vistnes Rebuttal, Section III.

94.     Dr. Vistnes posits that the benefits of MLS membership are so great that no rational broker would choose to withdraw from the MLS.[95]  Because in his view, there is no open question about the stability of the MLS, maintaining MLS stability and cooperation among its members cannot be a procompetitive justification for rules governing an MLS.

95.     This argument suffers from several flaws. The most serious is that Dr. Vistnes appears to consider the avoidance of significant withdrawals from the MLS as the only proffered procompetitive justification, and he fails to recognize the procompetitive benefits of avoiding MLS disruptions and frictions short of total withdrawal or implosion. This failure leads him to understate the benefits that may flow from the VOW Policies. Further, Dr. Vistnes also dismisses the risk and economic costs due to MLS break up, without reliable justification. Finally, Dr. Vistnes ignores testimony and evidence gathered since my last report that provides evidence of procompetitive benefits due to the VOW Policy.

## A.     There are Other Potential Procompetitive Benefits of the VOW Policies

96.     Dr. Vistnes focuses only on the NAR Policies' impact on brokers' decisions to withdraw from the MLS.  He does not address the other procompetitive benefits that can emerge from these VOW policies.  For example, the evidence on broker concerns indicates that NAR Policies were intended and expected to reduce friction among MLS members as well as expenditures on litigation and other contentious activities within the MLS, by providing brokers with a safety valve if they came to believe that VOWs, individually or collectively, were misusing their assets, *i.e.*, their

---

[95] Vistnes Rebuttal, pp. 7-11.

listings, for purposes not intended by the MLS.[96]  As a result, the NAR Policies can be expected to increase cooperation between brokers and facilitate transactions.  Further, because these policies can protect the value of listings for brokers representing sellers, they increase the incentives for listing brokers to invest in creating better services for consumers in order to obtain listings.  These investments not only benefit sellers, they also benefit buyers.

97.    MLSs often have rules in place that govern the interactions between brokers and the behavior of individual brokers. These rules cover, among many other things, the usage of MLS data by individual brokers, including VOWs.  While these rules can address misuses of MLS data and disputes between brokers, enforcement of these rules and resolution of disputes can be costly in terms of time and resources – both to the brokers involved and the MLS.  The NAR Policies may provide a less costly method to prevent data abuses and avoid disputes between brokers, by allowing listing brokers to opt out of having their listings displayed on the VOW's website.

98.    Moreover, since the NAR Policies enable brokers to protect themselves against potential abuses by VOW operators, it creates incentives for other brokers to act in accordance with MLS policies.  Eliminating this ability of brokers to protect themselves against abuses would increase the economic incentive to misuse listing information.  In this way, the NAR Policies can increase overall cooperation among brokers.

99.    In his deposition, Dr. Vistnes appears to acknowledge that harm to competition can emerge from broker dissatisfaction with the MLS, even if this

---

[96] Deposition of Laurie Janik, November 8, 2007, pp. 199-203.

dissatisfaction does not lead to MLS breakup. Specifically, Dr. Vistnes stated that he thinks "the general goal of the MLS is to keep its members happy and not complaining." He later opines that member unhappiness could "cause [the MLS] to deviate from its goal of serving all members … [MLSs] goal of working for all the constituent members."[97] Therefore, Dr. Vistnes himself implicitly acknowledges that broker dissatisfaction can affect the performance of the MLS without necessarily causing its fracture. Nonetheless, he continues to argue as if the only procompetitive justification offered in this case is the avoidance of complete MLS withdrawal.

100. In sum, by protecting the value of listings to listing brokers, these brokers have more incentives to invest in innovative and high quality services in order to obtain listings and to cooperate with other brokers (including those operating VOWs) in a way that facilitates the legitimate and procompetitive purposes of the MLS.

**B. Dr. Vistnes Improperly Dismisses the Benefits of Reducing the Likelihood of MLS Break Up**

101. Dr. Vistnes argues that brokers' withdrawal from an MLS is unlikely. To support this position, he cites statements by industry participants discussing the strong incentives of brokers to maintain a membership within an MLS. Dr. Vistnes also offers the lack of confirmed instances of MLS withdrawal because of VOWs as evidence of the improbability of MLS withdrawal.[98] This ignores the fact that hundreds of MLSs have adopted the VOW Policy. Therefore, the fact that brokers have not withdrawn from the

---

[97] Vistnes Deposition December 11, 2007 pp. 235 & 236.

[98] Vistnes Rebuttal, pp. 13-14. Dr. Vistnes also argues antitrust laws would prevent all MLSs with market power from adopting VOW Policies, and therefore, there would be no reason for brokers to switch MLSs because of VOWs. Vistnes Rebuttal, p. 8 fn 15. I do not address the legal merits of this argument.

MLS in these areas does not necessarily reflect what would have occurred in a world in which the policy was not adopted.

102.    The fact that brokers haven't withdrawn from MLSs that have not adopted the VOW Policy is not evidence that brokers did not value the "safety valve" that these policies provided.  In particular, VOW conduct is a key factor in brokers' decisions to opt out.  If VOWs do not take actions that diminish the value of listing brokers' assets then, over time, listing brokers' concern about having a "safety valve" would likely diminish.

103.    Furthermore, if Dr. Vistnes is correct that brokers are aware of this litigation and waiting to take action pending resolution of this lawsuit, then it would not make sense for brokers to withdraw from an MLS and form a new association that would have opt-out rules if, as Dr. Vistnes asserts[99], any such association would also be legally barred from having opt-out rules.

104.    Evidence gathered since my last report also supports the contention that the threat of broker withdrawal from the MLS was (and is) a reasonable concern. Specifically, representatives from Cendant, the largest real estate brokerage and franchisor in the nation, testified that they would have seriously considered withdrawing from MLSs in response to perceived abuses by VOWs in the absence of an opt-out right. Members of the committee that drafted the VOW Policy testified that they took threats such as Cendant's very seriously.[100]  Some brokers have stated that they may pull out the

---

[99]    Vistnes Rebuttal, p. 8 fn 15.

[100]   Deposition of Ann Bailey, November 29, 2007, pp. 169-175, 228-229; Deposition of Laurie Janik, November 8, 2007, pp. 190-193, 209-210; Deposition of David Charron, December 6, 2007, pp. 175-176; and Deposition of Alan Yassky, September 27, 2007, pp. 57-67, 76-83 and Government Exhibits 1209, 1212.

MLS in response to large third-party aggregators who operate VOWs unless they had an opt-out right.[101] Even VOW brokers recognize the seriousness of the threat of MLS withdrawal[102] and that withdrawal would lead to a deterioration of the cohesion of the MLS in a way which would seriously threaten their business.[103] This evidence supports the conclusion that procompetitive benefits would emerge from increased MLS stability associated with the NAR Policies.

105.    To counter this evidence on the possibility of MLS break up and the costs associated with a break up, Dr. Vistnes suggests that even if mass broker exits occurred, an alternative MLS would be formed (and consumers would not be harmed). His argument ignores the inefficiencies and costs associated with establishing and using alternative MLSs. A key benefit of the MLS is the provision of a centralized system to facilitate broker cooperation. The existence of multiple MLSs in an area increases the likely coordination and transaction costs faced by brokers and ultimately by consumers, as the evidence shows that past MLS splits did entail additional costs.[104] These costs included increased MLS membership costs, increased costs searching for and showing

---

[101]  Deposition of **REDACTED** 2007, pp. **REDACTED** and Deposition of **REDACTED** 2007, pp. and Exhibit

[102]  Deposition of Ray Gronowski, October 31, 2007, pp. 47-48; Deposition of Russell Capper, October 26, 2007, pp. 76-77, 115-119; and Deposition of Thomas Lynch, October 25, 2007, pp. 178-179.

[103]  Deposition of **REDACTED** 2007, pp.        Exhibit 43

[104]  Industry participants also agree that membership in multiple MLSs increases the costs to brokers. Deposition of Ann Bailey, November 29, 2007, pp. 206, 230-234; Deposition of Brad Tertell, November 20, 2007, pp. 21, 242-247; Deposition of Bud Fogel, September 17, 2007, pp. 65-66, 196-197; Deposition of Chris Eigel, September 6, 2007, pp. 82-83, 113-115, 181; Deposition of Elio Buoni, October 17, 2007, pp. 125-126; and Deposition of Tom Lynch, October 25, 2007, pp. 164-169. These include a single database, avoiding duplicative membership fees, and time savings from single entry of listings.

listings to buyers, and increased costs of cooperation between brokers.[105] Finally, Dr.

Vistnes' suggestion that these costs would not be passed on to consumers contradicts

basic economic theory, which predicts that consumers in competitive markets fully bear

cost increases associated with the provision of services (or goods).  Therefore, Dr.

Vistnes' claim that MLS pull-out would not harm consumers is unreliable.

---

[105]  The existence of two MLSs in Bakersfield increased the costs of conducting real estate
brokerage transactions. Deposition of Scott Rivera, May 29, 2007, pp. 22-25.

I declare under the penalty of perjury that foregoing is true and correct.

Executed on this 29 day of February, 2008.


Fredrick A. Flyer

# EXHIBIT 12

DR. FREDRICK FLYER          APRIL 16, 2008

Page 387

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

UNITED STATES OF AMERICA,     )

               Plaintiff,     ) Civil Action No.

       vs.                   ) 05-CV-5140

NATIONAL ASSOCIATION OF       )

REALTORS,                     )

              Defendant.     )


        The videotaped deposition of DR. FREDRICK
FLYER, called as a witness for examination, taken
pursuant to the Federal Rules of Civil Procedure of
the United States District Courts pertaining to the
taking of depositions, taken before ANDREA L.
CARTER, a Notary Public within and for the County of
Cook, State of Illinois, and a Certified Shorthand
Reporter of said state, CSR No. 84-3722, at One
South Dearborn Street, Chicago, Illinois, on the
16th day of April, A.D. 2008, at 8:43 a.m.

DR. FREDRICK FLYER          APRIL 16, 2008

Page 582

          1    their city and not in other cities?

          2         A.    Could consumers in a particular city be

          3    harmed if there is significant opt out.

          4              Again, it would depend on what the

12:59     5    competitive alternatives were, whether those

          6    competitive alternatives were good substitutes for

          7    VOWs.  Theoretically the answer is yes.

          8         Q.    Have you formed an opinion that the

          9    pro-competitive benefits of the VOW policy will be

12:59    10    widespread or systematic?

         11         MR. TREECE:  Object as vague.

         12    BY THE WITNESS:

         13         A.    That's -- that's not what I say in the

         14    report nor in any of my testimony.  So I haven't

12:59    15    inferred that the pro-competitive benefits would

         16    have been widespread or -- or systematic in that

         17    sense.

         18    BY MR. KRAMER:

         19         Q.    Okay.  Have you made any assessment or

13:00    20    reached any opinion rather on the extent to which

         21    the likely pro-competitive benefits of a VOW policy

         22    will be realized?

         23         A.    I have observed evidence that suggests

         24    that there are pro-competitive benefits, and those

DR. FREDRICK FLYER          APRIL 16, 2008

Page 583

1    pro-competitive benefits can extend well beyond the

2    benefits that Dr. Vistnes dismisses in -- in his

3    report, and that is MLS stability.  It could affect

4    and encourage listing brokers to invest more in

13:00 5    their listings.

6              So, for example, if the VOW policy

7    protected listing brokers against abusive -- abusive

8    actions by VOWs and it meant that the VOWs that

9    succeeded and sustained themselves in the

13:00 10    marketplace provided services to listing brokers,

11    that would encourage listing brokers to invest more

12    in their -- in their properties.  Maybe take more

13    pictures, more virtual tours, provide those tours to

14    the MLS because they know there's wide

13:01 15    dissemination, and then those properties would be

16    observed by customers.

17              So the potential for widespread and

18    systematic pro-competitive benefits are there and

19    extend beyond the benefits that have been identified

13:01 20    and dismissed by Dr. Vistnes.

21         Q.    I understand you have observed that

22    evidence.

23              My question is:  Have you formed an

24    opinion that the likely pro-competitive benefits of

DR. FREDRICK FLYER          APRIL 16, 2008

Page 584

1    the VOW policy will be widespread or systematic?

2         A.    And the answer to that question is I

3    haven't formed that opinion the way you stated it.

4         Q.    Do you agree that a broker can benefit by

13:01 5    opting out from VOWs in some situations?

6         A.    A broker can benefit by opting out of

7    VOWs in some situations.  I haven't -- I haven't

8    concluded that.  I'm not sure because its --

9    certainly for small brokers, I think the

13:02 10    incentive -- as long as the VOW is really providing

11    a service to -- that help the listing broker sell

12    the property, I think the incentives are there to

13    show the property.

14              The question is for larger brokers, you

13:02 15    know, that may have tremendous share are they better

16    off by not participating in some kind of membership

17    organization or organization where they could

18    potentially lose the other end of the sale, and

19    there it's more complicated because there's

13:02 20    countervailing forces, and I haven't done an

21    analysis that precludes the possibility that all

22    brokers would benefit by not opting out.

23         Q.    Can a broker benefit if opting out

24    hampers competition from a VOW arrival?

DR. FREDRICK FLYER          APRIL 16, 2008

Page 616

 1   have a basis to dismiss it, and if you cite the

 2   basis and go through sequences of steps to explain

 3   your logic and have good support for it, then you

 4   may have a reliable basis to draw conclusions.  It

14:42 5   really depends on the nature of the analyses.

 6        Q.    Let's switch gears here.

 7              In your opinion, the possibility of opt

 8   out gives VOW brokers --

 9        THE COURT REPORTER:  I'm sorry.  The

10   possibility of?

11        MR. KRAMER:  Opt -- opt out.

12        THE COURT REPORTER:  Okay, sorry.

13   BY MR. KRAMER:

14        Q.    -- gives VOW brokers an economic

14:42 15   incentive not to abuse other brokers' listing data,

16   correct?

17        A.    Well, if you -- let's take the context of

18   the VOW policy, for example, where you have an

19   ability to selectively opt out.  So if you have a

14:42 20   VOW that maybe doesn't bring any buyers to the table

21   but rather uses the data to market other services,

22   then -- or disparages listings and their -- and

23   their showings and upsets listing brokers because of

24   this information, listing brokers would have

DR. FREDRICK FLYER          APRIL 16, 2008

Page 617

1   recourse which encourages VOWs who may need the

2   listings to act in a way that's consistent with the

3   interest of the listing brokers.

4        Q.    And so would the answer to my question be

14:43  5   yes?

6        A.    I think so.  I think the answer to your

7   question would be, yes.  I mean, I state what I

8   think most precisely in the report.  Probably more

9   precisely than I could come up with now.

14:43 10        Q.    And how does the possibility of opt out

11   give VOW brokers an economic incentive not to abuse

12   other brokers' listing data as you have just

13   described?

14        A.    Because if you know that brokers will opt

14:43 15   out and not provide their listings to you if you

16   start abusing or disparaging their listings or doing

17   other things that they may take offense to and you

18   know other VOWs aren't going to do this, then you

19   would be competitively disadvantaged vis-à-vis other

14:44 20   VOWs and -- or other types of IDX sites that may not

21   do it, and, therefore, would have competitive

22   incentives in order to maintain your competitive

23   position to act in a way that's consistent with

24   selling or listing brokers' interest.

DR. FREDRICK FLYER          APRIL 16, 2008

Page 618

1     Q.     In reaching your opinions about the

2   pro-competitive -- sorry.

3            In reaching your opinions about the

4   pro-competitive effects of NAR's policies, did you

14:44  5   analyze any data, sir?

6     A.     You say data.  You mean actual

7   statistical data sets?

8     Q.     Yes, or any MLS data or anything of that

9   sort.

14:44 10     A.     Well, I -- this is in the context of the

11   first report.  I looked at Bakersfield in terms of

12   what type of concentration you needed in order to

13   break away from an MLS and create your own site.  I

14   have also looked at some recent deposition

14:45 15   testimony, and this -- for this report to look at

16   what, you know, critical mass of brokers might be

17   that could form an alternative to the MLS.  Have I

18   undertaken an econometric analysis, I have not.

19     Q.     What data have you looked at, if any,

14:45 20   concerning your opinions about the pro-competitive

21   effects of NAR's policies?

22     A.     Well, in terms of, you know, what

23   types -- what types of shares Cendant might have had

24   in particular areas.  You know, I understood they

DR. FREDRICK FLYER          APRIL 16, 2008

Page 619

1    were a large broker who was upset with -- or -- or

2    at least a promoter of some of the VOW policies, and

3    I looked at shares associated in the context again

4    with my first report in terms of when Bakersfield

14:46  5    split up, what happened.

6             I looked at -- that's pretty much it.  I

7    think share data would be the only thing or share --

8    or estimates of what shares would -- necessary

9    shares might be in order to break away and form your

14:46 10    own MLS, but, again, no econometric analysis was

11    undertaken.

12        Q.    Did you attempt to estimate any benefits

13    in reaching your opinions about the pro-competitive

14    effects of NAR's policies?

14:46 15        A.    My only analysis was whether or not there

16    was sufficient basis to think some benefits would

17    likely arise and whether or not -- and what the form

18    of those benefits might be.

19        Q.    And what did you do in that regard?

14:46 20        A.    Well, I read some of the -- this is more

21    in the context of the first report.  So -- so

22    actually I'm not sure that I am in a position to

23    adequately describe what I did, but part of what I

24    did is read the context of how the VOW policy -- the

DR. FREDRICK FLYER          APRIL 16, 2008

Page 620

```
          1   initial VOW policy was implemented or developed and

          2   how, you know, essentially the review board, who was

          3   on it, what the concerns were, what prompted it,

          4   essentially a historical record.

14:47     5        Q.    Anything else?

          6        A.    Well, that's what comes to mind in terms

          7   of my initial report.  In terms of other types of

          8   benefits that would arise, I looked at testimony

          9   talking about broker -- broker cooperation.  I try

14:47    10   to understand what -- what the Bakersfield

         11   experience was about.  I try to think about it in an

         12   economic context -- context.  What kind of benefits

         13   arise out of MLS or from the MLS in terms of broker

         14   cooperation.

14:47    15        Q.    Did you attempt to quantify benefits in

         16   reaching your opinions about the pro-competitive

         17   effects of NAR's policies?

         18        A.    I haven't -- to quantify and come up with

         19   an estimate requires some kind of statistical

14:48    20   analysis or econometric analysis that I -- as I have

         21   said, I haven't undertaken.

         22        Q.    Okay.  Is that a no?

         23        A.    When you say -- it's a, no, to putting a

         24   number on it.  It's not a, no, to whether or not I
```

DR. FREDRICK FLYER          APRIL 16, 2008

Page 621

         1    thought it was likely -- the evidence supported that

         2    some benefits existed.

         3         Q.    So -- so you did not undertake any

         4    quantitative analysis of whether there were

14:48    5    pro-competitive benefits of NAR's policies?

         6         A.    When you say that, you mean did I attempt

         7    to measure the size of those pro-competitive

         8    benefits?

         9         Q.    Yes, sir.

14:48   10         A.    I did not undertake any analysis that

        11    addresses that.

        12         Q.    Did you attempt to quantify any costs

        13    that might arise with NAR's policies when

        14    considering the pro-competitive effects of those

14:48   15    policies?

        16         A.    When you say -- I'm not sure what you

        17    mean by costs.

        18         Q.    Cost to competition.

        19         A.    But when you -- so if I am looking at

14:48   20    whether or not the policy -- there was evidence in

        21    the record that suggested that the policies would

        22    likely result in pro-competitive benefits, cost of

        23    competition I would term as anti-competitive harm.

        24              So are you asking me whether I tried to

DR. FREDRICK FLYER          APRIL 16, 2008

Page 622

1    measure what the anti-competitive harm would be of

2    those policies?

3         Q.    I am not talking about just that.  I'm

4    talking about any other costs as well I should

14:49  5    clarify.

6         A.    Well, I looked -- I looked at claims that

7    there were going to be litigation, and that, you

8    know, I understand litigation imposes costs just

9    from my own work experience, and -- and so I try to

14:49 10    identify what the costs might be if there wasn't a

11    policy.

12         Q.    Did you attempt to quantify the costs

13    that you identified, sir?

14         A.    No, again, I didn't -- I didn't attempt

14:49 15    to quantify the litigation costs or the other type

16    of costs that I have identified associated with the

17    pro-competitive benefits.

18         Q.    Okay.  Did you attempt to quantify any

19    risk that might arise in connection with your

14:49 20    opinion about the pro-competitive benefits of NAR's

21    policies?

22         A.    I'm not sure what you mean by risks.

23         Q.    Risks of achieving the intended effect.

24         MR. TREECE:  Object as vague.

DR. FREDRICK FLYER          APRIL 16, 2008

Page 623

           1    BY MR. KRAMER:

           2         Q.    The likelihood of achieving the intended

           3    effect.

           4         A.    You mean the likelihood that -- that the

14:50      5    policies themselves would result in --

           6         Q.    The intended effect.

           7         A.    I didn't try to quantify what the

           8    likelihood would be of intended effect because I

           9    just -- that likelihood would also vary across areas

14:50     10    depending on how much resistance there was by

          11    brokers and what their presence were in that -- in

          12    that area.

          13         Q.    Okay.  In reaching your opinions about

          14    the pro-competitive effects of NAR's policies, did

14:50     15    you perform any calculations in -- in that analysis.

          16         A.    No, again, the answer is I haven't done

          17    an empirical or an econometric analyses of what the

          18    size or likelihood of those probabilities might be.

          19         Q.    In discussing the potential

14:51     20    pro-competitive benefits of NAR's VOW policies, you

          21    have stated that those policies were intended to

          22    reduce MLS disruptions, frictions, expenditures on

          23    litigation, and other contentious activities, right?

          24         A.    That was my understanding based on the

DR. FREDRICK FLYER          APRIL 16, 2008

Page 624

    1   factual record.

    2        Q.   Can you explain what you mean by MLS

    3   disruptions?

    4        A.   Well, if you think, for example, that

14:51 5   there was a real threat to broker abuse of listings

    6   and I know there were some complaints that were

    7   issued in the context of this case that certain

    8   brokers had -- let's say, certain VOWs might have

    9   had a place on the -- on their site where people can

14:52 10  make statements about properties and so forth and

    11  certain listing brokers didn't like those

    12  statements.

    13        I evaluated, you know, what kind of costs

    14  could come from that, and some of those costs may be

14:52 15  less broker cooperation by not taking as many

    16  pictures, by not trying to promote the properties as

    17  aggressively on the internet because they view the

    18  internet as not necessarily a conducive environment

    19  to promote properties if those type of sites took

14:52 20  off.

    21        Q.   And what did you do in evaluating MLS

    22  disruptions as you've just suggested you did?

    23        A.   I try to sit there and understand what

    24  incentives are on the part of a listing broker and

DR. FREDRICK FLYER          APRIL 16, 2008

Page 625

         1    why they use the internet and what their incentives

         2    may be.

         3        Q.    Can -- can you explain what you meant by

         4    friction in the context of discussing potential MLS

14:52    5    benefits from NAR's VOW policies?

         6        A.    Do you have a particular sentence that

         7    you are looking at when you say --

         8        Q.    Yes, in paragraphs 95 and 96.

         9              Let me ask you this:  Would basically be

14:53   10    the -- would it basically be the case that the four

        11    terms you used:  MLS disruptions, frictions,

        12    expenditures on litigation, and other contentious

        13    activities could be described as various types of

        14    contentious activities in an MLS?

14:53   15        A.    And lack of investments by the listing

        16    broker because if you diminish the value of the

        17    listing brokers' listings, then the broker might

        18    have lower incentives to invest and promote those

        19    listings.

14:53   20              So as a consequence, frictions that can

        21    be imposed can both be in terms of cooperation, but

        22    also in terms of diminished value of the listings to

        23    the listing broker which could diminish the

        24    competitive offerings that might be provided

DR. FREDRICK FLYER          APRIL 16, 2008

Page 626

1    consumers.

2         Q.    Okay.  Can we agree if we -- if we talk

3    about those terms:  MLS disruptions, frictions,

4    expenditures on litigation, and other contentious

14:54 5    activities as frictions that we are encompassing

6    those terms?

7         A.    Sure, if that's what you want.

8         Q.    Okay.  Aside from what you have described

9    already in connection with MLS disruptions, what

14:54 10   other frictions are you referring to -- let me --

11   let me go on.

12              What -- what expenditures on litigation

13   are you referring to, please, sir?

14         A.    Well, again, that was in the context of

14:54 15   the first report, and I -- you know, if you want to

16   reference my first report, I cite it explicitly, but

17   there was threats that certain brokers said that

18   they would sue or at least there's deposition

19   testimony that implied that these brokers would

14:54 20   litigate if they didn't have some type of out.

21         Q.    You used the phrase expenditures on

22   litigation in your supplemental report in paragraph

23   96 on page 46 --

24         A.    Okay.

DR. FREDRICK FLYER          APRIL 16, 2008

Page 627

          1      Q.      -- and I'm asking what you meant there?

          2      A.      The same thing that I meant in my first

          3   report.  The expenditures on litigation that would

          4   have occurred if you take the deposition testimony

14:55    5   and the other records that indicated there was going

          6   to be some type of litigation or at least a

          7   probability of litigation as a result of not having

          8   some type of out for listing brokers.

          9      Q.      And would that litigation be litigation

14:55   10   involving threatened lawsuits against the National

         11   Association of Realtors as opposed to MLSs?

         12      A.      It could -- it could be both.  It could

         13   be all sorts of things.  I think it was one threat

         14   that I remember that was made directly against the

14:55   15   NAR that they were going to sue the NAR, but the

         16   litigation wouldn't necessarily just be limited to

         17   lawsuits between the NAR and brokers.  It could

         18   expand beyond that.

         19      Q.      Are you aware of any specific threats of

14:55   20   litigation against an MLS that you are alluding to

         21   here?

         22      A.      As I -- as I sit here, I don't think I'm

         23   in a position to recite the record of what -- what

         24   type of litigation was threatened, but, you know,

DR. FREDRICK FLYER          APRIL 16, 2008

Page 628

1    the documents I cite would contain that record.

2         Q.    Would the answer to my question be no?

3         A.    As I sit here, I can't recall the basis

4    for other type of litigation and whether or not

14:56 5    there was threats that were -- that were made

6    against the MLS.

7         Q.    So as you sit here, you are not aware of

8    any?

9         A.    That's correct, but, again, a lot of this

14:56 10    evidence was developed in the context of my first

11    report.

12         Q.    Are you sure you talked about

13    expenditures on litigation in your first report as

14    opposed to in your deposition?

14:56 15         A.    I thought it was in my first report or at

16    least it might have been in my deposition.  I recall

17    discussing it in the context of the evidence that

18    was collected in regards to my first report.

19         Q.    When you refer in paragraphs 95, 96 to

14:56 20    other contentious activities, is there anything that

21    comes to mind that you have not already described in

22    terms of the MLS frictions that we have been

23    discussing?

24         A.    Sure.  I mean, you could have -- let's

DR. FREDRICK FLYER          APRIL 16, 2008

Page 629

```
         1    say that you -- you know, particularly brokers don't

         2    like other brokers.  They may not take phone calls

         3    from them.  They may not cooperate in a -- in -- as

         4    an energetic a way as they might if we were in a

14:57    5    world where rules were set and codes of conduct were

         6    accepted and normal protocols were followed.

         7         Q.    Okay.  Anything else?

         8         A.    Well, if there's contentious activity,

         9    there could be also diminished incentives to follow

14:57   10    certain lines of business.  So if you think that,

        11    you know, when you provide a listing to the

        12    internet --

        13         Q.    Sir, I'm not asking you what the effects

        14    of the contentious activity is.  I'm asking you if

14:57   15    you are aware of any other contentious activity?

        16         A.    I see.  Besides non-cooperation between

        17    brokers, non-cooperation between brokers and the

        18    MLS, and non-cooperation between brokers and NAR,

        19    I'm not sure that I can identify, as I sit here, any

14:58   20    other types of contentious activity.

        21         Q.    Okay.  Now, as I started to do before,

        22    can we agree going forward that we will talk about

        23    MLS frictions to encompass the four terms that we

        24    have been discussing; that is, disruptions,
```

DR. FREDRICK FLYER          APRIL 16, 2008

Page 630

         1    frictions, expenditures on litigation, and other

         2    contentious activities?

         3          A.    As well as lack of investment in

         4    properties because of the diminished value of those

14:58    5    properties --

         6          Q.    Okay.  But that's an effect rather than

         7    something that --

         8          A.    Okay.

         9          Q.    Okay.

14:58   10          A.    As long as we understand those four terms

        11    then don't encompass all of the effects that could

        12    emanate from a --

        13          Q.    Yes, sir.

        14          A.    -- policy.  Okay.

14:58   15          Q.    Thank you.  Is it your opinion that

        16    reducing the friction in MLSs was one of the

        17    purposes for NAR's VOW policies?

        18          A.    Again, a lot of the testimony that I

        19    reviewed was in the context of my first report, but

14:59   20    that was my understanding that they wanted to --

        21    listing brokers wanted protection, and they wanted

        22    to diminish -- or to -- the MLS itself is an entity

        23    that's created to enhance cooperation between

        24    brokers, and as part of the MLS's mission to enhance

DR. FREDRICK FLYER          APRIL 16, 2008

Page 631

1    cooperation, these rules were -- certainly my

2    understanding of these rules were certainly in the

3    context of that particular goal.

4        Q.    And what is the basis of your

14:59  5  understanding of -- of the reducing friction goal in

6    MLSs as one the purposes for NAR's VOW policies?

7        A.    Well, let me just -- it starts with my

8    basis for understanding of what the MLS's purpose

9    is, and I have gone to MLS sites.  I have read

14:59 10  documents that actually I cited in my first report

11   about what the -- why MLSs are established, the

12   history of the MLS, what the MLS incentives are.  I

13   have gone to the NAR website to read why -- what

14   their missions are, and so -- and part of that

14:59 15  identifies creating an environment of cooperation.

16          Given that context, my understanding was

17   that there was contention regarding if we give VOWs

18   a -- a full data feed, how can we protect ourselves,

19   what can we do if VOWs started exploiting this, and

15:00 20  the history of -- of essentially what went into the

21   creation of the 2003 VOW policy.

22       Q.    And what was that based on that

23   understanding?

24       A.    Well, some of it was deposition testimony

DR. FREDRICK FLYER        APRIL 16, 2008

Page 632

         1    by members of the committee that developed the

         2    policy.  You know, there was at least four or five,

         3    six depositions that spoke about that.  It was -- it

         4    was subsequent follow-up depositions by some of the

15:00    5    members that were deposed later on and what they

         6    were thinking about and what their fears were and so

         7    on.

         8         Q.    Anything else that comes to mind?

         9         A.    I talked to Laurie Janik at length about

15:00   10    what -- you know, what was the purpose of the

        11    policies, what was the thinking behind the policies.

        12         Q.    Anything else, sir?

        13         A.    Well, Ralph Holmen I talked to him.  As I

        14    sit here, that's what I recall.

15:01   15         Q.    Why did you not state your opinion that

        16    one of the potential pro-competitive benefits of

        17    NAR' VOW policies would be reducing friction in your

        18    August 1st report?

        19         MR. TREECE:  Objection, misstates testimony.

15:01   20    BY THE WITNESS:

        21         A.    Well, part of this report is to reference

        22    and to address some of the claims made by

        23    Dr. Vistnes in his supplemental report.  So what's

        24    said here is actually directed at Dr. Vistnes's

DR. FREDRICK FLYER          APRIL 16, 2008

Page 633

1    supplemental report, but I actually don't think

2    that's a fair characterization of what I said in my

3    August 1st report.

4           I actually think identified the fact that

15:01 5    there were other potential pro-competitive benefits

6    besides just reducing the likelihood of MLS breakup,

7    and I think I identified cooperation and lower --

8    lower costs of having disruptive behavior.

9    BY MR. KRAMER:

15:02 10    Q.    If you did not, in fact, identify those

11    goals, would there be a reason why you didn't to

12    your knowledge?

13           A.    No, because I thought of those.  A lot of

14    this thinking was developed in the context of my

15:02 15    initial report.  So I would be surprised if it

16    wasn't mentioned in my initial report, and I

17    wouldn't -- if it wasn't mentioned in my initial

18    report, I wouldn't know why.

19           Q.    If it was mentioned in your original

15:02 20    report, why would you decide to include it now in

21    this supplemental report?

22           MR. TREECE:  Asked and answered.

23    BY THE WITNESS:

24           A.    Because Dr. Vistnes addresses

DR. FREDRICK FLYER          APRIL 16, 2008

Page 634

```
         1    pro-competitive benefits in his supplemental report,

         2    and my understanding of what my task was on this

         3    particular report was to address issues in the

         4    supplemental report that I had with Dr. Vistnes's

15:02    5    analyses.

         6    BY MR. KRAMER:

         7         Q.    To whose intent were you referring to

         8    when you concluded that NAR's VOW policies were

         9    intended to reduce MLS frictions?

15:03   10         MR. TREECE:  I'm sorry.  Say again.

        11                   (WHEREUPON, the record was read by

        12                    the reporter.)

        13    BY THE WITNESS:

        14         A.    I was referring to NAR's -- the committee

15:03   15    that developed the policies and what their thinking

        16    was in developing the policies and why they choose

        17    the policies that they choose.

        18    BY MR. KRAMER:

        19         Q.    To your knowledge, has any MLS disruption

15:03   20    actually occurred on any MLS that would have been

        21    deterred by NAR's challenge policies?

        22         A.    Has there been an MLS disruption that

        23    could have been avoided if those policies had been

        24    implemented in this area.  Am I aware of any
```

DR. FREDRICK FLYER          APRIL 16, 2008

Page 635

         1    incident like that?

         2         Q.    Yes, sir.

         3         A.    No.

         4         Q.    To your knowledge, has any friction

15:03    5    actually occurred in any MLS that would have been

         6    deterred by NAR's challenge policies?

         7         A.    Well, I think the record says that, yes,

         8    that there's probably been some frictions that have

         9    been avoided by the fact that these listing brokers

15:04   10    seemed pretty intent and claim to be sincere in

        11    their intent to take litigation matters and other

        12    types of actions, and the fact that we haven't seen

        13    those type of litigation come to bear suggests that

        14    these policies address that, and this litigation

15:04   15    that followed it was something that they are looking

        16    at closely in terms of what might occur.

        17         Q.    Okay.  I understand it's -- maybe some

        18    things didn't happen, but what I was trying to get

        19    at, Dr. Flyer, was are you aware of any frictions in

15:04   20    MLSs that have actually occurred and any MLS that

        21    would be deterred by NAR's challenge policies?

        22         A.    Well, I haven't undertaken an analysis on

        23    all the frictions that are -- or even some of the --

        24    a sample of frictions that have occurred in various

DR. FREDRICK FLYER          APRIL 16, 2008

Page 636

          1    MLSs.  In order to address that, I'd have to see

          2    whether the frictions were different in areas that

          3    implemented the policies vis-à-vis areas that did

          4    not --

          5         THE COURT REPORTER:  I'm sorry.  You're going

          6    to have to slow down.

          7    BY THE WITNESS:

          8         A.    So let me start again.  I haven't

          9    undertaken an analysis that addresses or examines

15:05 10    what frictions occur in various MLSs, and as a

         11    consequence of that, since I don't have a metric of

         12    the level of friction in these different MLSs, I

         13    don't have a basis from which to infer the amount or

         14    the -- or quantify exactly the reduction in friction

15:05 15    or to identify precisely the amount of friction that

         16    was avoided because of these policies.

         17             What I do have is an evidentiary basis

         18    that claims that brokers were concerned about VOWs,

         19    were concerned about particular aspects of VOWs,

15:05 20    were ready and willing to take actions if something

         21    wasn't done, and -- and the testimony of the

         22    committee itself that implemented the policy said

         23    that this was a serious consideration that they took

         24    seriously in developing these problems -- these

DR. FREDRICK FLYER        APRIL 16, 2008

Page 637

```
 1   policies.
 2   BY MR. KRAMER:
 3       Q.    Is the answer to the question I asked no?
 4       A.    If the answer -- if the question is have
 5   I taken an analyses to evaluate what frictions were
 6   avoided and quantify those, the answer to the first
 7   part is, yes, I have --
 8       Q.    No, that was not my question.  So let me
 9   interrupt you.
10             What I asked you was:  Are you aware of
11   any frictions that have actually occurred and any
12   MLS that would have been deferred by NAR's challenge
13   policies?
14       A.    Well, the evidence I looked at where it
15   was -- was evidence of what was said prior to the
16   implementation of the policy.  I haven't looked
17   looking -- historically looking backwards on what
18   levels of -- of non-cooperations occurred.
19             So the answer to that question is, no, I
20   haven't undertaken that type of analysis, only
21   evaluating whether there was an evidentiary basis at
22   the time the policy was developed to think that
23   these types of frictions may be serious and likely.
24       Q.    Are you aware of any expenditures on
```

15:06 5
15:06 10
15:06 15
15:07 20

DR. FREDRICK FLYER      APRIL 16, 2008

Page 638

1    litigation that actually occurred and any MLS that

2    would have been deterred by NAR's challenge

3    policies?

4        A.    Again, that's not an analysis I have

15:07 5  undertaken.

6        Q.    So the answer is no?

7        MR. TREECE:  You know, let me just interpose an

8    objection to this whole line of questioning because,

9    frankly, all of this really was in his first report

15:07 10 and --

11       MR. KRAMER:  It's in his supplemental report.

12       MR. TREECE:  No, what's in the supplemental

13   report is responsive -- responding to Mr. Vistnes --

14       MR. KRAMER:  Well, we are deposing him on his

15:07 15 supplemental report.

16       MR. TREECE:  Would you let me finish my

17   objection?

18       MR. KRAMER:  Okay, sorry.

19       MR. TREECE:  You know, it really wasn't his

15:07 20 first report.  He responded to Dr. Vistnes.  If you

21   want to ask him, you know, since the first report is

22   he aware of any expenditures on litigation, that

23   would be one thing, but it's quite clear that you

24   are going back all the way to his first report and

DR. FREDRICK FLYER          APRIL 16, 2008

Page 639

1    before, and we really came here with the expectation

2    that this -- this deposition would be focused on the

3    second report, and I don't think -- I don't think in

4    fairness -- well, I don't think in fairness the

15:08  5    questions really are limited to that.

6        MR. KRAMER:  Let me say two things.  I don't

7    think this was included in the first report, No. 1.

8    No. 2, it is in the second report, and it's a fair

9    subject of questioning in the second report.

15:08 10        MR. TREECE:  Okay.  Well, I would point you to

11    page 67 on in the first report to say, yes, it was

12    included, but second I don't to want -- you know, it

13    doesn't -- I don't want to get into a fight about

14    it, but I think it was in fairness in his first

15:08 15    report.

16            I -- you know, there are a number of

17    topics we have discussed today that I think were --

18    you know, you guys are take -- frankly, taking this

19    as an opportunity to take a second bite at the apple

15:08 20    as opposed to interrogating him on his second report

21    which I think was the intent of the deposition.

22        MR. KRAMER:  Okay.

23    BY MR. KRAMER:

24        Q.    Let me ask you:  Are you aware of any

DR. FREDRICK FLYER          APRIL 16, 2008

Page 640

          1    expenditures on litigation that have actually

          2    occurred in any MLS that would have been deterred by

          3    NAR's challenge policies, sir?

          4         A.    I'm not aware of expenditures on

15:09     5    litigation regardless of what the cause of that

          6    litigation is because I haven't studied what the

          7    expenditures on litigation are.  So I wouldn't be in

          8    a position because I don't have the data to address

          9    that.

15:09    10         Q.    Are you aware of any other contentious

         11    activities that have actually occurred in any MLS

         12    that would have been deterred by NAR's challenge

         13    policies?

         14         A.    Again, I didn't do an analysis of

15:09    15    contentious activities in MLSs.  So I'm not aware of

         16    contentious activities or what the level of

         17    contentious activities are in different MLSs for any

         18    particular reason because it's not an analysis I

         19    have conducted.

15:09    20         Q.    Have you identified any geographic area

         21    for which you conclude that reducing friction is

         22    likely in the absence of NAR's VOW policies?

         23         A.    Well, I would say that the testimony that

         24    I referred to in my first report where I talk about,

DR. FREDRICK FLYER          APRIL 16, 2008

Page 641

```
          1    you know, Cendant and other -- other brokers who had
          2    issues with -- with providing unlimited VOW feeds.
          3    Where those brokers operated would be areas where
          4    you would look at.
15:10     5         Q.    Let me ask you the question again.
          6               Have you identified any geographic area
          7    for which you conclude that increased friction is
          8    likely in the absence of NAR's VOW policies?
          9         A.    Well, yes.  I mean, geographic area would
15:10    10    be the U.S.  That some -- over the -- in the U.S.
         11    there were some pro-competitive benefits that would
         12    likely have emerged because of the implementation of
         13    the VOW policies by appeasing these brokers who had
         14    issues with these data feeds that were being
15:10    15    provided.
         16               More narrow than that, I haven't
         17    conducted an area-by-area analyses of where these
         18    brokers conducted their business and how large these
         19    effects might have been on an area-to-area basis.
15:11    20         Q.    Have you identified any geographic area
         21    for which you conclude that NAR's VOW policies are
         22    likely to prevent MLS frictions?
         23         A.    Again, since the information that was
         24    used by the committee that developed, these rules
```

DR. FREDRICK FLYER          APRIL 16, 2008

Page 642

         1    involved U.S. brokers, the area would be United

         2    States.  I didn't narrow it to more narrow

         3    geographic areas.

         4         Q.    And so the answer is that you have not

15:11    5    identified any local geographic area for which you

         6    conclude that NAR's VOW policies are likely to

         7    prevent friction?

         8         MR. TREECE:  Misstates the testimony.

         9    BY THE WITNESS:

15:11   10         A.    I haven't conducted an analysis of local

        11    areas to evaluate what the effects would have been

        12    on individual areas.

        13    BY MR. KRAMER:

        14         Q.    Okay.  Regarding the frictions we have

15:11   15    been discussing, are all of your analyses and

        16    conclusions and the bases for those conclusions

        17    contained in your first report?

        18         A.    Can you repeat that one more time.

        19         Q.    Yes.  Regarding the MLS frictions we have

15:12   20    been discussing encompassing the four terms, as we

        21    agreed were the word frictions, are all of your

        22    analyses and conclusions and the basis for those

        23    conclusions regarding MLS frictions contained in

        24    your first report?

DR. FREDRICK FLYER          APRIL 16, 2008

Page 643

           1       MR. TREECE:  Objection, overbroad.

           2    BY THE WITNESS:

           3       A.    The answer would be, no, because I cite

           4    Laurie Janik's deposition in the context of this

15:12      5    analysis.  I also cite other depositions as well.

           6           So David Charron I think is another

           7    deposition I cite.  I think he is head one of the

           8    MLSs.  I don't remember which one exactly.  So

           9    there's other evidence that I cite in the context of

15:12     10    this report that was not cited in the context of the

          11    initial report, and that evidence would represent

          12    new evidence in addition to what I said previously.

          13       MR. KRAMER:  Okay.  Let's take a break at this

          14    point, please.

15:13     15       THE VIDEOGRAPHER:  Going off the video record

          16    at 3:13 p.m.

          17                   (WHEREUPON, a recess was had at

          18                   3:13 p.m. until 3:22 p.m.)

          19       THE VIDEOGRAPHER:  Back on the video record at

15:22     20    3:22 p.m.  This is tape 6.

          21    BY MR. KRAMER:

          22       Q.    Dr. Flyer, we at one point were

          23    discussing your view that MLS frictions, if they

          24    occurred, may have the effect of reducing a listing

DR. FREDRICK FLYER        APRIL 16, 2008

Page 644

         1    broker's incentives; is that right?

         2         A.    They could, yes.

         3         Q.    Are you giving an opinion that a reduced

         4    listing broker's incentives are likely in the

15:22    5    absence of NAR's VOW policies?

         6         A.    I think the evidence that -- that I cite

         7    in my first report suggests that that was a

         8    consideration, and a purpose of the VOW policy was

         9    to mitigate the concerns that listing brokers had

15:23   10    about having their listings shown on VOWs, and to

        11    give them a safety valve in case there was some type

        12    of abuse by VOWs of those listings.

        13         Q.    And what generally is the evidence that

        14    you are referring to just for context here?

15:23   15         A.    I'm going to reference the evidence I

        16    cited in my first report, but essentially the

        17    deposition testimony of the members of the VOW

        18    committee.  It's Cendant letter.  It's the concerns

        19    that were expressed in any other document that I

15:23   20    cited in the report.

        21         Q.    Okay.  Did you quantify the risk of

        22    reduced listing broker's incentives?

        23         A.    I looked at whether or not these threats

        24    that were made by the listings brokers and the

DR. FREDRICK FLYER          APRIL 16, 2008

Page 645

          1    concerns that they express seemed to be strong

          2    concerns, and the testimony suggests that they were

          3    strong concerns which speaks to the probability.  It

          4    suggests that the probability was not insignificant.

15:24   5        Q.    My question was:  Did you quantify the

          6    risk of listing brokers' reduced incentives?

          7        A.    I have not conducted an econometric

          8    analysis where I have personally quantified those

          9    probabilities.

15:24  10        Q.    Did you estimate the costs of those

         11    listing brokers' reduced incentives?

         12        A.    Again, except for looking at the evidence

         13    that speaks to those costs and the fact that there

         14    was a lot of the resources devoted to developing the

15:24  15    policies would suggest that the costs were

         16    significant, I have not conducted an econometric

         17    analysis that quantifies those costs.

         18        Q.    Did you analyze any data relating to

         19    listing brokers' reduced incentives?

15:24  20        A.    I don't recall looking at specific data

         21    except for the information that was contained but

         22    not actual data.

         23        Q.    Did you do any empirical work on the

         24    question of listing brokers' reduced incentives?

DR. FREDRICK FLYER          APRIL 16, 2008

Page 646

```
      1        A.    When you say "empirical," I looked at
      2   what the factual basis was for the policy, what the
      3   concerns were by those two developed the policies,
      4   what the complaints were by those who launched
15:25 5   complaints that motivated the development of the
      6   policy.
      7             So that would be work that I would
      8   classify as empirical because it looks at what the
      9   factual basis was for the policies, but I haven't by
15:25 10  what you mean empirical undertaken a statistical
     11   analysis or an econometric analysis to evaluate
     12   that.  So if what you mean by empirical is
     13   essentially econometric or statistical, no, I
     14   haven't undertaken that analysis.
15:25 15       Q.    Have you performed any calculations
     16   relating to a reduced listing brokers' incentives?
     17        A.    I have not performed calculations related
     18   to that.
     19        Q.    Okay.  You have stated that without the
15:25 20  opt out provisions, listing brokers would lose a
     21   protection mechanism in instances where VOW
     22   operators misuse listing information, correct?
     23        A.    That's correct.
     24        Q.    Okay.  What instances of VOW operators
```

DR. FREDRICK FLYER          APRIL 16, 2008

Page 647

1    misusing listing information are you referring to?

2        A.    Well, the concerns that were expressed

3    that -- again, I'm going to go back to my first

4    report, but the concerns that were expressed -- and

15:26 5    when I say my first report, also the deposition that

6    clarified points I made in my report -- had to do

7    with -- well, one complaint was that, you know,

8    there was a field where people can write opinions

9    about different types of properties, and I know

15:26 10    those opinions upset certain brokers.

11            There was also issues about whether or

12    not VOWs were organizing not for the purposes of

13    representing buyers in transactions, but rather for

14    the purposes of getting eyeballs to their sites and

15:26 15    then either selling referrals or selling other types

16    of service -- related services such as mortgage

17    services, but by using the listing broker's

18    listings.  And I understood there was a complaint on

19    the part of many brokers that said that's not what

15:27 20    the purpose of the MLS was, that that's not why they

21    joined the MLS.

22            It wasn't to provide access to their

23    listings for others who were trying to develop

24    business models that have nothing to do with

DR. FREDRICK FLYER          APRIL 16, 2008

Page 648

         1   representing buyers and sellers of transactions so

         2   those are the types of -- of acts that I was

         3   referring to.

         4       Q.    Anything else?

15:27  5       A.    As I sit here, that's what comes to mind.

         6       MR. KRAMER:  I think we ought to change the

         7   tape is that what -- okay.  So we will take a moment

         8   while that's done.

         9       THE VIDEOGRAPHER:  I actually have -- I have

15:27 10   already changed tapes before that other break.

        11       MR. KRAMER:  Oh, I'm sorry.  I misread what I

        12   received here.  I'm sorry.  Okay.  Let's proceed.

        13       MR. TREECE:  Yeah, before you do, let me -- let

        14   me again interpose my objection that, as far as I

15:27 15   can tell, this is redundant of the first deposition

        16   and really covers the same areas that we covered

        17   from, you know, part whatever it is page 67 to about

        18   71 of the -- 70 -- excuse me -- of the first report.

        19   And particularly all the discussion about the -- the

15:28 20   reason I object is the discussion, for example,

        21   about the Cendant white paper, the depositions of

        22   Holmen, and the earlier depositions of Janik, etc.

        23   were the subject matter of that report, and Mr. --

        24   Dr. Flyer has indicated, you know, he was prepared

DR. FREDRICK FLYER          APRIL 16, 2008

Page 649

1    and prepared today to testify about his second

2    report and not to rehash what was on the first

3    report.

4          MR. KRAMER:  Well, let me point you to

15:28  5    paragraph 104 of the supplemental report that deals

6    with the issue we are currently addressing and -- in

7    terms of perceived abuses, then elaborated on in

8    this supplemental report so --

9          MR. TREECE:  But -- I'm sorry.

15:28 10          MR. KRAMER:  Paragraph 104 is the basic point,

11    and then there are elaborations on this in the

12    supplemental report.

13          MR. TREECE:  You understand my position.

14    Paragraph 104 specifically footnotes the depositions

15:29 15    that have occurred since the time of his last

16    deposition, I believe --

17          MR. KRAMER:  Okay.

18          MR. TREECE:  -- and that part I'm not objecting

19    to that --

15:29 20          MR. KRAMER:  Okay.

21          MR. TREECE:  -- but what I'm objecting to is

22    going back to the 2003 VOW policy, Cendant white

23    paper era, and reinterrogating him when I think you

24    actually did, not only have the opportunity, but I

DR. FREDRICK FLYER          APRIL 16, 2008

Page 650

        1    think you did in the first deposition.

        2        MR. KRAMER:  I think what -- I don't want to

        3    get in an argument, but I think this report focuses

        4    in on what evidence he is relying on, and I'm trying

15:29   5    to understand the full range of it.  That's all.

        6        MR. TREECE:  Okay.

        7    BY MR. KRAMER:

        8        Q.    Okay.  Are there any actual instances of

        9    VOW operators misusing listing information that you

15:29  10    are aware of, sir?

       11        A.    Well, besides the instances that I

       12    mentioned, there may be more, but those are the ones

       13    that come to mind.

       14        Q.    Okay.  And as I understood those

15:30  15    instances, those were concerns rather than actual

       16    instances of misuse?

       17        A.    Well, it was more than just concerns.  I

       18    mean, there were brokers who were upset that there

       19    was -- you could basically, you know, write opinions

15:30  20    on their properties and then show those opinions to

       21    potential customers.  So those were more than

       22    just -- there were concerns.  They were actual

       23    brokers who are upset about, you know, that type of

       24    information being displayed.

DR. FREDRICK FLYER          APRIL 16, 2008

Page 651

1          Q.     What are the instances of a specific

2     abuse you are aware of?

3          A.     Well, again, that's, you know, something

4     that was in the context of my first -- that's not

15:30  5     something I cited here.  So, you know, I would

6     reference my -- the information cited in my first

7     report.

8          Q.     What -- as we sit here today, what

9     specific actual misuses of listing information by a

15:31 10     VOW broker are you aware of, sir?

11          A.     Well, the one that I can think of is --

12     the term abuse -- let me just step back for a

13     second.  There's -- there's actions by a VOW broker

14     that can upset listing brokers.  Whether that

15:31 15     constitutes abuse or not, I'm not sure, but what it

16     does do is it -- if the listing broker is upset, it

17     diminishes the incentive to cooperate, and the one

18     example that I get is when people can, you know,

19     post opinions on websites about particular

15:31 20     properties.

21                 And my understanding is -- and, again,

22     I'm going to defer to my first report, but my

23     recollection of that was that that was part of the

24     reason why they have restrictions on what could be

DR. FREDRICK FLYER        APRIL 16, 2008

Page 652

1   displayed in association with a listing.  The other

2   thing that up -- was I think upset -- upsetting to

3   brokers that I can think of is what -- these

4   co-branding issues, whether or not it was clear who

15:32  5   was the operator of a website and, you know, what --

6   whether or not it was clear who the listing broker

7   was.

8           Those were instances -- all those were

9   instances that were cited in the -- and the factual

15:32 10   basis for those cites are provided in my initial

11   report.  Those were three different examples that I

12   can think of as I sit here.

13       Q.    Okay.  Let me ask you to -- going back to

14   the question I asked, what are actual abuses of VOW

15:32 15   operators with listing information that you are

16   aware of as you sit here today?

17       A.    Well, like I say, I don't know that I

18   would use the term -- to -- whether it's an abuse or

19   not, I'm not sure I'm in a position to address right

15:33 20   now, but I could tell you what the concerns were

21   that were expressed and --

22       Q.    I understand those.

23       A.    -- one type of concern was, you know,

24   how -- whether the listing broker was displayed,

DR. FREDRICK FLYER          APRIL 16, 2008

Page 653

        1    whether -- another concern was whether these

        2    listings were used for other businesses -- business

        3    purposes besides representing buyers and sellers in

        4    transactions, in other words, bringing buyers to the

15:33   5    table.

        6              Another concern was that there was

        7    sometimes disparaging remarks made on a -- on a

        8    listing broker's property.  I think I cited one

        9    more.  There was a fourth now that I think about it.

15:33  10    Anyhow, those -- those are the types of concerns.

       11    Whether or not there was actual abuse in those

       12    instances, I haven't studied those instances except

       13    for the fact that they did result in listing brokers

       14    complaining.

15:33  15         Q.   Dr. Flyer, you have also stated that the

       16    VOW brokers misuses of listing information may

       17    include VOW brokers taking actions or allowing

       18    others to take actions that are against the

       19    interests of the seller or imposing other types of

15:34  20    costs, correct?

       21         A.   I said these are things that they were

       22    upset about.  Whether I would characterize that as

       23    an abuse or not, that's a more complicated issue.  I

       24    would have to know what the policies are, what the

DR. FREDRICK FLYER          APRIL 16, 2008

Page 654

1    agreed on policies were, and whether or not that

2    violated those policies.

3          Q.    Okay.  Are you aware of any actual

4    misuses of listing information that may include VOW

15:34  5    brokers taking actions or allowing others to take

6    actions that are against the interests of the seller

7    or imposing other types of costs?

8          A.    I aware of instances where the -- where

9    the listing broker complained about actions.  So

15:34 10    that would be evidence that they thought those

11    actions were against their best interests.

12          Q.    Are you aware of any specific actions?

13          A.    Well, I remember the general detail --

14    the general characteristics of what they complained

15:34 15    about, but if you wanted me to go back to the names

16    and so forth, I would have to reference my initial

17    report because I don't remember the details of what

18    I -- of what I looked at in the context of my

19    initial report.

15:35 20          Q.    Is it your -- to your knowledge, have any

21    of the misuses of listing information actually

22    occurred?

23          A.    Well, if they resulted in real

24    complaints, then presumably they did occur unless

DR. FREDRICK FLYER          APRIL 16, 2008

Page 655

         1    you think that the brokers fabricated these

         2    complaints.  I mean, I don't have any reason to

         3    think that.

         4        Q.    But my question is:  Do you have any

15:35    5    knowledge that the misuses of listing information

         6    actually occurred, firsthand knowledge or -- I

         7    shouldn't say firsthand, but knowledge that they

         8    did.

         9        A.    Besides what I cite in the record and how

15:35   10    the record speaks to those facts, I have no

        11    firsthand knowledge or other type of knowledge on

        12    what happened.  I depended on the record to inform

        13    me.

        14        MR. KRAMER:  Can we take a break for a minute.

15:36   15        THE VIDEOGRAPHER:  Going off the video record

        16    at 3:36 p.m.

        17                   (WHEREUPON, a recess was had at

        18                   3:36 p.m. until 3:46 p.m.)

        19        THE VIDEOGRAPHER:  And we are back on the video

15:45   20    record at 3:46 p.m.

        21    BY MR. KRAMER:

        22        Q.    Because of our disconnect on a question

        23    and answer a little while ago, let me reask this

        24    question.

DR. FREDRICK FLYER          APRIL 16, 2008

Page 656

1          What actions are you referring to

2    specifically when you stated that VOW brokers

3    misuses of listing information may include VOW

4    brokers taking actions or allowing others to take

15:46  5    actions that are against the interests of the seller

6    or imposing other types of costs?

7          A.    Well, like I say, the concerns that were

8    expressed were that VOWs would use the listing

9    information not for the purposes of facilitating

15:46 10    transactions, but rather for the purposes of

11    facilitating other types of business activities.

12    That was one concern.

13          Another concern is that they would

14    display the property in a way that wasn't

15:46 15    necessarily in the best interests of the listing

16    broker or the seller of the property.  Another

17    concern was that there may be misleading information

18    regarding who the listing broker might have been.

19    Another concern was that it may not be clear from

15:46 20    the VOW operator's website who was operating the

21    website.

22          Those are the concerns I can think of as

23    I sit here, and to the extent that those concerns

24    were against the objective of what the MLS was

DR. FREDRICK FLYER          APRIL 16, 2008

Page 657

1   created for or against the objective of the

2   brokers -- listing brokers who participated in there

3   or imposed costs on those listing brokers, those

4   types of costs would have to be accounted for in --

15:47 5   when you are assessing what the competitive effects

6   of a policy might be.

7        Q.   Let me ask you what specific actions are

8   you referring to in connection with your statement

9   that VOW brokers misuses of listing information may

15:47 10   include VOW brokers taking actions or allowing

11   others to take actions that are against the interest

12   of sellers?  Leave out brokers interest, please.

13        A.   Well, I mean, let me go through each of

14   these independently and see whether or not it would

15:47 15   be in the -- against the interest of the seller.

16        The disparaging comments if they were --

17   I mean, if they were -- let me start again.

18   Disparaging comments on properties would not

19   necessarily be in the best interest of sellers.

15:48 20   Actually, anything that diminished the value of the

21   listings to listing brokers could diminish the

22   incentives of listing brokers to invest in services

23   provided to sellers to sell the property because

24   it's not a lucrative a business anymore.

DR. FREDRICK FLYER          APRIL 16, 2008

Page 658

1          If you diminish the value of the business

2     to listing brokers, you may diminish the value of

3     the services provided to sellers who use listing

4     brokers.  So actually all of these can eventually

15:48  5     translate into harm to sellers.

6          Q.    Aside from what you have just said, is

7     there anything else that can translate into harm to

8     sellers that you are aware of?

9          A.    Well, there may be.  I may think about it

15:48 10     later, but as I sit here, I can't think of other

11     examples.

12          Q.    Okay.  Are you aware of any of -- such

13     misuses of listing information having actually

14     occurred?

15:48 15          A.    Well, again, this is in context of my

16     first report.  I remember reading the record that

17     described these types of activities.  So this is,

18     you know, not my guess of what could occur, but

19     rather based on the record that I used to inform

15:49 20     myself about what was going on in the context of the

21     creation of the initial VOW policy.

22          Q.    Okay.  But my question was:  Are you

23     aware of any of the misuses that you described of

24     listing information actually having occurred?

DR. FREDRICK FLYER          APRIL 16, 2008

Page 659

 1          A.     Well, what I'm saying is the -- the

 2     record claims that some of these complaints were

 3     launched in response to actual activity.  So the

 4     ones that were -- the concerns that were expressed

15:49 5     as a result of actual activity would be events where

 6     these types of activities actually occurred.

 7          Q.     Have VOW brokers, to your knowledge,

 8     caused harm to sellers?

 9          A.     Well, the VOW brokers I have looked at,

15:49 10    ZipRealty and eRealty through -- and later

 11    Prudential, I can't say that I've observed any

 12    evidence that these brokers imposed any harm to

 13    sellers of properties.

 14         Q.     So would the answer to my question be no?

15:50 15         A.     Well, the answer is that for these larger

 16    brokers like Zip and eRealty, I don't see any

 17    evidence.  The evidence I have seen was -- was (A)

 18    evidence where -- in the sense of complaints about

 19    activities, and (B) evidence in the sense of what

15:50 20    they were concerned about might happen.

 21         Q.     Could some of the activities that were

 22    being complained about be in the interest of

 23    prospective buyers that would be undertaken by VOWs

 24    that were purportedly misuses of listing

DR. FREDRICK FLYER          APRIL 16, 2008

Page 660

1    information?

2         A.    Yes, I mean, for example, one misuse of

3    listing information was in the context of the

4    examples I have cited in this report where you talk

15:50  5    about Chicago, Washington D.C. where they expose

6    certain fields that the MLS said was against MLS

7    policy, let me say it in that way, and at least in

8    the short run, it could benefit buyers, but in the

9    long run if it disrupts the system, it likely would

15:51 10    harm both sellers and listing brokers, but also

11    would harm buyers because it would mean that the

12    whole process wouldn't function as well as it would

13    without these events.

14         Q.    Are you aware of any other purported

15:51 15    misuses of listing information that could be for the

16    interest of prospective buyers?

17         A.    Well, I named five types of events that

18    were actual concerns or actual complaints.  I'm not

19    sure in addition to those five events there's any

15:51 20    other characteristics in the -- in the record, but

21    that's not to say that there isn't.  It is just, as

22    I sit here, I can't recall.

23         Q.    Apart from being aware of evidence that

24    listing brokers might have reduced incentives as a

DR. FREDRICK FLYER          APRIL 16, 2008

Page 661

          1     result of MLS frictions, have you formed an opinion

          2     that listing brokers would, in fact, have reduced

          3     incentives?

          4          A.    I formed the opinion that the evidence

15:52     5     indicates that those concerns were real in the sense

          6     that abating concerns whether or not they come to

          7     fruition or not benefits the system.  I think those

          8     benefits were real.  I haven't formed an opinion on

          9     what the likelihood would be of, you know, abuse

15:52    10     going forward.

         11               And my -- you know, my sense of the

         12     matter is that, you know, the -- the penetration of

         13     VOWs is somewhat limited.  The role they are playing

         14     in terms of internet delivery of information right

15:53    15     now is not necessarily prominent.  There are many

         16     other sites.  So I'd say in terms of affecting the

         17     system, I see characteristics of many other internet

         18     sites, and how they conduct themselves are --

         19     probably bear more on the functioning of the market.

15:53    20          Q.    Okay.  My question was, though, apart

         21     from being aware of evidence, have you arrived at an

         22     opinion that listing brokers would, in fact, have

         23     reduced incentives as a result of misuse of listing

         24     information?

DR. FREDRICK FLYER          APRIL 16, 2008

Page 662

           1      A.     My opinion is that if there was misuse of

           2    listing information that diminished the value of the

           3    listings, that likely would result in diminished

           4    incentives for listing brokers.  Whether or not that

15:53      5    type of abuse was likely, I haven't formed an

           6    opinion on whether that type of abuse was likely

           7    except for the fact that the anticipation was that

           8    that was a real threat at least on the part of the

           9    brokers who complained.

15:53     10      Q.     Have you formed an opinion that listing

          11    brokers would as a result of misuse of data by VOWs

          12    put less effort into attracting and serving sellers?

          13      A.     Well, if VOWs abused listings, they --

          14    and there was -- and the abuse was severe, it could

15:54     15    result in that, and I haven't, like I said,

          16    undertaken what the probability of that abuse was.

          17    It would depend on the competitive significance of

          18    VOWs.  It would vary across areas.  Certain areas

          19    VOWs don't exist.  So, you know, what VOWs do have

15:54     20    no bearing on how the marketplace operates.

          21      Q.     In your supplemental report you also

          22    stated that NAR's VOW policies may provide a less

          23    costly method to prevent data abuse and avoid

          24    disputes between brokers by allowing listing brokers

DR. FREDRICK FLYER          APRIL 16, 2008

Page 663

        1    to opt out of having their listings displayed on the

        2    VOW's websites.

        3              Do you recall that?

        4        A.    Tell me the paragraph.

15:55   5        Q.    Paragraphs 97, 98.

        6        A.    Yes, I see it.

        7        Q.    Okay.  And my question is:  Are the data

        8    abuses you are referencing functionally the same as

        9    the data misuses that you have testifying about?

15:55  10        A.    That's what I was discussing here, yes.

       11        Q.    Okay.  Have you conducted any analysis of

       12    whether the -- there is a less restrictive way than

       13    brokers use of NAR's VOW policies of preventing data

       14    misuses by VOW operators?

15:55  15        A.    So what you are asking me have I

       16    conducted an analysis that identifies whether there

       17    was less costly ways to protect brokers than the VOW

       18    policy?

       19        Q.    Yes, sir.

15:56  20        A.    I have not conducted that analysis.

       21        Q.    You have stated that NAR's VOW policies

       22    can be expected to increase cooperation between

       23    brokers and facilitate transactions, correct?

       24        A.    If brokers feel they are protected

DR. FREDRICK FLYER          APRIL 16, 2008

Page 664

         1   against misuse, if VOW operators know that there's

         2   little return to misuse because they would be

         3   discriminated against in terms of provision of

         4   information or the ability to display that

15:56    5   information to be more precise, then, yes, it could

         6   facilitate cooperation.

         7        Q.    Okay.  And you have also stated that

         8   brokers use of NAR's VOW policies can increase

         9   overall cooperation among brokers, right?

15:56   10        A.    Well, to the extent it -- it facilitates

        11   cooperation between VOWs and other types of brokers,

        12   it facilitates cooperation overall.

        13        Q.    And so there's no real difference between

        14   those two statements between increasing cooperation

15:57   15   between brokers and facilitating transactions and

        16   increasing overall cooperation?

        17        A.    Well, you can facilitate particular

        18   transactions, but it also could facilitate the way

        19   that the industry develops.  So if all of a sudden I

15:57   20   know that going forward I'm protected in terms of

        21   how my information is going to displayed -- be

        22   displayed and I also know that the internet is

        23   growing in terms of importance, it may incentivize

        24   me differently to in -- and to invest in equipment

DR. FREDRICK FLYER          APRIL 16, 2008

Page 665

1   to film properties and to display those properties

2   on the internet.

3            It may also spur investment by

4   third-party sites to develop websites because they

15:57  5   know it's becoming a more important aspect of buying

6   real estate, and as a consequence of that, the

7   industry can actually benefit in a way that expands

8   beyond just a cooperation on any particular

9   transaction.

15:58 10       Q.    Is it your opinion that NAR's VOW

11   policies have actually increased overall cooperation

12   among brokers?

13       A.    Well, my understanding is that NAR's VOW

14   policy has only been implemented in a few locations

15:58 15   and adopted in some other locations, and in most

16   MSAs the policy is essentially on hold.

17       Q.    Okay.  So the question I have:  Is it

18   your opinion that NAR's VOW policies have actually

19   increased overall cooperation among brokers?

15:58 20       A.    My opinion is that the policy itself

21   hasn't really been implemented in a way that hasn't

22   been challenged.  So I don't -- I don't know that it

23   has.  That's not my opinion that it hasn't.  I just

24   don't know the answer to that.

DR. FREDRICK FLYER          APRIL 16, 2008

Page 666

 1          Q.     You have also stated that MLSs often have

 2     rules in place that address misuses of data, right?

 3          A.     They have rules in place that govern

 4     interaction between let's say brick and mortar

15:59  5     brokers, and that involves how information or data

 6     may be displayed.  For example, my understanding is

 7     that you can't put pictures of another broker's

 8     listings on your window unless you get explicit

 9     permission.  There are other types of rules of that

15:59 10     ilk that govern how brokers interact with each

11     other.

12          Q.     Are there also rules that govern the use

13     of listing data on the internet?

14          A.     Well, there are rules that -- what

15:59 15     particular fields can be displayed.  There are rules

16     on whether or not an IDX site, for example, can list

17     a particular broker's information if that broker

18     opted out of IDX.  So there are other rules as well,

19     yes.

15:59 20          Q.     What do the MLS rules that address

21     misuses of data provide for?

22          A.     Well, what I just mentioned:  Fields of

23     information that can be shown, whose broker's

24     listing you can show, and so on.

DR. FREDRICK FLYER          APRIL 16, 2008

Page 667

```
           1        Q.     Anything else?
           2        A.     Well, you mean under the policy or absent
           3    the policy?
           4        Q.     Under MS -- MLS rules.
16:00      5        A.     Well, MS -- MLS rules can vary greatly
           6    across areas.  So I don't know all the MLS rules
           7    that govern internet display in every area.  Certain
           8    areas I know have adopted rules.  For example, I
           9    think it was Boson I think I cite here adopted a
16:00     10    rule about essentially limits -- limits the type of
          11    information.  If you -- if you want, I can --
          12        Q.     That's okay.
          13        A.     It's in the report, but there are other
          14    types of rules that I cite in this report as well.
16:00     15        Q.     Have you studied the MLS rules that
          16    govern or address misuses of data?
          17        A.     I have studied what the restrictions are.
          18               Are you asking me have I studied how
          19    prevalent abuse is -- or is that what you are
16:00     20    asking?
          21        Q.     No, have you -- what I am asking have you
          22    studied MLS rules that address misuses of data?
          23        A.     I looked at restrictions on how data can
          24    be used.
```

DR. FREDRICK FLYER          APRIL 16, 2008

Page 668

         1          Q.     And what restrictions are you referring

         2     to?

         3          A.     Well, the ones I have just discussed, and

         4     the fact that certain fields, for example, can't be

16:01    5     shown in certain areas while other areas allow

         6     certain fields to be shown.  In fact, Las Vegas, for

         7     example, didn't allow address to be shown for a

         8     while.

         9          Q.     Anything else that you are aware of?

16:01   10          A.     Well, I mean, what I'm aware of is, you

        11     know, developed in my two reports.

        12          Q.     Okay.  Have you formed an opinion on

        13     whether allowing brokers to opt out of VOWs is

        14     likely to be less costly than MLSs enforcing

16:01   15     existing rules against data abuse?

        16          A.     Well, I haven't conducted that type of

        17     analysis, but if you -- if the MLS has -- have rules

        18     in place that essentially create the same type of

        19     protective mechanisms that were intended by the VOW

16:02   20     policy, then the effect of the VOW policy in those

        21     areas would be muted.

        22          Q.     Okay.  But my question was:  Have you

        23     formed an opinion on whether allowing brokers to opt

        24     out of VOWs is likely to be less costly than MLSs

DR. FREDRICK FLYER          APRIL 16, 2008

Page 669

1    enforcing existing rules against data abuse?

2         A.    I have not conducted that analysis.

3         Q.    But you have asserted that NAR's VOW

4    policies may provide a less costly method to prevent

16:02 5    data abuses than enforcing MLS rules, correct?

6         A.    That's correct.  I haven't concluded the

7    opposite either.  That -- that providing MLS rules

8    is a less costly method.

9         Q.    Okay.  What is the basis of a conjecture

16:02 10    that you have --

11         A.    The lack of information concerning that

12    particular comparison.  So I can't take a stance on

13    what that comparison might be, and, therefore, I

14    can't rule out the logical possibility that these

16:02 15    may lower costs.

16         Q.    Okay.  What is the basis of your

17    conjecture that NAR's VOW policies may provide a

18    less costly method to prevent data abuse than

19    enforcing MLS rules?

16:03 20         A.    Well, I don't say that.  What I say in

21    the report is the NAR policies may provide a less

22    costly method to prevent data abuses and avoid

23    disputes between brokers by allowing listing brokers

24    to opt out of having their listings displayed on VOW

DR. FREDRICK FLYER          APRIL 16, 2008

Page 670

1    websites.

2              I wasn't saying versus MLS rules.  That's

3    not a comparison I was making.

4         Q.    What is the basis of the conjecture you

16:03  5    just read?

6         A.    That if you have a policy that doesn't

7    really prevent the way most VOWs do business -- so,

8    for example, the most -- the most popular VOWs that

9    have really gotten traction in the marketplace

16:03 10    would -- are VOWs that -- from what I understand

11    about their businesses operate their businesses in a

12    way that's consistent with the VOW policy.

13              So, for example, ZipRealty wouldn't

14    really be affected by a lot of these co-branding

16:04 15    issues.  ZipRealty tries to keep a fairly clean

16    page.  So there isn't these advertising issues that

17    are there.  ZipRealty represents real buyers and

18    sellers so they wouldn't be affected by the

19    membership rule.

16:04 20              ZipRealty brings value to the table

21    because they represent buyers and sellers, and I

22    have done an analysis that shows that listing

23    brokers -- or at least indicates that listing

24    brokers have incentives to provide their listings

DR. FREDRICK FLYER          APRIL 16, 2008

Page 671

       1    for internet display, and so because of all of these

       2    things that major VOWs would be not affected by

       3    these restrictions, the costs that are imposed from

       4    a competitive perspective seem small.  There would

16:04  5    be very little cost from a competitive perspective,

       6    and yet, nevertheless, you would alleviate some of

       7    the concerns that brokers had regarding VOWs.

       8         Q.    Does your conjecture that you were just

       9    discussing encompass more selective opt out and

16:04 10    blanket opt out?

      11         A.    Well, I mean, both are part of the

      12    initial VOW policy.  So if you add -- if you add --

      13    blanket opt out gives you really very little

      14    additional rights than selective opt out because you

16:05 15    can replicate blanket opt out through selective opt

      16    out while the reverse is not true.  So the real

      17    question is does that analysis apply to selective

      18    opt out, and I would say, yes, it does.

      19         Q.    Okay.  Have you estimated the costs of

16:05 20    NAR's VOW -- VOW opt out policies to prevent data

      21    abuse?

      22         MR. TREECE:  Object to the form.  It's

      23    ambiguous.

      24

DR. FREDRICK FLYER          APRIL 16, 2008

Page 672

          1    BY THE WITNESS:

          2        A.    Okay.   I'm sorry.   Can you repeat that

          3    one more time.

          4    BY MR. KRAMER:

16:05     5        Q.    I'll change -- I will make it -- have you

          6    estimated the costs -- have you estimated the costs

          7    of NAR's VOW opt out policies to prevent data abuse?

          8        MR. TREECE:   Same objection.

          9    BY THE WITNESS:

16:05    10        A.    Well, if you look at the most popular

         11    VOWs that are in business today, they -- their

         12    business activities seem to be consistent with the

         13    restrictions imposed by the VOW policies and the ILD

         14    policy for that matter and, therefore, I'm not sure

16:06    15    what costs I have observed.   I haven't really seen

         16    any evidence that there would be significant costs.

         17    BY MR. KRAMER:

         18        Q.    But I take it you have not attempted to

         19    estimate the costs?

16:06    20        A.    Well, if there's no evidence of actual

         21    costs, I don't know that you need to do that

         22    estimation.   If you look at -- you know, if look at

         23    the world and you see VOW operators that are

         24    commercially successful are really following the

DR. FREDRICK FLYER          APRIL 16, 2008

Page 673

1    guidelines that are put forth in the VOW policy,

2    then the VOW policy seems -- would seem to have very

3    little cost on the way VOWs do business, and as a

4    consequence, would seem to have very little effect

16:06  5    on the -- more importantly, I should say, it would

6    little effect on the value that is received by

7    consumers.  So I don't see any real costs especially

8    from the consumer side associated with these types

9    of policies.

16:07 10    Q.    My question though is:  Is it correct

11    that you have not estimated the costs of NAR's VOW

12    opt out policies to prevent data abuse?

13    A.    I haven't conducted an econometric

14    analysis that quantifies what level of costs might

16:07 15    be associated with it except to note that the

16    evidence indicates that very little costs from the

17    consumer perspective would be associated with these

18    policies.

19    Q.    Have you estimated the costs of MLSs

16:07 20    enforcing their rules against data abuse?

21    A.    I have not.

22    Q.    Have you -- okay.

23    Dr. Flyer, in paragraph 62 of your

24    supplemental report, you state that you reviewed

DR. FREDRICK FLYER          APRIL 16, 2008

Page 742

1      Q.    Must an econometrician control for all

2  possible confounding factors in a study for you to

3  consider that study reliable?

4      A.    No, because if you could show the factors

18:02  5  you don't control for are not likely to be

6  correlated with the factors that are included in the

7  regression for -- specific -- specifically, if those

8  omitted factors are orthogonal or reasonably thought

9  to be orthogonal to what is included in the

18:02 10  regression, you can get unbiased estimates.

11      Q.    Let's switch gears to -- let me ask you

12  in what way is the anti-referral membership rule

13  pro-competitive in your view?

14      A.    The anti-referral membership rule.

18:03 15      Q.    In other words --

16      A.    The -- you mean, the referral rule?

17      Q.    The anti-referral rule for paid referrals

18  from --

19      A.    Yeah, I think I called that -- turn to my

18:03 20  report.  I think I called that the referral rule.

21      Q.    Okay.  That's fine.

22      A.    And if that -- in my understanding,

23  that's the rule that was incorporated in the initial

24  VOW policy.  You know, the benefits that could

DR. FREDRICK FLYER          APRIL 16, 2008

Page 743

        1    derive from that is if brokers feel that VOWs who

        2    are now operating aren't using their listings for

        3    other purposes other than representing buyers in

        4    transactions, it could encourage participation of

18:03   5    these listings brokers and encourage investments by

        6    these listings brokers to provide information that

        7    is useful.

        8            So in other words, a VOW would be better

        9    served if listing brokers really relied on the

18:04  10    internet to display listing information and,

       11    therefore, for example, spent the time and resources

       12    necessary to film the property, film more rooms of

       13    the property, take more pictures, and give more

       14    information that could be readily distributed via

18:04  15    the internet.

       16        Q.    And how would the referral rule lead to

       17    that?

       18        A.    Well, the referral rule my understanding

       19    was in response to a criticism that was -- or a

18:04  20    complaint that was launched that lots or -- a

       21    concern that was launched that lots -- or that VOW

       22    brokers may be using VOW listings not to ultimately

       23    represent buyers or sellers in transactions, but

       24    rather for other purposes such as, you know, maybe

DR. FREDRICK FLYER          APRIL 16, 2008

Page 744

1    marketing their sites so they can essentially then

2    just sell the referral, and I think the language

3    that was used is they weren't bringing any new

4    buyers to the table.

18:04  5          They were essentially just imposing the

6    equivalent of a tax on the system because they were

7    charging a referral fee and yet weren't really

8    providing any new buyers.

9          Q.    Are there any other likely

18:05 10   pro-competitive benefits from the referral rule that

11   you are pointing to?

12         A.    Besides, you know, encouraging listing

13   brokers better cooperation and -- not that I -- as I

14   sit here, that I can think of any other ones besides

18:05 15   ones I talk about here unless I cited it in my

16   initial report.  I talk about the referral rule in

17   greater length in my initial report and may have

18   said something that I don't recall as I sit here.

19         Q.    I think in your initial report you

18:05 20   suggested that the referral rule prevents

21   free-riding?

22         A.    Yeah, I think that's more or less what

23   I'm talking about here in terms of -- I don't know

24   that I used that language, but if I did, I think

DR. FREDRICK FLYER          APRIL 16, 2008

Page 745

     1   it's more or less consistent with what I am saying

     2   here.  That they are using the efforts of the

     3   listing brokers and the information that the listing

     4   brokers have gone out and obtained not to

18:06 5   necessarily bring value to the listing brokers which

     6   is really ultimately the incentives for the listing

     7   brokers to participate in the MLS, but rather to use

     8   that information to promote other business interests

     9   that are not necessarily the purpose of the MLS.

18:06 10       Q.   Is it your view that the 2005 NAR

    11   membership rule is likely to lead to the same

    12   pro-competitive benefits that you have identified

    13   with the referral rule?

    14       A.   Well, it's a slightly different rule.  It

18:06 15  identifies that brokers -- it changes the language,

    16   and I forget exactly how it changed the language,

    17   but instead of, you know, able to conduct sales,

    18   actually do or something along those lines.  That

    19   the brokers who get access to the MLS listings

18:06 20  actually participate in representing buyers and

    21   sellers.

    22            And to that extent it -- it could provide

    23   similar types of benefits, I'm not sure that they

    24   are exactly analogous.  Although, I know I put them

DR. FREDRICK FLYER          APRIL 16, 2008

Page 746

          1   together in a section in this report, and

          2   Dr. Vistnes has put them together.  They are still

          3   slightly different rules.

          4        Q.    Are there any additional pro-competitive

18:07  5   benefits that you attach to the 2005 membership

          6   rule?

          7        A.    Well, ultimately the benefits that I can

          8   think of -- the economic benefits that I can

          9   associate with the rules seem to be similar.

18:07 10        Q.    Okay.  When you use the term free-riding

         11   in relation to those rules, are you using the term

         12   free-riding as economists generally use it?

         13        A.    Well, are you talking -- did I use that

         14   term in this -- in this new report?

18:07 15        Q.    I'm not sure you used it in this report,

         16   but you certainly used it in the first one.

         17        A.    I'm -- well, I'd like to read the context

         18   of how I used it and sort of the -- it's hard for me

         19   to opine on -- or explain how I used it and what I

18:07 20   was thinking of when I used it because I don't -- I

         21   haven't read my report in a while so.

         22        Q.    Do you -- do you expect that you would --

         23   have used it in the way that economists generally

         24   use the concept of free-riding?

DR. FREDRICK FLYER          APRIL 16, 2008

Page 747

 1       A.     Well, free-riding in the economic concept

 2   is that other people benefit from the efforts of

 3   others.  So in that context, that's essentially what

 4   I should have meant, if I used it in an economic

18:08  5   sense.

 6            So if there was a group of -- or there

 7   was an entity that's benefiting from the work  of

 8   other entity, that's what free-riding implies.  So

 9   if I used the term, I would -- it would be used in

18:08 10   that context.

11       Q.     Is that a complete statement of

12   free-riding as what's usually used in economics?

13       A.     Well, it represents my understanding.

14   It's not the most articulate way to explain it, and

18:08 15   I'm sure given time, I could probably find a more

16   articulate way to explain it and probably would

17   reference books, but that's essentially the idea

18   behind free-riding.

19       Q.     Okay.  Has free-riding actually occurred

18:08 20   in any MLS that would have been prevented by the

21   anti-referral and membership rules to your

22   knowledge.

23       A.     Again, similar to what you asked before.

24   I haven't conducted an analysis of what looks back

DR. FREDRICK FLYER          APRIL 16, 2008

Page 748

        1    of what actually occurred since the implementation

        2    of the VOW policy in certain areas.  What I had

        3    looked at is what was the concerns at the time that

        4    the VOW policies were created, and that was a

18:09  5    concern that was expressed.

        6        Q.    So I take it you were not aware of any

        7    free-riding that has actually occurred in any MLS

        8    that would have been prevented by the anti-referral

        9    and membership rules, correct?

18:09 10        A.    Well, I'm aware that there were some

     11    concerns by brokers -- for example, I think it was

     12    regarding HBM II business model exactly -- because

     13    HBM II in my understanding doesn't normally

     14    represent buyers or sellers in transactions, but I'm

18:09 15    not sure exactly what the context of those concerns

     16    were, and I would have to go back to the record to

     17    be able to speak to that.

     18        Q.    Okay.  But my question was:  Is it

     19    correct that you are not aware as you sit here today

18:09 20    of any free-riding that has actually occurred on any

     21    MLS that would have been prevented by the

     22    anti-referral or membership rules?

     23        A.    I can't --

     24        MR. TREECE:  Yeah, let me pose an objection.

DR. FREDRICK FLYER        APRIL 16, 2008

Page 749

         1   In addition to what he has just testified to?

         2        MR. KRAMER:  Yes, yeah.

         3   BY THE WITNESS:

         4        A.    Well --

18:10    5   BY MR. KRAMER:

         6        Q.    Let me -- let me -- no, let me --

         7        MR. TREECE:  He says -- I understand there's

         8   some reference to HBM II floating around the

         9   testimony.

18:10   10        MR. KRAMER:  Right.  So let me just ask the

        11   question again.

        12   BY MR. KRAMER:

        13        Q.    Are you aware, as you sit here today, of

        14   any free-riding that has actually occurred in any

18:10   15   MLS that would have been prevented by the

        16   anti-referral or membership rules?

        17        A.    As I sit here, I can't recollect specific

        18   instances of -- of claim for free-riding that

        19   occurred after the implementation of the -- of the

18:10   20   VOW policies in the areas it was implemented and

        21   tied specifically to those areas, but that's not an

        22   analysis I have conducted.

        23        Q.    Did you identify any market where

        24   free-riding is likely to occur absent the

DR. FREDRICK FLYER          APRIL 16, 2008

Page 750

         1    anti-referral or membership rules, sir?

         2         A.    I have identified that there was concerns

         3    by brokers and -- but I -- besides the fact that

         4    those brokers were operating within the U.S., I

18:11    5    haven't identified where exactly those brokers who

         6    expressed those concerns were located.

         7         Q.    Okay.  And my question was:  Have you

         8    identified any market where free-riding is likely to

         9    occur absent the anti-referral or membership rules?

18:11   10         A.    Besides being in the U.S., I haven't

        11    identified the local areas that would be most -- or

        12    where the greatest concern was expressed.

        13         Q.    Is it your opinion that -- that absent

        14    the anti-referral and membership rules, that

18:11   15    free-riding is likely to occur?

        16         A.    No, it's my opinion that the concerns

        17    expressed by brokers or articulated by brokers

        18    addressed free-riding, and there was a concern that

        19    was motivating the policy and discussed by -- from

18:12   20    what I recollect, by the committee that established

        21    the policy.  It was a consideration, and the fact

        22    that it was a consideration expressed by brokers

        23    suggests that that concern was not insignificant at

        24    least from their expectations.

DR. FREDRICK FLYER        APRIL 16, 2008

Page 751

         1        Q.    Okay.  And I understand about broker

         2    concerns, but what I am trying to understand, sir,

         3    is did you identify any market where free-riding is

         4    likely to incur absent the anti-referral or

18:12    5    membership rules aside from broker concerns about

         6    it?

         7        A.    That's -- again, that's not an analysis

         8    that I have undertaken.  So I have not identified

         9    markets.

18:12   10        Q.    Did you quantify the risk of free-riding

        11    in any market?

        12        A.    In any local market?

        13        Q.    Yes, sir.

        14        A.    No, I haven't conducted that type of

18:12   15    analysis either.

        16        Q.    Did you quantify the risk of free-riding

        17    in any national sense?

        18        A.    I didn't quantify the risk except to note

        19    that the risk was expressed and considered by --

18:13   20    expressed by brokers and considered, and really the

        21    record on what I say about free-riding is really

        22    contained -- or what I reference is contained in my

        23    first report.

        24        Q.    Did you analyze whether free-riding is

DR. FREDRICK FLYER        APRIL 16, 2008

Page 752

        1    likely in the absence of the anti-referral and

        2    membership rules?

        3          A.    I haven't analyzed the probability.

        4          Q.    Have you attempted to estimate the costs

18:13   5    of free-riding in the absence of the anti-referral

        6    and membership rules?

        7          A.    I have attempted to identify the source

        8    of costs, but I haven't attempted to quantify what

        9    the aggregate amount of those costs would be.

18:13  10          Q.    Have you analyzed data concerning the

       11    costs of free-riding in the absence of the

       12    membership and anti-referral rules?

       13          A.    I haven't analyzed data.

       14          Q.    And I take it you have not performed any

18:14  15    calculations?

       16          A.    I have -- no, because I haven't performed

       17    any calculations.

       18          Q.    Have you analyzed whether free-riding

       19    will likely harm consumers?

18:14  20          A.    Well, if -- if free-riding occurs and it

       21    discourages broker investments in listing or

       22    discourages broker cooperations with internet

       23    websites then, yes, it would likely have an effect

       24    on consumers.

DR. FREDRICK FLYER          APRIL 16, 2008

Page 753

1        Q.     But my question was:  Have you analyzed

2    whether free-riding will likely harm consumers, sir?

3        A.     Well, I have analyzed it from the

4    economic sense whether if there -- indeed there's

18:14  5    free-riding that results in a response by listing

6    brokers, whether that response would have an effect

7    on consumers or could have an effect on consumers,

8    but I haven't quantified what the effect would be or

9    if -- you know, if it would be large at all.

18:14 10        Q.     But my question was:  Have you analyzed

11    whether free-riding will likely harm consumers?

12        A.     Will likely harm consumers.  I haven't

13    estimated the probability of free-riding occurring.

14    So I couldn't make the assessment that it would

18:15 15    likely harm consumers if I couldn't even say -- if I

16    couldn't assess the particular probability in a

17    particular area.

18        Q.     Have you analyzed whether free-riding has

19    reduced incentives to invest by decreasing value of

18:15 20    listing brokers' assets?

21        A.     I've identified that it's been a concern,

22    and the fact that they were willing to take

23    litigation on some of these issues indicates that

24    this is something that could impose costs on the

DR. FREDRICK FLYER          APRIL 16, 2008

Page 754

          1    system.

          2        Q.    My question, though, once again is:  Have

          3    you analyzed whether free-riding has reduced

          4    incentives to invest by increasing value of listing

18:15     5    brokers' assets?

          6        MR. TREECE:  Object as vague.

          7    BY THE WITNESS:

          8        A.    I haven't looked at the -- I haven't

          9    looked back historically to see whether -- you know,

18:15    10    to quantify how much free-riding has occurred, and

         11    to quantify whether or not that has resulted in

         12    reduced investments by brokers.

         13            What I have looked at is what the record

         14    was at the time the VOW policy was created to

18:16    15    understand what the considerations were that formed

         16    and shaped the policy that was implemented or

         17    eventually put forth by NAR.

         18    BY MR. KRAMER:

         19        Q.    So is the answer no?

18:16    20        A.    The answer is, no, I haven't look at

         21    the -- that type of report historically.

         22        Q.    Have you analyzed whether free-riding

         23    will reduce listing brokers' incentives to invest --

         24        MR. TREECE:  Same objection.

DR. FREDRICK FLYER       APRIL 16, 2008

Page 755

         1    BY THE WITNESS:

         2         A.    As I said before, I have analyzed that if

         3    you had free-riding, that would potentially change

         4    the incentives listing brokers have to invest, and

18:16    5    that change in incentives could result in harm to

         6    consumers.

         7    BY MR. KRAMER:

         8         Q.    Have you conducted and economic analysis

         9    of whether free-riding will reduce listing brokers'

18:16   10    incentives to invest?

        11         A.    Well, when you say economic analysis --

        12         MR. TREECE:  Same objection, excuse me.

        13    BY THE WITNESS:

        14         A.    Okay.  When you say economic analysis,

18:16   15    that would incorporate looking at the factual

        16    background of what went into the policies, what the

        17    broker concerns were.  If you are asking me

        18    specifically have I done -- conducted an econometric

        19    analysis, the answer is no.

18:17   20    BY MR. KRAMER:

        21         Q.    Have you done an economic analysis of

        22    which firms have engaged in free-riding in the

        23    absence of the rules?

        24         A.    Well, in the context --

DR. FREDRICK FLYER          APRIL 16, 2008

Page 756

1          Q.    I'm sorry.  Let me -- have you identified

2     any firms that have engaged in free-riding in the

3     absence of -- strike that.  It's getting late.

4               Have you -- which firms in your opinion

18:17 5     are likely to engage in free-riding in the absence

6     of the anti-referral and membership rules?

7          A.    Well, I haven't identified which firms

8     would be likely to free-ride.  That's not an

9     analysis I have conducted.  I do know that -- what

18:17 10    some of the concerns associated with free-riding

11    related to VOWs that didn't represent buyers or

12    sellers, and I -- at least in preparation for my

13    first report, I studied the business model of HBM II

14    to understand what it is that they did and how they

18:18 15    made their money.

16         Q.    You would agree that the referral rule

17    prohibits referral of VOWs?

18         MR. TREECE:  I'm sorry.  Say again.

19    BY MR. KRAMER:

18:18 20         Q.    Would you agree that the referral rule

21    prohibits referral of VOWs?

22         MR. TREECE:  Object as vague.

23    BY THE WITNESS:

24         A.    When you say referral of VOWs, you mean

DR. FREDRICK FLYER          APRIL 16, 2008

Page 769

1   STATE OF ILLINOIS )

2                     )  SS:

3   COUNTY OF COOK    )

4            I, ANDREA L. CARTER, a Notary Public

5   within and for the County of Cook State of Illinois,

6   and a Certified Shorthand Reporter of said state, do

7   hereby certify:

8            That previous to the commencement of the

9   examination of the witness, the witness was duly

10  sworn to testify the whole truth concerning the

11  matters herein;

12           That the foregoing deposition transcript

13  was reported stenographically by me, was thereafter

14  reduced to typewriting under my personal direction

15  and constitutes a true record of the testimony given

16  and the proceedings had;

17           That the said deposition was taken before

18  me at the time and place specified;

19           That I am not a relative or employee or

20  attorney or counsel, nor a relative or employee of

21  such attorney or counsel for any of the parties

22  hereto, nor interested directly or indirectly in the

23  outcome of this action.

24           IN WITNESS WHEREOF, I do hereunto set my

770

1  hand and affix my seal of office at Chicago,

2  Illinois, this 18th day of April, 2008.

3                    *Andrea T. Carter*

4

5              Notary Public, Cook

6              County, Illinois.

7              My commission expires 8/3/08.

8

9  C.S.R. Certificate No. 84-3722.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24